KRISTEN L. BOYLES (CSBA # 158450)
PAULO PALUGOD (NYB # 5047964)
*[Pro Hac Vice Admission Forthcoming]*
Earthjustice
705 Second Avenue, Suite 203
Seattle, WA  98104
Ph: (206) 343-7340 | Fax: (206) 343-1526
kboyles@earthjustice.org
ppalugod@earthjustice.org

ANDREA A. TREECE (CSBA # 237639)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
Ph: (415) 217-2089 | Fax: (415) 217-2040
atreece@earthjustice.org

*Attorneys for Plaintiffs*

*[Additional counsel listed at end]*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL, NATIONAL PARKS CONSERVATION ASSOCIATION, WILDEARTH GUARDIANS, and THE HUMANE SOCIETY OF THE UNITED STATES, <br><br> Plaintiffs, <br> v. <br><br> DAVID BERNHARDT, U.S. Secretary of the Interior, U.S. FISH AND WILDLIFE SERVICE, WILBUR ROSS, U.S. Secretary of Commerce, and NATIONAL MARINE FISHERIES SERVICE, <br><br> Defendants. | Case No. 3:19-cv-05206 <br><br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF <br><br> (Administrative Procedure Act, National Environmental Policy Act, Endangered Species Act) |

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 1 -

INTRODUCTION

1.      Congress passed the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, in 1973 to affirm our nation's commitment to the conservation of threatened and endangered species and their habitat – the forests, rangeland, prairies, rivers, and seas these species need to survive.  Congress specifically gave "conservation" a sweeping definition – the use of all methods and procedures necessary to recover threatened and endangered species so that they no longer need the Act's protections.  16 U.S.C. § 1532(3).  The ESA works, in part, by placing the survival and recovery of imperiled animals, fish, and plants at the forefront of every federal action and decision.

2.      For over 40 years, the Department of the Interior and the Department of Commerce, acting through the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively "the Services"), have administered the ESA through duly promulgated joint regulations.

3.      This action challenges three recent regulatory revision packages promulgated by FWS and NMFS on August 12, 2019, amending the regulations that implement ESA Sections 4 and 7, 16 U.S.C. §§ 1533, 1536.  The final regulations are currently available at http://www.regulations.gov in Docket Nos. FWS-HQ-ES-2018-0006; FWS-HQ-ES-0007; FWS-HQ-ES-2018-0009.  The rules will be published in the Federal Register and become effective 30 days later.

4.      Federal defendants issued the challenged regulatory revisions in three parts: one repealing the longstanding FWS regulation implementing ESA Section 4(d) that automatically extended certain protections to threatened animals and plants upon listing (50 C.F.R. §§ 17.31, 17.71); one amending other parts of ESA Section 4 regulations jointly promulgated by FWS and NMFS that govern listing, delisting, and designation of critical habitat (generally codified under

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 2 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

50 C.F.R. § 424); and one revising FWS and NMFS regulations governing ESA Section 7 consultations (generally codified under 50 C.F.R. § 402).  In these regulatory revisions, the Services claim they have acted to increase clarity and encourage transparency; to the contrary, the regulatory revisions weaken and violate the requirements of the ESA.

5.    Taken together, this package of regulatory changes undermines the fundamental purpose of the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species…."  16 U.S. C. § 1531(b).  The revised regulations violate the plain language and overarching purpose of the ESA; they also lack any reasoned basis and are arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

6.    Additionally, the Services failed to consider and disclose the significant environmental impacts from these regulations in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*  The final regulatory revisions are major federal actions, none qualify for categorical exclusions from NEPA compliance, and each will affect the human environment by undermining the ESA's purpose and protections.

7.    For these violations of law, plaintiffs seek an order (1) declaring the revised ESA regulations invalid, (2) vacating the revised ESA regulations, (3) enjoining reliance on the revised ESA regulations, and (4) reinstating the prior ESA regulations.

JURISDICTION AND VENUE

8.    This action is brought pursuant to the APA, 5 U.S.C. §§ 701-706.  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question).[1]

---

[1] Pursuant to 16 U.S.C. § 1540(g), plaintiffs provided 60 days' notice of intent to sue on August 20, 2019 to the Services for (1) failure to consult on the revised regulations in violation of ESA

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 3 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

9.      Venue is properly vested in this Court under 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3), as a number of the plaintiffs reside in this district, plaintiffs have members and offices in California, and many of the consequences of the defendants' violations of the law giving rise to the claims occurred or will occur in this district.

INTRADISTRICT ASSIGNMENT

10.      This case is properly assigned to the San Francisco Division or the Oakland Division under Civil L.R. 3-2(c) because many of the plaintiffs and their members are located in counties within those districts.

PARTIES

11.      The plaintiffs in this action are:

A.      <u>Center for Biological Diversity</u>, a non-profit environmental organization dedicated to the protection of native species and their habitats through science, policy, and environmental law.  The Center is incorporated in California and headquartered in Tucson, Arizona, with field offices throughout the United States and Mexico, including in Oakland, California.  The Center has more than 1.6 million members and on-line activists.  The Center and its members are concerned with the conservation of imperiled species, including ones that will be affected by the regulations at issue in this suit, and with the effective implementation of the ESA. The Center submitted extensive comments on the proposed ESA regulatory revisions, as well as worked as part of a coalition that delivered over 800,000 public comments to the Services opposing these regulations.

---

Section 7, (2) failure to use the best scientific and technical information available in developing and promulgating the revised regulations with respect to ESA Section 4, and (3) violation of ESA Section 4's statutory commands.  If the Services fail to provide a satisfactory response, plaintiffs will take appropriate steps to amend this complaint to include these claims at the conclusion of the 60-day period.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 4 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

B.      Defenders of Wildlife, a nonprofit membership organization dedicated to the protection of all native animals and plants in their natural communities, including our country's most imperiled wildlife and habitat.  Headquartered in Washington, D.C., Defenders has seven regional offices, with its California Regional Office located in Sacramento, California. Defenders has more than 1.8 million members and on-line activists across the nation.  Defenders submitted extensive comments on the proposed ESA regulatory revisions, as well as participated in the coalition that delivered over 800,000 public comments to the Services opposing these regulations.

C.      Sierra Club, one of the oldest environmental organizations in the United States. Sierra Club is incorporated in the State of California as a Nonprofit Public Benefit Corporation with headquarters in Oakland, California.  The organization has over 779,000 members nationwide, and local chapters across the country.  Sierra Club is dedicated to protecting and preserving the natural and human environment, and its purpose is to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments.  Its mission includes engaging its members and the public to protect public lands, wildlife habitat, and wildlife, and it has been a longtime, active public advocate for imperiled wildlife.  When FWS and NMFS proposed the challenged revisions to the ESA's regulations, the Sierra Club submitted comments not only on behalf of itself, but also as part of a coalition that delivered over 800,000 public comments to the Services opposed these regulatory changes.

D.      Natural Resources Defense Council ("NRDC"), an international non-profit membership organization whose mission is to ensure the rights of all people to the air, the water,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 5 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

and the wild.  To that end, NRDC works on behalf of its over 384,000 members to protect and conserve species threatened with extinction.  NRDC has offices in San Francisco, CA; New York, NY; Washington, DC; Santa Monica, CA; Chicago, IL; Bozeman, MT; and Beijing, China.  NRDC submitted extensive comments opposing the challenged ESA regulatory amendments and participated in the coalition that delivered over 800,000 public comments to the Services opposed to these regulations.

E.    National Parks Conservation Association ("NPCA"), founded in 1919, as a leading voice for America's national parks; NPCA works to protect and preserve parks for present and future generations.  NPCA is headquartered in Washington, D.C., and has 27 regional and field offices throughout the country, including the Pacific Regional Field Office in Oakland, California.  NPCA has over 1.3 million members and supporters.  There are over 600 threatened and endangered species that call a national park unit home.  NPCA provided detailed comments on the proposed regulatory revisions and is interested in maintaining the strong legal protections provided by the ESA for threatened and endangered species who live in park ecosystems.

F.    WildEarth Guardians, a non-profit environmental organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians is incorporated in New Mexico and headquartered in Santa Fe, New Mexico with additional offices in Denver, CO, Missoula, MT, Portland, OR, and Tucson, AZ.  Guardians has approximately 231,000 members and supporters nationwide.  Guardians and its members are concerned about protecting threatened and endangered species from extinction and extensively rely upon the ESA to ensure imperiled species receive the protections they need to survive and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 6 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    recover.  Guardians submitted comments on the proposed ESA regulatory revisions and was part

2    of the coalition that delivered over 800,000 comments to the Service opposing these regulations.

3        G.    The Humane Society of The United States, ("HSUS"), founded in 1954, the

4    nation's largest animal protection organization.  HSUS is a non-profit organization

5    headquartered in Washington D.C., with regional offices in California and throughout the United

6    States.  On behalf of its millions of members and constituents in Northern California and

7    nationwide, HSUS works to promote the humane treatment of all animals and the protection and

8    recovery of threatened and endangered species and their habitats.  HSUS regularly advocates for

9    threatened and endangered species through the ESA regulatory process, including by petitioning

10   federal agencies to list and designate critical habitat for species and commenting on proposed

11   regulatory actions.  As part of a coalition of animal protection and conservation organizations,

12   HSUS and its affiliates submitted comments opposing the regulatory changes challenged in this

13   lawsuit.

14       12.    Plaintiffs and their members use threatened and endangered species and their

15   critical habitat located in California and other states nationwide for recreational, scientific, and

16   aesthetic purposes.  Plaintiffs have members who reside near, visit, or otherwise use and enjoy

17   threatened and endangered species and their critical habitat in a variety of ways, including

18   wildlife viewing and education and aesthetic and spiritual enjoyment.  The plaintiffs and their

19   members derive scientific, recreational, aesthetic, and conservation benefits of and enjoyment

20   from threatened and endangered species and their critical habitat.  The past, present, and future

21   enjoyment of these benefits by plaintiffs and their members has been, is being, and will continue

22   to be irreparably harmed by defendants' disregard of their statutory duties and by the unlawful

23   injuries imposed on imperiled species and their critical habitat by their actions.

24

25   COMPLAINT FOR DECLARATORY
26   AND INJUNCTIVE RELIEF - 7 -

13.     The aesthetic, conservation, recreational, and scientific interests of these groups and their members in threatened and endangered species and their critical habitat have been, are being, and, unless the relief prayed for is granted, will continue to be directly and adversely affected by the failure of defendants to comply with the law.

14.     The defendants in this action are:

A.     <u>David Bernhardt</u>, U.S. Secretary of the Interior, in his professional capacity.  Mr. Bernhardt has responsibility for implementing and fulfilling the duties of the United States Department of the Interior, including the administration of the ESA with regard to threatened and endangered terrestrial and freshwater plant and animal species.  Mr. Bernhardt signed the final revised ESA regulations at issue;

B.     <u>U.S. Fish and Wildlife Service</u>, an agency of the U.S. Department of the Interior, charged with administering the ESA with respect to threatened and endangered terrestrial and freshwater plant and animal species;

C.     <u>Wilbur Ross</u>, U.S. Secretary of Commerce, in his professional capacity.  Mr. Ross has responsibility for implementing and fulfilling the duties of the United States Department of Commerce, including the administration of the ESA with regard to threatened and endangered marine species and anadromous fish species.  Mr. Ross signed the final revised ESA regulations at issue; and

D.     <u>National Marine Fisheries Service</u>, an agency of the U.S. Department of Commerce, responsible for administering the ESA with regard to threatened and endangered marine species and anadromous fish species.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 8 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

BACKGROUND

I.    THE ENDANGERED SPECIES ACT MAKES CONSERVATION, PROTECTION, AND RECOVERY OF IMPERILED SPECIES AND THEIR HABITAT A NATIONAL PRIORITY.

15.    Congress passed the ESA in 1973 in response to the extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species…."  16 U.S.C. § 1531(b).  Congress defined "conservation" under the ESA as "the use of all methods and procedures which are necessary to bring any endangered species to the point at which the measures provided pursuant to this act are no longer necessary," that is, when the species have recovered and no longer need the protection of the ESA.  16 U.S.C. § 1532(3).

16.    In broad strokes, the ESA seeks to protect and recover imperiled species and populations by listing them as threatened or endangered based on enumerated statutory factors, 16 U.S.C. § 1533(a)(1)(A)-(E), using the "best scientific and commercial data available.  16 U.S.C. § 1533(b).

17.    The term "endangered species is defined as "any species which is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.  16 U.S.C. § 1532(20).

18.    At the same time as a species is listed as threatened or endangered, the Services must designate and protect critical habitat for the species, subject to certain exceptions.  16 U.S.C. § 1533(a)(3), (b)(2).  The ESA directs FWS and NMFS to issue additional protective regulations for threatened species if deemed necessary and advisable.  16 U.S.C. § 1533(d).  The listing and designation of critical habitat provisions are contained in Section 4 of the ESA – the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 9 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

section Congress labeled the "cornerstone of effective implementation" of the Act.  S. Rep. No. 97-418, at 10 (1982).

19.     Congress expressly recognized the independent value of protecting critical habitat when it enacted the ESA:

> Man can threaten the existence of species of plants and animals in any of a number of ways. … The most significant of those has proven also to be the most difficult to control:  the destruction of critical habitat. ...
>
> There are certain areas which are critical which can and should be set aside.  It is the intent of this legislation to see that our ability to do so, at least within this country, is maintained.

H.R. Rep. No. 412, 93d Cong., 1st Sess. 5 (1973).

20.     In 1976, Congress reiterated the distinct importance of critical habitat and the prohibition on adverse modification:

> It is the Committee's view that classifying a species as endangered or threatened is only the first step in insuring its survival.  Of equal or more importance is the determination of the habitat necessary for that species' continued existence.  Once a habitat is so designated, the Act requires that proposed federal actions not adversely affect the habitat.  If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitat.

H.R. Rep. No. 887, 94th Cong., 2d Sess. 3 (1976).

21.     Under ESA Section 7, Congress charged each and every federal agency with the affirmative duty to further conservation of imperiled species; the ESA explicitly elevates species protection over the primary missions of federal agencies.  16 U.S.C. § 1536(a).

22.     In addition to an overarching affirmative duty, the ESA requires every federal agency to obtain review and clearance for activities that may affect listed species or their habitat. If an activity authorized, funded, or carried out by a federal agency may affect a listed species or

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 10 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

its designated critical habitat, that activity cannot go forward until consultation (a biological review of the proposal by FWS or NMFS) ensures that it will not "jeopardize" the species or result in the "destruction or adverse modification" of designated critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

23.     Agency actions subject to consultation include actions taken by the Services themselves.  *See* FWS and NMFS, Endangered Species Act Consultation Handbook 1-5 to 1-6, App. E (1998) (describing Intra-Service Section 7 Consultation requirements), *available at* http://www.fws.gov/endangered/consultations/s7hndbk/s7hndbk.htm.  When the Services' own actions "may affect" a listed species or critical habitat, they must consult with the Endangered Species office of FWS or the NMFS Office of Protected Resources.

24.     The listing of a species as endangered under the ESA triggers prohibitions under Section 9 of the Act, 16 U.S.C. § 1538, including the prohibition on the "take," of species, which is defined to include "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(18); *see also* 50 C.F.R. § 17.3 (harm "means an act which actually kills or injures wildlife.  Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.").

25.     The prohibitions in ESA Section 9 also extend beyond intentional take of endangered species to "incidental take," or take that is not a direct goal of the proposed action. During Section 7 consultation, if FWS or NMFS concludes that take will not jeopardize the species, then the agency may issue a written statement that specifies the impacts of the incidental taking on the species, mitigation measures, reporting requirements, and any other terms and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 11 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   conditions with which the action agency must comply ("Incidental Take Statement").  16 U.S.C.

2   § 1536(b)(4)(C).

3       26.     Similarly, ESA Section 10 regulates incidental take by private entities.  FWS or

4   NMFS may permit "any taking otherwise prohibited by Section 9(a)(1)(B) if such taking is

5   incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  16.

6   U.S.C. 1539(a)(1)(B).  If FWS or NMFS finds that the taking will not reduce the likelihood of

7   the survival and recovery of the species, the agency may issue an Incidental Take Permit.  16

8   U.S.C. § 1539(a)(2)(B)(iv).

9       27.     Today, the ESA protects more than 1,600 plant and animal species and millions of

10  acres have been designated as critical habitat to allow for species' survival and recovery.  Since

11  its enactment, the ESA has prevented the extinction of 99 percent of the species under its

12  protections.

13  II.   OVER FORTY YEARS AGO, FWS PROMULGATED THE BLANKET 4(D) RULE
        TO ENSURE COMPLETE PROTECTION FOR ALL THREATENED SPECIES.

14
15      28.     Section 4(d) of the ESA requires the Services to promulgate regulations necessary

16  and advisable to conserve species listed as threatened, including regulations prohibiting the take

    of threatened species.  16 U.S.C. § 1533(d).

17
18      29.     In 1975, only two years after Congress enacted the ESA, FWS exercised its

19  authority and responsibility under Section 4(d) to extend the prohibition on "take" in Section 9 of

20  the ESA to all threatened species.  50 C.F.R. § 17.31(a) (2018); Reclassification of the American

21  Alligator and Other Amendments, 40 Fed. Reg. 44,111, 44,425 (Sept. 26, 1975).  This rule

22  created the default situation that a threatened species would receive all of the "anti-take"

23  protections provided to endangered species, unless FWS promulgated a species-specific rule that

24  changed those protections.

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 12 -

26
*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    30.    Colloquially referred to as the "Blanket 4(d) Rule," *id.,* the D.C. Circuit upheld it

2    against *ultra vires* and contrary to the plain language of the statute challenges.  *Sweet Home*

3    *Chapter of Cmtys. for a Great Or. v. Babbitt*, 1 F.3d 1, 5-8 (D.C. Cir. 1993), *rev'd on other*

4    *grounds*, 515 U.S. 687 (1995).

5    31.    FWS found that presumptively providing threatened species with protection,

6    rather than reserving it solely for endangered species facing imminent extinction, allowed the

7    agency to work towards halting the slide of threatened species to endangered status.  In addition

8    to flexibility, this approach allowed the agency to protect threatened species while working on a

9    species-specific rulemaking.  FWS noted that the presumption of complete protection, along with

10   the ability to tailor protections if need be with a specific 4(d) rule, constituted "the cornerstone of

11   the system for regulating threatened wildlife."  40 Fed. Reg. at 44,414.

12   32.    On September 16, 1977, FWS clarified the Blanket 4(d) Rule and explicitly

13   prohibited the possession of illegally taken threatened species, as well as their commercial

14   transportation and sale in foreign or interstate commerce.  Protection for Threatened Species of

15   Wildlife, 42 Fed. Reg. 46,561-62 (September 16, 1977); *see also* 42 Fed. Reg. 46,539

16   (September 16, 1977) (exercising emergency rulemaking authority to make the prohibition on

17   the possession, transportation, and sale of illegally taken threatened species immediately

18   effective).  Maintaining the presumption of protection, this clarifying amendment to the Blanket

19   4(d) Rule continued to presumptively apply the strict prohibitions applicable to endangered

20   species to threatened species.

21   33.    Since 1975, FWS has listed over 300 species as threatened and applied the

22   Blanket 4(d) Rule to them.  Of that number, less than a quarter later received species-specific

23   Section 4(d) rules.

24

25   COMPLAINT FOR DECLARATORY

26   AND INJUNCTIVE RELIEF - 13 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

III.    FOR OVER THIRTY YEARS, THE SERVICES' JOINT REGULATIONS HAVE
        IMPLEMENTED ESA SECTIONS 4 AND 7.

        34.     FWS and NMFS are the federal agencies charged by Congress with implementing

the ESA, and most of their ESA regulations have been in effect since 1986 or earlier.  The

Services adopted joint regulations implementing ESA Sections 4 and 7 approximately 30 years

ago.  *See* 45 Fed. Reg. 13,010 (Feb. 27, 1980) (Section 4); 48 Fed. Reg. 38,900 (Oct. 1, 1984

(Section 4); 51 Fed. Reg. 19,926 (June 3, 1986) (Section 7).  The ESA Regulations have not been

substantially amended since that time, with only minor amendments adopted in 2015 and 2016.

*See* 80 Fed. Reg. 26,832 (May 11, 2015) (Section 7); 81 Fed. Reg. 7,214 (Feb. 11, 2016)

(Section 7); 81 Fed. Reg. 7,439 (Feb. 11, 2016) (Section 4).

IV.    THE CHALLENGED REGULATIONS REVERSE PROTECTIONS FOR
        THREATENED AND ENDANGERED SPECIES AND THEIR CRITICAL HABITAT.

        A.      The 2018 Proposed Rules

        35.     On July 25, 2018, FWS and NMFS issued three proposed regulatory packages

revising the ESA regulations.  All three proposed regulatory changes sought to carry out

Executive Order 13777, which directs federal agencies to eliminate allegedly "unnecessary

regulatory burdens."  Enforcing the Regulatory Reform Agenda, 82 Fed. Reg. 12,285 (Mar. 1,

2017).  First, FWS proposed to repeal the Blanket 4(d) Rule by revising regulations found in 50

C.F.R. §§ 17.31, 17.71.  83 Fed. Reg. 35,174-78 (July 25, 2018).  While conceding that the

Blanket 4(d) rule represented a reasonable interpretation of the ESA, FWS attempted to justify

the proposed repeal of the Blanket 4(d) Rule by asserting that it wished to align itself with the

procedures used by NMFS and that it had developed experience on species-specific 4(d) rules

over the years.  83 Fed. Reg. at 35,175.

        36.     The second package of proposed regulatory revisions focused on the rules

promulgated by FWS and NMFS implementing the listing, delisting, and designation of critical

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 14 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  habitat provisions of ESA Section 4, specifically 50 C.F.R. § 424.11 (Factors for Listing,

2  Delisting, or Reclassifying Species) and 50 C.F.R. § 424.12 (Criteria for Designating Critical

3  Habitat).  83 Fed. Reg. 35,193-201 (July 25, 2018).

4      37.  The third set of proposed regulatory changes involved the FWS and NMFS

5  regulations implementing ESA Section 7.  83 Fed. Reg. 35,178-93 (July 25, 2018).  These

6  revisions proposed changes to the regulatory definitions (50 C.F.R. § 402.02), regulations on

7  formal consultation (50 C.F.R. § 402.14), regulations on reinitiation of formal consultation (50

8  C.F.R. § 402.16), and those for other provisions (50 C.F.R. § 402.17).

9      38.  In both packages proposing changes to the rules implementing ESA Sections 4

10  and 7, FWS and NMFS also asked for input on broad, unfocused swaths of the regulations,

11  seeking comments on "any provisions in part 424 of the regulations, including but not limited to

12  revising or adopted as regulations existing practices or policies, or interpreting terms or phrases

13  from the Act."  83 Fed. Reg. at 35,194.  "[T]he final rule may include revisions to any provisions

14  in part 424 that are a logical outgrowth of this proposed rule."  *Id.*; *see also* 83 Fed. Reg. at

15  35,179 (same for revisions in part 402).

16      39.  The federal agencies indicated that they were not likely to undertake an

17  environmental assessment or environmental impact statement under NEPA when promulgating

18  the proposed revisions.  The agencies asserted that the rules would likely fall under a

19  "categorical exclusion" exempting them from NEPA review.  83 Fed. Reg. at 35,176, 35,191,

20  35,200.  Specifically, FWS and NMFS stated that the proposed rules were likely categorically

21  exempt as "policy, directive, regulation, or guideline that is administrative, legal, technical, or

22  procedural in nature" that "would not individually or cumulatively have a significant effect on

23  the human environment."  *Id.*

24

25  COMPLAINT FOR DECLARATORY

26  AND INJUNCTIVE RELIEF - 15 -

40.     FWS and NMFS accepted comments on all three packages of proposed ESA

revised regulations through September 24, 2018.  The proposed revisions sparked great concern

and controversy, with over 800,000 comments being submitted to the agencies opposed to the

proposed revisions.

B.     The Final 2019 FWS Repeal of the Blanket 4(d) Rule

41.     On August 12, 2019, FWS issued final rules amending 50 C.F.R. §§ 17.31 and

17.71 to eliminate the Blanket 4(d) Rule that prohibits take of threatened animals and plants.

Final Rule, Revision of the Regulations for Prohibitions to Threatened Wildlife and Plants,

*available at* https://www.fws.gov/endangered/esa-library/pdf/prohibitions-to-threatened-wildlife-

and-plants.pdf and http://www.regulations.gov in Docket No. FWS–HQ–ES– 2018–0007.

42.     FWS's new rule removes the presumption that threatened species will receive

protection from take, which has far-reaching impacts.  Any species listed or reclassified as

threatened in the future "would have protective regulations only if the Service promulgates a

species-specific rule," and yet the new rule imposes no obligation on FWS to adopt any such

species-specific rules.

43.     FWS gave scant reasons for eliminating the Blanket 4(d) Rule.  First, FWS noted

that the Department of Commerce (acting through NMFS) did not have a similar rule for species

under its jurisdiction.  Second, FWS alleged that it had acquired "considerable experience in

developing species-specific rules over the years."  The agency went on to allege that such

species-specific 4(d) rules provide benefits such as "removing redundant permitting

requirements, facilitating implementation of beneficial conservation actions, and making better

use of [the agency's] limited personnel and fiscal resources by focusing prohibitions on the

stressors contributing to the threatened status of the species."

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 16 -

44.     FWS claimed that reversal of the Blanket 4(d) Rule will allow FWS to "tailor [species-specific] regulations to the conservation needs of the species."  In support of the revision, FWS noted two species-specific 4(d) rules which were adopted while the Blanket 4(d) Rule was still in effect, citing the coastal California gnatcatcher's and Kentucky arrow darter's species-specific 4(d) rules as examples of when species-specific 4(d) rules allowed FWS to "capitalize" on specific regulations to meet the "conservation needs of the species."

45.     Commenters on the rule, including plaintiffs, noted that FWS has issued species-specific 4(d) rules for only a fraction of the species listed in the last ten years; NMFS manages far fewer species than FWS and has still failed to provide species-specific 4(d) rules for all its threatened species; and the Blanket 4(d) Rule in no way prohibited FWS from issuing species-specific 4(d) rules, as its own examples highlighted.

46.     In response to comments critical of FWS's intent to eliminate the Blanket 4(d) Rule, FWS responded that it "intended to finalize species-specific 4(d) rules concurrently with final listing or reclassification determinations.  *Id.*  However, FWS refused to create a binding regulatory requirement to ensure concurrent promulgation of listing and species-specific 4(d) decisions.  FWS also asserted its interpretation that the statute itself does not require species-specific 4(d) rules to be promulgated at the time of listing.  *Id.* ("[W]e have discretion to revise or promulgate species-specific rules at any time after the final listing or reclassification determination.").

C.     The Final Section 4 Listing and Critical Habitat Regulatory Revisions

47.     On August 12, 2019, FWS and NMFS issued final changes to the joint regulations that implement ESA Section 4 listing and critical habitat requirements.  Final Rule, Revision of the Regulations for Listing Species and Designating Critical Habitat, *available at* https://www.fws.gov/endangered/esa-library/pdf/listing-and-designating-critical-habitat.pdf and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 17 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   at http://www.regulations.gov in Docket No. FWS–HQ–ES–2018–0006.  Major changes and

2   revisions are described below.

### 1.   Adding economic considerations to listing decisions

4   48.    The ESA requires that listing decisions to protect endangered and threatened

5   species be made "solely on the basis of the best scientific and commercial data available."  16

6   U.S.C. § 1533(b)(1)(A).  Congress added the word "solely" in the 1982 amendments to the Act

7   to underscore that non-biological considerations should play no role in listing decisions.  Pub. L.

8   No. 97-304, 96 Stat. 1411; *see also* H.R. Rep. No. 97-567, at 19 (1982) (noting that the term

9   "solely" was added to emphasize that listing determinations were to be made "solely upon

10   biological criteria and to prevent non-biological considerations from affecting such decisions").

11   49.    The Services' final regulation deletes from 50 C.F.R. § 424.11(b), the Services'

12   regulation establishing listing factors, the phrase "without reference to possible economic or

13   other impacts."

### 2.   Revising the definition of foreseeable future

15   50.    The Services finalized a new definition of the term "foreseeable future," which

16   increased the level of certainty required to protect species, contravening Congress's intent to

17   "give the benefit of the doubt to the species."  H.R. Rep. No. 96-697, at 12 (1979) (Conf. Rep.),

18   reprinted in 1979 U.S.C.C.A.N. 2572, 2576.  Listing decisions must be made "solely on the basis

19   of the best scientific and commercial data available," and injecting notions of "likelihood" into

20   those decisions is contrary to the ESA.  While the Services purported to follow the guidance set

21   forth in a 2009 opinion from the Department of the Interior's Solicitor (M-37021, Jan. 16, 2009),

22   the revised definition deviates significantly from current practice and the 2009 opinion.

23   51.    The 2009 Opinion's definition of "the foreseeable future" was animated by a

24   desire to avoid "reliance on assumption, speculation, or preconception."  2009 Opinion at 8.  To

25   COMPLAINT FOR DECLARATORY
26   AND INJUNCTIVE RELIEF - 18 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

ensure imperiled species receive the benefit of the doubt in listing decisions, as Congress intended, the 2009 Opinion requires only that predictions be reliable, rejecting a definition that would limit "the foreseeable future" to only "predictions that can be made with certainty." *Id.* at 9.

52.     The final changes to Section 424.11 do not adopt the 2009 Opinion's definition, instead adding the requirements that "both the future threats and the species' responses to those threats are likely."  Demanding that both threats and responses to threats be "likely" — which the Services clarified means "more likely than not" — goes beyond ensuring against decisions based on assumption, speculation, or preconception.  The consequence of imposing this increased certainty requirement is that species facing extinction from the impacts of climate change or other future events involving prediction and uncertainty will improperly be deprived of protection until after it is too late to prevent their extinction, violating the ESA's command to use the best available science.

### 3.     Undermining recovery criteria

53.     For nearly four decades, the ESA's listing regulations restricted the delisting of a species to only situations where the best scientific and commercial data available "substantiate" that the species is no longer threatened nor endangered.  45 Fed. Reg. 13,010, 13,023 (Feb. 27, 1980) (promulgating original version of 50 C.F.R. § 424.11(d)).  The previous regulations specified that the Services either must know the locations and fate of all individuals of the species or must allow "a sufficient period of time" before delisting to "indicate clearly" the species is actually extinct.  50 C.F.R. § 424.11(d)(1).  The Services insisted on this high bar to ensure that any decision to delist due to extinction is based on "conclusive evidence appropriate for the species in question."  49 Fed. Reg. 38,900, 38,903 (Oct. 1, 1984); *see also* FWS, Proposed Rule, Endangered Status for Franklin's Bumble Bee, 84 Fed. Reg. 40,006, 40,008

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 19 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

(Aug. 13, 2019) ("Recent approaches to evaluating extinction likelihood place increased emphasis on the extensiveness and adequacy of survey effort, and caution against declaring a species as extinct in the face of uncertainty.") (citation omitted).

54.     The Services' revisions drop the requirement that data "substantiate" any delisting decision.  The revisions also permit the Services, in making delisting decisions, to disregard formal recovery and/or delisting criteria established in species recovery plans for the very purpose of gauging species' progress towards recovery.

### 4.     *Expanding critical habitat exemptions*

55.     The ESA allows the Services to forego designating critical habitat for a species if such designation is "not prudent" because it could result in actual harm to the species.  The final regulations expand the circumstances under which the Services may find designation "not prudent" to include situations where:  the threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species; threats to habitat "stem solely from causes that cannot be addressed through management actions resulting from" Section 7 consultations; or, areas within the jurisdiction of the United States provide no more than a "negligible" conservation value for a species occurring primarily outside the jurisdiction of the United States.

56.     The ESA defines unoccupied critical habitat to include "specific areas outside the geographical area occupied by the species at the time it is listed" that "are essential for the conservation of the species."  16 U.S.C. § 1532(5)(A)(ii).  Instead of focusing on whether unoccupied areas are essential for conservation based on the best available scientific data, the final regulations limit the designation of unoccupied critical habitat only to those situations where it can be determined with "reasonable certainty" both that the area will contribute to the conservation of the species and that the area contains at least one "physical or biological feature"

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 20 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

essential to the conservation of the species.  The final rule imposes an elevated certainty requirement on the determination of what areas are "essential," rather than requiring decisions to be made based on the best available science.

57.     The final regulation also impermissibly and unreasonably limits the designation of unoccupied areas as critical habitat to situations where the designation of only occupied areas would be inadequate to ensure the conservation of the species.  The Service itself previously identified such a limitation as "unnecessary and unintentionally limiting."  FWS/NMFS, Proposed Regulatory Amendments re Critical Habitat, 79 Fed. Reg. 27,073 (May 12, 2014).

58.     The final regulation also revises the definition of "physical and biological features" at 50 C.F.R. § 424.02 to define such features as "essential" only when they "occur in specific areas."  This introduces a new limitation, not based in the statute, that restricts the designation of critical habitat.  This change affects the designation of occupied critical habitat and, under the final rules, unoccupied critical habitat as well.

D.     The Final Section 7 Consultation Regulatory Changes

59.     To ensure that any action by a Federal agency authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered or threatened species, ESA Section 7 requires FWS and NMFS as the consulting agencies to: (1) use the best available science; (2) conduct an independent scientific review as a check on agencies that might seek to take actions at the expense of protecting threatened and endangered species; and (3) if jeopardy or destruction/adverse modification of critical habitat is found, develop alternatives and mitigation that the action agencies must take to protect species and their habitat.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 21 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

60.     The ESA makes the best science currently available the determinant of whether an action must undergo consultation or is likely to cause jeopardy or degrade critical habitat, and the ESA requires that uncertainty be resolved in favor of protection.

61.     ESA regulations distinguish between two types of consultation:  formal and informal.  During both types of consultations, the action agencies and the Services have a statutory duty to use the best available scientific information.  16 U.S.C. § 1536(a)(2); 50 C.F.R. 402.14(g)(8).

62.     Formal consultations culminate with the Services' issuance of a biological opinion, in which the Services determine whether an action is likely to either jeopardize the survival and recovery of a listed species or destroy or adversely modify a species' designated critical habitat.  16 U.S.C. § 1536(b); 50 C.F.R. 402.02 (definition of "formal consultation").  In order to make this determination, the Service must review all relevant information and provide a detailed evaluation of the action's effects, including the cumulative effects of other activities in the area, on the listed species and critical habitat.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)-(h).

63.     As part of the formal consultation process, the Services must also formulate discretionary conservation recommendations to reduce or minimize the action's impacts on listed species or critical habitat.  50 C.F.R. § 402.14(g)(6).

64.     If the Services determine that the action is likely to jeopardize the species or adversely modify its critical habitat, the biological opinion must specify reasonable and prudent alternatives that will avoid such jeopardy or adverse modification.  16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(h)(3).  If the jeopardy or adverse modification cannot be avoided, however, the agency action may not proceed.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 22 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

65.     Informal consultations are those consultations in which the action agency determines that an action "may affect," but is "not likely to adversely affect" ("NLAA") the listed species or its critical habitat and the pertinent Service concurs in writing in that determination.

66.     Informal consultation is often a give-and-take process through which the Services can obtain sufficient information about, or modifications to, the action to concur in the action agency's NLAA determination.  During informal consultation, the Services may, and often do, suggest modification to the action that will avoid the "the likelihood of adverse effects to listed species or critical habitat."  50 C.F.R. § 402.13(b).

67.     The informal consultation process does not conclude until the pertinent Service issues its written concurrence, and only then may the consultation be resolved without preparation of a biological opinion.  If the Service does not concur, or if the action agency has determined that the action is "likely to adversely affect" the listed species, the agencies must conduct a formal consultation.  *Id.* §§ 402.02, 402.14(a).

68.     On August 12, 2019, FWS and NMFS issued final changes to the regulations that implement ESA Section 7.  Proposed Rule, Endangered and Threatened Wildlife and Plants; Revision of Regulations for Interagency Cooperation, *available at* https://www.fws.gov/endangered/esa-library/pdf/interagency-cooperation.pdf and at http://www.regulations.gov at Docket No. FWS–HQ–ES–2018–0009.  Major changes and revisions are described below.

        1.      *Unchecked reliance on mitigation promises*

69.     Section 7(a)(2) of the ESA expressly requires the Services to "insure" that agency actions are not likely to cause jeopardy or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2).  During formal consultation, the Services have an

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 23 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

obligation under their own regulations to "use the best available scientific and commercial data available and give appropriate consideration to beneficial actions taken by the Federal agency" in formulating its biological opinion of the impacts of an agency action, any reasonable and prudent alternatives, and reasonable and prudent measures to minimize the impacts of incidental take (mitigation measures).  50 C.F.R. § 402.14(g)(8), 402.02.  Courts have held for almost thirty years that the Services cannot rely on an agency's proposal to undertake mitigation measures that are uncertain to occur or succeed to reach a "no-jeopardy" conclusion.  The Ninth Circuit has held that a no-jeopardy conclusion based on mitigation measures must include "specific and binding plans" with a "clear definite commitment of resources for future improvements." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935-36 (9th Cir. 2008).

70.     The Services finalized a new provision that amends 50 C.F.R. § 402.14(g)(8) to mean that for purposes of rendering a no-jeopardy opinion or finding that the proposed action does not destroy or adversely modify critical habitat, the consulting agency may rely on the action agency's assertion that it will mitigate any incidental take without requiring any additional demonstration of specific binding plans.  The Services justify their proposal by asserting that "judicial decisions have created confusion" about the level of certainty required for mitigation measures.  But the decisions the Services cite (and many more) have, consistent with Congress's intent, been uniform in holding that mitigation measures cannot be relied on to avoid a jeopardy determination unless those measures are sufficiently concrete, specific, and certain to occur.

2.     *Definition of destruction or adverse modification of critical habitat*

71.     The Services' new definition of "destruction or adverse modification" of critical habitat requires the scale of the impacts to be relative to the value of critical habitat "as a whole." Yet the purpose of establishing critical habitat is for the government to delineate territory that is not only necessary for the species' survival but also essential for the species' recovery.  The

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 24 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   critical habitat designation already represents the area essential to the survival and recovery of

2   species, adding "as a whole" conflicts with the ESA's plain language and focus on recovery.

3          72.     The "as a whole" language means that the prohibition on "destruction or adverse

4   modification" of critical habitat will not be triggered unless the critical habitat would be reduced

5   below the minimum deemed necessary for survival or recovery of the species, which amounts to

6   jeopardizing the species.  This impermissibly prevents the prohibition on "destruction or adverse

7   modification" from having independent effect from the prohibition on jeopardizing the species.

8          73.     This is a special concern for highly migratory or wide-ranging species that, by

9   definition, require large amounts of designated critical habitat.  The "as a whole" language also

10  disregards circumstances where the Service has designated critical habitat necessary for certain

11  functions, such as dispersal habitat or nesting/roosting/foraging habitat for threatened northern

12  spotted owls in the Pacific Northwest.  While the proposed rule included a recognition that some

13  areas of critical habitat may be disproportionately biologically important or relevant to the

14  species, the final language does not capture those nuances or require an analysis that would

15  ensure the Services' conclusions are based on such biologically determinative distinctions.

16                 3.      *Reinitiation of consultation on land management plans*

17         74.     The Services' final regulations exempt programmatic land management plans

18  from the requirement to reinitiate consultation upon listing of the new species or designation of

19  new or additional critical habitat, with several exemptions.

20         75.     Later consultations on site-specific actions cannot fill the void.  Consultation on

21  programmatic actions provides a full picture of all relevant impacts in order to determine

22  whether the combination of activities in the plan will avoid jeopardy and adverse modification of

23  critical habitat.  These determinations are appropriately made at the programmatic level, where

24  the agency is best able to consider the aggregate impacts of all the proposed activities, together

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 25 -

26

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    with other activities taking place in the same area.  Deferring this analysis to project-specific

2    consultations risks masking or missing these collective impacts.

3                    *4.        Definition of environmental baseline*

4         76.    The Services finalized a new definition of the "environmental baseline" that

5    creates a distinction between entirely new and ongoing agency actions.  50 C.F.R. § 402.02

6    ("The consequences to listed species or designated critical habitat from ongoing agency actions

7    or existing agency facilities that are not within the agency's discretion to modify are part of the

8    environmental baseline.").

9         77.    Segregating from a proposed action those aspects and effects that are ongoing is

10   inconsistent with the definition of "action" as anything a Federal agency authorizes, funds, or

11   carries out.  50 C.F.R. § 402.02.  For example, where the past and present effects of an on-going

12   federal action hasten or continue a species' decline to extinction, carrying that action forward

13   necessarily means carrying forward those harmful effects.  In other words, a decision to continue

14   an ongoing action (even if modified to be slightly less harmful than it was previously) is as much

15   a decision to carry forward the harmful effects as it is a decision to continue the action in a

16   slightly less detrimental fashion.

17        78.    Consultation on a proposed modification and continuation of an ongoing action

18   must ensure that the entire ongoing action does not appreciably reduce the likelihood of survival

19   and recovery and/or destroy or adversely modify critical habitat.  The final definition invites that

20   improper comparison between the past and present impacts of an ongoing federal action and the

21   effects of the action.

22

23

24

25   COMPLAINT FOR DECLARATORY

26   AND INJUNCTIVE RELIEF - 26 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

5.      *New definitions for activities reasonably certain to occur and consequences of proposed action*

79.     The Services added a new section, § 402.17 Other Provisions, that defines "activities that are reasonably certain to occur" in subsection (a) and "consequences caused by the proposed action" in subsection (b).

80.     Subsection (b) states that "[t]o be considered an effect of a proposed action, a consequence must be caused by the proposed action (i.e., the consequence would not occur but for the proposed action and is reasonably certain to occur)."  Including a requirement that the consequence be "reasonably certain to occur" creates a new standard for showing a consequence is caused by the proposed action.  The ESA requires that any doubt should be read in favor of protecting the species and that the proposed action bear the burden of risk and uncertainty.

81.     Subsection (b) also lists three mandatory considerations for determining that a consequence is not caused by the proposed action, and is therefore not an effect of the action, including that the consequence is "remote in time," "geographically remote," and "reached through a lengthy causal chain" such that they are not "reasonably certain to occur."  Temporal or geographic remoteness do not necessarily bear on whether an impact is reasonably certain to occur.  These criteria would allow the agency to avoid consideration of a particular effect in, among other things, a biological assessment, determination of the lead and cooperating agencies, and reinitiation of formal consultation.  This requirement would require the agency to ignore during Section 7(a)(2) consultation the consequences of a proposed action simply because those consequences do not meet the arbitrary and vague new causation standard.

82.     The Services' definition of consequences caused by the proposed action also includes a newly minted "but for" causation test – requiring that a consequence will not be considered unless it would not occur unless exclusively caused by the proposed activity.  This

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 27 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   new definition would allow the Services to speculate that certain impacts — for example, the

2   growth inducing effects of a new highway — would occur regardless of the proposed activity

3   and on that basis avoid consideration of those impacts in the ESA Section 7(a)(2) consultation

4   process.

5          83.     Section 7(a)(2) requires Federal agencies to consult with the Services to insure

6   that *any action* authorized, funded, or carried out by such agency is not likely to jeopardize

7   species or adversely modify critical habitat.  Artificially limiting and attempting to draw bright

8   lines around some elements of a proposed action to cabin—or exclude consequences entirely

9   from—the consultation process would result in far greater risk to species listed as endangered

10  and threatened and violates the best available science requirement of the ESA.

11         E.     The Services Failed To Comply with NEPA and ESA Consultation Requirements.

12         84.     The Services did not analyze the impacts of the revised regulations under NEPA.

13  For the elimination of the Blanket 4(d) Rule, FWS invoked two categorical exclusions under 43

14  C.F.R. § 46.210(i) — that the revisions were of a legal, technical, or procedural nature and that

15  any potential impacts were too broad, speculative, and conjectural for meaningful analysis.  The

16  Service also found that no extraordinary circumstances were present.

17         85.     For the revisions to the ESA Section 4 regulations, the Services concluded that the

18  regulations were categorically excluded from NEPA review and that no extraordinary

19  circumstances were present.

20         86.     For the revision to the ESA Section 7 regulations governing consultation, the

21  Services also concluded that the regulations were categorically excluded from NEPA review and

22  that no extraordinary circumstances were present.

23

24

25  COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 28 -
26

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

87.     Nor did the Services consult on the effects of any of the revised regulations under ESA Section 7 or use the best scientific and technical information available in developing and promulgating the revised regulations.

CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

Violation of the National Environmental Policy Act
and the Administrative Procedure Act:
Failure to Prepare an Adequate Environmental Impact Statement

88.     NEPA is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1.  Among other things, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental effects of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This statement is commonly known as an Environmental Impact Statement ("EIS").  A "major federal action" upon which an EIS may be required includes "new or revised agency rules [and] regulations."  40 C.F.R. § 1508.18(a).  The environmental effects that must be considered in an EIS include "indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," as well as direct effects.  40. C.F.R. § 1508.8.  An EIS must also consider the cumulative impacts of the proposed action, that is, the environmental impacts that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  40 C.F.R. § 1508.7; *see also* § 1508.27(b)(7).  The purpose of an EIS is to inform the decision-makers and the public of the significant environmental impacts of the proposed action, means to mitigate those impacts, and reasonable alternatives that will have lesser environmental effects.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 29 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

89.     NEPA requires federal agencies, including FWS and NMFS, to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  40 U.S.C. § 4332(E).  This requires an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14(a), as well as describe the "underlying purpose and need to which the Agency is responding in proposing the alternatives, including the proposed action."  40 C.F.R. § 1502.13.  The consideration of alternatives is described as the "heart" of the NEPA analysis.  40 C.F.R. § 1502.14.

90.     NEPA also requires that defendants use high quality, accurate scientific information and ensure the scientific integrity of the analysis in an EIS.  *See* 40 C.F.R. § 1500.1(b); 40 C.F.R. § 1502.24.

91.     The regulations promulgated by the federal agency responsible for overseeing implementation of NEPA, the Council on Environmental Quality ("CEQ"), authorize agencies to specify categories of actions "[w]hich normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4))."  40 C.F.R. § 1507.3(b)(2)(ii).  The CEQ regulations define "categorical exclusion" as "a category of actions which do not individually or cumulatively have a significant effect on the human environment," and they require that all federal agencies establish those categories by rule.  40 C.F.R. § 1508.4.  The CEQ regulations also require that agency regulations establishing categorical exclusions "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect."  *Id.*

92.     FWS has defined a categorical exclusion as "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 30 -

whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case." 43 C.F.R. § 46.210(i).

93.     NMFS similarly defined categorical exclusions in NOAA Administrative Order 216-6A and Companion Manual, Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities (Jan. 13, 2017), Appendix E.

94.     FWS and NMFS have stated that the regulatory revisions were categorically excluded from NEPA because the revisions' environmental impacts are "fundamentally administrative, legal, technical, or procedural in nature," and "too broad, speculative, or conjectural to lend themselves to meaningful analysis."  To the contrary, the ESA revisions remove substantive protections from threatened and endangered species, revise the conditions for listing, delisting, and designating critical habitat, and change substantive measures in ESA biological consultations.  The revisions are likely to have significant adverse environmental effects and are likely to harm threatened and endangered species and their designated critical habitat.

95.     Even if the revisions could be covered by a categorical exclusion, extraordinary circumstances require the preparation of an EIS or EA.  The revisions have highly controversial environmental effects, involve unresolved conflicts concerning alternative uses of available resources, have highly uncertain and potentially significant environmental effects, involve unique or unknown environmental risks, establish a precedent for future action and represent a decision in principle about future actions with potentially significant environmental effects, and have significant impacts on listed species, species proposed to be listed, and designated critical habitat under the ESA.  43 C.F.R. § 46.215.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 31 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

96.     FWS and NMFS are subject to NEPA, and the final decisions revising the ESA regulations are major federal actions significantly affecting the human environment within the meaning of 42 U.S.C. § 4332(2)(C) for at least the following reasons:

a.      The revised regulations "may adversely affect an endangered or threatened species or its [critical] habitat."  40 C.F.R. § 1508.27(b)(9).

b.      The effects of the revised ESA regulations will fall on areas with unique geographic characteristics, including recreation areas, designated wilderness, wild and scenic rivers, and ecologically critical areas within the meaning of 40 C.F.R. § 1508.27(b)(3).

c.      The effects of the revised ESA regulations on the quality of the human environment are likely to be "highly controversial" within the meaning of 40 C.F.R. § 1508.27(b)(4).

d.      The possible effects on the human environment involve "unique [and] unknown risks" within the meaning of 40 C.F.R. § 1508.27(b)(5).

e.      The revisions "may establish a precedent for future actions with significant effects" within the meaning of 40 C.F.R. § 1508.27(b)(6).

f.      The revisions threaten a violation of federal law imposed for the protection of the environment, namely the ESA, within the meaning of 40 C.F.R. § 1508.27(b)(10).

97.     FWS's and NMFS's promulgation of the revised ESA regulations under a categorical exclusion to NEPA; their promulgation of the ESA regulations without preparing an EIS that (a) examines an adequate range of alternatives, (b) has a statement of purpose and need that corresponds to the agencies' proposed action, (c) identifies the correct no action alternative baseline for comparing and assessing direct, indirect, and cumulative environmental effects, and (d) uses high quality scientific information; and their promulgation of ESA revised regulations

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 32 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  without preparing an EIS that examines the overarching direct, indirect, and cumulative

2  environmental effects is arbitrary, capricious, an abuse of discretion, and otherwise not in

3  accordance with law, in violation of NEPA, the CEQ regulations, the FWS and NMFS guidelines

4  implementing NEPA, and the APA, 5 U.S.C. § 706(2)(A).

SECOND CLAIM FOR RELIEF

Violation of Administrative Procedure Act:
Failure to Provide Adequate Notice and Comment

98.     Fundamental to the APA's procedural framework is the requirement that, absent

narrow circumstances, a federal agency must publish as a proposal any rule that it is considering

adopting and allow the public the opportunity to submit written comments on the proposal.  5

U.S.C. § 553.  The proposal must be detailed and described with reasonable specificity to allow a

meaningful opportunity to comment.

99.     In the packages of changes to regulations implementing ESA Sections 4 and 7,

FWS and NMFS made it clear that they viewed these rulemakings as applying to "all of part

402" and "all of part 424" and asserted that the "final rule[s] may include revisions to any

provisions in [Parts 402 and 424] that are a logical outgrowth of this proposed rule…."  83 Fed.

Reg. at 35,179; *id.* at 35,194.

100.     On August 12, 2019, FWS and NMFS issued the final regulatory revisions for

ESA Section 7, including changes that were not detailed or disclosed in the proposed rules.

These include new language amending 50 C.F.R. § 402.17, purporting to define what "activities

are reasonably certain to occur," limiting the "consequences caused by the proposed action," and

redefining the "environmental baseline."  In changes to 50 C.F.R. § 424.12, the Services also

finalized new regulatory language restricting the designation of unoccupied critical habitat by

introducing a new requirement for the presence of "physical or biological features" that was not

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 33 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

part of the proposed regulation, was not discussed in any way in the proposed regulation, and

represents a departure from the Service's past interpretation.  In the same section, the Services

finalized new regulatory language imposing a heightened certainty requirement with regard to

the designation of unoccupied critical habitat that was not part of or intimated by the proposed

rule.

101.    The Services' general requests for comments on topics or potential additional

changes, disconnected from any specific proposals, did not provide fair notice of how the agency

actually planned to amend those provisions, nor are the added revisions a logical outgrowth of

the proposed rules.

102.    FWS and NMFS promulgation of the 2019 Revised ESA Regulations without

adequate notice and comment as required under 5 U.S.C. § 553, is arbitrary, capricious, an abuse

of discretion, not in accordance with law, and without observance of procedure required by law

with the meaning of the APA, 5 U.S.C. § 706(2).

THIRD CLAIM FOR RELIEF

Violation of the Endangered Species Act and Administrative Procedure Act:<br>Contrary to Law and Failure of Rational Decisionmaking<br>With Respect to ESA Section 7 Regulatory Revisions

103.    The FWS and NMFS cannot adopt regulations that are manifestly contrary to the

text and purpose of the ESA.

104.    When promulgating regulations, FWS and NMFS must articulate a satisfactory

explanation for their action, including a rational connection between the facts found and the

choice made.  A regulation is arbitrary and invalid if the agency relies on "factors which

Congress has not intended it to consider" or "entirely fail[s] to consider an important aspect of

the problem."

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 34 -

105.     When an agency issues a regulation changing or amending a prior regulation, it faces a high burden.  The agency must demonstrate that a proposed rule is (1) permissible under the statute, that (2) there are good reasons for it, and that (3) the agency believes it to be better, which the conscious change of course adequately indicates.  When a new regulation rests upon a factual finding contrary to prior policy, an agency must provide a more detailed justification than what would suffice if the new policy were created on a blank slate.  Any unexplained inconsistency between the prior rule and its replacement is a basis for finding the agency's interpretation arbitrary and capricious.

106.     Numerous sections of the 2019 Revised ESA Regulations with respect to ESA Section 7 are contrary to the text and purpose of the ESA, including:

- Unchecked reliance on mitigation promises;

- Redefining ongoing harms as part of the environmental baseline;

- Definition of destruction or adverse modification of critical habitat;

- Limiting the effects and activities considered during consultation; and

- Reinitiation of consultation on land management plans.

107.     Promulgation of these same sections by FWS and NMFS also lack detailed justification and rational basis and fails to use the best available science, as required by the ESA.

108.     FWS's and NMFS's promulgation of the 2019 Revised Regulations with respect to ESA Section 7 is arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 35 -

(1)     Declare that FWS and NMFS acted arbitrarily, capriciously, and contrary to NEPA and the CEQ regulations, in violation of the APA, 5 U.S.C. § 706(2)(A), by invoking categorical exclusions and failing to prepare an Environmental Impact Statement on the 2019 Revised ESA Regulations, and by failing to evaluate alternatives to, and the full impacts of, the revised regulations;

(2)     Declare that FWS and NMFS acted arbitrarily, capriciously, and contrary to the ESA, in violation of the APA, 5 U.S.C. § 706(2)(A), in promulgating the 2019 Revised ESA Regulations;

(3)     Hold unlawful and vacate the 2019 Revised ESA Regulations;

(4)     Enjoin FWS and NMFS from applying or otherwise relying upon the 2019 Revised ESA Regulations;

(5)     Award plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

(6)     Grant plaintiffs such further and additional relief as the Court may deem just and proper.

DATED this 21st day of August, 2019.

//

//

//

//

//

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 36 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Respectfully submitted,

s/ *Kristen L. Boyles*
KRISTEN L. BOYLES (CSBA # 158450)
PAULO PALUGOD (NYB # 5047964)
[*Pro Hac Vice Admission Forthcoming*]
EARTHJUSTICE
705 Second Avenue, Suite 203
Seattle, WA  98104
Ph:  (206) 343-7340 | Fax:  (206) 343-1526
kboyles@earthjustice.org
ppalugod@earthjustice.org

*Attorneys for Plaintiffs Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Natural Resources Defense Council, National Parks Conservation Association, WildEarth Guardians, and The Humane Society of The United States*

s/ *Andrea A. Treece*
ANDREA A. TREECE (CSBA # 237639)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
Ph:  (415) 217-2089 | Fax: (415) 217-2040
atreece@earthjustice.org

*Local Counsel for Plaintiffs*

REBECCA RILEY (ISBA # 6284356)
[*Pro Hac Vice Admission Forthcoming*]
NATURAL RESOURCES DEFENSE COUNCIL
20 North Wacker Drive, Suite 1600
Chicago, IL 60606
Tel: 312-651-7900
rriley@nrdc.org

KARIMAH SCHOENHUT (DCBA #1028390)
SIERRA CLUB
[*Pro Hac Vice Admission Forthcoming*]
2101 Webster St., Suite 1300
Oakland, CA 94612
Tel: 202-548-4584
karimah.schoenhut@sierraclub.org

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 37 -

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104-1711*
*(206) 343-7340*