JEAN E. WILLIAMS,
Deputy Assistant Attorney General
SETH M. BARSKY, Section Chief
MEREDITH L. FLAX, Assistant Section Chief
COBY HOWELL, Senior Trial Attorney
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
1000 S.W. Third Avenue
Portland, OR 97204
Phone: (503) 727-1023
Fax: (503) 727-1117
Email: coby.howell@usdoj.gov

*Attorneys for Federal Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (Oakland)

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,<br><br>Plaintiffs,<br><br>vs.<br><br>DAVID BERNHARDT, ET AL.,<br><br>Federal Defendants. | Case. No. 4:19-cv-05206-JST<br><br>**FEDERAL DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: February 5, 2020[1]<br>Time:  2:00 pm PST<br>Place:  Courtroom 6, 2nd Floor<br>Judge: The Honorable John S. Tigar |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Under Local Civil Rule 7, notice is hereby given that on February 5, 2020, or as soon as this matter may be heard, in the Courtroom of the Honorable John S. Tigar (Courtroom 6), David Bernhardt, Secretary of the Department of the Interior, *et al.,* (collectively "Federal Defendants")

---

[1] The parties have stipulated to a briefing schedule previously filed with the Court.

1  will move this Court to dismiss this case for lack of subject-matter jurisdiction pursuant to

2  Federal Rule of Civil Procedure 12(b)(1).

3        As set forth below, Federal Defendants request that the Court dismiss Plaintiffs'

4  Complaint because they lack Article III standing and the claims are not ripe for judicial review.

5  Counsel have conferred and Plaintiffs indicated that they will oppose this motion.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ...................................................................................................ii - vii

INTRODUCTION ..................................................................................................................1

BACKGROUND ....................................................................................................................2

    I.     SECTION 4 REVISIONS .........................................................................4

    II.    SECTION 4(d) REVISIONS ....................................................................8

    III.   SECTION 7(a)(2) REVISIONS................................................................11

STANDARD OF REVIEW ...................................................................................................14

ARGUMENT ........................................................................................................................14

    I.     PLAINTIFFS HAVE NOT ALLEGED FACTS SUFFICIENT TO
         ESTABLISH STANDING...................................................................15

         A.    There is No Past or Present Injury-in-Fact. ..................................17

         B.    Plaintiffs' Allegations of Future Harm are too Speculative......................18

    II.    PLAINTIFFS' CHALLENGES ALSO ARE NOT RIPE ....................................24

CONCLUSION.....................................................................................................................28

1

TABLE OF AUTHORITIES

2

CASES:                                                                    PAGE

3

*Abbott Laboratories v. Gardner,*
    387 U.S. 136 (1967)..............................................................................24

4

*Ass'n of Am. Medical Colleges v. United States,*
    217 F.3d 770 (9th Cir. 2000) ............................................................14

5

6

*Babbitt v. Sweet Home Chapter of Communities for a Great Or.,*
    515 U.S. 687 (1995)................................................................................3

7

8

*Biodiversity Legal Foundation v. Badgley,*
    309 F.3d 1166 (9th Cir. 2002) ..........................................................15

9

10

*Bova v. City of Medford,*
    564 F.3d 1093 (9th Cir. 2009) ..........................................................24

11

*Butte Envtl. Council v. U.S. Army Corps of Engineers,*
    620 F.3d 936 (9th Cir. 2010) ............................................................12

12

13

*Chapman v. Pier 1 Imports (U.S.),*
    631 F.3d 939 (9th Cir. 2011) ...................................................... 16-17

14

15

*Clappe v. Amnesty International USA,*
    568 U.S. 398 (2013)................................................................15, 22, 24

16

17

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006)..............................................................................19

18

19

*Doe v. Holy See,*
    557 F.3d 1066 (9th Cir. 2009) ..........................................................14

20

*El Rescate Legal Servs. v. Exec. Office of Immigration Review,*
    959 F.2d 742 (9th Cir. 1991) ............................................................21

21

22

*Food & Water Watch v. Vilsack,*
    808 F.3d 905 (D.C. Cir. 2015)..........................................................21

23

*Habeas Corpus Resource Center v. U.S. Dep't of Justice,*
    816 F.3d 1241 (9th Cir. 2016)..............................................24, 25, 26

24

25

*Khan v. Johnson,*
    65 F. Supp. 3d 918 (C.D. Cal. 2014) ..............................................14

26

27

*Kokkonen v. Guardian Life Ins. Co. of America,*
    511 U.S. 375 (1994) ...........................................................................14

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .............................................................25, 23, 24

*Lujan v. National Wildlife Federation,*
    497 U.S. 871 (1990) ...........................................................................25

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ......................................................................23 - 24

*Missouri ex rel. Koster v. Harris,*
    847 F.3d 646 (9th Cir. 2017) ............................................................16

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*
    538 U.S. 803 (2003) .....................................................................25, 26

*Ohio Forestry Ass'n v. Sierra Club,*
    523 U.S. 726 (1998) .....................................................................25, 27

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,*
    898 F.2d 1410 (9th Cir. 1990) .......................................................22 - 23

*Safer Chemicals, Healthy Families v. EPA,*
    --F.3d--, 2019 WL 5997404 (9th Cir. Nov. 14, 2019) .........................26 - 27

*Savage v. Glendale Union High School,*
    343 F.3d 1036 (9th Cir. 2003) ..........................................................14

*Schlesinger v. Reservists Comm. To Stop the War,*
    418 U.S. 208 (1974) ...........................................................................24

*Scott v. Pasadena Unified School Dist.,*
    306 F.3d 646 (9th Cir. 2002) .......................................................15 - 16

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,*
    549 U.S. 422 (2007) ...........................................................................15

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) .......................................................................15

*Sullivan v. Everhart,*
    494 U.S. 83 (1990) ........................................................................23 - 24

*Summers v. Earth Island Inst*,
    555 U.S. 488 (2009)..........................................................16, 18, 19, 20, 23

*Sweet Home Chapter of Communities for a Great Or. v. Babbitt*,
    1 F.3d 1 (D.C. Cir. 1993) ...............................................................................9

*Thomas v. Anchorage Equal Rights Commission*,
    220 F.3d 1134 (9th Cir. 2000) ................................................................. 24 - 25

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017)..................................................................................15

*Trout Unlimited v. Lohn*,
    559 F.3d 946 (9th Cir. 2009) .........................................................................9

*Weyerhaeuser Co. v. FWS*,
    139 S. Ct. 361 (2018)................................................................................9, 11

*Wilderness Soc'y v. Rey*,
    622 F.3d 1251 (9th Cir. 2010) ......................................................................23

STATUTES:

Endangered Species Act of 1973, 16 U.S.C. §§ 1531 – 1544:

    Section 2(b), 16 U.S.C. § 1531(b) ................................................................3

    Section 3, 16 U.S.C. § 1532 ........................................................................11

    Section 3(5)(A), 16 U.S.C. § 1532(5)(A) ......................................................4

    Section 3(6), 16 U.S.C. § 1532(6) ..............................................................4, 7

    Section 3(15), 16 U.S.C. § 1532(15) ............................................................3

    Section 3(20), 16 U.S.C. § 1532(20) .......................................................4, 6, 7

    Section 4(a)(1), 16 U.S.C. § 1533(a)(1)........................................................4

    Section 4(a)(3)(A), 16 U.S.C. § 1533(a)(3)(A) ..........................................4, 27

    Section 4(b)(1)(A), 16 U.S.C. § 1533(b)(1)(A) ..............................................4

    Section 4(b)(2), 16 U.S.C. § 1533(b)(2) ........................................................5

    Section 4(d), 16 U.S.C. § 1533(d) ................................................................8

Section 4(g), 16 U.S.C. § 1533(g) ................................................................4

Section 7(a)(2), 16 U.S.C. § 1536(a)(2)..................................................11, 23

Section 7(a)(3)(A), 16 U.S.C. § 1536(b)(3)(A) ...................................... 11 - 12

Section 9(a), 16 U.S.C. § 1538(a) ................................................................8

Section 9(a)(a), 16 U.S.C. § 1538(a)(1)........................................................8

Section 9(a)(1)(A-G), 16 U.S.C. § 1538(a)(1)(A)-(G) ...................................9

Section 11(f), 16 U.S.C. § 1540(f)................................................................3

RULES:

Federal Rule of Civil Procedure 12(b)(1) ....................................................14

REGULATIONS:

50 C.F.R. Pt. 17...........................................................................................3

50 C.F.R. § 17.31(a) ...................................................................................17

50 C.F.R. § 17.31(a) (1978) ..........................................................................9

50 C.F.R. Pt. 402 ..........................................................................................3

50 C.F.R. § 402 ............................................................................................1

50 C.F.R. § 402.01(b) ...................................................................................3

50 C.F.R § 402.02 .......................................................................................12

50 C.F.R. § 402.13 .........................................................................11, 12, 13

50 C.F.R. § 402.13(a) ..................................................................................11

50 C.F.R. § 402.14 .........................................................................11, 12, 13

50 C.F.R. § 402.14(a) ..................................................................................11

50 C.F.R. § 402.14(b) ..................................................................................11

50 C.F.R. § 402.14(c)...................................................................................13

50 C.F.R. § 402.14(g) ........................................................................ 11 - 12

50 C.F.R. § 402.14(g)(4)(8). ............................................................. 13

50 C.F.R. § 402.14(h) ........................................................................ 11 - 12

50 C.F.R. § 402.14(l) ......................................................................... 13

50 C.F.R. § 402.15 ............................................................................. 22

50 C.F.R. § 402.15(a) ........................................................................ 22

50 C.F.R. § 402.16 ............................................................................. 12, 13

50 C.F.R. § 402.16(b) ........................................................................ 13

50 C.F.R. § 402.17 ............................................................................. 12

50 C.F.R. Pt. 424 ............................................................................... 3

50 C.F.R. § 424.11 ............................................................................. 5

50 C.F.R. § 424.11(b) (2018) ............................................................ 5

50 C.F.R. § 424.11(d) ........................................................................ 6, 26

50 C.F.R. § 424.11(e) ........................................................................ 6

50 C.F.R. § 424.12 ............................................................................. 5

FEDERAL REGISTER:

45 Fed. Reg. 13010 (Feb. 27, 1980) ................................................. 3

49 Fed. Reg. 38900 (Oct. 1, 1984) .................................................... 3

51 Fed. Reg. 19926 (June 3, 1986) .................................................... 11

70 Fed. Reg. 37160 (June 28, 2005) .................................................. 9

70 Fed. Reg. 37195 ............................................................................ 9

81 Fed. Reg. 7214 (Feb. 11, 2016) .................................................... 3

83 Fed. Reg. 35174 (July 25, 2018) ................................................... 3

83 Fed. Reg. 35175 ................................................................................10

83 Fed. Reg. 35178 ............................................................................4, 12

83 Fed. Reg. 35179 ................................................................................12

83 Fed. Reg. 35180 ................................................................................12

83 Fed. Reg. 35181 ................................................................................12

83 Fed. Reg. 35182 ................................................................................12

83 Fed. Reg. 35183 ................................................................................12

83 Fed. Reg. 35193 ..................................................................................4

83 Fed. Reg. 35194 ..................................................................................5

83 Fed. Reg. 35195 ..............................................................................4, 5

83 Fed. Reg. 35196 ..............................................................................5, 7

83 Fed. Reg. 35197 ..............................................................................5, 7

84 Fed. Reg. 44753 (Aug. 27, 2019) ...............................1, 4, 10, 17, 19

84 Fed. Reg. 44754 ................................................................................10

84 Fed. Reg. 44755 ................................................................................10

84 Fed. Reg. 44976 ...................................................... 1, 4, 13, 14, 17 - 18

84 Fed. Reg. 44977 ................................................................................13

84 Fed. Reg. 44978 ................................................................................13

84 Fed. Reg. 44979 ................................................................................13

84 Fed. Reg. 44980 ................................................................................13

84 Fed. Reg. 44981 ................................................................................12

84 Fed. Reg. 44983 ................................................................................12

84 Fed. Reg. 44984 ................................................................................12

84 Fed. Reg. 45016 ........................................................................................................12

84 Fed. Reg. 45018 ........................................................................................................13

84 Fed. Reg. 45020 (Aug. 27, 2019)..................................................................1, 4, 5, 17

84 Fed. Reg. 45023 ..........................................................................................................8

84 Fed. Reg. 45024 ....................................................................................................6, 21

84 Fed. Reg. 45026 ....................................................................................................6, 21

84 Fed. Reg. 45031 ........................................................................................................26

84 Fed. Reg. 45032 ........................................................................................................26

84 Fed. Reg. 45040 ..............................................................................................7, 26, 27

84 Fed. Reg. 45052 ........................................................................................................21

84 Fed. Reg. 45053 ..........................................................................................................7

84 Fed. Reg. 64210 (Nov. 21, 2019)..............................................................................20

1

2

**MEMORANDUM OF POINTS AND AUTHORITIES**

3

4

**INTRODUCTION**

5

More than 30 years ago, the Secretaries of the Departments of the Interior and Commerce

6

("Secretaries"), acting through the U.S. Fish and Wildlife Service ("FWS") and the National

7

Marine Fisheries Service ("NMFS") (collectively "Services") first promulgated regulations

8

interpreting and implementing the Endangered Species Act ("ESA" or "Act").  On August 27,

9

2019, in three separate rulemakings, the Services issued their latest revisions to these regulations

10

clarifying, interpreting, and implementing portions of Sections 4, 4(d), and 7(a)(2) of the ESA.

11

*See* 84 Fed. Reg. 45020 (Section 4 revisions); 84 Fed. Reg. 44753 (Section 4(d) revisions);[2] 84

12

Fed. Reg. 44976 (Section 7(a)(2) revisions).  The Section 4 and 4(d) revised regulations became

13

effective on September 26, 2019, and the Section 7(a)(2) revised regulations became effective on

14

October 28, 2019.

15

Seventeen States, the District of Columbia and the City of New York ("State Plaintiffs"),

16

the Center for Biological Diversity and other non-governmental organizations ("CBD

17

Plaintiffs"), and the Animal Legal Defense Fund ("ALDF") (collectively "Plaintiffs") challenge

18

each of these revisions in three separate suits alleging violations of the Administrative Procedure

19

Act ("APA"), National Environmental Policy Act ("NEPA"), and ESA.[3]  Although there are

20

minor differences in the allegations, all three Plaintiffs generally contend they are harmed

21

because the revisions allegedly undermine the conservation purposes of the ESA.  Federal

22

Defendants disagree with the merits of these allegations.  The Court, however, cannot resolve

23

24

[2] The Section 4(d) revisions were promulgated by FWS alone and were not joint regulations.

25

26

[3] This Court has related the three cases: *Center for Biological Diversity v. Bernhardt*, 19-cv-5206 (N.D. Cal. Aug. 21, 2019); *California v. Bernhardt*, 19-cv-6013 (N.D. Cal., Sept. 25, 2019);

27

*Animal Legal Def. Fund v. Bernhardt*, 19-cv-06812 (N.D. Cal., Oct. 21, 2019).  Federal Defendants are filing an identical motion and memorandum in all three cases.

this disagreement here because Plaintiffs fail to identify any specific application or harm from the Services' promulgation of the revisions.

Accordingly, the Court lacks subject-matter jurisdiction over these facial challenges for two primary reasons.  First, Plaintiffs lack Article III standing.  Because the revisions have not been applied in a manner that causes harm to these Plaintiffs, they cannot demonstrate the required injury-in-fact.  Second, and similarly, Plaintiffs' claims are not ripe.  Plaintiffs speculate how the Services will apply these revisions in future administrative processes, yet it is far from clear that this application will ever harm Plaintiffs' interests.

Throughout the complaints, Plaintiffs presuppose that the Services will implement the revisions in a manner that will run afoul of statutory provisions in the ESA.  But unless Plaintiffs can show that the Services have applied these new regulations in a specific context resulting in harm to their stated interests, Plaintiffs cannot show injury-in-fact.  No amount of artful pleading or rhetoric can change this reality.  If Plaintiffs encounter a situation where application of the revised regulations harms their interests in a concrete manner, they can file a complaint at that time.  But that situation has not happened, and may never.  Because standing and ripeness cannot be predicated on speculation, the Court should grant Federal Defendants' motion to dismiss.

## BACKGROUND

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of [certain] treaties and conventions . . . ." 16 U.S.C. § 1531(b).  To achieve these purposes, Congress set out broad procedural and substantive requirements in various sections of the Act, and provided the Secretaries with rulemaking authority to implement those requirements.[4]  16 U.S.C. §§ 1540(f); *Babbitt v. Sweet*

---

[4] The Secretaries share responsibility for implementing the ESA.  16 U.S.C. § 1532(15).  Generally, Interior's jurisdiction extends to terrestrial and freshwater species and Commerce's jurisdiction covers marine species.  The Secretary of the Interior has delegated his authorities

*Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 708 (1995) ("When it enacted the ESA, Congress delegated broad administrative and interpretive power to the Secretar[ies]").

For over 30 years, the Services have implemented these broad procedural and substantive requirements principally through joint regulations.  *See, e.g.* 50 C.F.R. parts 17, 402, 424.[5] During those decades, the Services gained valuable experience in implementing the Act and their own regulations, and over those years issued guidance interpreting or clarifying the regulations to facilitate implementation of the Act.[6]  During this same time, numerous courts also reviewed the Services' interpretations of the Act and regulations and, at times, provided their own gloss on how the Services' application of the regulations should proceed.  This 30-plus years of regulatory implementation has thus yielded a complicated mosaic of interpretive-gloss on the earlier regulations.

To update and clarify these regulations, in 2018 the Services issued three separate proposed rules addressing Sections 4(d), 4, and 7(a)(2) of the Act.  83 Fed. Reg. 35174 ("Section 4(d) proposed rule"); 83 Fed. Reg. 35193 ("Section 4 proposed rule"); 83 Fed. Reg. 35178 ("Section 7(a)(2) proposed rule").  The Services provided notice in the Federal Register and solicited public comment on the proposed rules.  After considering and addressing these public comments, the Secretaries exercised their rulemaking authorities and, on August 27, 2019, issued a trio of final rules revising certain portions of the existing regulations.  *See* 84 Fed. Reg. 45020;

under the ESA to FWS, and the Secretary of Commerce has similarly delegated his authorities to NMFS.  50 C.F.R. § 402.01(b).

[5] The Services periodically revised portions of the regulations, such as amendments to the Sections 4 and 7 regulations in 2016.  *See, e.g.,* 81 Fed. Reg. 7214 (Feb. 11, 2016) (amending 50 C.F.R. Part 402); 81 Fed. Reg. 7414 (Feb. 11, 2016) (amending 50 C.F.R. Part 424).  But, in the main, the earlier regulations have remained the operative regulations for 30-plus years.  *See also,* 45 Fed. Reg. 13010 (Feb. 27, 1980); 49 Fed. Reg. 38900 (Oct. 1, 1984).

[6] *See, e.g.*, FWS, *Laws and Policies, Regulations and Policies*, available at https://www.fws.gov/endangered/laws-policies/regulations-and-policies.html (last visited Dec. 6, 2019) (identifying interpretive guidance and policies relating to application of Sections 4 and 7 of the ESA).

84 Fed. Reg. 44753; 84 Fed. Reg. 44976.  The relevant statutory authorities and the revisions to 50 C.F.R. parts 17, 402, and 424, are each addressed below.

## I.    SECTION 4 REVISIONS

Under ESA Section 4, the Services "shall by regulation" determine "whether any species is an endangered species or a threatened species" after considering five statutory factors, the best scientific and commercial data available, and States' and foreign governments' efforts to protect the species.  16 U.S.C. § 1533(a)(1), (b)(1)(A).  An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range."  *Id*. § 1532(6).  A "threatened species" is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id*. § 1532(20).  If a listed species no longer meets the definition of an endangered or threatened species, the Services shall remove the ESA's protections from the species (delisting).  If a species is delisted, the Services must monitor that species for at least five years.  *Id*. § 1533(g).

Section 4 also directs the Services to designate critical habitat for any species listed as endangered or threatened, "to the maximum extent prudent and determinable."  16 U.S.C. § 1533(a)(3)(A).  "Critical habitat" is defined in relevant part as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and . . . (ii) specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).  The Services must designate critical habitat on the basis of the "best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact of specifying any particular area as critical habitat."  *Id*. § 1533(b)(2).  The Services "may exclude any area from critical habitat if [they] determine[] that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless [they] determine[] . . . [failure to do so] will result in the extinction of the species concerned."  *Id*.  A critical habitat designation does not directly limit or

affect the conduct of non-federal actors; it has significance only when a proposed action has a Federal nexus that triggers ESA Section 7 consultation.  *Weyerhaeuser Co. v. FWS*, 139 S. Ct. 361, 365-66 (2018).

To aid in these statutory duties, the Services jointly promulgated regulations setting forth the procedures for adding, removing, or reclassifying endangered or threatened species, 50 C.F.R. § 424.11, as well as the criteria for designating critical habitat for listed species, *id.* § 424.12.  On July 25, 2018, the Services proposed five general revisions to the listing and critical habitat regulations.  These revisions entail: (1) the deletion of economic impact language; (2) the framework for discussing the foreseeable future; (3) factors to consider in delisting; (4) specific circumstances that support "not prudent" determinations for critical habitat; and (5) clarifications and revisions to the standards and process for designating critical habitat in unoccupied areas.  83 Fed. Reg. at 35194-97.  The Services provided proposed regulatory text for each of these issues along with an explanation and solicited public comments on these as well as other potential areas for change.  83 Fed. Reg. at 35,194.

On August 27, 2019, the Services published the Section 4 final rule adopting many of their proposed revisions.  84 Fed. Reg. 45020.  The revisions do not have any retroactive effect and apply only prospectively.  *Id.* ("Nothing in these final revised regulations is intended to require that any previously completed classification decision or critical habitat designation must be reevaluated on the basis of these final regulations.").  Among the regulatory changes, the Services first revised the regulatory text governing the listing inquiry by removing the phrase "without reference to possible economic or other impacts of such determination" from 50 C.F.R. § 424.11(b) (2018).  The Services explained that this change aligns the regulatory text with the statutory language of 16 U.S.C. § 1533(b)(1)(A) and, in limited circumstances, allows the collection and presentation of economic information to the public.  Because the Services revised the language to closely align the regulatory language with the statutory language, the removal of this language does not change the statutory command to make listing determinations based solely on biological considerations without reference to economic considerations.  84 Fed. Reg. 45024

1

2

3

("[T]he Act does not prohibit the Services from compiling economic information or presenting that information to the public, as long as such information does not influence the listing determination").

4

5

6

7

8

9

10

11

12

13

14

Second, the Services codified the framework for assessing "foreseeable future" as used in in 50 C.F.R. § 424.11(d).  A threatened species is statutorily defined as "any species which is likely to become an endangered species within the *foreseeable future* throughout all or a significant portion of its range."  16 U.S.C. § 1532(20) (emphasis added).  Because there is no statutory definition of "foreseeable future," the Services historically have determined its meaning on a case-by-case basis using guidance issued by the Department of the Interior Office of the Solicitor.[7]  The Services' revision codifies the case-by-case approach and clarifies that, in undertaking this assessment, "[t]he term foreseeable future extends only so far into the future as the Services can reasonably determine that both the future threats and the species responses to those threats are likely" and that the Services "need not identify the foreseeable future in terms of a specific period of time."  50 C.F.R. § 424.11(d).

15

16

17

18

19

20

21

22

23

Third, the Services clarified the factors and criteria for delisting a species.  50 C.F.R. § 424.11(e).  As relevant here, the Services made clear that the standards for listing and delisting are the same, *i.e.*, the five enumerated statutory factors in 16 U.S.C. § 1533(a)(1).  83 Fed. Reg. 35196.  The Services also made a number of changes to address ambiguous regulatory language that did not adequately reflect the statutory command—that species should be delisted when they no longer meet the definition of an endangered or threatened species.  *Id.*  For example, the term "recovery" was removed as one of the bases for delisting to convey that the analysis is based on whether the species meets the definition of an endangered or threatened species in 16 U.S.C. § 1532 (6), (20).  83 Fed. Reg. 35196.

24

25

Fourth, with respect to designating critical habitat, the Services revised 50 C.F.R. § 424.12(a)(1) to set forth a non-exhaustive list of circumstances in which the Services may find it

26

27

---

[7] This approach is consistent with the Department of the Interior, Office of Solicitor's 2009 "M-opinion" on foreseeable future.  84 Fed. Reg. 45026.

"not prudent" to designate critical habitat, as contemplated in 16 U.S.C. § 1533(a)(3)(A) (commonly referred to as "not prudent determinations"), 83 Fed. Reg. 35196-97.  The Services also explained that they will make "not prudent" determinations based on whether particular circumstances are present, rather than a subjective determination of whether it is "beneficial" to a species.  The Services thus removed the prior regulatory language—"would not be beneficial to the species"—from 50 C.F.R. § 424.12(a)(1)(ii) because that language had caused confusion and because the alterations better aligned with the statutory language.  83 Fed. Reg. 35197; 84 Fed. Reg. 45040.  The Services further explained that these changes provide clarity and specificity on how the Services exercise their statutory authorities; the changes were not intended to expand the circumstances in which the "not prudent" determinations will be made and such determinations will remain rare.  *Id.*

Fifth, the Service revised the procedure and criteria for designating unoccupied critical habitat.  84 Fed. Reg. 45053.  The revisions establish a sequence under which the Services "first evaluate areas occupied by the species" and then turn to consideration of unoccupied habitat.  In so doing, the Services simply returned to the same regulatory approach that had been the governing standard for more than 30-years from 1984-2016.  *Id.*  The Services also clarified that unoccupied habitat is "essential" only if occupied critical habitat is "inadequate to ensure the conservation of the species."  *Id.*  In addition, for an unoccupied area to be considered "essential," there must be reasonable certainty both that "the area will contribute to the conservation of the species" and that it "contains one or more of those physical or biological features essential to the conservation of the species."  *Id.*  The Services made these revisions in part to address the Supreme Court's recent decision in *Weyerhaeuser*, 139 S. Ct. 361, where the Court remanded the unoccupied portion of a critical habitat designation because FWS had not determined whether the designated area constituted "habitat" for the species.  *Id.* at 45022-23, 45049.

Finally, the Services made a minor revision to the definition of "physical or biological features" a phrase that appears in the statutory definition of "critical habitat."  84 Fed. Reg.

45023.  The Services' revised definition provides, in relevant part, that "physical or biological features essential to the conservation of the species are the features that occur in specific areas and that are essential to support the life-history needs of the species, including but not limited to, water characteristics, soil type, geological features, sites, prey, vegetation, symbiotic species, or other features."  *Id.*  The Services revised the definition to more closely align with the statutory language, where only those features that are essential to the conservation of the species can lead to the designation of occupied critical habitat.  *Id.*

## II.    SECTION 4(d) REVISIONS

ESA Section 4(d) provides that, whenever a species is listed as "threatened," the Services shall issue regulations they deem "necessary and advisable to provide for the conservation of such [threatened] species" and "may by regulation" extend the Section 9 prohibitions to such species.  16 U.S.C. § 1533(d).[8]  These regulations are often referred to as 4(d) rules.  On its face, Congress chose to apply the Section 9 prohibitions only to endangered species, but through Section 4(d) provided the Services with discretionary rulemaking authority to extend the same prohibitions to threatened species.[9]  16 U.S.C. §§ 1538(a), 1533(d).

In 1978, FWS, but not NMFS, exercised this authority and extended the protections of Section 9 to all species listed as "threatened" except where it issued a special 4(d) rule for a particular species.  50 C.F.R. § 17.31(a) (1978)).  Various timber groups challenged the regulation, commonly referred to as the "Blanket 4(d) Rule," arguing that FWS cannot

---

[8] The statute provides: "Whenever any species is listed as a threatened species ... the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife...."  16 U.S.C. § 1533(d).

[9] Section 9 provides in relevant part: "with respect to any *endangered* species of fish or wildlife listed pursuant to section 1533 of this title it is unlawful for any person subject to the jurisdiction of the United States to – [import, take, possess, deliver, sell]. . . or violate any regulation pertaining to such species or to any threatened species of fish or wildlife listed pursuant to section 1533 of this title and promulgated by the Secretary pursuant to authority provided by this chapter."  16 U.S.C. § 1538(a)(1)(A)-(G) (emphasis added).

automatically extend the protections of Section 9 to all threatened species in "one fell swoop," but rather must issue "species-specific" rules. *Sweet Home Chapter of Communities for a Great Or. v. Babbitt*, 1 F.3d 1, 3, 6 (D.C. Cir. 1993), *modified on reh'g*, 17 F.3d 1463 (D.C. Cir. 1994). The D.C. Circuit rejected this challenge, finding that FWS' interpretation of an ambiguous statutory term was permissible and therefore deferred to the agency.  1 F.3d at 8 ("In light of the statute's ambiguity, the challenged FWS regulation is a reasonable and permissible construction of the ESA.").  While the D.C. Circuit upheld FWS' Blanket 4(d) Rule as a permissible approach under the statute, it also readily acknowledged that a case-by-case approach was consistent with the statute as well.  *Id.*

In contrast to FWS, since passage of the ESA NMFS has chosen not to proceed via a similar blanket rule, but instead has issued "species-specific" 4(d) rules for threatened species under its jurisdiction.  These 4(d) rules tailor the level of protections to the particular circumstances, which in many cases fosters better conservation of the threatened species by providing certain incentives to interested parties.  *See e.g.,* 70 Fed. Reg. 37160, 37195 (June 28, 2005).  NMFS' different approach and interpretation of Section 4(d) also has been upheld by the courts.  *See, e.g., Trout Unlimited v. Lohn*, 559 F.3d 946, 962 (9th Cir. 2009).

On July 25, 2018, FWS proposed to revise 50 C.F.R. §§ 17.31, 17.71 to remove the "blanket" extension of Section 9 protections to all future threatened species.  Instead, FWS proposed to more closely align with NMFS' longstanding approach and promulgate "species-specific" 4(d) rules addressing which Section 9 prohibitions, and any other necessary protections, would be extended to the particular species.  83 Fed. Reg. 35175.  FWS proposed this revision because it had gained considerable experience developing species-specific rules resulting in benefits, "including removing redundant permitting requirements, facilitating implementation of beneficial conservation actions, and making better use of . . . limited personnel and fiscal

resources . . . ." 83 Fed. Reg. 35175.[10]  FWS also explained that it wanted to align its "practices with those of NMFS" while still providing a "meaning to the statutory distinction between" endangered and threatened species.  *Id.*  Notably, the proposed rule included language specifying that the revision would not have any retroactive effect on species currently listed as threatened and would apply only to species listed as threatened in the future.

On August 27, 2019, FWS published the 4(d) final rule.  84 Fed. Reg. 44753.  Consistent with the proposed rule, the final rule removed future application of blanket protections by specifying that its provisions apply only to species listed as threatened on or before the effective date of September 26, 2019.  84 Fed. Reg. 44753.  However, for any species listed after September 26, 2019, FWS "intend[s] to finalize the species-specific rule[s] concurrent with the final listing or reclassification determination."  84 Fed. Reg. 44753.  For all species already listed as threatened, nothing changes.  But, for those species that are listed as threatened in the future, FWS intends to address the level of protections through a species-specific rule, similar to NMFS' approach, which is the statutory default.

In the final rule, FWS explained the reasons for retaining the proposed revisions were: (1) to promote the benefits of species-specific rules; and (2) to align more closely with NMFS' regulatory structure.  84 Fed. Reg. 44754.  In addition, while addressing public comments, FWS estimated, based on the historical practices, that issuing species-specific rules would not significantly add to FWS' workload and would add efficiency, predictability, and transparency to the process.  84 Fed. Reg. 44755.

## III.    SECTION 7(a)(2) REVISIONS

ESA Section 7(a)(2) imposes procedural and substantive duties.  The statute procedurally directs each "federal agency" (commonly referred to as an "action agency") to consult with the "Secretary" in certain circumstances.  16 U.S.C. § 1536(a)(2).  The federal agency consults with

---

[10] Even under the Blanket Rule, FWS reserved the authority to issue species-specific 4(d) rules in lieu of the Blanket Rule and did so numerous times. 84 Fed. Reg. 44754, 44755 (noting FWS promulgated 37 species-specific 4(d) rules over last 21 years).

1   the Secretary to meet its substantive obligation to "insure that any action authorized, funded, or

2   carried out . . . is not likely to jeopardize the continued existence of any endangered species or

3   threatened species or result in the destruction or adverse modification" of designated critical

4   habitat.  *Id.*  Section 7(a)(2) does not prescribe how the procedural consultation obligation shall

5   be fulfilled, nor does the statute define the substantive standards imposed by Section 7(a)(2).  *Id.*

6           The Services jointly promulgated regulations in 1986 to interpret and administer the

7   Section 7(a)(2) consultation process.  *See* 50 C.F.R. § 402; 51 Fed. Reg. 19926 (June 3, 1986).

8   Under that process, to determine if Section 7(a)(2) applies, a federal agency makes an initial

9   determination of whether its proposed action "may affect" listed species or critical habitat.  50

10  C.F.R. § 402.14(a).  If the federal agency determines that its actions "may affect" listed species

11  or critical habitat, it must engage in consultation with the Services.  50 C.F.R. §§ 402.13, 402.14.

12          Consultation may proceed in either of two ways: informal or formal.  Informal

13  consultation is a process comprised of all discussions and correspondence between the consulting

14  agency (the Services) and the action agency in order to determine whether formal consultation is

15  necessary.  50 C.F.R. § 402.13(a).  If an action agency determines, with the written concurrence

16  of the consulting agency (a "letter of concurrence"), that the action "is not likely to adversely

17  affect" the listed species or critical habitat, the consultation process is terminated and formal

18  consultation is not necessary.  50 C.F.R. § 402.13(a).  If either the action agency or consulting

19  agency determines that the proposed action is "likely to adversely affect" listed species or critical

20  habitat, the agencies must engage in formal consultation.  50 C.F.R. §§ 402.13(a), 402.14(a)–(b).

21  Formal consultation concludes with the issuance of a biological opinion by the consulting agency

22  assessing the likelihood of jeopardy to the species and whether the proposed action will result in

23  destruction or adverse modification of critical habitat.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §

24  402.14(g), (h).

25          On July 25, 2018, the Services proposed eight general revisions to the consultation

26  regulations.  83 Fed. Reg. 35178.  The proposed revisions did not alter the basic longstanding

27  consultation framework or process, but did propose some refinements and clarifications.  This

included revising the regulatory definitions of: (1) "destruction or adverse modification" for critical habitat; (2) "Director;" (3) "effects of the action;" and (4) "environmental baseline."  83 Fed. Reg. 35178-80; 50 C.F.R § 402.02.  Other more general, non-definitional revisions included: (5) establishing deadlines for informal consultation, 50 C.F.R. § 402.13; (6) criteria and procedures for formal consultation, 50 C.F.R. § 402.14; (7) reinitiation of consultation, 50 C.F.R. § 402.16; and (8) adopting a new provision entitled "Activities that are reasonably certain to occur," 50 C.F.R. § 402.17.  84 Fed. Reg. 44981.

After considering the public comments, the Services finalized the revisions.  As relevant here, the Services revised the definition of "destruction or adverse modification" to mean "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species."  84 Fed. Reg. 44981.  The Services implemented this change and added the words "as a whole" to make the regulation consistent with the Services' longstanding application of the adverse modification standard that analyzes whether an action affects the ability of the critical habitat designation as a whole to provide for the conservation of the species.  *See, e.g., Butte Envtl. Council v. U.S. Army Corps of Engineers*, 620 F.3d 936, 948 (9th Cir. 2010).  The regulatory definition does not, as the Services explained, minimize the scope of the Services' analysis.  83 Fed. Reg. 35180-81; 84 Fed. Reg. 44983-84.

Similarly, the Services revised the definitions of "effects of the action" and "environmental baseline" to simplify the regulatory inquiry.  83 Fed. Reg. 35182-83.  The previous joint regulation had confusingly embedded the definition of environmental baseline within the definition of effects of the action.  50 C.F.R. § 402.02 (2018).  With the revisions, the Services created two separate definitions for clarity.  *See* 84 Fed. Reg. 45016.  The new definition of "effects of the action" also eliminated the labels of "direct" and "indirect" effects contained in the old regulation, so that the analysis can focus on evaluating the effects to listed species rather than parsing or categorizing the types of effects considered.  84 Fed. Reg. 44976-77.  Relatedly, the Services also clarified the analysis for determining whether an effect should be considered by the Services by articulating a two-step test incorporating "but-for" and

"reasonably certain to occur." 84 Fed. Reg. 44976-79.  Neither portion of the test is new; the Services previously applied a "but for" causal inquiry in analyzing effects, and the prior definition of indirect effects included only those effects that are reasonably certain to occur.  *Id.*

The Services also revised some of the procedures for informal and formal consultation. 50 C.F.R §§ 402.13, 402.14.  As to informal consultation, the Services clarified the materials that action agencies should submit to the Services and established a 60-day deadline for the consultation process which may be extended to a maximum of 120 days.  84 Fed. Reg. 44979.  For formal consultation, the Services revised the regulation to specify what is necessary to initiate formal consultation. 50 C.F.R. § 402.14(c).  The Services also clarified that they add the effects of the action to the environmental baseline and consider measures intended to avoid, minimize, or offset the effects of the action like any other portion of the proposed agency action under review.  *Id.* § 402.14(g)(4)(8). The Services also established provisions for an expedited consultation process, under specified conditions.  50 C.F.R. § 402.14(l).

The Services further addressed the criteria for reinitiating consultation.  50 C.F.R. § 402.16; 84 Fed. Reg. 45018.  The primary change clarified that an agency is not required to reinitiate consultation after approving a land management plan prepared pursuant to 43 U.S.C. § 1712 or 16 U.S.C. § 1604 when (1) a new species is listed or critical habitat is designated after approval and (2) any action that may affect listed species or critical habitat will be addressed through a separate action-specific consultation.  50 C.F.R. § 402.16(b).  This change was made in part to incorporate certain provisions in the 2018 Omnibus Appropriations Act.  84 Fed. Reg. 44980.

Finally, like the other regulations, the Section 7(a)(2) revisions are not retroactive and do not affect any completed consultation.  84 Fed. Reg. 44976 ("The revisions to the regulations in this rule are prospective; they are not intended to require that any previous consultations under section 7(a)(2) of the Act be reevaluated . . . .").

## STANDARD OF REVIEW

Federal courts are courts of limited jurisdiction, *Ass'n of Am. Medical Colleges v. United States*, 217 F.3d 770, 778 (9th Cir. 2000) (quoting *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994)), and the plaintiff bears the burden of establishing that a controversy is within a court's jurisdiction.  *Kokkonen*, 511 U.S. at 377.  Rule 12(b)(1) allows a party to assert, by motion, that the court does not have subject-matter jurisdiction over a matter and should therefore dismiss the case.  Fed. R. Civ. P. 12(b)(1).  "A challenge to subject-matter jurisdiction 'can be either facial, confining the inquiry to allegations in the complaint, or factual, permitting the court to look beyond the complaint."  *Khan v. Johnson*, 65 F. Supp. 3d 918, 923 (C.D. Cal. 2014) (quoting *Savage v. Glendale Union High School*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003)).  Here, we move to dismiss the complaints on facial grounds pursuant to Fed. R. Civ. P. 12(b)(1).  In this situation, while a court "assumes plaintiff's factual allegations to be true and draws all reasonable inferences in his favor," it does not accept the "truth of legal conclusions merely because they are cast in the form of factual allegations."  *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009).

## **ARGUMENT**

Plaintiffs' complaints all presuppose that the Services will apply these revised regulations in a manner that harms their interests in ESA-listed species.  But that future, unidentified scenario does not now exist, and may never.  As explained below, Plaintiffs have failed to establish standing to pursue their claims for relief.  Even if the Court were to find standing with respect to some or all of their claims for relief, Plaintiffs' claims are not ripe for judicial review.[11]

## I.   PLAINTIFFS HAVE NOT ALLEGED FACTS SUFFICIENT TO ESTABLISH STANDING

---

[11] While standing and ripeness are related, either doctrine is independently sufficient to dismiss Plaintiffs' cases.  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (because there is no mandatory sequencing of jurisdictional issues, courts may dispose of threshold issues in any order).

1    To establish Article III standing, a plaintiff must allege facts showing that it (1) suffered

2   an injury-in-fact, (2) that is fairly traceable to the defendant's conduct, and (3) that is likely to be

3   redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

4   (1992).[12]  The elements of standing must exist at the time the complaint is filed. *Biodiversity*

5   *Legal Foundation v. Badgley*, 309 F.3d 1166, 1171 (9th Cir. 2002) ("standing is determined as of

6   the commencement of the litigation").  "Where, as here, a case is at the pleading stage, the

7   plaintiff must clearly allege facts demonstrating each element."  *Spokeo, Inc. v. Robins*, 136 S.

8   Ct. 1540, 1547 (2016) (citations omitted).

9    Of standing's three elements, injury-in-fact is "first and foremost."  *Id.*  A plaintiff must

10   show an injury that is "concrete and particularized" and "actual or imminent, not conjectural or

11   hypothetical." *Id.* at 1547-48.  "For an injury to be 'particularized,' it 'must affect the plaintiff in

12   a personal and individual way.'"  *Id.* at 1548 (quoting *Defenders of Wildlife*, 504 U.S. at 560

13   n.1).  In other words, Plaintiffs must demonstrate "such a personal stake in the outcome of the

14   controversy as to . . . justify [the] exercise of the court's remedial powers on [their] behalf."  *See*

15   *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (brackets in original).  A

16   threatened injury "must be *certainly impending* to constitute injury in fact" or there must be a

17   "substantial risk that the harm will occur."  *Clapper v. Amnesty International USA*, 568 U.S. 398,

18   409, 414 n.5 (2013) (emphasis in original).  "[A]llegations of *possible* future injury are not

19   sufficient." *Id.* at 409 (emphasis in original); *Scott v. Pasadena Unified School Dist.*, 306 F.3d

20   646 (9th Cir. 2002) (plaintiff's allegation of future injury suffices "only if he or she

21   is *immediately* in danger of sustaining some *direct* injury as the result of the challenged official

22   conduct and the injury or threat of injury is both real and immediate, not conjectural or

23   hypothetical") (emphasis in original) (citation omitted).  Finally, standing is "ordinarily

24   'substantially more difficult' to establish" where, as here, a plaintiff "is not himself the object of

25

26   ─────────────────────

27   [12] In *Lujan*, the Supreme Court held that some of the same plaintiffs involved here lacked Article III standing to challenge aspects of the 1986 ESA Section 7 regulations.

the government action or inaction he challenges."). *Summers v. Earth Island Inst*, 555 U.S. 488, 493 (2009) (citation omitted).

Here, all of the Plaintiffs' alleged injuries are premised on speculation, conjecture, and possible future injury. The CBD Plaintiffs and ALDF allege that their members have recreational, aesthetic, and scientific interests generally in threatened and endangered species and their critical habitat throughout the entire nation and, in the case of ALDF, interests in all species throughout the country that may be listed someday. CBD Compl. ¶ 13; ALDF Compl. ¶ 15. Both CBD and ALDF also allege generally that they have organizational interests in advocating for and conserving species. CBD Compl. ¶ 12; ALDF Compl. ¶¶ 13-14. As to how those interests are allegedly injured, both sets of Plaintiffs include boilerplate allegations that their interests "have been, are being, and will continue to be irreparably harmed" by the regulations. ALDF Compl. ¶ 15; CBD Compl. ¶¶ 13, 16. For their part, the States allege sovereign, institutional, and proprietary interests generally in all species within their respective borders, and that they "have suffered a legal wrong and concrete injury" due to the promulgation of the regulations. States Compl. ¶ 123.

While the Plaintiffs may be adept at alleging cognizable interests, as shown below, these conclusory allegations of how those interests are actually specifically and imminently injured are plainly insufficient to show injury-in-fact, even at the pleading stage. *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 654 (9th Cir. 2017) (while the standard is more permissive at the pleading stage, the complaint must still plead facts showing that the threatened injury is "certainly impending"). Indeed, the complaints fail to allege any specific *facts*, as opposed to conclusory statements, as to how Plaintiffs are harmed. Simply reciting that they are harmed because the regulations allegedly will lessen protections for species is not sufficient. *Chapman v. Pier 1 Imports (U.S.)*, 631 F.3d 939, 954-55 & n. 9 (9th Cir. 2011) *(en banc)*.

### A.   There is No Past or Present Injury-in-Fact.

First, Plaintiffs' allegations of past and present harms falter out of the gate. The revisions are not retroactive and do not change any current protections for already-listed species. 84 Fed.

Reg. 45020; 84 Fed. Reg. 44753; 84 Fed. Reg. 44976.  Thus, there is no past or present injury-in-fact caused by the challenged regulations.

For example, ALDF alleges that FWS' Blanket 4(d) Rule has been instrumental in protecting its members' interests in threatened species.  ADLF Compl. ¶ 50 (alleging interests in threatened brown bears and hyacinth macaw and certain protections attendant to these threatened species).  But, with the 4(d) revisions, all threatened species that were covered by the Blanket 4(d) Rule continue to be subject to the prohibitions and protections of Section 9.  50 C.F.R. § 17.31(a).  Take of a threatened brown bear or macaw is still prohibited, and ALDF's interests in those protections remain exactly the same.  There has been no change in their interests with respect to those listed threatened species, and there may never be any change attributable to the revised 4(d) regulation for those species.

Similarly, Plaintiffs contend that the listing and critical habitat revisions harm their interests.  *See, e.g.,* CBD Compl. ¶ 14.  But the Section 4 revisions apply only to species listed and critical habitat designated after the rule became effective.  It is axiomatic that species must be listed under the ESA before an interest in ESA-listed species could be harmed.  And, to the extent Plaintiffs' interests lie in currently-listed species or previously-designated critical habitat, *see id.;* States Compl. ¶¶ 19-81, those interests are not harmed because the regulations are not retroactive.

Likewise, while the Section 7(a)(2) revisions will be applied to currently listed species and critical habitat through the consultation process, to the extent there is any impact from the new provisions, it would only occur in future biological opinions or letters of concurrence.  Consultations previously completed under Section 7(a)(2) of the Act will not be reevaluated.  84 Fed. Reg. 44976.  In short, if this Court were to strike down some or all of these revisions tomorrow, nothing would change for current listed ESA species or completed consultations, and thus Plaintiffs' interests in those species remain the same.  Plaintiffs cannot establish a past or present injury-in-fact.

## B.    **Plaintiffs' Allegations of Future Harm are too Speculative.**

This brings us to Plaintiffs' second problem—reliance on future speculative injuries caused by future, speculative administrative processes. The challenged regulations prescribe procedures and standards for the Services' administration and implementation of the ESA. They govern only the conduct of the Services and other Federal agencies; they do not directly or immediately regulate or affect any of the Plaintiffs or their members. Plaintiffs do not identify any specific application of the regulations to a particular species in a way that would result in an injury to Plaintiffs or their members. Instead, Plaintiffs' assertions of harm are wholly contingent on administrative processes that have not yet occurred, regarding yet-to-be identified species, located in some unidentified location in the country. It is impossible to determine from these allegations whether these unidentified administrative processes will harm Plaintiffs' concrete interests in ESA-listed species.

Plaintiffs do not allege, nor could they, that every application of the regulations will result in a different outcome than under the prior *status quo*. Under the new revisions, species will still be listed as endangered or threatened, critical habitat designated, 4(d) rules issued, and Section 7 consultations undertaken. Plaintiffs' speculative fear that conceivably a future application of the new rules may yield a different, less protective outcome (in their view) for a given species somewhere across the country falls far short of establishing that their injury is imminent or concrete. *Summers*, 555 U.S. at 495 (injury is not concrete or imminent in facial challenge to generally applicable regulation where regulation covered more than 190 million acres and in absence of application of the regulation it was impossible to tell which projects were allegedly unlawful).[13] This speculative chain exists for each of the challenged regulations.[14]

[13] Nor can Plaintiffs avoid this result by alleging broad-based memberships across the country, or in the case of the States, that ESA-listed species are found in each of the Plaintiff States. The Supreme Court has held that reliance on the statistical probability of injury cannot substitute for specific allegations of harm necessary to sustain standing. *Summers*, 555 U.S. at 497-98.

[14] Plaintiffs' complaints lump together their challenges to the three regulations. The challenged regulations, however, are separate agency actions, promulgated in three distinct rulemakings. Accordingly, Plaintiffs must establish standing to challenge each regulation independently. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (plaintiff must establish standing

1    For example, the parties are particularly focused on revisions to the Blanket 4(d) Rule.

2    States Compl. ¶ 120; ALDF Compl. ¶¶ 49-50.  To establish standing, Plaintiffs presume: (1)

3    FWS will list some unidentified species as threatened in the future;[15] (2) the species will be

4    found at a location that Plaintiffs use, enjoy, or regulate; (3) FWS will fail to issue a species-

5    specific 4(d) rule at the time of that listing; and (4) a plaintiff member or State has an interest in

6    that particular species and their interest would actually be impacted by the lack of a 4(d) rule.

7    Only in that instance could there be some change caused by the revised 4(d) regulation and, thus,

8    a conceivable harm to a member or State.  Not only is the causal chain lengthy and tenuous, it

9    runs counter to FWS' expressed intent to issue species-specific 4(d) rules concurrent with

10   threatened listings.  84 Fed. Reg. 44753 ("we intend to finalize the species-specific rule

11   concurrent with the final listing or reclassification determination.").  And any presumption that

12   FWS will act contrary to this stated intent is not supportable.  *See Sullivan v. Everhart*, 494 U.S.

13   83, 94 (1990) ("Respondents' fear of intentional manipulation" by an agency "can be entirely

14   dismissed if this provision is observed in good faith – as we must presume, in this facial

15   challenge, it will be." ).  If FWS issues a species-specific rule concurrent with listing a new

16   threatened species, Plaintiffs will suffer no harm from the revised 4(d) regulation whatsoever.

17   Indeed, this scenario already played out.  On November 21, 2019, FWS listed the

18   meltwater lednian stonefly and the western glacier stonefly as threatened species utilizing their

19   new regulations.  84 Fed. Reg. 64210 (Nov. 21, 2019).  And, as FWS indicated in the revised

20   4(d) regulation, FWS concurrently issued a species-specific 4(d) rule extending Section 9

21   protections and prohibitions to these stoneflies.  *Id.* at 64224 ("This 4(d) rule will provide for the

---

22
23   separately for each claim he seeks to press).  Thus, even if Plaintiffs could establish standing for
     a challenge to one of the rulemakings, that would not be sufficient for standing as to all three
24   rules.

25   [15] By definition, the 4(d) regulation applies only to threatened species listed by FWS.  So
26   Plaintiffs cannot plausibly allege harm from the 4(d) regulation based on alleged effects to any
     endangered species, or to threatened species under NMFS jurisdiction, which always have
27   proceeded through species-specific 4(d) rules.

conservation of the western glacier stonefly and meltwater lednian stonefly by prohibiting the following activities, except as otherwise authorized or permitted: Importing or exporting; take; possession and other acts with unlawfully taken specimens; delivering, receiving, transporting, or shipping in interstate or foreign commerce in the course of commercial activity; or selling or offering for sale in interstate or foreign commerce.").  That is, not only were these species listed as threatened, but they were also afforded the same protections of Section 9 just as if the Blanket 4(d) Rule were still in effect.  To the extent any Plaintiff had an interest in these species and was planning to visit this specific location in Montana, there is no injury-in-fact from the revised 4(d) regulations.  The mechanism for protection under 4(d) is slightly different, but the interest in species protection remains in exactly the same spot.  Speculating on future harms, contrary to the agencies' stated rationale and demonstrated action, comes nowhere near the showing required for concrete and imminent harm.  *Defenders of Wildlife*, 504 U.S. at 562-64 (plaintiffs failed to demonstrate injury-in-fact to mount facial challenge to ESA Section 7 consultation regulations because, *inter alia*, plaintiffs failed to show imminent injury to their own interests); *Summers*, 555 U.S. at 495 (no concrete harm where it is impossible to tell without further specification which particular applications of the regulations are allegedly unlawful).

Plaintiffs fare no better in their challenges to the ESA Section 4 listing and critical habitat regulations.  Once again Plaintiffs must speculate that (1) sometime in the future, a yet-to-be identified species, (2) is located in some area of the country that Plaintiffs use, enjoy, or regulate, (3) will not be listed, listed as threatened rather than endangered, or have less critical habitat designated, (4) because of application of some part of the challenged regulations that Plaintiffs believe to be unlawful, as opposed to the myriad of other legal or biological factors that could lead to the same result, and (5) that a plaintiff member or State has an actual interest in the particular species that is impacted by the change of regulations.  Again, it is impossible to tell from the bare bones allegations if, where, how, or when any of the Plaintiffs would be affected by the Section 4 regulations at all.

The closest any Plaintiff comes to raising a factual, as opposed to conclusory allegation, is CBD's contention that "by *requiring* that economic analyses be prepared before any species may be listed, the regulations require the Center . . . to spend resources addressing economic considerations that under the prior regulatory regime and the statute itself have no role in the Service's listing process." CBD Compl. ¶ 15 (emphasis added).[16]  But this is inadequate as well. As an initial matter, the assertion is factually wrong.  The relevant regulatory provision provides: "The Secretary shall make any determination required by paragraphs (c), (d), (e) of this section *solely* on the basis of the best available scientific and commercial information regarding a species' status." 84 Fed. Reg. 45052 (emphasis added).  It says nothing of "required" economic data collection, much less require CBD or any other non-federal entity to do anything.[17]    In any event, the CBD Plaintiffs would not be harmed under their theory unless (1) the Services collected economic information, and (2) this information actually influenced or changed the outcome so that a species was not listed under the ESA.  That is, their alleged harm could only occur if the Services ignored their own revised regulation and the Act.  This "theory of *future injury*" is far too speculative to show a threatened injury that is "certainly impending" or a "substantial risk that the harm will occur." *Clapper*, 568 U.S. at 401, 414 n.5.

---

[16] To the extent Plaintiffs are alleging harm to CBD's organization by voluntarily choosing to expend resources in the context of future administrative actions, Plaintiffs' theory fails.  They cannot show that such expenditures are imminent, as discussed below.  Nor would such abstract expenditures translate to a cognizable organizational harm. *Food & Water Watch v. Vilsack*, 808 F.3d 905, 921 (D.C. Cir. 2015) (organization alleged that it would spend resources educating its members and the public about the agency's action, but did not provide evidence that its 'organizational activities have been perceptibly impaired in any way.'"); *El Rescate Legal Servs. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991) (organization suffers an injury-in-fact when "defendants' 'practices have perceptibly impaired [the plaintiff's] ability to provide'" the services it was formed to provide).

[17] The preamble does discuss the possibility of economic data collection to inform the public, but it also makes clear that any listing determination must be made solely on the best available science and data, as required by the statute.  84 Fed. Reg. 45024 ("the Act does not prohibit the Services from compiling economic information or presenting that information to the public, as long as such information does not influence the listing determination.").

Similar deficiencies pervade the Section 7(a)(2) allegations.  Plaintiffs assert they may be harmed by the Services' application of the revised regulations in a future Section 7(a)(2) consultation.  CBD Compl. ¶¶ 74-93.  Once again, this alleged harm is entirely premised on speculation and future contingencies.  First, Plaintiffs identify no ESA consultation that has or imminently will apply the ESA regulations in a way that could possibly impact their concrete interests.  Second, the assertions of harm presume that application of the revised regulations will change the outcome of ESA consultations in a manner that is detrimental to a listed species (thus feeding Plaintiffs' speculation that they will be harmed at some indeterminate point in the future).  This presumption is incorrect.  If, for example, application of the revisions does not change the result (*e.g.,* jeopardy to no-jeopardy), then there is no concrete effect on the listed species and no harm to Plaintiffs.  Or Plaintiffs may even agree with the result of the consultation and thus could not claim to be harmed.  *See, e.g., United States v. Oregon,* 68-cv-00513-MO (D. Oregon), ECF No. 2607 at 3-4 (Feb. 26, 2018) (States of Oregon and Washington supporting and relying upon FWS and NMFS consultations in a joint motion).  Third, it also presumes the errant consultation will involve a species in an area of the country they use, enjoy, or regulate, and that their interest in that species actually will be impacted.

And fourth, even assuming that a change in the Section 7(a)(2) determination occurs, there is still a complete legal break in the causal chain.  The Services provide their biological opinion to the action agency, but ultimately it is the action agency's substantive duty to avoid jeopardizing a listed species.  50 C.F.R. § 402.15.  Once the action agency receives a biological opinion from one of the Services, it then makes its own determination about how to proceed with the proposed action.  *Id.* § 402.15(a); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415-16 (9th Cir. 1990).  As relevant here, even assuming the Services applied the revised regulations in a manner that changes the outcome of the consultation, it is still the action agency's duty to avoid jeopardizing the listed species of concern to Plaintiffs.  *Id.*; 16 U.S.C. § 1536(a)(2) ("Each federal agency shall . . . insure that any action . . . is not likely to jeopardize . . . .").  Because any harm to species and derivative harm to Plaintiffs is contingent

on the actions of independent third parties, Plaintiffs have a heightened burden to demonstrate standing, which they fail to meet. *See Defenders of Wildlife*, 504 U.S. at 560.

Nor does Plaintiffs' invocation of procedural injury with respect to the NEPA and APA notice-and-comment claims, or CBD's ESA failure-to-consult claim, carry this burden. CBD Compl. ¶¶ 106, 128 (APA and ESA claims); ALDF Compl. ¶ 103 (NEPA claim); States Compl. ¶ 122 (NEPA claim). While these type of challenges can give rise to procedural injury in appropriate circumstances, the Supreme Court and Ninth Circuit have been clear that assertions of procedural harm without any tie to an affected concrete interest do not establish injury-in-fact. *Summers*, 555 U.S. at 496 ("But deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."); *Wilderness Soc'y v. Rey*, 622 F.3d 1251, 1260 (9th Cir. 2010). It is not enough to merely allege an interest in ESA-listed species and reference an attendant procedure; there must be "concrete application of those regulations." *Summers*, 55 U.S. at 490. Thus, Plaintiffs must set forth an interest in at least one ESA-listed species that is concretely affected by the revised regulations to establish sufficient particularity. But, like the deficiencies in *Wilderness Society*, and *Summers*, there is no "concrete and particular project . . . connected to the procedural loss." *Wilderness Society*, 622 F.3d at 1260; *Summers*, 555 U.S. at 496-97. [18]

---

[18] Nor does the States' reliance on *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) save their case. States Compl. ¶ 114. First, the ESA does not authorize the particular kind of pre-enforcement challenge at issue there, which was heavily relied upon by the Supreme Court to find for the States in that case. *Mass. v. EPA,* 549 U.S. at 520 ("Congress has moreover recognized a concomitant procedural right to challenge the rejection of its rulemaking petition as arbitrary and capricious. § 7607(b)(1)."). Moreover, nothing in *Mass. v. EPA* obviated the need to allege non-speculative facts to sustain standing. To the contrary, Massachusetts alleged very specific injuries to its coastal property. *Id*. at 522-523. Unlike the alleged ongoing harm from failing to act in *Mass. v. EPA*, here current status of ESA listed species does not change with the revisions. *Cf.* 549 U.S. at 522 (discussing the concrete injury to state territory from sea level rise). And, as shown above, the States' allegations of future injury are premised entirely on conjecture. Finally, to the extent the States assert harm to non ESA-listed species, the States are free to protect the vast majority of such species under State law. Any harm to those species is a

1    We are not arguing that Plaintiffs can never establish standing.  Plaintiffs may be able to

2    establish standing to challenge these regulatory revisions in the right case, *e.g.* where the

3    Services apply these revisions in a manner that concretely harms their interests.  But by bringing

4    facial challenges, in some cases before the regulations were even effective, Plaintiffs have quite

5    simply jumped the gun.  *See Bova v. City of Medford*, 564 F.3d 1093, 1096–97 (9th Cir. 2009)

6    (no standing where alleged injury was contingent upon future events that may not occur).

7    At bottom, Plaintiffs seek to establish standing based on pure generalized grievances—

8    *i.e.*, their dissatisfaction with the regulatory actions of the Services.  But predicating jurisdiction

9    on diffuse, non-specific, generalized harms runs contrary to binding precedent.  *Defenders of*

10   *Wildlife*, 504 U.S. at 560, 573-77 ("generalized grievance[s]" are not akin to the invasion of a

11   "legally protected" interest that is "concrete and imminent"); *Schlesinger v. Reservists Comm. To*

12   *Stop the War*, 418 U.S. 208, 220 (1974) ("[S]tanding to sue may not be predicated upon an

13   interest … held in common by all members of the public, because of the necessarily abstract

14   nature of the injury all citizens share.").  Plaintiffs lack standing and the Court should dismiss

15   these cases.

16   ## II.   PLAINTIFFS' CHALLENGES ALSO ARE NOT RIPE.

17   An Article III case or controversy requires both standing, "which concerns *who* may

18   bring suit," and ripeness, "which concerns *when* a litigant may bring suit."  *Habeas Corpus*

19   *Resource Center v. U.S. Department of Justice*, 816 F.3d 1241, 1247 (9th Cir. 2016).  Ripeness

20   requires "fitness of the issues" for judicial resolution and "hardship to the parties" from

21   withholding judicial review.  *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49 (1967).  In

22   many cases, including this one, constitutional ripeness "coincides squarely with standing's injury

23   in fact prong."  *Thomas v. Anchorage Equal Rights Commission*, 220 F.3d 1134, 1138 (9th Cir.

24   2000) (*en banc*).

25   

26   product of their own action or inaction, and a litigant cannot self-inflict injury to establish

27   standing.  *Clapper*, 568 U.S. at 417-18.

By bringing facial challenges, Plaintiffs seek "pre-enforcement review" of the revised regulations.  This means "the litigant challenges regulations anticipating that an administrative agency [here the Services] will, in the near future, apply those regulations in a manner that will harm the litigant's interests."  *Habeas Corpus*, 816 F.3d at 1252.  Pre-enforcement review is occasionally permissible if the regulations can immediately affect "primary conduct," *i.e.,* choosing between compliance or penalties.  *Id.*  But those circumstances are not present in this case.  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) ("a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the [Administrative Procedure Act (APA)] until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.") (brackets in original) (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 891 (1990)).

In *Habeas Corpus,* the Ninth Circuit encountered a similar request for pre-enforcement review of generally applicable Department of Justice regulations that simply set forth criteria and procedures for future administrative processes, but were not immediately applicable to the litigants.  816 F.3d at 1248-51.  The Ninth Circuit found that standing was lacking and that the challenges to the regulations were not ripe.  *Id.* at 1248.  In analyzing ripeness, the Ninth Circuit evaluated three factors: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented."  *Id.* at 1252 (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998).  The Ninth Circuit found that the pre-enforcement challenge did not meet any of the *Ohio Forestry* factors.  The same holds true here.

As to hardship, the revised regulations apply only to the Services and other federal agencies, not Plaintiffs.  The regulations also are prospective and therefore do not cause Plaintiffs hardship.  All of FWS' currently listed threatened species retain the protections of the

1    Blanket 4(d) Rule; all existing critical habitat designations remain the same; and all completed

2    Section 7(a)(2) consultations remain the same.  *See supra* 18.  As in *Habeas Corpus*, where the

3    litigants faced uncertainty with new criteria and procedures, delayed judicial review here is

4    unlikely to cause hardship even if Plaintiffs may have to change some minor aspects of their

5    approach to wildlife and conservation.  816 F.3d at 1253.  Uncertainty is not enough.  *Nat'l Park*

6    *Hosp. Ass'n*, 538 U.S. at 811 ("Petitioner's argument appears to be that mere uncertainty as to the

7    validity of a legal rule constitutes a hardship for purposes of the ripeness analysis. We are not

8    persuaded.").

9         With respect to the second factor, judicial review would certainly interfere with

10   application of the revised regulations.  The Services are charged with implementation of the

11   ESA, and they should be given an opportunity to determine precisely how the regulations will be

12   applied.  For example, if the Services were presented with a petition to list a certain species from

13   the CBD Plaintiffs, *see* CBD Compl. ¶ 14 (referencing their practice of filing petitions), the

14   Services would apply the now-codified approach of "foreseeable future" in evaluating species for

15   threatened status.  50 C.F.R. § 424.11(d).  As the revised regulations make clear, this will be

16   done on a case-by-case basis and will involve an inherently species-specific scientific inquiry.

17   84 Fed. Reg. 45040, 45031-32 (noting the need for species-specific foreseeable future inquiry

18   due to the multiple variables and factors affecting any individual species.  The "foreseeable

19   future" inquiry and analysis would occur, but it is difficult to predict how that would shape a

20   listing decision in the abstract.  If this Court steps in now to dictate how the Services—the

21   agencies charged with protecting ESA-listed species—should apply that definition and, more

22   broadly, their revised regulations, it will deny the opportunity for these issues to "sort themselves

23   out" prior to judicial review.  *Habeas Corpus*, 816 F.3d at 1254; *see also Safer Chemicals,*

24   *Healthy Families v. EPA*, --F.3d--, 2019 WL 5997404, at *10 (9th Cir. Nov. 14, 2019) (finding a

25   challenge to specific regulations unripe because there was uncertainty how the regulatory

26   provision would be applied: "Because of the ambiguity in the rules, we cannot predict whether

27

Petitioners will be harmed in the way they claim, or whether the Agency will in fact apply these rules as Petitioners wish.").

Finally, courts would benefit from further factual refinement. All of Plaintiffs' grievances turn on the Services' future application of the revisions. *See, e.g.,* States Compl. ¶ 119. But how the Services conduct their analyses, interpret certain provisions, and make specific findings, will largely determine if an administrative process runs afoul of "full compliance with the ESA's plain language." *Id.* Take as an example the issue of a "not prudent" critical habitat determination. The statute requires that, "to the maximum extent prudent and determinable," the Services designate critical habitat concurrent with listing any species. 16 U.S.C. § 1533(a)(3)(A). Although the Services rarely find that designating critical habitat is not prudent, *see* 84 Fed. Reg. 45040, if the Services applied the revised, non-exhaustive list and made a "not prudent" finding, a court could examine those findings to evaluate whether the determination runs afoul of the Act's plain language. The Services' factual findings and supporting rationale are indispensable for this type of statutory judicial review.[19] Otherwise the Court is left with "abstract disagreements over administrative policies that the ripeness doctrine seeks to avoid." *Ohio Forestry*, 523 U.S. at 736. Allowing the Services to make that finding will undeniably provide important definition and context thereby facilitating meaningful judicial review.

Plaintiffs have chosen to challenge these regulations without awaiting any application of the regulations. However, without findings, facts, and context of how the regulations will be applied, this Court cannot possibly envision all possible scenarios where the revisions may be valid, as is required with facial challenges. And, in the interim, there is no hardship to Plaintiffs from these revised regulations. If the Services apply these revised regulations in a way that

---

[19] For example, with respect to an imperiled species that is sought after by poachers, designating critical habitat would reveal the location of that species. In that circumstance, designating critical habitat might not be prudent because detailing the location of a critically endangered species might make it vulnerable to poachers. If the not-prudent finding were challenged, a court would need to be able to consider the facts regarding the scale of collection of the species and the extent to which a critical habitat designation would reveal to potential poachers location information that is not already available through other means.

actually causes concrete harm to these Plaintiffs, judicial review would be far better served by examining that particular case or controversy.  That, in fact, is what Article III demands. Plaintiffs' claims are not ripe and should be dismissed.

## **CONCLUSION**

For the reasons stated above, the Court should grant Federal Defendants' motions and dismiss Plaintiffs' complaints for lack of subject-matter jurisdiction.

DATED: December 6, 2019.

<div style="margin-left:40%">

JEAN E. WILLIAMS,
Deputy Assistant Attorney General
SETH M. BARSKY, Chief
MEREDITH FLAX, Assistant Chief

*/s/ Coby Howell.*
COBY HOWELL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
1000 S.W. Third Avenue
Portland, OR 97204
Phone: (503) 727-1023
Fax: (503) 727-1117
Email: coby.howell@usdoj.gov

*Attorneys for Federal Defendants*

</div>

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (Oakland)

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ET AL., | Case. No. 4:19-cv-05206-JST |
| Plaintiffs, | |
| vs. | **CERTIFICATE OF SERVICE** |
| DAVID BERNHARDT, ET AL., | |
| Federal Defendants. | |

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.


*/s/ Coby Howell*
COBY HOWELL, Senior Attorney