DAMIEN M. SCHIFF, No. 235101
Email: dschiff@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

JONATHAN WOOD, No. 285229
Email: jwood@pacificlegal.org
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201-5330
Telephone: (202) 888-6881
Facsimile: (916) 419-7747

Attorneys for Proposed Defendant-Intervenors

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>DAVID BERNHARDT, U.S. Secretary of the Interior, et al.,<br><br>Defendants,<br><br>and<br><br>KENNETH KLEMM; BEAVER CREEK BUFFALO CO.; WASHINGTON CATTLEMEN'S ASSOCIATION; and PACIFIC LEGAL FOUNDATION,<br><br>Proposed Defendant-Intervenors. | No. 4:19-cv-05206-JST<br><br>**NOTICE OF MOTION AND MOTION TO INTERVENE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT (FRCP 24)**<br><br>Date:  February 26, 2020<br>Time:  2:00 p.m.<br>Place: Courtroom 6 – 2nd Floor<br>Judge: Honorable Jon S. Tigar |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on Wednesday, February 26, 2020, at 2:00 p.m., or as soon thereafter as may be heard by this Court, Proposed Defendant-Intervenors Kenneth Klemm, Beaver Creek Buffalo Co., Washington Cattlemen's Association, and Pacific Legal Foundation ("Applicants") move for leave to intervene in this action.

Applicants hereby move this Court for an order to intervene as defendants in this action as a matter of right pursuant to Federal Rule of Civil Procedure 24(a). In the alternative, they request leave to intervene by permission pursuant to Federal Rule of Civil Procedure 24(b).

Counsel for Applicants contacted the existing parties to determine their positions on this motion and were informed that they would not be able to provide a position until they reviewed it.

The motion is based on this notice of motion and motion to intervene; the accompanying memorandum of points and authorities; the declarations submitted with this motion; the documents previously filed in this action; and any other material the Court may consider in the briefing and oral argument of this matter.

# Table of Contents

**Page**

Table of Authorities ........................................................................................... iii

Memorandum of Points and Authorities ........................................................ 1

Introduction ......................................................................................................... 1

Applicants ............................................................................................................ 2

Background .......................................................................................................... 4

Argument ........................................................................................................... 11

   I.    Applicants Satisfy Rule 24(a) and Should Be
        Granted Intervention as of Right ..................................................... 11

      A.   Applicants' Motion to Intervene Is Timely ................................. 12

      B.   Applicants Have an Interest Relating to the Subject of This Litigation ....... 12

      C.   Disposition of This Case May Impair or Impede Applicants' Interests ........ 16

      D.   None of the Parties Adequately Represent Applicants' Interests ................. 17

  II.   In the Alternative, Applicants Satisfy the
        Standard for Permissive Intervention ............................................. 20

Conclusion ......................................................................................................... 21

# Table of Authorities

**Page**

## Cases

*Arakaki v. Cayetano,*
    324 F.3d 1078 (9th Cir. 2003)..................................................................................17

*Ariz. Cattle Growers' Ass'n v. Salazar,*
    606 F.3d 1160 (9th Cir. 2010).....................................................................................5

*Babbitt v. Sweet Home Chapter of Communities for a Great Or.,*
    515 U.S. 687 (1995).................................................................................................4-5

*Cal. Sea Urchin Comm'n v. Bean,*
    828 F.3d 1046 (9th Cir. 2016)..................................................................................14

*California ex rel. Lockyer v. United States,*
    450 F.3d 436 (9th Cir. 2006)........................................................................11-13, 16

*Californians for Safe & Competitive Dump Truck Transp. v. Mendonca,*
    152 F.3d 1184 (9th Cir. 1998)..................................................................................18

*Citizens for Balanced Use v. Montana Wilderness Ass'n,*
    647 F.3d 893 (9th Cir. 2011)..............................................................................12, 17

*Cty. of Fresno v. Andrus,*
    622 F.2d 436 (9th Cir. 1980)....................................................................................13

*Defenders of Wildlife v. Bernhardt,*
    No. 1:19-cv-1709 (D.D.C. Sept. 12, 2019)................................................................2

*Employee Staffing Servs. v. Aubry,*
    20 F.3d 1038 (9th Cir. 1994)....................................................................................20

*Fair Hous. of Marin v. Combs,*
    285 F.3d 899 (9th Cir. 2002)....................................................................................16

*Forest Conservation Council v. United States Forest Service,*
    66 F.3d 1489 (9th Cir. 1995)............................................................................14-15, 17

*Greene v. United States,*
    996 F.2d 973 (9th Cir. 1993)....................................................................................13

*Idaho Farm Bureau Fed'n v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995)....................................................................................15

*Kootenai Tribe of Idaho v. Veneman,*
   313 F.3d 1094 (9th Cir. 2002).............................................................................20

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
   624 F.3d 1083 (9th Cir. 2010).............................................................................16

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992).............................................................................................15

*Michigan v. EPA,*
   135 S. Ct. 2699 (2015).........................................................................................14

*Nuesse v. Camp,*
   385 F.2d 694 (D.C. Cir. 1967).............................................................................13

*Orange Cty. v. Air California,*
   799 F.2d 535 (9th Cir. 1986)...............................................................................20

*Permian Basin Petrol. Ass'n v. Dep't of Interior,*
   127 F. Supp. 3d 700 (W.D. Tex. 2015)..................................................................2

*Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria v.*
   *United States,* 921 F.2d 924 (9th Cir. 1990) .........................................................13

*SEC v. United States Realty & Improvement Co.,*
   310 U.S. 434 (1940).............................................................................................20

*Sierra Club v. EPA,*
   995 F.2d 1478 (9th Cir. 1993)..............................................................................13

*S.W. Center for Biological Diversity v. Berg,*
   268 F.3d 810 (9th Cir. 2001)...............................................................................16

*Tennessee Valley Authority v. Hill,*
   437 U.S. 153 (1978)...............................................................................................6

*Trbovich v. United Mine Workers of Am.,*
   404 U.S. 528 (1972).............................................................................................17

*United States v. Alisal Water Corp.,*
   370 F.3d 915 (9th Cir. 2004)...............................................................................12

*United States v. City of Los Angeles,*
   288 F.3d 391 (9th Cir. 2002)...............................................................................11

*Utah Ass'n of Counties v. Clinton,*
   255 F.3d 1246 (10th Cir. 2001).......................................................................17-19

*Weyerhaeuser Co. v. U.S. Fish and Wildlife Service,*
    139 S. Ct. 361 (2018)..................................................................................4-5, 9

*Wilderness Soc'y v. U.S. Forest Service,*
    630 F.3d 1173 (9th Cir. 2011)...............................................................11-12, 15

## Statutes

16 U.S.C. § 1532(5)..................................................................................................4-5

16 U.S.C. § 1532(19)...................................................................................................4

16 U.S.C. § 1533(a)(3)................................................................................................4

16 U.S.C. § 1533(a)(3)(B)...........................................................................................6

16 U.S.C. § 1533(d)..................................................................................................5, 8

16 U.S.C. § 1538.....................................................................................................4-5

## Regulation

50 C.F.R. § 17.31.......................................................................................................7

## Rules

Fed. R. Civ. P. 24........................................................................................................1

Fed. R. Civ. P. 24 advisory committee note to 1966 amendment..............................16

Fed. R. Civ. P. 24(a) ............................................................................................1, 11-12

Fed. R. Civ. P. 24(a)(2) ......................................................................................11-12, 15

Fed. R. Civ. P. 24(b) ...............................................................................................2, 20

Fed. R. Civ. P. 24(b)(2) ...............................................................................................20

## Other Authorities

81 Fed. Reg. 7414 (Feb. 11, 2016)...............................................................................7

83 Fed. Reg. 35,174 (July 25, 2018)..............................................................................8

83 Fed. Reg. 35,193 (July 25, 2018)..............................................................................9

84 Fed. Reg. 44,753 (Aug. 27, 2019) ...........................................................1, 7, 10, 13 18

84 Fed. Reg. 45,020 (Aug. 27, 2019) ......................................................................1, 10, 14

Congressional Research Service, *A Legislative History of the Endangered Species Act of 1973, as Amended in 1976, 1977, 1978, 1979, and 1980* (1982) ............................................................ 5

Lueck, Dean & Michael, Jeffrey A., *Preemptive Habitat Destruction under the Endangered Species Act*, 46 J.L. & Econ. 27 (2003) .............................. 6

Reilly, Amanda, *States drop suit as Trump admin reopens habitat rules*, E&E News (Mar. 16, 2018), https://www.eenews.net/stories/1060076609/ ........................................ 19

S. Rep. No. 93-307 (1973) ............................................................................ 5, 8

Schiff, Damien M., *Judicial Review Endangered: Decisions Not to Exclude Areas From Critical Habitat Should Be Reviewable Under the APA*, 47 Envtl. L. Rep. News & Analysis 10,352 (2017) .................................. 6

U.S. Fish and Wildlife Service, *Environmental Conservation Online System: Delisted Species*, https://ecos.fws.gov/ecp0/reports/delisting-report (last visited Dec. 6, 2019) ........................................................ 6

Western Association of Fish and Wildlife Agencies, *The 2018 Lesser Prairie-Chicken Range-wide Conservation Plan Annual Progress Report* (2019), https://www.wafwa.org/Documents%20and% 20Settings/37/Site%20Documents/Initiatives/Lesser%20Prairie%20 Chicken/Annual%20Reports/2018%20LPC%20RWP%20Annual%20 Report.pdf........................................................................................................ 2

Wood, Jonathan, *Take it to the Limit: The Illegal Regulation Prohibiting the Take of Any Threatened Species Under the Endangered Species Act*, 33 Pace Envtl. L. Rev. 23 (2015) .............................. 8, 18

1

2

**Memorandum of Points and Authorities**

**Introduction**

Pursuant to Federal Rule of Civil Procedure 24, Kenneth Klemm, Beaver Creek Buffalo Co., Washington Cattlemen's Association, and Pacific Legal Foundation (collectively, "Applicants") move to intervene to protect their interests at stake in this litigation.

Plaintiffs Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Natural Resources Defense Council, National Parks Conservation Association, WildEarth Guardians, and the Humane Society of the United States, challenge the U.S. Fish and Wildlife Service's and National Marine Fisheries Services' adoption of rules implementing the Endangered Species Act. *See* Compl. ¶ 3. Two of the challenged rules affect how private property is regulated under the act and, therefore, implicate Applicants' interests. One governs how the Fish and Wildlife Service regulates "take" of threatened species, those not currently endangered but at risk of becoming so in the foreseeable future. *See* Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44,753 (Aug. 27, 2019). The other clarifies when the Fish and Wildlife Service and National Marine Fisheries Service will designate areas as critical habitat for protected species. *See* Regulations for Listing Species and Designating Critical Habitat, 84 Fed. Reg. 45,020 (Aug. 27, 2019). Plaintiffs contend that both rules violate the Endangered Species Act and the Administrative Procedure Act.[1]

Applicants seek to intervene to defend these rules. They each have interests in the Endangered Species Act and its regulation of private property that would be affected by this lawsuit and that are not adequately represented by the existing parties. Therefore, they are entitled to intervention as of right. Fed. R. Civ. P. 24(a).

---

[1] These are not the only rules Plaintiffs challenge nor the only claims they raise. However, because the claims described above are those which would most affect Applicants' interests, they seek to intervene only to defend the merits of those claims.

Alternatively, Applicants move for permissive intervention. Fed. R. Civ. P. 24(b). Accordingly, the Motion to Intervene should be granted.

### Applicants

**Kenneth Klemm** is a Kansas landowner and bison rancher. Declaration of Kenneth Klemm ¶¶ 3-4. Believing that a healthy ecosystem promotes the health of his land and his business, Klemm manages his property to also benefit native wildlife by conserving and restoring habitat. *Id.* ¶¶ 6-8, 13. Thanks to these efforts, annual evaluations of rangeland health have shown sustained improvements to the health of the land.

The land is located within the range of the lesser prairie chicken, a species currently being considered for listing under the Endangered Species Act, [2] although the species does not currently occupy Klemm's land. *Id.* ¶ 10. The lesser prairie chicken was previously listed as threatened in 2014, but that decision was struck down for giving short shrift to voluntary conservation efforts intended to protect the species.[3] As a result of conservation efforts like Klemm's, the species' population doubled from 2013 to 2018.[4] Critical to the continuation of this progress is the maintenance of landowners' incentives to conserve and improve lesser prairie chicken habitat. *See* Declaration of Kenneth Klemm ¶ 13.

Klemm is also the chairman of the National Bison Association's Conservation Committee, in which capacity he encourages conservation efforts among the group's

---

[2] *See* Dkt. No. 6 at 2, *Defenders of Wildlife v. Bernhardt*, No. 1:19-cv-1709 (D.D.C. Sept. 12, 2019) (setting a deadline for a decision whether to propose the lesser prairie chicken's listing).

[3] *See Permian Basin Petrol. Ass'n v. Dep't of Interior*, 127 F. Supp. 3d 700 (W.D. Tex. 2015).

[4] *See* Western Association of Fish and Wildlife Agencies, *The 2018 Lesser Prairie-Chicken Range-wide Conservation Plan Annual Progress Report* (2019), https://www.wafwa.org/Documents%20and%20Settings/37/Site%20Documents/Initiatives/Lesser%20Prairie%20Chicken/Annual%20Reports/2018%20LPC%20RWP%20Annual%20Report.pdf.

members and in concert with conservation groups. *Id.* ¶¶ 9, 15. The organization has more than 1,000 members in all 50 states and around the world, many of whom own properties that provide habitat to endangered and threatened species. *Id.* As the committee's chair, Klemm encourages members to adopt conservation management plans like that Klemm follows on his property. *Id.* Respecting property rights and individual liberty, he advocates voluntary conservation efforts, which also promote greater innovation and creativity. *Id.*

**Beaver Creek Buffalo Co.** is a bison-ranching business operated by Klemm and a partner that holds lease rights to 4,000 acres, including land within the range of species being considered for listing under the Endangered Species Act. *Id.* ¶¶ 4-5. This land, too, is managed to benefit native wildlife under a conservation management plan. *Id.* ¶¶ 6-8. As a for-profit business, the company is sensitive to regulation that increases the costs of its ranching and conservation activities. *Id.* ¶ 14. For instance, regulation of take and critical habitat increase Beaver Creek's operating costs, as well as raising risks that the business and those involved in it will face significant civil and criminal penalties for inadvertently violating regulations. *Id.*

**Washington Cattlemen's Association** is a non-profit trade organization that represents over 1,300 cattlemen and landowners throughout the State of Washington. Declaration of Toni Meacham ¶ 4. In addition to operating their businesses, these landowners provide habitat to listed species and species being considered for listing under the Endangered Species Act. *Id.* ¶¶ 5-7, 13. As a result, these members are significantly burdened by Endangered Species Act regulations, including the treatment of common land use activities as "take" if they inadvertently disturb or harm listed species. *Id.* ¶¶ 6, 13, 15. Likewise, designation of members' land as critical habitat increases permitting burdens, mitigation requirements, and other costs. *Id.* ¶¶ 7, 13.

To advance its members' business and conservation interests, the association filed a rulemaking petition in 2016 urging the Fish and Wildlife Service to repeal the

blanket take prohibition for threatened species, on the grounds that it exceeded the agency's authority and undermined incentives to conserve species. *Id.* ¶¶ 8-10, 14. The agency responded to this petition by adopting the challenged 4(d) rule. *Id.* ¶ 11.

**Pacific Legal Foundation** (PLF) is a donor-supported, non-profit with a mission to protect individual liberty, property rights, and to promote limited government. Declaration of Todd Gaziano ¶¶ 4, 14. To further this mission, PLF has long advocated reforms to the Endangered Species Act to increase respect for property rights and individual liberty. *Id.* ¶¶ 5-6, 10, 14. PLF represented the Washington Cattlemen's Association in their petition urging the repeal of the illegal and counterproductive blanket prohibition on take of threatened species. *Id.* ¶¶ 9, 14. PLF also filed comments urging the adoption of the proposed rule. *Id.* ¶ 11. PLF represented pro bono most of the landowners in *Weyerhaeuser Co. v. U.S. Fish and Wildlife Service*, 139 S. Ct. 361 (2018), challenging the excessive designation of unoccupied areas as critical habitat. Declaration of Todd Gaziano ¶¶ 12, 16. PLF has also generated substantial scholarly research on these issues and advocated these reforms in congressional testimony and other forms of advocacy. *Id.* ¶¶ 7-10, 15.

## Background

*The Endangered Species Act*

The Endangered Species Act charges the Fish and Wildlife Service and National Marine Fisheries Service with the protection and recovery of endangered and threatened species. Private property is regulated under the statute through a broad prohibition on the "take" of endangered species and the designation of "critical habitat." 16 U.S.C. § 1532(5) (defining critical habitat); *id.* § 1532(19) (defining take); *id.* § 1533(a)(3) (providing for the designation of critical habitat); *id.* § 1538 (prohibiting take of endangered species).

Take is defined broadly to include not only intentional actions to harm or capture species, but also common land use activities that inadvertently affect species or their habitats. *See Babbitt v. Sweet Home Chapter of Communities for a Great Or.,*

1   515 U.S. 687, 696-704 (1995). Recognizing the take prohibition's stringency, Congress

2   limited its application to endangered species, explaining that it should "be absolutely

3   enforced *only* for those species on the brink of extinction." Congressional Research

4   Service, A Legislative History of the Endangered Species Act of 1973, as Amended in

5   1976, 1977, 1978, 1979, and 1980 at 358 (1982) (statement of Sen. Tunney). *See* 16

6   U.S.C. § 1538 (prohibiting take of only "with respect to any endangered species").

7       The prohibition could be extended to threatened species—those not yet

8   endangered but at risk of becoming so in the foreseeable future—but only if necessary

9   and advisable for the protection of that species. 16 U.S.C. § 1533(d); S. Rep. No. 93-

10   307, at 8 (1973) ("[O]nce he has listed a species of fish or wildlife as a threatened

11   species," the Secretary may prohibit take "as to the particular threatened species.").

12   But take of such species would presumptively be unregulated because Congress

13   wished for states to take the lead on regulating these species. Congressional Research

14   Service, A Legislative History of the Endangered Species Act of 1973, as Amended in

15   1976, 1977, 1978, 1979, and 1980 at 358 (statement of Sen. Tunney) ("States . . . are

16   encouraged to use their discretion to promote the recovery of threatened species . . .").

17       Designation of critical habitat triggers additional scrutiny and regulation

18   should the use of designated property require federal funding or approval, such as

19   development that requires a Clean Water Act permit. *See, e.g.*, *Weyerhaeuser*, 139 S.

20   Ct. at 366. Areas occupied by a species at the time of listing can be designated as

21   critical habitat if they contain the physical or biological features essential to the

22   conservation of the species and which may require special management considerations

23   or protection. 16 U.S.C. § 1532(5). The statute imposes a "more onerous procedure on

24   the designation of unoccupied areas." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d

25   1160, 1163 (9th Cir. 2010). For these areas, the specific site must be essential for the

26   conservation of the species, as opposed to merely containing the types of features

27   essential to that conservation. 16 U.S.C. § 1532(5).

28   ///

After the Supreme Court held in *Tennessee Valley Authority v. Hill* that the Endangered Species Act eschews consideration of economic impacts and requires regulation "whatever the cost," 437 U.S. 153, 184 (1978), Congress amended the statute to explicitly require consideration of the costs and benefits of designating critical habitat. *See* Damien M. Schiff, *Judicial Review Endangered: Decisions Not to Exclude Areas From Critical Habitat Should Be Reviewable Under the APA*, 47 Envtl. L. Rep. News & Analysis 10,352, 10,355-56 (2017). Thus, today, critical habitat can only be designated "after taking into consideration the economic impact," and may exclude areas where "the benefits of such exclusion outweigh the benefits of [inclusion], unless . . . the failure to designate such area as critical habitat will result in the extinction of the species concerned." 16 U.S.C. § 1533(a)(3)(B)

Because the Endangered Species Act imposes significant burdens on private landowners, it has long been recognized to create perverse incentives for such landowners. For instance, studies have found that take regulation encourages landowners to preemptively destroy habitat, to avoid the burdens that would be imposed if species were accommodated. *See* Dean Lueck & Jeffrey A. Michael, *Preemptive Habitat Destruction under the Endangered Species Act*, 46 J.L. & Econ. 27 (2003). Likewise, the requirements for costly and time-consuming permits for activities involving protected species, including activities intended to benefit those species, can discourage voluntary conservation. The lack of any positive incentive to counteract these perverse incentives has led to a recovery rate for listed species of less than 2% during the 46 years since the Endangered Species Act was enacted. *See* U.S. Fish and Wildlife Service, *Environmental Conservation Online System: Delisted Species*, https://ecos.fws.gov/ecp0/reports/delisting-report (last visited Dec. 6, 2019).

*Prior Endangered Species Act regulations*

In 1975, the Fish and Wildlife Service issued a regulation, commonly known as the "blanket 4(d) rule," that prohibited the take of all threatened species, including any subsequently listed, unless the agency issued a separate rule to relax the

1  prohibition for a particular species. 50 C.F.R. § 17.31 (now amended to exclude species
2  listed after September 26, 2019). Under that regulation, endangered and threatened
3  species were generally regulated the same, despite the differences in the threats they
4  face and despite Congress's choice to explicitly distinguish between these two
5  categories for purposes of regulating take. The National Marine Fisheries Service has
6  never had a rule like the blanket 4(d) rule, following instead the statute's approach of
7  leaving take of threatened species unregulated unless it determines that such
8  regulation is necessary and advisable for the conservation of the particular species.
9  84 Fed. Reg. at 44,753.

10      Prior to 2016, both the Fish and Wildlife Service and National Marine Fisheries
11  Service determined critical habitat by considering occupied areas before turning to
12  unoccupied areas, designating the latter only if the former was insufficient for the
13  conservation of the species. In 2016, the agencies eliminated this rule. *See*
14  Implementing Changes to the Regulations for Designating Critical Habitat, 81 Fed.
15  Reg. 7414 (Feb. 11, 2016). Under the 2016 regulations, unoccupied areas were more
16  likely to be designated than ever before because, among other things, the agencies
17  took the position that unoccupied areas could be "essential" even if they lacked the
18  physical and biological features necessary for the species to be able to occupy the area,
19  there was no reasonable likelihood the area would develop such features and that such
20  features would never exist in quantities necessary for the area to serve an essential
21  role in the species' conservation. *Id*. at 7420.

22  *Washington Cattlemen's rulemaking petition*

23      On August 10, 2016, Washington Cattlemen filed a rulemaking petition with
24  the Fish and Wildlife Service urging the repeal of the blanket 4(d) rule. *See*
25  Washington Cattlemen's Association's Petition to Repeal 50 C.F.R. § 17.31
26  (reproduced at Meacham Declaration Att. 1). That petition explained that the rule
27  exceeded the Fish and Wildlife Service's authority under the ESA, which only
28  authorizes take of threatened species to be regulated after a determination that such

regulation is necessary and advisable for the particular species. *See id.* at 9-13. *See also* 16 U.S.C. § 1533(d); S. Rep. No. 93-307, at 8. This interpretation is compelled by the text of the statute, the overall statutory scheme, and legislative history. *See* Meacham Declaration Att. 1 at 9-13. *See also* Jonathan Wood, *Take it to the Limit: The Illegal Regulation Prohibiting the Take of Any Threatened Species Under the Endangered Species Act*, 33 Pace Envtl. L. Rev. 23, 47-52 (2015).

The petition also urged the reform on conservation grounds, explaining that the blanket 4(d) rule undermined species recovery. Meacham Declaration Att. 1 at 3-9. The blanket 4(d) rule compounded the Endangered Species Act's incentive problems, by denying private landowners any reward for the recovery of endangered species. *Id.* at 7. This is because, even where landowners successfully recovered endangered species to the point that they could be upgraded to threatened, the same burdensome regulations would continue to apply. *Id.* Likewise, the blanket 4(d) rule eliminated any downside to landowners from allowing threatened species to decline to the point that they became endangered. *Id.* Under the statute's approach, in contrast, regulations loosen as species recover and tighten as they decline, better aligning the incentives of private landowners with the interests of rare species.

*Proposed rules*

In response to Washington Cattlemen's Petition, the Fish and Wildlife Service proposed to repeal the blanket 4(d) rule, at least for those species listed in the future. Meacham Declaration ¶ 11. Under the proposed rule, all species currently listed as threatened would remain regulated by it absent further rulemaking for that species. *See* Proposed Revision for the Regulations for Prohibitions to Threatened Wildlife and Plants, 83 Fed. Reg. 35,174 (July 25, 2018). But all species listed as threatened in the future, including those upgraded from endangered to threatened, would not be subject to the blanket rule. *See id.* Instead, take of these species would be regulated only if and to the extent the agency determined necessary and advisable for that species, as reflected in a species-specific regulation. *See id.*

1   The Fish and Wildlife Service and National Marine Fisheries Service also
2   proposed to revise their regulations for designating critical habitat by restoring the
3   preference for considering all occupied areas before turning to unoccupied areas. *See*
4   Proposed Revision of the Regulations for Listing Species and Designating Critical
5   Habitat, 83 Fed. Reg. 35,193 (July 25, 2018). The agencies also proposed to limit the
6   designation of unoccupied areas to situations where there is a reasonable likelihood
7   that the area will contribute to the species' conservation, reasoning that this better
8   reflected the statute's requirement that an unoccupied area be essential for
9   conservation than did the 2016 regulation. *Id*. at 35,198. This would include an
10   analysis of whether a private landowner was interested in investing substantial
11   resources to restore an unoccupied area as habitat for a species. *Id*.

12   *Weyerhaeuser v. U.S. Fish and Wildlife Service*

13   On November 27, 2018, the Supreme Court decided *Weyerhaeuser v. U.S. Fish*
14   *and Wildlife Service*, holding unanimously that the Endangered Species Act limits the
15   designation of "critical habitat" to areas that currently constitute habitat. 139 S. Ct.
16   at 368-69. In that case, the Fish and Wildlife Service designated 1,500 acres of private
17   property as critical habitat for the dusky gopher frog even though the frog did not live
18   there and couldn't unless the land was substantially modified. *Id*. at 366. The Fish
19   and Wildlife Service also determined that the designation could cost the landowner as
20   much as $33.9 million in lost development, making it unlikely he would respond
21   favorably to the suggestions that he invest significant additional resources to modify
22   his land for the frog's benefit. *Id*. at 366-67.

23   *Final Rules*

24   On August 27, 2019, the Fish and Wildlife Service finalized the prospective
25   repeal of the blanket 4(d) rule, as proposed. Under the new rule, take of species listed
26   as threatened going forward will be regulated only if and to the extent that the Fish
27   and Wildlife Service determines it necessary and advisable for the conservation of that
28   species and issues a regulation to that effect. *See* Regulations for Prohibitions to

1    Threatened Wildlife and Plants, 84 Fed. Reg. 44,753 (Aug. 27, 2019). In finalizing the

2    rule, the Fish and Wildlife Service acknowledged that it expects the rule will better

3    incentivize private landowners to conserve and recover species. *See id.* at 44,755,

4    44,757.

5         The Fish and Wildlife Service and National Marine Fisheries Service also

6    finalized their proposed critical habitat rule, making minor changes based on the

7    *Weyerhaeuser* decision and public comments. As proposed, the final rule restores the

8    preference for designating occupied areas before considering unoccupied areas. *See*

9    Regulations for Listing Species and Designating Critical Habitat, 84 Fed. Reg. 45,020

10   (Aug. 27, 2019). Responding to *Weyerhaeuser*, the Fish and Wildlife Service and

11   National Marine Fisheries Service will also only designate unoccupied areas if they

12   contain one or more of the physical or biological features essential to the conservation

13   of the species. *Id.* at 45,022. Finally, they will focus on those unoccupied areas where

14   there is a "reasonable certainty" that the land will contribute to the conservation of

15   the species, including consideration of landowner willingness to conserve habitat. *Id.*

16   at 45,021, 45,044-45.

17   *This lawsuit*

18        On August 21, 2019, Plaintiffs Center for Biological Diversity, et al., filed this

19   lawsuit to challenge the U.S. Fish and Wildlife and National Marine Fisheries

20   Services' adoption of the final revised rules. Plaintiffs allege that in promulgating the

21   revised 4(d) rule the Services failed to provide a rational basis under the Endangered

22   Species Act for departing from the Blanket 4(d) rule, in violation of the Administrative

23   Procedure Act. *See* Compl. ¶¶ 116, 119. They allege that in adopting the critical

24   habitat rule the Services adopted regulations contrary to the text and purpose of the

25   Endangered Species Act and failed to provide a detailed justification or rational basis

26   for the revisions, in violation of the Endangered Species Act and the Administrative

27   Procedure Act. *See* Compl. ¶¶ 122-124. Further, Plaintiffs allege that in promulgating

28   ///

1   the critical habit rule the Services failed to follow adequate notice and comment
2   procedures, in violation of the Administrative Procedure Act. *See* Compl. ¶¶ 106-108.

3        The Plaintiffs' challenge raises a number of additional claims against the 4(d)
4   and critical habitat rules, as well as other revised rules. However, these other claims
5   do not directly concern private property, and thus Applicants do not seek intervention
6   to defend their merits.

7                                    **Argument**

8                                       **I**

9              **Applicants Satisfy Rule 24(a) and Should**
10             **Be Granted Intervention as of Right**

11       A party has a right to intervene if it (a) applies in a timely manner, (b) claims
12   an interest relating to the subject of the case, which will be impaired or impeded by
13   its disposition, and (c) its interests aren't adequately represented by the existing
14   parties. Fed. R. Civ. P. 24(a). In applying this standard, courts "normally follow
15   'practical and equitable considerations' and construe the Rule 'broadly in favor of
16   proposed intervenors.'" *Wilderness Soc'y v. U.S. Forest Service*, 630 F.3d 1173, 1179
17   (9th Cir. 2011) (*en banc*) (quoting *United States v. City of Los Angeles*, 288 F.3d 391,
18   397 (9th Cir. 2002)). This is because "'[a] liberal policy in favor of intervention serves
19   both efficient resolution of issues and broadened access to the Courts.'" *Id*. (quoting
20   *City of Los Angeles*, 288 F.3d at 397-98). Accordingly, a "prospective intervenor 'has a
21   sufficient interest for intervention purposes if it will suffer a practical impairment of
22   its interests as a result of the pending litigation.'" *Id*. (quoting *California ex rel.*
23   *Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006)).

24       When analyzing a motion to intervene as of right under Rule 24(a)(2), Ninth
25   Circuit courts apply a four-part test to determine whether to grant an applicant's
26   motion:

27        (1)    The application for intervention must be timely;

28   ///

(2)    The applicant must have a "significantly protectable" interest relating to the property or transaction that is the subject of the action;

(3)    The applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and

(4)    The applicant's interest must be inadequately represented by the existing parties in the lawsuit.

*Wilderness Soc'y*, 630 F.3d at 1177; Fed. R. Civ. P. 24(a).

### A.   Applicants' Motion to Intervene Is Timely

Three factors inform whether a motion to intervene is timely: (1) the stage of the proceedings; (2) prejudice to existing parties; and (3) the reason for delay in moving to intervene. *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004). Applicants move to intervene at an early stage of this litigation, and thus, delay is not an issue. *See Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (noting that a motion to intervene was timely when it was filed within three months of the filing of the complaint and two weeks of the filing of an answer). Federal Defendants filed a motion to dismiss on December 6, 2019, just days before this motion.[5] ECF No. 33. The court is yet to rule on any substantive matters. A coalition of industry groups likewise filed a motion to intervene as defendants on December 13, 2019. ECF No. 36. Because intervention is sought so early, it will not prejudice any of the parties nor result in significant disruption or delay. Consequently, Applicants' motion is timely.

### B.   Applicants Have an Interest Relating to the Subject of This Litigation

To intervene as of right, a party must have an "interest relating to the property or transaction that is the subject of the action . . . ." Fed. R. Civ. P. 24(a)(2). This interest test is not a bright-line rule but is instead met if applicants will "suffer a

---

[5] Applicants take no position on the issues raised in the Federal Defendants' motion to dismiss.

practical impairment of [their] interests as a result of the pending litigation." *California ex rel. Lockyer*, 450 F.3d at 441. Accordingly, a court should make a "practical, threshold inquiry," *Greene v. United States*, 996 F.2d 973, 976 (9th Cir. 1993), and "'involv[e] as many apparently concerned persons as is compatible with efficiency and due process.'" *Cty. of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)). The types of interests protected are interpreted "'broadly, in favor of the applicants for intervention.'" *Sierra Club v. EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993) (quoting *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria v. United States*, 921 F.2d 924, 926 (9th Cir. 1990)).

Applicants have several significant interests in this action supporting their right to intervene. Kenneth Klemm, Beaver Creek Buffalo Company, and members of the Washington Cattlemen's Association have an interest in this litigation based on their ownership and use of private land, as well as their conservation activities. *See* Klemm Declaration ¶¶ 3-8, 13-14; Meacham Declaration ¶¶ 4-7, 13. Although the challenged rules are prospective, they are affected by them today because they must make decisions about the use of their land and investment in conservation activities in anticipation of future regulation under the rules. *See* Klemm Declaration ¶¶ 13-14; Meacham Declaration ¶ 13. [6]

The challenged 4(d) rule makes it less likely that their conservation efforts will be penalized by increased regulatory burdens, thereby better incentivizing actions to conserve and recover species. 84 Fed. Reg. at 44,755, 44,757. If, for instance, the lesser prairie chicken is listed as threatened again, the Fish and Wildlife Service will only

---

[6] Because the rules are prospective, rather than retroactive, the landowners affected are not those currently regulated but those who will be affected by species listed or whose status is changed in the future. However, this is no obstacle to Applicants' intervention, as they are affected by the rules today and will likely be affected in additional ways in the near future. Indeed, were Applicants' injuries too uncertain to satisfy intervention, this would preclude Plaintiffs' standing which depends on assertions about how landowners like Applicants will respond to the challenged rules.

regulate take of the species to the extent necessary and advisable for its conservation, and only then after issuing a regulation to that effect. To justify such regulation, the Fish and Wildlife Service will have to consider the anti-conservation incentives this would create for landowners like Klemm and Beaver Creek Buffalo Company.

Similarly, when Washington Cattlemen's Association members contribute to the recovery of endangered species, their efforts will be rewarded by reduced regulation when the species' status is upgraded to threatened. Meacham Declaration ¶¶ 10, 13-14. If Plaintiffs' prevail, on the other hand, such regulation may automatically be imposed without consideration of the effect on their business and conservation activities. Likewise, the critical habitat rule makes it less likely Applicants will be punished for conserving their land's potential to be restored as habitat, by requiring consideration of the effects a designation would have on their willingness to conserve habitat. 84 Fed. Reg. 45,044-45.

Applicants also have procedural interests at stake in this litigation. Under the challenged rule, the agency would have to undertake a rulemaking, with cost-benefit analysis, before imposing burdensome take regulations for threatened species, a process which Applicants would have a right to participate in and to seek judicial review. *See Cal. Sea Urchin Comm'n v. Bean*, 828 F.3d 1046, 1049 (9th Cir. 2016) (a rulemaking is "clearly a final agency action"); *see also Michigan v. EPA*, 135 S. Ct. 2699, 2717 (2015) (broad statutory criteria like "appropriate" require cost-benefit analysis). These interests would also be lost were Plaintiffs to prevail, because such regulation would resume being imposed automatically without such consideration and procedures.

For these reasons, Applicants have significant protectable interests in this action as private landowners and conservationists. *See Forest Conservation Council v. United States Forest Serv.*, 66 F.3d 1489, 1494 (9th Cir. 1995) ("[W]hen, as here, the injunctive relief sought by plaintiffs will have direct, immediate, and harmful effects upon a third party's legally protectable interests, that party satisfies the 'interest' test

of Fed. R. Civ. P. 24(a)(2); [it] has a significantly protectable interest that relates to the property or transaction that is the subject of the action."), *abrogated on other grounds*, *Wilderness Soc'y v. United States Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011). Indeed, as the objects of the challenged regulations, their interests easily qualify them for intervention. *Cf. Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (noting that there is "ordinarily little question" of standing for the object of a regulation).

Applicants also have protectable interests based on their advocacy for property rights and voluntary conservation, including advocacy for the specific reforms challenged in this case. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995) (holding that a "public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it has supported"). Although many groups may have supported the challenged rule-changes, *see* ECF No. 36 (motion to intervene by American Farm Bureau, et al., based on, among other things, the filing of comments supporting the challenged rules), the Washington Cattlemen's Association filed a rulemaking petition urging the repeal of the blanket 4(d) rule, to which the Fish and Wildlife Service responded by adopting the challenged 4(d) rule. Meacham Declaration ¶¶ 8-11, 14. This activity uniquely entitles Washington Cattlemen's Association to intervene in this case, which challenges the legality of that measure. *See Idaho Farm Bureau Fed'n*, 58 F.3d at 1397. Pacific Legal Foundation is likewise entitled to intervene on these grounds, based on its role in the rulemaking petition, challenging the designation of unoccupied critical habitat in *Weyerhaeuser*, and other advocacy for the challenged reforms. Gaziano Declaration ¶¶ 5-16.

Additionally, Kenneth Klemm and Washington Cattlemen's Association have an additional interest based on their advocacy of voluntary conservation among the National Bison Association's and Washington Cattlemen's Association's members. Klemm Declaration ¶¶ 9, 15; Meacham Declaration ¶¶ 4-5, 10, 13-15. If Plaintiffs prevail, this advocacy will be made more difficult because of the restoration of

regulations that perversely punish landowners for engaging in such beneficial activities. *See La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (a party has a right to intervene where litigation would frustrate its advocacy efforts).

## C.   Disposition of This Case May Impair or Impede Applicants' Interests

Disposition of this case plainly threatens to impair and impede Applicants' interests. The threshold for demonstrating potential impairment of interests is low, as Rule 24(a)'s requirement addresses whether, as a practical matter, a denial of intervention would impede a prospective intervenor's ability to protect its interests. *California ex rel. Lockyer*, 450 F.3d at 442 ("Having found that appellants have a significant protectable interest, we have little difficulty concluding that the disposition of this case may, as a practical matter, affect it.").

The interests identified above may be impaired or impeded if Applicants are denied intervention. If Plaintiffs prevail, it will alter the regulations that govern Applicants' use of their property to their detriment. *See S.W. Center for Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001) ("We follow the guidance of Rule 24 advisory committee notes that state that '[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.'") (quoting Fed. R. Civ. P. 24 advisory committee note to 1966 amendment).

If Plaintiffs prevail, it will frustrate Applicants' past efforts to advocate the challenged reforms and force them to divert resources in future listing decisions and critical habitat designations that affect them or their members adversely. *See La Asociacion de Trabajadores de Lake Forest*, 624 F.3d at 1088 (explaining that an organization can establish an injury "when it suffer[s] 'both a diversion of its resources and a frustration of its mission.'") (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002)). *See id.* (injury exists when organization "suffer[s] some other injury if it had not diverted resources to counteracting the problem.").

### D.   None of the Parties Adequately Represent Applicants' Interests

The "burden in showing inadequate representation is minimal: it is sufficient to show that representation *may* be inadequate." *Forest Conservation Council*, 66 F.3d at 1498 (citations omitted) (emphasis in the original). *See also Citizens for Balanced Use v. Mountain Wilderness Ass'n*, 647 F.3d at 898 (same); *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972) ("[T]he burden of making that showing should be treated as minimal."). The Ninth Circuit has established a three-part test for addressing this factor:

(1)    Whether the interest of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments;

(2)    Whether the present party is capable and willing to make such arguments;

(3)    Whether a proposed intervenor would offer any necessary elements to the proceeding that other parties would neglect.

647 F.3d at 898. The "most important factor," however, is "'how the interest compares with the interests of existing parties.'" *Id*. If the "'government is acting on behalf of a constituency that it represents,'" then there is "an assumption of adequacy.'" *Id*. (quoting *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003)).

Applicants meet the threshold for demonstrating that the government will not adequately represent their interests, a common conclusion where a regulated party seeks to intervene in a case in which its regulator is also a party. Indeed, Washington Cattlemen's Association's members are regulated by governments on both sides of this dispute, rendering the assumption of adequacy paradoxical in this case.

The federal government's public interests are not such that it will undoubtedly make all of Applicants' arguments. The government has a variety of regulatory interests implicated by this case, including maximizing its power and discretion. *See Forest Conservation Council*, 66 F.3d at 1499 (noting that the government is more focused on "broad public interests") (collecting cases). *See also Utah Ass'n of Counties*

1    *v. Clinton*, 255 F.3d 1246, 1255 (10th Cir. 2001) (same). As private landowners whose

2    business and conservation activities are shaped by the challenged regulations,

3    Applicants have direct interests in this case that the general public lacks. *See*

4    *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184,

5    1189 (9th Cir. 1998) (intervention appropriate where intervenor's interest is more

6    narrow and parochial than those of the public at large). The government may not give

7    the same consideration to these interests as Applicants would, given the need to

8    balance other political and policy concerns.

9         The substantial expertise Applicants have about the on-the-ground effects of

10   regulations on private landowners as well as the legal and policy questions underlying

11   these rules favors their right to intervene. *See Utah Ass'n of Counties*, 255 F.3d at

12   1255 (The minimal inadequacy "showing is met when the applicant for intervention

13   has expertise the government may not have."). For instance, the government is likely

14   to defend the rules on grounds that maximize the agencies' discretion going forward,

15   to preserve agency power. *See* 84 Fed. Reg. at 44,754 (suggesting that the challenged

16   4(d) rule is but one of several reasonable interpretations of the statute and, therefore,

17   the agency should be afforded deference). Applicants, by contrast, will argue that

18   deference is inappropriate for the major questions presented in this case, which must

19   instead be resolved by the courts according to the terms of the statute. *See Take it to*

20   *the Limit*, *supra* at 42-43. The statute, properly understood, not only permits the

21   repeal of the blanket 4(d) rule but requires it. *See* Meacham Declaration Att. 1 at 9-

22   13. Given the agencies' institutional interest in preserving their power and discretion,

23   they are unlikely to make the same arguments as Applicants.

24        Moreover, the government's inconsistency on the issues raised in this case

25   create doubt that it will steadfastly advance Applicants' interests. The challenged

26   rules reverse earlier rules issued by the same agencies. This includes, in the critical

27   habitat case, rules of very recent vintage. Given the vicissitudes of agency politics,

28   ///

there is at least some doubt that the government will be capable and willing of making all of Applicants' arguments throughout the course of litigation.[7]

Finally, because much of the case turns on assumptions about how private landowners will respond to the new rules, Applicants provide an important perspective which is currently absent from the case. *Cf. Utah Ass'n of Counties*, 255 F.3d at 1255.

Moreover, none of the proposed intervenors, if allowed to intervene, would adequately represent Applicants' interests.[8] They lack the Applicants' specific land and conservation interests. *Compare* ECF No. 36 at 10-13 (citing general interests in avoiding regulatory burdens and permitting costs) *with* Klemm Declaration ¶¶ 3-8, 10-11 (describing Klemm and Beaver Creek Buffalo Co.'s efforts to restore habitat on their land, including for the lesser prairie chicken). They lack the immediacy of Applicants' interests, which in Klemm's case concerns land within the range of a species currently being considered for listing and, thus, subject to the prospective rules challenged here. *See* ECF No. 36-4 (citing effects from only previously listed species).

Nor do they adequately represent Applicants' advocacy interests, as they were not the petitioners who originally sought the challenged reforms, *compare* ECF No. 36-4, ¶ 9 (citing comments filed supporting the challenged rules) *with* Meacham Declaration ¶¶ 8-11 (describing Washington Cattlemen's Association's petition that led to this reform), did not litigate the case that affected the outcome of the critical habitat reforms, *see* Gaziano Declaration ¶¶ 5-16, and do not claim other advocacy

---

[7] In fact, the challenged critical habitat rule is, in part, a response to the federal government's decision not to defend the earlier rule in litigation challenging it. *See* Amanda Reilly, *States drop suit as Trump admin reopens habitat rules*, E&E News (Mar. 16, 2018), https://www.eenews.net/stories/1060076609/ (discussing settlement of the earlier suit due to the proposal of the rules challenged in this case).

[8] Applicants are not suggesting that the other proposed intervenors' motions fall short. Rather, the outcomes of those motions should not affect this motion, given the unique and specific interests Applicants assert.

1  interests that Applicants do, *see* Klemm Declaration ¶¶ 9, 15. Additionally, Applicants

2  provide unique expertise not claimed by any of the proposed intervenors. *See* Gaziano

3  Declaration ¶¶ 5-8, 14-15.

## II

### In the Alternative, Applicants Satisfy the Standard for Permissive Intervention

7  If the Court denies Applicants' motion to intervene as of right, it should

8  alternatively grant Applicants permission to intervene pursuant to Rule 24(b)(2).

9  Courts have broad discretion to grant intervention under the permissive standard.

10 *See Orange Cty. v. Air California*, 799 F.2d 535, 539 (9th Cir. 1986). Rule 24(b)(2)

11 "'plainly dispenses with any requirement that the intervenor shall have a direct

12 personal or pecuniary interest in the subject of the litigation.'" *Employee Staffing*

13 *Servs. v. Aubry*, 20 F.3d 1038, 1042 (9th Cir. 1994) (quoting *SEC v. United States*

14 *Realty & Improvement Co.*, 310 U.S. 434, 459 (1940)). Notably, "[u]nlike rule 24(a), a

15 'significant protectable interest' is not required by Rule 24(b) for intervention; all that

16 is necessary for permissive intervention is that intervenor's 'claim or defense and the

17 main action have a question of law or fact in common.'" *Kootenai Tribe of Idaho v.*

18 *Veneman*, 313 F.3d 1094, 1108 (9th Cir. 2002) (citing Fed. R. Civ. P. 24(b)).

19 Applicants' defenses raise a question of law or fact in common with Plaintiffs'

20 claims and the government's defenses. For instance, the argument that the

21 Endangered Species Act forbids the blanket 4(d) rule and allows regulation of take of

22 threatened species only after a species-specific analysis, *see* Meacham Declaration

23 Att. 1 at 9-13, raises a question of law (whether the new rule is consistent with the

24 Endangered Species Act) also raised by Plaintiffs' complaint. Therefore, were the

25 Court to conclude that Applicants lack a right to intervene, it should allow

26 intervention permissively under Rule 24(b).

27 ///

28 ///

1

## Conclusion

2       Applicants have a right to intervene or, in the alternative, should be given

3  permission to intervene to protect their interests at stake in this litigation. The motion

4  to intervene should be granted.

5       DATED: December 17, 2019.

6                                          Respectfully submitted,

7                                          DAMIEN M. SCHIFF
                                           JONATHAN WOOD
8

9
                                           By s/ Jonathan Wood
10                                              JONATHAN WOOD

11                                         Attorneys for Proposed Defendant-
                                           Intervenors
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28