1  JEAN E. WILLIAMS,
2  Deputy Assistant Attorney General
   SETH M. BARSKY, Section Chief
3  MEREDITH L. FLAX, Assistant Section Chief
   COBY HOWELL, Senior Trial Attorney
4  MICHAEL R. EITEL, Senior Trial Attorney
   U.S. Department of Justice
5  Environment & Natural Resources Division
   Wildlife & Marine Resources Section
6  1000 S.W. Third Avenue
   Portland, OR 97204
7  Phone: (503) 727-1023
   Fax: (503) 727-1117
8  Email: coby.howell@usdoj.gov
9
   *Attorneys for Federal Defendants*
10

11              IN THE UNITED STATES DISTRICT COURT
12        FOR THE NORTHERN DISTRICT OF CALIFORNIA (Oakland)

13

14  CENTER FOR BIOLOGICAL DIVERSITY,          Case. No. 4:19-cv-05206-JST
15  et al.,
                                              **REPLY IN SUPPORT OF FEDERAL
16                   Plaintiffs,              DEFENDANTS' MOTION TO DISMISS
                                              AND MEMORANDUM OF POINTS AND
17                   vs.                      AUTHORITIES**

18  DAVID BERNHARDT, et al.,
                                              Date: February 26, 2020
19                   Federal Defendants.      Time:  2:00 pm PST
                                              Place:  Courtroom 6, 2nd Floor
20                                            Judge: The Honorable Jon S. Tigar

21

22

23

24

25

26

27

28

Fed. Defendants' Reply in Support of Motion to Dismiss, 4:19-cv-05206-JST

1

**TABLE OF CONTENTS**

2

PAGE

3    INTRODUCTION ....................................................................................................... 1

4    ARGUMENT .............................................................................................................. 2

5        A.   State Plaintiffs Fail to Allege Facts in their Complaint Sufficient to Establish Standing. .. 6

6        B.   CBD Plaintiffs and ALDF Fail to Establish Standing. ....................................... 14

7        C.   Neither CBD Plaintiffs nor ALDF Establish Organizational Standing. ........................... 18

8        D.   Plaintiffs' Claims Are Also Not Ripe. ............................................................ 22

9    CONCLUSION .......................................................................................................... 25

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**

<u>CASES</u>                                                                                                <u>PAGE</u>

*Am. Diabetes Ass'n v. U.S. Dep't of Army*, 938 F.3d 1147 (9th Cir. 2019) ............................... 20

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002)........................................ 17

*Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247 (3rd Cir. 2014) .............................................. 21

*Bova v. City of Medford*, 564 F.3d 1093 (9th Cir. 2009)........................................................... 18

*California ex rel. Lockyer v. U.S. Dep't of Agric.,* 459 F. Supp. 2d 874 (N.D. Cal. 2006) .......... 15

*Citizens for Better Forestry v. U.S. Department of Agriculture,* 341 F.3d 961 (9th Cir. 2003)... 15

*City and County of San Francisco v. Whitaker*, 357 F. Supp. 3d 931 (N.D. Cal. 2018) ........ 12, 14

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ............................................................. 18, 21

*Colo. Dep't of Nat. Res. v. FWS*, 362 F. Supp. 3d 951 (D. Colo. 2018)........................................ 9

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943

 (9th Cir. 2011) ................................................................................................................. 20

*Center for Biological Diversity v. Jewell*, Civ. No. 16-cv-1932-MSK-STV (D. Co.),  ................ 8

*Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701 (9th Cir. 2009)............................ 5, 16

*Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332 (2006)................................................................ 17

*Davis v. Fed. Election Comm'n*, 554 U.S. 724 (2008) ................................................................ 17

*Del Norte County v. United States*, 732 F.2d 1462 (9th Cir. 1984)............................................. 18

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ........................................................... 14

*Desert Survivors v. Interior*, No. 3:16-cv-01165-JCS (N.D. Cal.),  ............................................. 8

*Doe v. Holy See*, 557 F.3d 1066 (9th Cir. 2009)........................................................................ 22

*E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838 (N.D. Cal. 2018) ..................... 19, 22

*Earth Island Inst. v. Ruthenbeck,* 490 F.3d 687 (9th Cir. 2007)................................................... 3

*Ecology Ctr. v U.S. Forest Serv.*, 192 F.3d 922 (9th Cir. 1999).................................................. 24

*El Rescate Legal Servs. v. Exec. Office of Immigration Review*, 959 F.2d 742 (9th Cir. 1992)... 20

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216

 (9th Cir. 2012)................................................................................................................. 20

*Fed. Election Comm. v. Akins*, 524 U.S. 11 (1998) .............................................................. 19, 21

1   *Golden Gate Salmon Assoc. v. Ross*, 17-cv-01172 (E.D. Cal.) ...................................... 9

2   *Habeas Corpus Res. Ctr. v. U.S. Dep't of Justice*, 816 F.3d 1241 (9th Cir. 2016) ............... 23, 25

3   *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ..................................... 19

4   *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,  624 F.3d 1083,

5       1088-89 (9th Cir. 2010) ........................................................... 19, 22

6   *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990) ........................................... 6, 23

7   *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................ 10, 18

8   *Massachusetts v. EPA*, 549 U.S. 497 (2007) ...................................... passim

9   *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,

10      463 U.S. 29 (1983) ........................................................................ 13

11  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803 (2003) ......................... 22, 25

12  *Nat'l Wildlife Fed'n v. NMFS*, 839 F. Supp. 2d 1117 (D. Or. 2011)............................ 9

13  *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059 (9th Cir. 2002) ............................ 24

14  *Reno v. Flores*, 507 U.S. 292 (1993) ..................................................... 6, 24

15  *Safer Chems., Healthy Families v. EPA*, 943 F.3d 397 (9th Cir. 2019) ......................... 23

16  *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676 (9th Cir. 2012) ........... 14

17  *Scott v. Pasadena Unified School Dist.,* 306 F.3d 646 (9th Cir. 2002) ........................ 17

18  *Sierra Club v. Morton*, 405 U.S. 727 (1972) ............................................... 22

19  *Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097 (9th Cir. 2004) ............................ 19

20  *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ....................................... 19

21  *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89 (D.C. Cir. 2002) ........................ 13

22  *Summers v. Earth Island Institute*, 555 U.S. 488 (2009) ........................................ passim

23  *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134 (9th Cir. 2000)............................ 23

24  *Toilet Goods Ass'n. v. Gardner*, 387 U.S.  (1967)........................................ 25

25  *Trout Unlimited v. Lohn*, 645 F. Supp. 2d 929 (D. Or. 2007) ........................................ 8

26  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,*

27      454 U.S. 464 (1982) ........................................................... 7, 25

28  *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011)................................. 5, 16

*Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136 (9th Cir. 2003) ...................................... 22

*Warth v. Seldin*, 422 U.S. 490 (1975) ................................................................................ 19

*Washington Toxics Coalition v. U.S. Dep't. of Interior*,

    457 F. Supp. 2d 1158 (W.D. Wash. 2006) ......................................................... 15

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................................... 22

*Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220 (10th Cir. 2012) ...................................... 10


STATUTES

5 U.S.C. § 704.................................................................................................................. 5, 12

5 U.S.C. § 706(2) .................................................................................................................. 12

5 U.S.C. § 706(2)(A)............................................................................................................. 13

5 U.S.C. § 706(2)(D).............................................................................................................. 13

5 U.S.C. § 553 ........................................................................................................................ 12

16 U.S.C. § 1533(b)(3)(A) ..................................................................................................... 20

16 U.S.C. § 1533(b)(4) ........................................................................................................... 21

16 U.S.C. § 1533(d) ................................................................................................................ 21


FEDERAL REGULATIONS

50 C.F.R. § 402.14(l) ............................................................................................................. 24

50 C.F.R. § 402.16(b) ............................................................................................................. 24

50 C.F.R. § 424.11 .................................................................................................................. 21

50 C.F.R. § 424.14 .................................................................................................................. 20

50 C.F.R. § 424.16(c).............................................................................................................. 16

84 Fed. Reg. 44976 (Aug. 27, 2019)................................................................................ 1, 24

84 Fed. Reg. 45020 (Aug. 27, 2019)................................................................................ 1, 24

84 Fed. Reg. 67060 (Dec. 6, 2019) ......................................................................................... 9

84 Fed. Reg. 69918 (Dec. 19, 2019) ....................................................................................... 9

85 Fed. Reg. 1018 (Jan. 8, 2020) .......................................................................................... 10

84 Fed. Reg. 44753 (Aug. 27, 2019) ............................................................................... 1, 9, 24

84 Fed. Reg. 64210 (Nov. 21, 2019) .................................................................................. 9, 16

84 Fed. Reg. 65080 (Nov. 26, 2019) ....................................................................................... 9

84 Fed. Reg. 69712 (Dec. 19, 2019) ..................................................................................... 10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Federal Defendants, the Secretaries of the Departments of the Interior and Commerce ("Secretaries"), as well as the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively "Services"), have moved to dismiss three separate challenges to their revised Endangered Species Act ("ESA") regulations under Federal Rule of Civil Procedure 12(b)(1) on standing and ripeness grounds.[1]  The revised regulations clarify, interpret, and implement portions of Sections 4, 4(d), and 7(a)(2) of the ESA.  *See* 84 Fed. Reg. 45020 (Aug. 27, 2019) (Section 4 revisions); 84 Fed. Reg. 44753 (Aug. 27, 2019) (Section 4(d) revisions); 84 Fed. Reg. 44976 (Aug. 27, 2019) (Section 7(a)(2) revisions).  They apply to the Services in the course of their administration of the ESA, and none of the revised regulations apply retroactively to any threatened species or endangered species.

Seventeen States, the District of Columbia and the City of New York ("State Plaintiffs"), the Center for Biological Diversity and other non-governmental organizations ("CBD Plaintiffs"), and the Animal Legal Defense Fund ("ALDF") (collectively "Plaintiffs"), oppose Federal Defendants' motions to dismiss.  ECF 74, 19-cv-6013 (State Plaintiffs' Opposition); ECF 48, 19-cv-5206 (CBD Plaintiffs' Opposition); ECF 39, 19-cv-6812 (ALDF's Opposition). For their part, the State Plaintiffs argue that the factual allegations in their complaint are sufficient alone to establish standing largely because they are entitled to "special solicitude" under *Massachusetts v. EPA*, 549 U.S. 497 (2007).  In contrast, the CBD Plaintiffs and ALDF attached dozens of standing declarations in an attempt to establish injury-in-fact.  ECF 41-1, 48-24, 19-cv-5206 (CBD's Declarations); ECF 39-1, 39-5, 19-cv-6812 (ALDF's Declarations).

The common theme that emerges from Plaintiffs' briefing is that the three revised regulations, standing alone, injure Plaintiffs' interests in threatened and endangered species and

---

[1] This Court related the three cases: *Center for Biological Diversity v. Bernhardt*, 19-cv-5206 (N.D. Cal. Aug. 21, 2019); *California v. Bernhardt*, 19-cv-6013 (N.D. Cal., Sept. 25, 2019); *Animal Legal Def. Fund v. Bernhardt*, 19-cv-06812 (N.D. Cal., Oct. 21, 2019).  Under a stipulated scheduling order, Federal Defendants filed three identical motions to dismiss in each case.  ECF 46 (*California* Motion); ECF 33 (*Center* Motion); ECF 21 (*Animal Legal Def. Fund* Motion).  Federal Defendants have consolidated their replies into one brief and are filing that identical brief in each of the three cases pursuant to a stipulation with the parties.

their critical habitat.  Yet, while Plaintiffs' responses are long in describing their various interests in species writ-large, they are demonstrably short in identifying any present or certainly impending injury to those interests arising from the mere promulgation of the regulations.  The revised regulations, standing alone, do not require or prohibit any action on the part of Plaintiffs.  And any tangible effect will not occur until after the revised regulations are applied to a species or habitat in a subsequent administrative process.  The reason Plaintiffs struggle so hard and ultimately fail to articulate any injury-in-fact flowing from the revised regulations is that the revised regulations do not govern Plaintiffs and will not be applied retroactively—a point Plaintiffs readily concede.  *See, e.g.*, ECF 74 at 22 n.6, ECF 48 at 9.  Nor do Plaintiffs present the Court with a live dispute over a concrete application of the revised regulations.  As a result, Plaintiffs rely on little more than probabilities and chance to assert a cognizable harm.  There must be that "personal stake in the outcome" of the litigation and here we have none.  Regardless of whether the claims are labeled as procedural or substantive, Plaintiffs' showing is insufficient under Article III.

Federal Defendants are not proposing a "new legal test for standing," and we are not arguing that the revised regulations "may one day be challengeable."  ECF 74 at 8; ECF 48 at 11.  The revised regulations can be challenged today, but they cannot be challenged in the *abstract* as Plaintiffs are trying to do here.  Nor are Federal Defendants asking the Court to break new ground.  The circumstances presented here are materially identical to the fact pattern the Supreme Court held was inadequate to support standing in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009).  Plaintiffs have failed to show an injury-in-fact and the Court lacks subject-matter jurisdiction. It therefore should grant Federal Defendants' motions to dismiss.

## ARGUMENT

We find ourselves in materially the same spot the Supreme Court found itself in *Summers*.  Plaintiffs there raised a claim against a specific timber sale, the Burnt Ridge Project, as well as direct challenges to certain Forest Service regulations.  555 U.S. at 492.  The plaintiffs relied on factual allegations and a declaration (Marderosian Declaration) describing the harm that would occur as a result of application of the regulations to the Burnt Ridge Project.  *Id.* at 494.

The government conceded standing for the Burnt Ridge Project claim based on the Marderosian Declaration, but the regulations, standing alone, did not injure those plaintiffs and the government challenged plaintiffs' standing for the facial challenges.  *Id.*

Following a preliminary injunction, the government settled the timber sale claim, leaving only a facial challenge to two regulations.  *Summers,* 555 U.S. at 491; *see also Earth Island Inst. v. Ruthenbeck,* 490 F.3d 687, 696 (9th Cir. 2007) (dismissing the remaining facial challenges against other regulations not at issue with the Project as unripe).  When the timber sale claim was dropped from the lawsuit, the Supreme Court recognized that those plaintiffs were now challenging only the Forest Service's regulations "in the abstract."  *Summers,* 555 U.S. at 494. Without concrete application of the regulations to some specific agency action, like the Burnt Ridge Project, the plaintiffs' injuries were too speculative and probabilistic to establish injury-in-fact.  *Id.* at 495 ("It is a failure to allege that *any* particular timber sale or other project claimed to be unlawfully subject to the regulations will impede a specific and concrete plan … to enjoy the national forests.") (emphasis in original).  And the Supreme Court found that those plaintiffs lacked standing, even though the Marderosian Declaration was in the judicial record and had articulated injury-in-fact flowing from application of the regulations to the Burnt Ridge Project. *Id.* at 497 ("Respondents alleged such injury in their challenge to the Burnt Ridge Project, claiming that but for the allegedly unlawful abridged procedures they would have been able to oppose the project that threatened to impinge on their concrete plans to observe nature in that specific area.  *But Burnt Ridge is now off the table*.") (emphasis added).

Plaintiffs' challenges here present the same legal situation, albeit arrived at through different procedural pathways.  Plaintiffs submit declarations alleging harm based on subsequent administrative processes (much like the Burnt Ridge Project, Marderosian Declaration).  *See, e.g.*, ECF 48-1 at 4, Whitehurst Decl. ¶ 12; ECF 48-5 at 4; Nagano Decl. ¶ 11.  But there is no claim or live dispute in any of the three cases challenging any specific administrative processes. Indeed, Plaintiffs repeatedly and emphatically deny that they are bringing a live dispute with a concrete application of the revised regulations.  ECF 74 at 8; ECF 48 at 10 ("Neither the conservation group plaintiffs nor the plaintiffs in the related cases bring a challenge to the future

1    implementation of the Final Regulations.").

2        In both *Summers* and the present cases, Plaintiffs are asking to proceed with facial

3    challenges to regulations that do not apply to them, a point the Supreme Court found compelling.

4    *Summers,* 555 U.S. at 493 ("The regulations under challenge here neither require nor forbid any

5    action on the part of respondents.  The standards and procedures that they prescribe for Forest

6    Service appeals govern only the conduct of Forest Service officials engaged in project

7    planning."); ECF 74 at 26 ("This is not a case challenging final regulations that may be enforced

8    against State Plaintiffs as regulated parties in the future.").  Plaintiffs argue that they may

9    proceed without a live claim or dispute related to an agency action that allegedly harms their

10   concrete interests.  ECF 48 at 10.  Whether Plaintiffs failed to bring the claim or dispute in the

11   first instance, as they chose to do here, or whether it was resolved through settlement like the

12   timber sale in *Summers*, there is no legal difference between the two for standing purposes.  This

13   Court is still being asked, just as the Supreme Court was asked in *Summers*, to evaluate whether

14   Plaintiffs "have standing to challenge the regulations in the absence of a live dispute over a

15   concrete application of those regulations." 555 U.S. at 490.

16       Even in the context of procedural challenges, where the standards for redressability are

17   relaxed, the Supreme Court answered this question decidedly in the negative, finding there was

18   no injury-in-fact.  *Id.* at 497 ("the requirement of injury in fact is a hard floor of Article III

19   jurisdiction . . .").  The Supreme Court required a concrete application to a live dispute because

20   the lack of any live dispute requires speculation and probabilistic inquiries on harms, which are

21   too far removed from the litigants.  *Id.* at 497 (rejecting injury-in-fact based on "a statistical

22   probability that some of those members are threatened with concrete injury"); *id.* at 496

23   (rejecting reliance on the secondary Bensman Declaration because "we are asked to assume not

24   only that Bensman will stumble across a project tract unlawfully subject to the regulations, but

25   also that the tract is about to be developed by the Forest Service in a way that harms his

26   recreational interests, and that he would have commented on the project but for the regulation").

27   That is, there must be "'such a *personal stake in the outcome* of the controversy' as to warrant

28   [plaintiff's] invocation of federal-court jurisdiction." *Id.* at 493 (quoting *Warth*) (emphasis

added).  Without a live dispute and concrete application of a regulation presented in the case, there is no personal stake in the outcome and, therefore, no injury-in-fact sufficient to confer Article III standing.

Contrary to Plaintiffs' arguments, the government is not arguing that litigants can never bring a facial-only challenge to regulations.  That occurs under certain circumstances.  For example, when regulations apply directly to an entity, or are self-effectuating in a manner that causes harm, a facial challenge may be permissible.  *See, e.g.*, *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481, 483 (9th Cir. 2011) (regulations ceding ownership rights and court finding injury-in-fact where it prevented the litigant from "obtaining title and ownership") (citation omitted); *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 708 (9th Cir. 2009) (finding standing when regulations authorizing incidental take "threaten imminent, concrete harm to [plaintiffs'] interests by destroying polar bears and walrus in the Beaufort Sea").  But when, as here, the revised regulations do not apply to the Plaintiffs, there must be some claim or dispute in the case challenging a concrete application of a contested regulation that allegedly causes harm.  Otherwise, the challenge is, by definition, "abstract."  *Summers,* 555 U.S. at 494.

Nor is the government arguing that Plaintiffs can never challenge these revised regulations.  Plaintiffs' declarations demonstrate how the Services may, through subsequent administrative processes, apply the revised regulations in a way that allegedly would cause their members to suffer injury-in-fact.  *See, e.g.*, ECF 48 at 32, citing Whitehurst Decl. ¶ 12, Donelly Decl. ¶¶ 5-7 (referencing the biological opinion for the One Lake Project that used the revised Section 7(a)(2) regulation).  If Plaintiffs want to challenge the revised Section 7(a)(2) regulation, they can file suit challenging that particular biological opinion.  As part of that challenge, Plaintiffs can pursue challenges to aspects of the regulations that the Services applied in a way that allegedly injures their members.  *See, e.g.*, 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.").  But Plaintiffs do not challenge that biological opinion or any other administrative process applying the regulations.  ECF 74 at 31 n.9 (arguing that FWS' stonefly "not prudent" finding is unlawful, but declining to bring a claim challenging that determination).

There is no reason why this Court must guess at the Services' application of the revised regulations in the abstract and theorize whether there is any set of circumstances under which the regulation would be lawful, as it must with a facial challenge. *Reno v. Flores*, 507 U.S. 292, 301 (1993) ("To prevail in such a facial challenge, respondents 'must establish that no set of circumstances exists under which the [regulation] would be valid.'") (alteration in original). Plaintiffs can bring a lawsuit over a concrete application of the regulation, where a court can then examine how the specific revised regulation is applied in a specific factual and legal context. Inexplicably, they have not done so.

True, bringing live disputes may cause Plaintiffs frustration and inconvenience. ECF 74 at 8 (complaining that they would have to "file dozens of legal challenges …"). But these are sophisticated entities with substantial resources and, as they contend, are "the principal non-governmental movers of ESA policy and practice." ECF 48 at 9. In any event, inconvenience is not injury-in-fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990) ("The case-by-case approach that this requires is understandably frustrating to an organization such as respondent, which has as its objective across-the-board protection of our Nation's wildlife and the streams and forests that support it. But this is the traditional, and remains the normal, mode of operation of the courts.").

Regardless of whether a claim is labeled procedural or substantive, injury-in-fact is a constitutional hard floor. To rise above the floor, the Supreme Court requires a live dispute with concrete application of the contested regulations. *Summers*, 555 U.S. at 497. To require less would ignore controlling precedent. *Id.* Under the circumstances where the revised regulations (1) do not apply to Plaintiffs directly, (2) do not apply retroactively, (3) must be carried out through subsequent administrative processes to have an effect, and (4) are being challenged only in the abstract, Plaintiffs have failed to establish an injury-in-fact. Whether viewed under the standing or ripeness doctrines, this Court lacks jurisdiction.

A.    **State Plaintiffs Fail to Allege Facts in their Complaint Sufficient to Establish Standing.**

Unlike the organizational Plaintiffs, State Plaintiffs rely on the allegations in their

complaint for standing purposes.  ECF 74 at 8.  They argue that their interests in species and habitat are sufficient when considering the "special solicitude" the Supreme Court discussed in *Massachusetts v. EPA*, 549 U.S. 497.  State Plaintiffs have considerable interests in species and habitats within their borders, but an interest, even deeply held, is not enough to establish standing.  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,* 454 U.S. 464, 486 (1982) ("standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy").  Even in the context of "special solicitude," there still must be injury-in-fact to those States' interests that are fairly traceable to the revised regulations, and State Plaintiffs' factual allegations here are deficient.

In *Massachusetts v. EPA*, the State of Massachusetts asserted a sovereign interest in protecting its coastline territory.  549 U.S. at 519.  The State argued that greenhouse gas emissions would incrementally cause sea levels to rise, thereby eroding the State's coastline.  *Id.* at 522 ("According to petitioners' unchallenged affidavits, global sea levels rose somewhere between 10 and 20 centimeters over the 20th century as a result of global warming . . . These rising seas have already begun to swallow Massachusetts' coastal land.").  The State further argued that EPA's failure to regulate greenhouse gas emissions would exacerbate this erosion of its coastline causing concrete harm to its sovereign territorial interest.  *Id.* at 521 ("EPA's steadfast refusal to regulate greenhouse gas emissions presents a risk of harm to Massachusetts that is both 'actual' and 'imminent.'") (citation omitted).  The Supreme Court found that there was a fairly traceable connection between the interest (preserving the coastline), the challenged agency action (the denial of the petition for rulemaking), and the injury-in-fact (sea-level rise).  *Id.* at 526 ("[T]he rise in sea levels associated with global warming has already harmed and will continue to harm Massachusetts. The risk of catastrophic harm, though remote, is nevertheless real. That risk would be reduced to some extent if petitioners received the relief they seek.").  The connection was readily apparent and clear—if EPA regulated greenhouse gas emissions, sea level rise would incrementally slow, and the State's interest in its coastline would be redressed.  EPA did not even contest the connection.  *Id.* at 523 ("EPA does not dispute the existence of a causal connection between manmade greenhouse gas emissions and global warming.  At a

minimum, therefore, EPA's refusal to regulate such emissions 'contributes' to Massachusetts' injuries.").

No such connections exist here. Unlike the denial of the petition for rulemaking, which no party disputed would exacerbate shoreline loss to the State, the revised ESA regulations do not directly affect the State Plaintiffs' interests in the species or habitat within their borders. For example, State Plaintiffs contend that the Section 4 revised regulation (what they term the "Listing Rule") will make it "more difficult to list species as threatened . . . [while] easing the process for delisting species . . . ." ECF 74 at 14. But this is merely a legal conclusion. They never assert *facts* as to how the Section 4 revised regulation, standing alone, injures their interests. The reason the State Plaintiffs struggle with this connection is that they cannot possibly know how the Services will apply this regulation to species within their borders. Any listing or delisting action will be done through a separate administrative process. It is that agency action, not the revised regulations, that theoretically could cause them harm. And, even with a future application, the State Plaintiffs cannot credibly maintain that *every* application of the regulations will harm them.

Many of these State Plaintiffs, for example, have fought against listing species under the ESA. The State of Oregon vigorously and repeatedly argued against NMFS listing the Oregon Coast coho and expended considerable resources in doing so. *Trout Unlimited v. Lohn*, 645 F. Supp. 2d 929, 964 (D. Or. 2007) ("NMFS's finding of uncertainty whether current habitat conditions are sufficient to support viability is not based on reasonable competing inferences, but is instead based on Oregon's plagued conclusions."). In *Desert Survivors v. Interior*, No. 3:16-cv-01165-JCS (N.D. Cal.), the State of Nevada did the same with the Greater Sage Grouse. In *Center for Biological Diversity v. Jewell*, Civ. No. 16-cv-1932-MSK-STV (D. Co.), the States of Colorado and New Mexico both joined litigation unsuccessfully defending FWS' decision not to list the Rio Grande Cutthroat. The list goes on. *See also Colo. by and through Colo. Dep't of Nat. Res. v. FWS*, 362 F. Supp. 3d 951 (D. Colo. 2018) (Colorado's and Utah's unsuccessful challenge to FWS' listing of the Gunnison sage grouse). Our point here is that it is far from clear how the State interests will even align, much less how they will view the application of the

revised regulations to particular factual circumstances in any subsequent administrative processes.[2]

Similarly, State Plaintiffs' complaint with the Section 7(a)(2) revised regulations is contingent on application in a future consultation (formal or informal).  ECF 74 at 15.  Whether a consultation reaches a different conclusion because of the application of the revised regulation, rather than the myriad other factors the Services take into account during a consultation, is complete speculation.  State Plaintiffs could not possibly know how these consultations will turn out.  And, here again, State Plaintiffs' interests may even align with Services' conclusions, as has occurred many times before.  *See*, *e.g.*, *Nat'l Wildlife Fed'n v. NMFS*, 839 F. Supp. 2d 1117, 1122 (D. Or. 2011) (State of Washington supporting NMFS' no jeopardy conclusion); *Golden Gate Salmon Assoc. v. Ross*, 17-cv-01172 (E.D. Cal.) (California supporting NMFS' no jeopardy conclusions), ECF 78 (brief in opposition to plaintiffs' motion for summary judgment).

The allegations about the Section 4(d) revision are even more conclusory.  ECF 74 at 15.  State Plaintiffs contend that the 4(d) revision will be implemented in the future, and nothing more.  *Id.*  But the 4(d) revision does not change any existing protection for species, and FWS has conveyed that it intends to issue a species-specific 4(d) rule concurrently with any future listing decision.  84 Fed. Reg. 44753.[3]  It is entirely unclear how a State would be harmed (assuming they actually want the species listed in the first place).  The historical variations in State positions beg for concrete application in a live dispute.

State Plaintiffs also contend that the revised regulations harm them financially.  ECF 74

---

[2] Even accepting the States' assertions that they want all species to be listed in the future, the only cited example of an application of the revised regulations refutes their sweeping assertions of harm.  ECF 46 at 29, 19-cv-6013 (FWS applying the revised Section 4 regulations and listing the two species of stonefly as threatened species); *see also* 84 Fed. Reg. 64210 (Nov. 21, 2019).

[3] *See also* 84 Fed. Reg. 65080 (Nov. 26, 2019) (proposed rule to reclassify June sucker from an endangered to threatened species and 4(d) rule); 84 Fed. Reg. 67060 (Dec. 6, 2019) (proposed rule to list Bartram's stonecrop as a threatened species and 4(d) rule); 84 Fed. Reg. 69918 (Dec. 19, 2019) (final rule reclassifying Hawaiian goose from an endangered to threatened species and 4(d) rule); 84 Fed. Reg. 69712 (Dec. 19, 2019) (proposed rule to list West Coast distinct population segment of fisher as a threatened species and 4(d) rule); 85 Fed. Reg. 1018 (Jan. 8, 2020) (proposed rule to list Hermes copper butterfly as a threatened species and 4(d) rule).

Fed. Defendants' Reply in Support of Motion to Dismiss, 4:19-cv-05206-JST          9

at 15. They argue that the "responsibility for, and the costs and burden of, protecting imperiled species and their habitats . . . falls more heavily on State Plaintiffs." *Id.* This argument, again, is speculative and conjectural. Currently, all non-ESA listed species are subject to State jurisdiction, which means the States already bear the "responsibility for, and the costs and burden of" these species. *Id.* Because the revised regulations are not retroactive, the States' existing financial responsibility for non-ESA listed species is not altered (and thus the States are not harmed by the regulations). *See Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220, 1234 (10th Cir. 2012) (rejecting standing where the state would incur costs regardless of the federal policy). Moreover, the States' example of a *future* listing rule that may or may not have a species-specific 4(d) rule, with which they may or may not agree, ECF 74 at 16, only reinforces the point that it is the subsequent administrative process that may cause them additional financial burden, not the revisions themselves.

Perhaps recognizing the weakness in their factual assertions, State Plaintiffs, as well as the other Plaintiffs, argue that their burden should be lessened because they have specific claims alleging procedural violations and injuries. ECF 74 at 16. This argument fails for three main reasons.

First, not every claim in this case, or the other two cases, are procedural claims. In reviewing challenges to an ESA regulation like the ones at issue here, the Supreme Court did not view those claims as procedural and thus did not lower the standing bar. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562, 572 (1992) (rejecting the circuit's characterization that the challenges to ESA regulations were procedural). The Supreme Court instead *heightened* the standing inquiry because the regulation applied only to the Services. *Id.* at 562 ("[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."). And the Supreme Court rejected Plaintiffs' position that they can establish standing under the guise of procedural injury alone, *i.e.*, without a concrete and particularized injury-in-fact. *Id. at* 573 n.8 ("If we understand [the dissent] correctly, it means that the Government's violation of a certain (undescribed) class of procedural duty satisfies the concrete-injury requirement by itself, without

any showing that the procedural violation endangers a concrete interest of the plaintiff (apart from his interest in having the procedure observed). We cannot agree.").

Second, Plaintiffs confuse the distinct prongs of the standing inquiry.  It is correct that Congress may relax the standards on the redressability prong of a standing analysis with procedural statutes.  But that does not obviate the requirement to demonstrate injury-in-fact.  As the Supreme Court held in *Summers*:

> It makes no difference that the procedural right has been accorded by Congress.
> That can loosen the strictures of the redressability prong of our standing inquiry --
> so that standing existed with regard to the Burnt Ridge Project, for example,
> despite the possibility that Earth Island's allegedly guaranteed right to comment
> would not be successful in persuading the Forest Service to avoid impairment of
> Earth Island's concrete interests ….  Unlike redressability, however, the
> requirement of injury in fact is a hard floor of Article III jurisdiction that cannot
> be removed by statute.

*Summers,* 555 U.S. at 497.  No matter how hard Plaintiffs try to cloak their claims in procedural injury, it does not change the reality that they fail to demonstrate injury-in-fact from the regulations themselves.

Both *Summers* and *Defenders*, the two most analogous cases to the circumstances here, drive at the same point.  It is not enough to have an interest in the government complying with a particular procedure; the failure to comply must be able to impact a concrete interest.  *Summers*, 555 U.S. at 496 ("[D]eprivation of a procedural right without some concrete interest . . . is insufficient to create Article III standing.").  Here, even assuming Plaintiffs' allegations that the Services' regulations or decisionmaking processes were somehow procedurally deficient, as we must in light of their allegations at the motion to dismiss stage, there is no resulting risk to species or Plaintiffs because the revised regulations are not self-effectuating.  Without that tangible effect from the regulations themselves, there simply is no injury-in-fact traceable to the revisions.

Finally, relying on this Court's dicta in *City and County of San Francisco v. Whitaker*,

357 F. Supp. 3d 931, 942 (N.D. Cal. 2018), Plaintiffs argue in passing that their substantive challenges to the regulations are in fact "procedural" claims.  ECF 74 at 9; ECF 48 at 6-7.  As in *Whitaker*, the Court need not decide the issue because, as explained above, Plaintiffs lack "standing under even the more lenient procedural standing approach."  357 F. Supp. 3d at 942.

Even if the Court reaches this issue, Plaintiffs' Administrative Procedure Act ("APA") challenges to the regulations are not "procedural" claims subject to a procedural rights standing inquiry.  In *Whitaker*, the Court suggested that APA "arbitrary and capricious" claims are procedural rights cases because the Court in *Massachusetts v. EPA* applied a procedural rights standing inquiry in a case where the Court reviewed the merits under an "arbitrary and capricious" standard of review.  357 F. Supp. 3d at 941-42.  But the "arbitrary and capricious" standard of review was not central to the Court's standing inquiry.  The Court performed a procedural rights inquiry because Congress, through the Clean Air Act's citizen-suit provision, conferred a procedural right to the plaintiffs to challenge an agency's failure to initiate rulemaking.  *Massachusetts v. EPA*, 549 U.S. at 517-18 (finding "Congress has 'accorded a procedural right' … to challenge agency action unlawfully withheld") (citation omitted); *id.* at 520 ("Congress has moreover recognized a concomitant procedural right to challenge the rejection of its rulemaking petition as arbitrary and capricious.") (citation omitted).  That is, Congress relaxed the redressability requirements.

Here, Plaintiffs' substantive APA challenges are to regulations promulgated pursuant to the rulemaking procedures set forth in APA Section 553, the claims arise under APA Section 704, and the Court reviews the claims under APA Section 706(2).  *See* 5 U.S.C. §§ 553, 704, 706(2).  Most of Plaintiffs' claims allege that the Services' revisions are "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law," *i.e.*, substantive challenges to the revisions.[4] 5 U.S.C. § 706(2)(A). None of the substantive claims allege any omitted procedure set forth in APA Section 553, nor do any of the substantive claims allege that

---

[4] The substantive claims for relief in the complaints are: CBD Plaintiffs Am. Compl., ECF 28, (3rd Claim, ¶ 114; 4th Claim, ¶ 119; 5th Claim, ¶ 124); State Plaintiffs Am. Compl., ECF 28, (1st Claim, ¶ 130; 2nd Claim ¶ 139); ALDF Compl., ECF 1, ¶ 91.

the Services acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).
And neither APA Section 704 nor APA Section 706(2) grant Plaintiffs a procedural right to
challenge the withholding of agency action. For good reason. These are not procedural claims.
Construing every arbitrary and capricious challenge as a procedural violation would render
Congress' distinction between APA Section 706(2)(A) and 706(2)(D) superfluous.

Indeed, the Supreme Court's seminal standing decision in *Defenders*—where the Court
first broached procedural standing—itself involved a facial challenge to the promulgation of
regulations implementing ESA Section 7. The Court did not suggest, much less analyze, standing
through a procedural injury lens. The result must be the same here. *See also Motor Vehicle Mfrs.
Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50–51 (1983) (remanding
revocation of a regulation because it lacked a reasoned explanation under § 706(2) and rejecting
that this is procedural: "Specifically, it is submitted that to require an agency to consider an
airbags-only alternative is, in essence, to dictate to the agency the procedures it is to follow.
Petitioners both misread *Vermont Yankee* and misconstrue the nature of the remand that is in
order. In *Vermont Yankee*, we held that a court may not impose additional procedural
requirements upon an agency. We do not require today any specific procedures which [the
agency] must follow"). Nor can *Massachusetts v. EPA* be read to have implicitly overruled
*Defenders* on this issue or to have effected a sea change in the law on this point. Since
*Massachusetts v. EPA*, courts in this Circuit and the Supreme Court have continued to apply the
traditional Article III standing inquiry to claims arising under the APA and reviewed under APA
Section 706(2).[5] *See, e.g.*, *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565-66, 2567-69
(2019); *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 699-704 (9th Cir.
2012). Thus, unlike in *Whitaker* when the Court suggested a procedural rights inquiry applies to

---

[5] Nor would applying a procedural rights inquiry to the APA claims make sense. Courts relax the
redressability and imminence requirements in a procedural rights standing inquiry because of the
difficulty in determining whether "the substantive result would have been altered" where the
agency performed the omitted procedure. *Mass. v. EPA*, 549 U.S. at 518 (quoting *Sugar Cane
Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002)). That question does
not exist here, where Plaintiffs' APA claims do not claim the agencies omitted any procedure.

1   a true procedural omission, like the failure to provide "any reasoned explanation whatsoever,"

2   357 F. Supp. 3d at 942, the Services here promulgated regulations and provided hundreds of

3   pages of contemporaneous, detailed explanations and responses to comments.  And Plaintiffs'

4   APA claims challenge the substance of those regulations.  Plaintiffs' APA claims are thus

5   prototypical challenges to agency actions and the Court should evaluate Plaintiffs' standing

6   under the traditional Article III standing inquiry.

7        For all claims pled in these cases, Plaintiffs cannot rely merely on alleged procedural

8   injury alone; they must establish a cognizable injury-in-fact, which they cannot do based on the

9   nature of the ESA regulations challenged in this case and their failure to bring a live claim.  But

10  even if a procedural injury alone sufficed, it would not establish that this Court has jurisdiction

11  for all claims raised in the three cases.

12  **B.   CBD Plaintiffs and ALDF Fail to Establish Standing.**

13       Unlike the State Plaintiffs, CBD Plaintiffs and ALDF filed dozens of declarations to

14  establish injury-in-fact.  In doing so, they effectively concede that the allegations in their

15  complaints were deficient.  In any event, the declarations do not cure Plaintiffs' standing

16  problems.

17       Nearly all of Plaintiffs' declarations allege harm, not from the revised regulations

18  themselves, but from administrative processes that have yet to occur, may not occur in the

19  manner they presuppose, or may never happen at all.  The examples from CBD Plaintiffs alone

20  are numerous.  *See, e.g.*, ECF 48-3 at 6, Clark Decl. ¶ 20 ("I am concerned that the 2019 changes

21  to the ESA regulations will make it easier for FWS *to delist* the Canada lynx . . . .") (emphasis

22  added); ECF 48-23 at 6, Beck Decl. ¶ 18 ("*If Key deer are delisted*, or are downlisted and left

23  without adequate protection from harm, my work here will be for naught.") (emphasis added);

24  ECF 48-22 at 4, Curry Decl. ¶ 6 (referencing a *proposed rule* and relying on a future rule for

25  Nashville crayfish);  ECF 48-21 at 7, Jones Decl. ¶ 21 (relying on only a petition to list the

26  Lesser prairie chicken);  ECF 48-19 at 5, Trageser Decl. ¶ 13 (relying on only a petition to list the

27  Dunes sagebrush lizard);  ECF 48-24 at 8, Keefover Decl. ¶ 28 (asserting only an interest in

28  Yellowstone grizzly bears, which are currently listed).  None of these interests are harmed by the

regulations themselves, as the Plaintiffs and declarants admit by pointing to proposed applications of the regulations (in ways that may, or may not, injure their members).

CBD Plaintiffs also rely on a number of judicial opinions to support their position. ECF 48 at 15-16. Some characterizations are outright misleading, and none are analogous to the facts presented here. Plaintiffs rely on *Washington Toxics Coalition v. U.S. Dep't. of Interior*, 457 F. Supp. 2d 1158 (W.D. Wash. 2006), asserting the opinion was issued in 2014 and thus properly applies the law in this Circuit. But the case was decided in 2006, well before the Supreme Court in *Summers* undercut *Washington Toxics* reasoning that a facial challenge can proceed in absence of a live dispute.[6] ECF 48 at 15. *Washington Toxics* is factually distinguishable for another reason. The Court there found the facial challenge was permissible in large part because the litigants would never get the chance to challenge the Services' counterpart regulations because the Services would not be a part of future decisionmaking. *Id.* at 1171 ("[S]hould Plaintiffs wish to challenge an [not likely to adversely affect] determination in the future, they may only assert this claim against EPA because the Services will have no role in making this determination."). Those unique facts are not present here. Plaintiffs can challenge the Services' application of the revised regulations in future decisions if they are harmed by that application.

CBD Plaintiffs' citations to post-*Summers* decisions also fail to support their argument because they neglect to recognize that the regulations at issue in those cases were self-effectuating and had direct, immediate effects. ECF 48 at 15. In *Kraayenbrink,* the regulations ceded ownership and "effectively require[d] the BLM to take prompt corrective action against [the declarant] rather than phasing in any reduction of grazing …. 632 F.3d at 484 (citation omitted). For the other plaintiffs in *Kraayenbrink*, the regulations had the immediate effect of

---

[6] CBD Plaintiffs' heavy reliance on *Citizens for Better Forestry v. U.S. Department of Agriculture,* 341 F.3d 961 (9th Cir. 2003), ECF 48 at 18-19, as well as *California ex rel. Lockyer v. U.S. Department of Agriculture,* 459 F. Supp. 2d 874 (N.D. Cal. 2006), ECF 48 at 15, are likewise outdated in light of *Summers*, which was decided well after these decisions. Moreover, unlike the situation here, in both those cases, the rule at issue also had immediate tangible effects. *Id.* at 887 ("as a practical matter, the new rule removed substantive protections of roadless areas in all states for at least two years …"); *Citizens for Better Forestry*, 341 F.3d at 972 (the 2000 rule "decreases substantive environmental requirements…").

1    excluding their declarant "from participating in various management decisions."  *Id.* at 485.

2    There is no similar provision in the revised regulations that would exclude any of the Plaintiffs

3    from an administrative process that they are currently entitled to participate in under the ESA.

4    Plaintiffs will still receive notice in the Federal Register, and they may submit comments under

5    the revised regulations.  50 C.F.R. § 424.16(c).  Nothing on that front has changed as a result of

6    the regulatory revisions.

7         Similarly, in *Kempthorne*, the regulations "authorize[d] for a five-year period the non-

8    lethal 'take' of polar bears and Pacific walrus by oil and gas activities . . . ." 588 F.3d at 705.

9    The court found injury because "[i]f the plaintiffs' allegations are true, the Service's incidental

10   take regulations threaten imminent, concrete harm to these interests by destroying polar bears

11   and walrus in the Beaufort Sea."  *Id.* at 708.  Like sea-level rise in *Massachusetts v. EPA*, the

12   injury asserted (take of polar bears and walrus) was fairly traceable to the regulation because the

13   "Service's regulation *authorizes incidental take* that is contrary to the Center's interest."  *Id.*

14   (emphasis added).  Here, the revised regulations authorize no specific actions, let alone the

15   "take" of endangered or threatened species.

16        Finally, CBD Plaintiffs' arguments on imminence miss the point.  ECF 48 at 16-17.  The

17   government does not deny that the regulations are being applied.  Indeed, we highlighted this for

18   the Court with the stonefly listing decision.  ECF 46 at 29 (explaining how FWS listed these

19   species as threatened species, accompanied with a species-specific 4(d) rule); 84 Fed. Reg.

20   64210.  The issue is not whether the regulations have been or will be applied.  The issue is

21   whether a concrete application gives rise to a live dispute over the regulations themselves.

22   *Summers,* 555 U.S. at 490.  Here, we have no challenge to a concrete application and no live

23   dispute over any specific portion of the regulations.[7]  And, even assuming that Plaintiffs had

24

25   [7]  CBD Plaintiffs provided a declaration alleging harm from FWS' stonefly decision because
     FWS listed species as threatened rather than endangered and made a "not prudent" critical

26   habitat finding.  ECF 48-5 at 6, Nagano Decl. ¶ 20.  Yet Plaintiffs have not brought a claim
     challenging the stonefly decision and, therefore, provide no way for the Court to examine the

27   merits of that decision to determine whether the application of the regulations either injures
     Plaintiffs' members or is unlawful.  Nor, for that matter, can Plaintiffs rely on these and other

28   post-complaint events to establish standing, as the elements of standing must exist at the time the

1  standing to challenge one application of the regulations, that would not establish standing to

2  challenge all three regulations *in toto*.  Standing for one regulation does not confer standing to

3  challenge other regulations, and Plaintiffs must show they have standing for each claim and form

4  of relief sought.  *Daimler Chrysler Corp. v. Cuno*, 547 U.S. 332, 352-353 (2006).  To do

5  otherwise would amount to a "significant revision of our precedent interpreting Article III."  *Id*.

6  Standing, after all, is "is not dispensed in gross."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724,

7  734 (2008) (citation omitted).

8        For its part, ALDF largely raises the same arguments and once again focuses almost

9  entirely on the Section 4 and 4(d) revisions.  It first argues that, because FWS will now have to

10  issue species-specific 4(d) rules, there may be a delay in processing listing decisions.  ECF 39 at

11  17-18, 19-cv-6812.  Yet ALDF must identify factual allegations showing that a particular

12  species, of which it or its members has an interest, will experience harm from a delay in a listing

13  decision because of the 4(d) revision.  *Scott v. Pasadena Unified School Dist.,* 306 F.3d 646, 657

14  (9th Cir. 2002).  Generalized, theoretical concerns with delay are not enough.  *Defenders*, 504

15  U.S. at 573-77.

16        Here, ALDF members assert, verbatim, the same interest in zoo-captive giraffes, but none

17  of the declarants even mention the word delay.  ECF 39-1 at 3, Fetters Decl. ¶ 9 ("I am aware

18  that the FWS is currently considering listing giraffes under the Endangered Species Act. Under

19  the FWS's previous regulations, giraffes would enjoy automatic protections as soon as they are

20  listed as threatened; under the new regulations, they will not be protected until FWS issues

21  species-specific regulations."); ECF 39-2 at 3, Garner Decl. ¶ 10 (identical language); ECF 39-5

22  at 4, Delmoro Decl. ¶ 13 (identical language).  ALDF provides mere conclusory argument, not

23  factual allegations, that the Section 4(d) revision will delay a specific listing decision.  This

24

25  complaint was filed.  *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171 (9th Cir. 2002).
   And any concrete and particularized "injury" stemming from the stonefly decision (or later
26  applications of select regulations) could not possibly justify review of those regulations that
   FWS did not apply in those decisions. Plaintiffs cannot cherry pick select instances where FWS
27  or NMFS have applied the regulations to justify wholesale review of every regulatory revision in
   the abstract. *Summers*, 555 U.S. at 490.
28

1   diffuse "theory of *future* injury" is too speculative to show that injury is "certainly impending" or

2   a "substantial risk that the harm will occur." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401,

3   414 n.5 (2013); *Bova v. City of Medford*, 564 F.3d 1093, 1096-97 (9th Cir. 2009).

4          Nor is it axiomatic that the Section 4(d) regulation will delay listing decisions.  Any

5   future delay in making listing decisions could be attributable to a myriad of factors.  But these

6   factors existed before the revised regulation, and Plaintiffs point to no facts (or even include

7   factual allegations) for why the Section 4(d) regulation will cause additional delays.  To the

8   contrary, Plaintiffs admit that the Services often issued species-specific 4(d) rules under the old

9   regime, proving that the Services know how to perform this task. *See, e.g.,* ECF 28, ¶ 36 (CBD

10  Amended Compl.); ECF 48-8, ¶ 12 (Greenwald Decl.); ECF 39 at 4 (ALDF Opp.).  It is a leap

11  too far to presume, without evidence, that the Services will delay listings solely because of the

12  revised Section 4(d) regulation.  *Del Norte County v. United States*, 732 F.2d 1462, 1468 (9th

13  Cir. 1984) ("In the absence of clear evidence to the contrary, courts presume that public officers

14  properly discharge their duties …").  And, if the captive giraffe listing decision is delayed,

15  ALDF can file a lawsuit at the appropriate time.

16          **C.      Neither CBD Plaintiffs nor ALDF Establish Organizational Standing.**

17          CBD Plaintiffs also argue they have standing apart from any injury to their members.

18  ECF 48 at 16-19.[8]  An organization may "seek judicial relief from injury to itself," *Warth v.*

19  *Seldin*, 422 U.S. 490, 511 (1975), where the organization satisfies "the requirement for

20  individual standing: a demonstration of concrete and particularized injury."  *Smith v. Pac. Props.*

21  *& Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004); *City of Lake Forest*, 624 F.3d at 1088 n.4

22  ("[A]n organization may sue only if it was forced to choose between suffering an injury and

23  diverting resources to counteracting the injury.").  The organizational Plaintiffs fail to establish

24

25  ─────────────────────
    [8] ALDF does not raise a similar argument, relying instead on harm to its members as the basis
    for the organization's standing. ALDF, in fact, failed to allege any specific facts of
26  organizational standing in its complaint.  ECF 1, 19-cv-6812; *see La Asociacion de Trabajadores*
    *de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088-89 (9th Cir. 2010) (organizational
27  complaint that asserted "standing on behalf of its members rather than on behalf of itself as an
    organization" cannot be cured with *after-the-fact* affidavits at summary judgment).
28

Fed. Defendants' Reply in Support of Motion to Dismiss, 4:19-cv-05206-JST          18

the regulations injure them, for three reasons.

First, the organizations argue that the regulations conflict with the organizations' missions. ECF 48 at 17. These arguments fail for the same reasons discussed above—the regulations themselves cause no harm to the organizations, and any future harm to the organizations would be fairly traceable to a site-specific application not before the Court. In any event, while an organization may have standing with "*both* a diversion of its resources and frustration of its mission," *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir. 2013) (emphasis added, citation omitted), a mere "setback to the organization's abstract social interests" alone does not suffice, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Fed. Election Comm. v. Akins*, 524 U.S. 11, 24 (1998) ("abstract" harm, such as "injury to the interest in seeing that the law is obeyed," lacks "the concrete specificity" necessary for standing). As shown below, Plaintiffs rest on harms to their abstract social interests, not cognizable harms to the organizations themselves.

Second, the organizations do not identify a cognizable injury to themselves. An organizational harm relates to "the organization's ability to function as an organization," which can occur through government actions or policies that affect the organization's ability to secure funds, obtain members, or perform its core functions. *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838, 850 (N.D. Cal.), *appeal docketed*, No. 18-17274 (9th Cir. Nov. 27, 2018) (quoting *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1225 (9th Cir. 2012) (Ikuta, J., concurring)). Here, the organizations assert that their core functions include education, advocacy, litigation, and associated activities, where they "routinely" file petitions to list species, comment on agency actions, and sue federal agencies. *See, e.g.*, ECF 48-8 ¶¶ 4, 8-9; ECF 48-17 ¶¶ 5-6. But they identify no aspect of the regulations that interferes with these functions. Quite the contrary. The organizations assert they will continue to prepare petitions, comment on rulemakings, file litigation, and engage in other typical organization activities. ECF 48-8 ¶¶ 14-28; ECF 48-17 ¶¶ 15-24; ECF 48-15 ¶¶ 16-21. An organization that is "merely going about its business as usual" does not establish a cognizable organizational harm. *Am. Diabetes Ass'n v. U.S. Dep't of Army*, 938 F.3d 1147, 1155 (9th Cir.

2019).

Third, the organizations do not show that the regulations require them to do anything, let alone *force* them to divert resources from core organizational functions. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc) (relevant inquiry whether the action there "forced" the organizations to divert resources); *El Rescate Legal Servs. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1992) (challenged policy "*require[d]* the organizations to expend resources … they otherwise would spend in other ways") (emphasis added). The organizations, for example, state that they "routinely" file petitions to list species under the ESA. ECF 48 at 18; ECF 48-8 ¶¶ 9, 11. The ESA provides that interested parties may petition the agencies to list species, 16 U.S.C. § 1533(b)(3)(A), and the implementing regulations specify the required contents of a petition, 50 C.F.R. § 424.14. Neither the Section 4 nor Section 4(d) regulations revised the required contents of a petition. As a result, while the organizations complain that the Section 4(d) regulation requires them to address "take" protections in petitions, ECF 48-8 ¶¶ 15-17; ECF 48-17 ¶¶ 14-15, the regulations require no such thing. Whether or how the organizations choose to address "take" protection is their choice; it is not an action the regulations force upon them, such that resources diverted to this task are harms attributable to the regulations.[9]  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 286 (3d Cir. 2014) (organization cannot show standing based on "alleged additional expenditures … consistent with [its] typical activities"). Moreover, FWS always had the authority to issue species-specific 4(d) rules before the revision, 16 U.S.C. §

---

[9] Nor are the organizations' self-serving statements they did not need to address "take" protections prior to the Section 4(d) regulation persuasive. Defenders of Wildlife, for example, complains of having to spend more resources addressing "take" in its petitions for the Lesser prairie chicken and the Dunes sagebrush lizard. ECF 48-17 ¶ 16. But those petitions, filed before FWS promulgated the revised regulation, addressed "take" protections for the species. *See* Lesser Prairie Chicken Petition at 101 (addressing Section 4(d) rules and adequacy of "take" protections), *available at* https://ecos.fws.gov/docs/petitions/92000//903.pdf (last visited Jan. 23, 2020); Dunes Sagebrush Lizard Petition at 24, 27-28, 32 (discussing adequacy of incidental take provisions), *available at* https://ecos.fws.gov/docs/petitions/92210//1040.pdf (last visited Jan. 23, 2020); *see also* ECF 48 at 18 (arguing FWS had provided take protections to threatened species "as a matter of course"); *but see* ECF 48-8 ¶ 12 (admitting that FWS had promulgated species-specific 4(d) rules).

1533(d), and like before, any future rulemaking will provide an opportunity for public notice and comment. 16 U.S.C. § 1533(b)(4).

The organizations' assertions that they are harmed by the Services' consideration of economic factors in listing decisions fare no better.  ECF 48 at 18-19.  They argue that the Section 4 regulations "will require the Center to spend time and resources where it never did before." *Id.* at 19 (quoting ECF 38 ¶ 15, 19-cv-5206-JST).  But the Section 4 regulations *prohibit* the Services from considering economic factors when making listing decisions.  84 Fed. Reg. at 45052 ("The Secretary shall make any determination" list, delist, or reclassify a species "*solely* on the basis of the best available scientific and commercial information regarding a species' status") (quoting 50 C.F.R. § 424.11) (emphasis added); *id.* at 45024 (explaining that the Services may compile and publish economic information "as long as the information does not influence the listing determination").  The regulations thus refute Plaintiffs' position that they are forced to address economic factors, and Plaintiffs cannot "manufacture standing" merely by "making an expenditure" in response to the regulations.  *Clapper*, 568 U.S. at 416.[10]  Seemingly aware of this problem, Plaintiffs now ask the Court to ignore the regulatory prohibition on considering economic factors as a "merits" question.  ECF 48 at 19.  But a "federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."  *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990).  And this Court should not accept Plaintiffs' erroneous legal interpretations when addressing standing.  *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009) (per curiam) ("We do not, however, accept the 'truth of legal conclusions merely because they are cast in the form of factual allegations.'") (quoting *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003)).

As these examples show, this case is unlike those cases in which an organization is

---

[10] Plaintiffs' other examples are similar—they identify possible, volitional changes to their advocacy and participation when performing organizational functions. *See, e.g.*, ECF 48-8 ¶ 23 (arguing that the organization spends money to address a delisting proposal or advocates against specific projects, not that the regulations require it to do so); ECF 48-15 ¶ 16 (organizations intend to address the regulations in commenting on future regulations).  As above, these arguments do not establish that the *regulations* compel the organizations to expend funds to avoid an injury to themselves.  *City of Lake Forest*, 624 F.3d at 1088 n.4.

1    injured for purposes of Article III standing.  In *East Bay Sanctuary Covenant*, for example, this

2    Court recently determined that an organization representing individuals had standing because the

3    government policy impaired the organization's ability to pursue asylum cases, which also

4    jeopardized its funding.  349 F. Supp. 3d at 851.  And the Court found that the organization

5    diverted resources outside of core functions to address these harms.  *Id*. at 851-52.  Here, by

6    contrast, the organizations identify no way the regulations themselves impede their core

7    functions, much less force them to divert resources to counteract a cognizable harm.  They

8    instead assert standing because they oppose and will advocate against the regulations

9    applications in the future.  That argument, if accepted, would confer standing to any organization

10   with a "special interest" in the matter, in direct contravention of established Article III precedent.

11   *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).

12        **D.    Plaintiffs' Claims Are Also Not Ripe.**

13        Plaintiffs start from the erroneous premise that facial challenges are presumptively ripe

14   and reviewable.  ECF 48 at 32; ECF 74 at 24; ECF 39 at 27.  That is not the law.  *Nat'l Park*

15   *Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (a "regulation is not ordinarily

16   considered the type of agency action 'ripe' for judicial review under the [APA] until the scope of

17   the controversy has been reduced to more manageable proportions, and its factual components

18   fleshed out, by some concrete action applying the regulation to the claimant's situation in a

19   fashion that harms or threatens to harm him.") (alteration in original) (quoting *Lujan*, 497 U.S. at

20   891).  A facial challenge is presumptively *not* reviewable unless Congress creates an exception.

21   *Id.*  Plaintiffs compound this false premise by claiming that, as long as they establish standing,

22   their claims are automatically ripe for review.  ECF 74 at 24 ("a plaintiff's injury in fact signals

23   that a case and controversy exists in satisfaction of Article III, the constitutional requirement of

24   ripeness is also satisfied.").  Here again, this is not the law.  *Habeas Corpus Res. Ctr. v. U.S.*

25   *Dep't of Justice*, 816 F.3d 1241, 1247 (9th Cir. 2016).  While "[s]orting out where standing ends

26   and ripeness begins is not an easy task," *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d

27   1134, 1138 (9th Cir. 2000) (en banc), they are not one in the same.  If this were the case, there

28   would be no such thing as a constitutional ripeness inquiry since Article III standing is an

indispensable requirement for Federal court jurisdiction in every case.  In any event, whether labeled as constitutional or prudential ripeness here, the result is the same: these challenges are unripe.

The distinctions between standing and ripeness matter because Plaintiffs try to bundle all their claims to seek wholesale judicial review of all three regulations in this action.  For example, ALDF asserts an interest in captive giraffes, and contends that *if* the giraffe is listed, FWS *may not* issue a specific-specific 4(d) rule at the same time.  ECF 39-1 at 3, Fetters Decl. ¶ 9 ("I am aware that the FWS is currently *considering* listing giraffes under the Endangered Species Act.") (emphasis added).  There are at least two future contingencies that must come to pass before ALDF would be allegedly injured.  And even assuming both occur, the alleged injury is not even remotely connected to the Sections 4 or 7(a)(2) revisions.  There is simply too much uncertainty in how the Services will apply the regulation in the future to this species.  That is precisely the reason the Ninth Circuit has concluded other facial challenges to regulations were not ripe. *Habeaus Corpus*, 816 F.3d at 1254; *see also Safer Chems., Healthy Families v. EPA*, 943 F.3d 397, 415-16 (9th Cir. 2019).

There is another aspect of the problem here too.  Some of the challenged regulatory provisions have not even been applied yet.  For example, the Services are not currently aware that the expedited consultation regulation, 50 C.F.R. § 402.14(l), or the reinitiation regulation for land management plans, 50 C.F.R. § 402.16(b), have been invoked.[11]  Thus, without an instance in which these regulations have been applied, a claim against them cannot possibly be ripe.[12]  *See*

---

[11] Plaintiffs' bundling further underscores the jurisdictional deficiency of their cases.  Within each of the final rules, 84 Fed. Reg. 45020 (Section 4 revisions); 84 Fed. Reg. 44753 (Section 4(d) revisions); 84 Fed. Reg. 44976 (Section 7(a)(2) revisions), the Services revised many different *regulations*.  Standing to challenge one regulation—for example, the Services' revised definition of "destruction or adverse modification" in 50 C.F.R. § 402.02—does not confer standing to challenge 50 C.F.R. § 402.14(l), much less all the regulations revised in the Section 4, 4(d), and 7(a)(2) final rules.

[12] The standard of review for facial challenges to an agency's regulation highlights why there must be a concrete application for a court to review.  *See Reno*, 507 U.S. at 301 ("To prevail in such a facial challenge, respondents 'must establish that no set of circumstances exists under which the [regulation] would be valid.'") (alteration in original).  Plaintiffs do not contest the new expedited consultation provision in 50 C.F.R. § 402.14(l).  In the absence of any challenge

*Ecology Ctr. v U.S. Forest Serv*., 192 F.3d 922, 925-26 & n.6 (9th Cir. 1999) (holding challenge to the Forest Service's compliance with forest-wide monitoring duties was unripe where the challenge was not tied to a specific project); *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002) (to "win scrutiny of the Forest Service's forest-wide management practices, [plaintiffs] must challenge a specific, final agency action, the lawfulness of which hinges on these practices").  Just because certain aspects of certain regulations have been applied, that does not mean every regulation, and every claim for relief, is ripe.

For those aspects of the revised regulations that allegedly have been applied in certain contexts, like the definition of "adverse modification" in the One Lake biological opinion referenced in Plaintiffs' papers,  ECF 48-1 at 4, Whitehurst Decl. ¶ 12, such an application could give rise to a ripe, live claim.[13]  But *Plaintiffs did not bring that claim*.  The ripeness doctrine addresses not only the *time* at which judicial review may take place, but the "agency action" that is the proper *subject* of that review.  The agency action that is the proper focus of judicial review is the live dispute in which a regulation was applied in a concrete manner.

In contrast, Plaintiffs insist on generic, facial challenges to all aspects of all the revised regulations that are presumptively not reviewable without concrete application.  *Nat'l Park Hosp.,* 538 U.S. at 808, 810 ("We concluded the case was not ripe for judicial review because the impact of the regulation could not 'be said to be felt immediately by those subject to it in conducting their day to day affairs' and 'no irremediabl[y] adverse consequences flowed from requiring a later challenge.'") (quoting *Toilet Goods Ass'n. v. Gardner*, 387 U.S. 164 (1967)).  And, while pointing to concrete applications of specific regulations, they do not direct their challenge to those applications.  This can be construed only as a concession that there is no hardship in waiting.  *Habeas Corpus*, 816 F.3d at 1253.

---

or complaint, the Court would need to conclude that there are indeed circumstances in which this regulatory provision is valid.  This illustrates why there must be concrete application in a live dispute to give rise to a ripe claim.   Without concrete application in a live dispute there is too much uncertainty.

[13] Even then, at most a challenge to the ESA Section 7 regulations could be ripe.

1    At bottom, Plaintiffs can challenge any application of the regulations that injures them

2    (and thereby seek redress for that injury).  This approach adheres to the ripeness doctrine—it

3    challenges the correct agency actions (the ones injuring Plaintiffs) at the correct time (upon

4    application of the regulations).  And this approach does not harm Plaintiffs.  If or when one of

5    the challenged regulations are applied in a way that injures Plaintiffs, they can challenge those

6    actions and seek redress for their injury.  In accord, Plaintiffs present no basis for this Court to

7    sidestep the ripeness doctrine to engage in a facial challenge to the ESA regulations.

8    ## CONCLUSION

9    Whether viewed under the standing or ripeness doctrines, or under the labels of

10   procedural or substantive, Plaintiffs ask this Court to review the revised regulations in the

11   abstract.  As the Supreme Court noted, however, review should not occur "in the rarified

12   atmosphere of a debating society, but in a concrete factual context conducive to a realistic

13   appreciation of the consequences of judicial action."  *Valley Forge Christian Coll.*, 454 U.S. at

14   472.  We have neither the appropriate factual context nor appreciation of the consequences in the

15   present cases.  Plaintiffs chose not to bring a live dispute over a concrete application of one of

16   the challenged regulations. They instead want wholesale review and relief divorced from any

17   actual, concrete application.  Article III demands more.  The Court should grant Federal

18   Defendants' motions and dismiss Plaintiffs' complaints.

19

20   DATED: January 24, 2020.

21                                  JEAN E. WILLIAMS,
                                    Deputy Assistant Attorney General
22                                  SETH M. BARSKY, Chief
                                    MEREDITH L. FLAX, Assistant Chief
23

24                                  */s/ Coby Howell.*
                                    COBY HOWELL, Senior Trial Attorney
25                                  U.S. Department of Justice
                                    Environment & Natural Resources Division
26                                  Wildlife & Marine Resources Section

27
                                    */s/ Michael R. Eitel*
28

MICHAEL R. EITEL, Senior Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
1000 S.W. Third Avenue
Portland, OR 97204
Phone: (503) 727-1023
Fax: (503) 727-1117
Email: coby.howell@usdoj.gov

*Attorneys for Federal Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA (Oakland)

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | Case. No. 4:19-cv-05206-JST |
| Plaintiffs, | |
| vs. | **CERTIFICATE OF SERVICE** |
| DAVID BERNHARDT, et al., | |
| Federal Defendants. | |

| | |
|---|---|
| STATE OF CALIFORNIA, et al., | Case. No. 4:19-cv-06013-JST |
| Plaintiffs, | |
| vs. | |
| DAVID BERNHARDT, et al., | **CERTIFICATE OF SERVICE** |
| Federal Defendants. | |

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND, | Case. No. 4:19-cv-06812-JST |
| Plaintiff, | |
| vs. | |
| DAVID BERNHARDT, et al., | **CERTIFICATE OF SERVICE** |
| Federal Defendants. | |

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.

_/s/ Michael R. Eitel_
MICHAEL R. EITEL, Senior Attorney