KRISTEN L. BOYLES (CSBA # 158450)
PAULO PALUGOD (NYBA # 5047964)
*[Admitted Pro Hac Vice]*
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA  98104
Ph: (206) 343-7340
kboyles@earthjustice.org
ppalugod@earthjustice.org

ANDREA A. TREECE (CSBA # 237639)
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
Ph: (415) 217-2089
atreece@earthjustice.org

*Attorneys for Plaintiffs*

*[Additional counsel listed at end]*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL, NATIONAL PARKS CONSERVATION ASSOCIATION, WILDEARTH GUARDIANS, and THE HUMANE SOCIETY OF THE UNITED STATES, | Case No. 4:19-cv-05206-JST<br><br>Related Cases: No. 4:19-cv-06013-JST<br>No. 4:19-cv-06812-JST<br><br>SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>(Administrative Procedure Act, National Environmental Policy Act, Endangered Species Act) |
| Plaintiffs,<br>v.<br><br>DAVID BERNHARDT, U.S. Secretary of the Interior, U.S. FISH AND WILDLIFE SERVICE, WILBUR ROSS, U.S. Secretary of Commerce, and NATIONAL MARINE FISHERIES SERVICE,<br><br>Defendants. | |

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 1 -

Plaintiffs Center for Biological Diversity *et al.* file this Second Amended Complaint challenging the Trump administration's promulgation of revised Endangered Species Act regulations as allowed under the Court's Order Granting Motion to Dismiss at 10, ECF 87 (May 18, 2020).  The amendments and attached exhibits provide specific factual allegations, including identified members whose particular interests have suffered or will suffer harm and the risk of harm.  The amendments summarize the interests of individual members of each of the Plaintiff groups in the protection of particular threatened and endangered species and their geographic habitat, as well as the injury and risk of injury to Plaintiff groups and their members from the promulgation of the challenged regulations.  The amendments also summarize the core organizational interests and resources that are injured or at risk of injury from the promulgation of the challenged regulations.  The full declarations of the individual members are attached to the complaint as Exhibits B-Z and are incorporated by reference.  For the convenience of the Court and other parties, Plaintiffs have kept the paragraph numbers the same as in the First Amended Complaint, ECF 28 (Oct. 23, 2019); paragraphs 12-16, 42a, 93, 109, 110, 120, 121, and the Prayer for Relief contain amended language.

### INTRODUCTION

1.       Congress passed the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*, in 1973 to affirm our nation's commitment to the conservation of threatened and endangered species and their habitat – the forests, grassland, prairies, rivers, and seas these species need to survive.  Congress specifically gave "conservation" a sweeping definition – the use of all methods and procedures necessary to recover threatened and endangered species so that they no longer need the Act's protections.  16 U.S.C. § 1532(3).  The ESA works, in part, by placing the survival and recovery of imperiled animals, fish, and plants at the forefront of every federal action and decision.

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 2 -

2.      For over 40 years, the Department of the Interior and the Department of Commerce, acting through the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively "the Services"), have administered the ESA through duly promulgated joint regulations.

3.      This action challenges three regulatory revision packages promulgated by FWS and NMFS, amending the regulations that implement ESA Sections 4 and 7, 16 U.S.C. §§ 1533, 1536.  *See* 84 Fed. Reg. 44,753 (Aug. 27, 2019) (ESA Section 4(d) regulation); 84 Fed. Reg. 44,976 (Aug. 27, 2019) (ESA Section 7 regulations); 84 Fed. Reg. 45,020 (Aug. 27, 2019) (ESA Section 4 regulations).

4.      Federal Defendants issued the challenged regulatory revisions in three parts: one repealing the longstanding FWS regulation implementing ESA Section 4(d) that automatically extended certain protections to threatened animals and plants upon listing (50 C.F.R. §§ 17.31, 17.71); one amending other parts of ESA Section 4 regulations jointly promulgated by FWS and NMFS that govern listing, delisting, and designation of critical habitat (generally codified under 50 C.F.R. § 424); and one revising FWS and NMFS regulations governing ESA Section 7 consultations (generally codified under 50 C.F.R. § 402).  In these regulatory revisions, the Services claim they have acted to increase clarity and encourage transparency; to the contrary, the regulatory revisions weaken and violate the requirements of the ESA.

5.      Taken together, this package of regulatory changes undermines the fundamental purpose of the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species…."  16 U.S.C. § 1531(b).  The revised regulations violate the plain language and overarching purpose of the ESA; they also lack

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 3 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

any reasoned basis and are arbitrary and capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

6.      Additionally, the Services failed to consider and disclose the significant environmental impacts from these regulations in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*  The final regulatory revisions are major federal actions, none qualify for categorical exclusions from NEPA compliance, and each will affect the human environment by undermining the ESA's purpose and protections.

7.      The Services also failed to consult under ESA Section 7 on the revised ESA regulations, regulations that clearly may affect ESA-listed species and critical habitat.  This type of consultation provides a vital check on the biological impacts and risks that stem from regulatory actions.

8.      For these violations of law, Plaintiffs seek an order (1) declaring the revised ESA regulations invalid, (2) vacating the revised ESA regulations, (3) enjoining reliance on the revised ESA regulations, and (4) reinstating the prior ESA regulations.

## JURISDICTION AND VENUE

9.      This action is brought pursuant to the APA, 5 U.S.C. §§ 701-706, and the ESA, 16 U.S.C. § 1540(g)(1).  This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 16 U.S.C. § 1540(g)(1).  To the extent required by the ESA, 16 U.S.C. § 1540(g), Plaintiffs provided 60 days' notice of intent to sue on August 20, 2019 to Federal Defendants.  A copy of the notice is attached as Exhibit A.

10.      Venue is properly vested in this Court under 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3), as a number of the Plaintiffs reside in this district, Plaintiffs have members and offices in California, and many of the consequences of the Federal Defendants' violations of the law giving rise to the claims occurred or will occur in this district.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 4 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1

INTRADISTRICT ASSIGNMENT

2        11.      This case is properly assigned to the San Francisco Division or the Oakland

3    Division under Civil L.R. 3-2(c) because many of the Plaintiffs and their members are located in

4    counties within those districts.

5                                              PARTIES

6        12.      The Plaintiffs in this action are:

7        A-1.     Center for Biological Diversity, a non-profit environmental organization

8    dedicated to the protection of native species and their habitats through science, policy, and

9    environmental law.  The Center is incorporated in California and headquartered in Tucson,

10   Arizona, with field offices throughout the United States and Mexico, including in Oakland,

11   California.  The Center has more than 1.6 million members and on-line activists.  The Center and

12   its members are concerned with the conservation of imperiled species, including ones that will be

13   affected by the regulations at issue in this suit, and with the effective implementation of the ESA.

14   The Center submitted extensive comments on the proposed ESA regulatory revisions, as well as

15   worked as part of a coalition that delivered over 800,000 public comments to the Services

16   opposing these regulations.

17       A-2.     The Center's individual members—including Arizona resident and staff GIS

18   specialist Kara Clauser, Oregon resident and staff scientist Tierra Curry, Nevada resident and

19   staff member Patrick Donnelly, Oregon resident and staff member David Noah Greenwald,

20   Arizona resident and staff member Brett Hartl, Virginia resident and staff member Stephanie

21   Kurose, and Washington resident Chris Nagano—have visited, studied, worked, and recreated on

22   lands that are home to threatened and endangered species, and they have specific intentions to

23   continue to do so frequently and on an ongoing basis, as set forth in the declarations attached to

24   this complaint.  The Center's members derive recreational, spiritual, professional, commercial,

25

26   SECOND AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 5 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

scientific, educational, and aesthetic benefits from their interactions with threatened and

endangered species and their critical habitat across the United States.

A-3.    Ms. Curry studies and works to protect southeast U.S. freshwater biodiversity,

with the Nashville crayfish (*Faxonius shoupi*) as a particular focus.  Exh. F, Curry Decl. ¶¶ 6-8.

Ms. Curry's work has been impacted by the 2019 regulation's elimination of the requirement to

substantiate a species' recovery before delisting as Ms. Curry was forced to devote significant

staff time responding to FWS's unwarranted proposal to remove ESA protections from the

Nashville crayfish.  Exh. I, Greenwald Decl. ¶ 23.  Mr. Donnolly has been personally involved in

ESA issues in Nevada, including a biological opinion for the Lee Canyon Ski Area looking at

impacts to the endangered Mount Charleston blue butterfly (*Icaricia shasta charlestonensis*).

This biological opinion used the 2019 regulations to limit considerations of harmful impacts to

designated critical habitat.  Exh. G, Donnelly Decl. ¶¶ 8-14.  Mr. Donnolly often visits Mount

Charleston blue butterfly habitat, including designated critical habitat, for photography and

spiritual renewal.  Mr. Nagano, an entomologist and former FWS endangered species biologist,

collects and observes stoneflies—including Meltwater lednian stoneflies (*Lednia tumana*) and

Western glacier stoneflies (*Zapada glacier*), species for which FWS found the designation of

critical habitat to be "not prudent" pursuant to the 2019 regulations—throughout California,

Montana, and the west and has definite plans to continue his research, observations, and

enjoyment of nature.  Exh. Q, Nagano Decl. ¶¶16-20.

A-4.    The Center has a long history of environmental advocacy with a particular focus

on threatened and endangered species in geographic areas across the United States, including

recent work to protect Lake sturgeon (*Acipenser fulvescens*), Oregon Coast spring chinook

(*Oncorhynchus tshawytscha*), Siskiyou mountain salamander (*Plethodon stormi*), Dunes

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 6 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

sagebrush lizard (*Sceloporus arenicolus*), Lesser prairie chicken (*Tympanuchus pallidicinctus*), and the Mojave poppy bee (*Perdita meconis*), and ongoing work to protect the Greater sage grouse (*Centrocercus urophasianus*), Stippled studfish (*Fundulus bifax*), and Nine spotted ladybug (*coccinella novemnotata*), among others.  Exh. I, Greenwald Decl. ¶¶ 10, 14.  As a result of the Center's work, over 700 species and nearly half a billion acres of critical habitat have been protected under the ESA.  Exh. I, Greenwald Decl. ¶¶ 9-11.  When the Center submitted substantial comments on the proposed ESA regulatory revisions, it would have also commented on the new definitions of "environmental baseline," "activities that are reasonably certain to occur," and "consequences caused by the proposed actions," had those definitions been provided to the public before promulgation of the final 2019 regulations.  Exh. J, Hartl Decl. ¶¶ 7-8.  Similarly, the Center would have commented on the new definition for "physical or biological features," additional qualifiers in the definition of "foreseeable future, or additional requirements for protection of unoccupied critical habitat, but those new definitions and requirements were unknown until the issuance of the final 2019 regulations.  Exh. N, Kurose Decl. ¶¶ 7-8.

B-1.   <u>Defenders of Wildlife</u>, a nonprofit membership organization dedicated to the protection of all native animals and plants in their natural communities, including our country's most imperiled wildlife and habitat.  Headquartered in Washington, D.C., Defenders has seven regional offices, with its California Regional Office located in Sacramento, California.  Defenders has more than 1.8 million members and on-line activists across the nation.  Defenders submitted extensive comments on the proposed ESA regulatory revisions, as well as participated in the coalition that delivered over 800,000 public comments to the Services opposing these regulations.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 7 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

B-2.    Defenders has individual members, including Maryland resident and senior attorney Jane Davenport McClintock, Virginia resident and Senior Endangered Species Act Counsel Jason Rylander, Washington D.C. resident and Vice President for Conservation Law Michael P. Senatore, Arizona resident Scott Trageser, and Florida resident and staff member Kent Wimmer, who regularly visit, study, work, photograph, or recreate on lands or marine areas that are protected habitat for threatened and endangered species.  Each of the members has specific intentions to continue to interact with threatened, endangered, or imperiled species and their habitat frequently and on an ongoing basis, as set forth in the attached declarations. Defenders' members and staff derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their interactions with threatened and endangered species and their critical habitat.

B-3.    Ms. McClintock has taken her family whale-watching vacations for the past several years and has concrete plans go whale-watching in the future; professionally, Ms. McClintock holds a seat on the Atlantic Large Whale Take Reduction Team that works to advise NMFS about ways to reduce harm to critically endangered North Atlantic right whales (*Eubalaena glacialis*) and other cetaceans.  Exh. O, McClintock Decl. ¶¶ 16, 18-19.  Mr. Rylander, a staff member of Defenders for 15 years, regularly travels to visit, observe, photograph, and protect Piping plovers (*Charadrius melodus*) and Red knots (*Calidris canutus*) on the Atlantic coast of the U.S.  Exh. U, Rylander Decl. ¶¶ 9-14, 21.  Mr. Trageser, a professional wildlife photographer, derives professional, economic, and personal benefits from visiting habitat for threatened and endangered species, looking for and viewing Dunes sagebrush lizard (*Sceloporus arenicolus*) and other southwest desert animals.  Exh. X, Trageser Decl. ¶¶ 9-11.  Mr. Wimmer's work on recovery of endangered Red-cockaded woodpeckers

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 8 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   (*Leuconotopicus borealis*) and their habitat includes leading hikes and observations, activities he

2   will continue frequently and on an ongoing basis in the future.  Exh. Z, Wimmer Decl. ¶¶ 4-6.

3        C-1.   <u>Sierra Club</u>, one of the oldest environmental organizations in the United States.

4   Sierra Club is incorporated in the State of California as a Nonprofit Public Benefit Corporation

5   with headquarters in Oakland, California.  The organization has over 779,000 members

6   nationwide, and local chapters across the country.  Sierra Club is dedicated to protecting and

7   preserving the natural and human environment, and its purpose is to explore, enjoy, and protect

8   the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems

9   and resources; and to educate and enlist humanity to protect and restore the quality of the natural

10  and human environments.  Its mission includes engaging its members and the public to protect

11  public lands, wildlife habitat, and wildlife, and it has been a longtime, active public advocate for

12  imperiled wildlife.  When FWS and NMFS proposed the challenged revisions to the ESA's

13  regulations, the Sierra Club submitted comments not only on behalf of itself, but also as part of a

14  coalition that delivered over 800,000 public comments to the Services opposed these regulatory

15  changes.

16       C-2.   The Sierra Club has individual members, including Florida resident Vivian Beck,

17  Montana resident Bob Clark, Kansas resident C. Elaine Giessel, Washington resident and staff

18  member Daniel Ritzman, and Mississippi resident Andrew Whitehurst, who regularly visit,

19  study, work, photograph, or recreate on lands that are protected habitat for threatened and

20  endangered species.  Each of the members has specific intentions to continue to interact with

21  threatened, endangered, or imperiled species and their habitat frequently and on an ongoing

22  basis, as set forth in the attached declarations.  Sierra Club members and staff derive recreational,

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 9 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

spiritual, professional, scientific, educational, and aesthetic benefits from their interactions with threatened and endangered species and their critical habitat.

C-3.     Ms. Beck has for years dedicated her time to education about and protection of Florida Key deer (*Odocoileus virginianus clavium*) in and around her home in Big Pine, Florida and will continue to do so.  Exh. B, Beck Decl. ¶¶ 4, 13-16, 18.  Mr. Clark, a Sierra Club member and former staff member, works at a hiking and backpacking guide in various areas in western Montana, eastern Idaho, and Northwest Wyoming that are habitat for Canada lynx (*Lynx canadensis*), and has definite plans to continue to regularly visit lynx habitat for work and recreation.  Exh. C, Clark Decl. ¶¶ 6-10, 15.  Ms. Giessel has been a Sierra Club member for almost 40 years, and has worked as an environmental educator and scientist with a focus on grasslands and prairies; she will continue to regularly visit these habitat areas in the future.  Exh. H, Giessel Decl. ¶¶ 3-4, 13 (Black-footed ferret (*Mustela nigripes*)), 15 (Monarch butterfly (*Danaus plexippus*)), 25 (Whooping crane (*Grus americana*)).  Mr. Ritzman, who is also a member of Defenders, has worked and recreated on the coastal plain of Arctic Alaska, areas designated as Polar bear (*Ursus maritimus*) critical habitat, and has definite plans to return in the future.  Exh. T, Ritzman Decl. ¶¶ 16, 23-35.  Mr. Whitehurst, who is also a Center member, has a specific interest in the protection and recovery of Gulf sturgeon (*Acipenser oxyrhynchus desotoi*), recreates in sturgeon habitat, and has personally been involved in the biological opinion for the One Lake Project on the Pearl River in Mississippi, which uses the new regulatory definition of "destruction or adverse modification of critical habitat" to discount impacts to sturgeon critical habitat.  Exh. Y, Whitehurst Decl. ¶¶ 3-14.

D-1.     <u>Natural Resources Defense Council</u> ("NRDC"), an international non-profit membership organization whose mission is to ensure the rights of all people to the air, the water,

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

and the wild.  To that end, NRDC works on behalf of its over 384,000 members to protect and conserve species threatened with extinction.  NRDC has offices in San Francisco, CA; New York, NY; Washington, DC; Santa Monica, CA; Chicago, IL; Bozeman, MT; and Beijing, China.  NRDC submitted extensive comments opposing the challenged ESA regulatory amendments and participated in the coalition that delivered over 800,000 public comments to the Services opposed to these regulations.

D-2.    NRDC has individual members, including Oregon resident David Pengelley, who have visited, studied, worked, and recreated on lands that are home to threatened and endangered species, and they have specific intentions to continue to do so frequently and on an ongoing basis, as set forth declarations attached to this complaint.  Mr. Pengelley regularly visits and recreates in the habitat in the Pacific Northwest for numerous protected species, including the Northern spotted owl (*Strix occidentalis caurina*) and Marbled murrelet (*Brachyramphus marmoratus*), as well as species that may warrant protection in the near future, like the Horned grebe (*Podiceps auritus*).  Exh. S, Pengelley Decl. ¶¶ 6-16.  He frequents habitat found on federal lands, like the Siuslaw National Forest, as well as other non-federal lands near his home in Corvallis, Oregon.  Mr. Pengelley also plans to take annual trips to Yellowstone National Park to enjoy Whitebark pine (*Pinus albicaulis*) forests and the many species that rely upon them.

E-1.    National Parks Conservation Association ("NPCA"), founded in 1919, as a leading voice for America's national parks; NPCA works to protect and preserve parks for present and future generations.  NPCA is headquartered in Washington, D.C., and has 27 regional and field offices throughout the country, including the Pacific Regional Field Office in Oakland, California.  NPCA has over 1.3 million members and supporters.  There are over 600 threatened and endangered species that call a national park unit home.  NPCA provided detailed

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 11 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    comments on the proposed regulatory revisions and is interested in maintaining the strong legal

2    protections provided by the ESA for threatened and endangered species who live in park

3    ecosystems.

4            E-2.    NPCA has individual members, including Montana resident George H. Corn and

5    Washington D.C. resident and staff member Bart Melton, and Alaska resident Jim Stratton, who

6    have visited, studied, worked, and recreated on lands that are home to threatened and endangered

7    species, and they have specific intentions to continue to do so frequently and on an ongoing

8    basis, as set forth declarations attached to this complaint.  Mr. Corn, who has held various

9    elected offices in Ravalli County for many years, regularly hikes, skis, and backpacks in areas

10   that provide habitat for wolverines (*Gulo gulo*); he has volunteered to help with long-term

11   wolverine monitoring studies, and he has definite plans to continue hiking and skiing in

12   wolverine habitat.  Exh. E, Corn Decl. ¶¶ 4, 9-13.  Mr. Melton, an NPCA staff member, regularly

13   visits areas that provide habitat for monarch butterflies (*Danaus plexippus*) and whitebark pine

14   trees (*Pinus albicaulis*).  Exh. P, Melton Decl. ¶¶ 10, 16, 19, 27.  Mr. Stratton, a former Director

15   of Alaska State Parks, has visited and will continue to visit national parks across the United

16   States, most often to look for and observe mammals and birds.  Exh. W, Stratton Decl. ¶¶ 4, 6,

17   19 (California spotted owl (*Strix occidentalis occidentalis*)), 25 (Golden-winged warbler

18   (*Vermivora chrysoptera*)), 32-34 (Piping plover (*Charadrius melodus*)).

19          F-1.    WildEarth Guardians, a non-profit environmental organization dedicated to

20   protecting and restoring the wildlife, wild places, wild rivers, and health of the American West.

21   Guardians is incorporated in New Mexico and headquartered in Santa Fe, New Mexico with

22   additional offices in Denver, CO, Missoula, MT, Portland, OR, and Tucson, AZ.  Guardians has

23   approximately 231,000 members and supporters nationwide.  Guardians and its members are

24

25   SECOND AMENDED COMPLAINT FOR DECLARATORY
26   AND INJUNCTIVE RELIEF - 12 -

concerned about protecting threatened and endangered species from extinction and extensively rely upon the ESA to ensure imperiled species receive the protections they need to survive and recover.  Guardians submitted comments on the proposed ESA regulatory revisions and was part of the coalition that delivered over 800,000 comments to the Service opposing these regulations.

F-2.     Guardians has individual members, including New Mexico resident and Executive Director John C. Horning and Colorado resident and staff member Taylor Jones, who have visited, studied, worked, and recreated on lands that are home to threatened and endangered species, and they have specific intentions to continue to do so frequently and on an ongoing basis, as set forth declarations attached to this complaint.  Mr. Horning is Guardians' Executive Director; Guardians has worked to protect many species under the ESA in the United States, including the Gray wolf (*Canis lupus*), Mexican gray wolf (*Canis lupus baileyi*), Grizzly bear, (*Ursus arctos horribilis*), Wolverine (*Gulo gulo*), Canada lynx (*Lynx canadensis*), Mexican spotted owl (*Strix occidentalis lucida*), Gunnison sage grouse (*Centrocercus minimus*), Rio Grande silvery minnow (*Hybognathus amarus*), Yellow-billed cuckoo (*Coccyzus americanus*), Southwestern willow flycatcher (*Empidonax traillii extimus*), and New Mexico meadow jumping mouse (*Zapus hudsonius luteus*).  Exh. K, Horning Decl. ¶¶ 2, 4.  Guardians' campaign to protect species has included multiple lawsuits that have resulted in settlement agreements to address the FWS's backlog of ESA actions.  Exh. K, Horning Decl. ¶¶ 9-11, 14.  Ms. Jones, Guardians member and staff member with a master's degree in conservation biology, works for species' protections under the ESA and notes the changes in language between the draft and final revised regulations that the public was unaware of and could not comment upon.  Exh. L, Jones Decl. ¶¶ 4, 7, 15.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 13 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

G-1.   The Humane Society of The United States, ("HSUS"), founded in 1954, the nation's largest animal protection organization.  HSUS is a non-profit organization headquartered in Washington D.C., with regional offices in California and throughout the United States.  On behalf of its millions of members and constituents in Northern California and nationwide, HSUS works to promote the humane treatment of all animals and the protection and recovery of threatened and endangered species and their habitats.  HSUS regularly advocates for threatened and endangered species through the ESA regulatory process, including by petitioning federal agencies to list and designate critical habitat for species and commenting on proposed regulatory actions.  As part of a coalition of animal protection and conservation organizations, HSUS and its affiliates submitted comments opposing the regulatory changes challenged in this lawsuit.

G-2.   HSUS has individual members, including Colorado resident Wendy Keefover and Montana resident David Pauli, who have visited, studied, worked, and recreated on lands that are home to threatened and endangered species, and they have specific intentions to continue to do so frequently and on an ongoing basis, as set forth declarations attached to this complaint.  Ms. Keefover has a longstanding interest in native carnivores and has been acting to protect cougars (*Puma concolor*), gray wolves (*Canis lupus*), and grizzly bears (*Ursus arctos horribilis*) for many years—backpacking, hiking, and observing grizzly bears in their protected habitat.  Ms. Keefover will continue these trips as long as her health allows.  Exh. M, Keefover Decl. ¶¶ 5, 16-21.  Mr. Pauli is an animal care professional who is deeply connected to wolverines, has seen wolverines (*Gulo gulo*) in the wild, and takes several trips annually (and will continue to do so) to hike and snow-shoe in wolverine habitat.  Exh. R, Pauli Decl. ¶¶ 4, 7-9, 11-13.

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 14 -

13.     As detailed above and in the attached declarations (Exh. B-Z) that are incorporated by reference into this Second Amended Complaint, the Plaintiff groups and their members use threatened and endangered species and their critical habitat located in California and other states nationwide for recreational, scientific, professional, and aesthetic purposes. Plaintiffs have members who reside near, visit, or otherwise use and enjoy threatened and endangered species and their critical habitat in a variety of ways, including wildlife viewing, education, and aesthetic and spiritual enjoyment.  Exh. D, Clauser Decl. Exh. 1 (map of Center members who live near designated critical habitat).  Plaintiffs have a concrete interest in the Services' lawful implementation of the ESA and its role in preventing harm to and promoting recovery of imperiled wildlife, and the regulatory revisions challenged in this lawsuit fundamentally undermine and contradict the requirements of the ESA.  Plaintiffs have members who reside, work, travel, and recreate in places where imperiled plants and animals protected by the ESA are found, along with designated critical habitat, federal lands, and non-federal facilities and activities requiring federal permits and licenses subject to the ESA's section 7 consultation requirements.  Plaintiffs' concrete interests are also injured by the Services' violation of procedural duties under NEPA and the APA.  *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003); *W. Watershed Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011).  The Plaintiff groups and their members derive scientific, recreational, aesthetic, economic, and conservation benefits of and enjoyment from threatened and endangered species and their critical habitat.  The past, present, and future enjoyment of these benefits by plaintiff groups and their members has been, is being, and will continue to be irreparably harmed by the Services' disregard of their statutory duties and by the unlawful injuries and risk of injuries imposed on imperiled species and their critical habitat by their actions.  The "presence of one

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 15 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   party with standing is sufficient to satisfy Article III's case-or-controversy requirement."

2   *Rumsfeld v. Forum For Academics and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *see Brown*

3   *v. City of Los Angeles*, 521 F.3d 1238, 1240 n.1 (9th Cir. 2008) ("[T]he presence in a suit of even

4   one party with standing suffices to make a claim justiciable.").

5        14.    In addition to harming and risking harm to the concrete interests of Plaintiffs'

6   members, the regulatory changes adopted by the Services also harm the operations and core

7   missions of one or more of the plaintiff organizations themselves.  For example, the regulatory

8   changes greatly frustrate, impede, and divert resources away from the Center's core mission to

9   obtain critically important legal and practical protections for species at grave risk of extinction.

10  As an essential part of its core mission to protect the nation's and world's dwindling biodiversity,

11  the Center routinely submits formal petitions for the listing of imperiled species as endangered or

12  threatened and, once such species are listed, the Center invokes the vital safeguards afforded by

13  the Act to ensure that species obtain the on-ground-protections they need to avoid extinction and

14  recover.  Exh. I, Greenwald Decl. ¶ 9 (over 700 species and nearly half a billion acres of critical

15  habitat protected as a result of the Center's work).  The Services' far-reaching regulatory

16  changes seriously frustrate, impede, and divert vitally important resources away from these core

17  organizational efforts on behalf of at-risk species, including by erecting barriers to new listings

18  and critical habitat designations, substantially delaying the listing process, and greatly weakening

19  the statutory protections for species that are listed.  For example, the Center and Guardians

20  provide services to their members in the form of petitions for ESA protections, and each have

21  settled lawsuits against FWS and NMFS in exchange for deadlines for ESA actions, deadlines

22  that may be missed due to the challenged regulations.  Exh. I, Greenwald Decl. ¶¶ 11, 15-16;

23  Exh. K, Horning Decl. ¶¶ 10-12.

24

25  SECOND AMENDED COMPLAINT FOR DECLARATORY
26  AND INJUNCTIVE RELIEF - 16 -

15.     The regulatory changes adopted by the Services also necessitate a diversion of Plaintiffs' resources away from their core conservation missions in an effort to counteract the grave injury inflicted on their essential species-protection efforts.  For example, by deleting from 50 C.F.R. § 424.11(b) the phrase "without reference to possible economic or other impacts," and making clear that in the course of making listing decisions the Services intend to "compil[e] economic information" and "present[] that information to the public," 84 Fed. Reg. at 45,024, the regulations require the Center, Defenders, and other plaintiffs to spend resources addressing economic considerations that under the prior regulatory regime and the statute itself have no role in the Service's listing process.  This addition of economic information will further divert Plaintiffs' resources away from their core missions into areas that under the prior regulatory regime would be unnecessary.  Exh. I, Greenwald Decl. ¶ 21 (Center put in "untenable position of either hiring economic experts at significant cost or devoting significant staff time to responding to the economic assessments); Exh. V, Senatore Decl. ¶ 18 (economic comments will be a "drain on Defenders' resources and will harm the organization's ability to promote its members' interests").  *See also* Exh. I, Greenwald Decl. ¶¶ 15-17, 20-21, 23, 27; Exh. V, Senatore Decl. ¶¶ 14-18; Exh. K, Horning Decl. ¶¶ 16-18.  The insertion of economic factors into the listing process for the first time is, unavoidably, exacerbating the Services' delays in responding to listing petitions, impeding the ability of the Center and others to fulfill their core missions and requiring the expenditure of further resources as Plaintiffs expend time and effort (on notice letters and other communications with the Services) attempting to ensure that its petitions are addressed in a timely manner.  Exh. I, Greenwald Decl. ¶¶ 14, 23 (Center forced to spend organizational time and resources petitioning for protective species-specific 4(d) rules;

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 17 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    staff senior scientist forced to devote significant extra time responding to proposal to remove

2    ESA protections that would otherwise be expended on furthering core mission).

3          16.     The ESA expressly declares that endangered and threatened "species of fish,

4    wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific

5    value to the Nation and its people."  16 U.S.C. § 1531(a)(3).  The harms that would result from

6    the loss of biological diversity are enormous, and the nation cannot fully apprehend their scope

7    because of the "*unknown* uses that endangered species might have and … the *unforeseeable*

8    place such creatures may have in the chain of life on this planet."  *Tenn. Valley Auth. v. Hill*, 437

9    U.S. 153, 178-79 (1978) (emphases in original) (the value of this genetic heritage is "quite

10   literally, incalculable").  The aesthetic, conservation, organizational, recreational, professional,

11   and scientific interests of these groups and their members in threatened and endangered species

12   and their critical habitat have been, are being, and, unless the relief prayed for is granted, will

13   continue to be directly and adversely affected by the failure of Federal Defendants to comply

14   with the law.

15         17.     The Defendants in this action are:

16         A.     David Bernhardt, U.S. Secretary of the Interior, in his professional capacity.  Mr.

17   Bernhardt has responsibility for implementing and fulfilling the duties of the United States

18   Department of the Interior, including the administration of the ESA with regard to threatened and

19   endangered terrestrial and freshwater plant and animal species.  Mr. Bernhardt signed the final

20   revised ESA regulations at issue;

21         B.     U.S. Fish and Wildlife Service, an agency of the U.S. Department of the Interior,

22   charged with administering the ESA with respect to threatened and endangered terrestrial and

23   freshwater plant and animal species;

24

25   SECOND AMENDED COMPLAINT FOR DECLARATORY
26   AND INJUNCTIVE RELIEF - 18 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

C.     <u>Wilbur Ross</u>, U.S. Secretary of Commerce, in his professional capacity.  Mr. Ross has responsibility for implementing and fulfilling the duties of the United States Department of Commerce, including the administration of the ESA with regard to threatened and endangered marine species and anadromous fish species.  Mr. Ross signed the final revised ESA regulations at issue; and

D.     <u>National Marine Fisheries Service</u>, an agency of the U.S. Department of Commerce, responsible for administering the ESA with regard to threatened and endangered marine species and anadromous fish species.

BACKGROUND

I.     THE ENDANGERED SPECIES ACT MAKES CONSERVATION, PROTECTION, AND RECOVERY OF IMPERILED SPECIES AND THEIR HABITAT A NATIONAL PRIORITY.

18.     Congress passed the ESA in 1973 in response to the extinction crisis to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species…."  16 U.S.C. § 1531(b).  Congress defined "conservation" under the ESA as "the use of all methods and procedures which are necessary to bring any endangered species to the point at which the measures provided pursuant to this act are no longer necessary," that is, when the species have recovered and no longer need the protection of the ESA.  16 U.S.C. § 1532(3).

19.     In broad strokes, the ESA seeks to protect and recover imperiled species and populations by listing them as threatened or endangered based on enumerated statutory factors, 16 U.S.C. § 1533(a)(1)(A)-(E), using the "best scientific and commercial data available.  16 U.S.C. § 1533(b).

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 19 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

20.     The term "endangered species is defined as "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).  A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.  16 U.S.C. § 1532(20).

21.     At the same time as a species is listed as threatened or endangered, the Services must designate and protect critical habitat for the species, subject to certain exceptions.  16 U.S.C. § 1533(a)(3), (b)(2).  The ESA directs FWS and NMFS to issue additional protective regulations for threatened species if deemed necessary and advisable.  16 U.S.C. § 1533(d).  The listing and designation of critical habitat provisions are contained in Section 4 of the ESA – the section Congress labeled the "cornerstone of effective implementation" of the Act.  S. Rep. No. 97-418, at 10 (1982).

22.     Congress expressly recognized the independent value of protecting critical habitat when it enacted the ESA:

> Man can threaten the existence of species of plants and animals in any of a number of ways. … The most significant of those has proven also to be the most difficult to control:  the destruction of critical habitat. ...

> There are certain areas which are critical which can and should be set aside.  It is the intent of this legislation to see that our ability to do so, at least within this country, is maintained.

H.R. Rep. No. 412, 93d Cong., 1st Sess. 5 (1973).

23.     In 1976, Congress reiterated the distinct importance of critical habitat and the prohibition on adverse modification:

> It is the Committee's view that classifying a species as endangered or threatened is only the first step in insuring its survival.  Of equal or more importance is the determination of the habitat necessary for that species' continued existence.  Once a habitat is so designated, the Act requires that proposed federal actions not adversely affect the habitat.  If the protection of endangered and threatened species depends in large measure on the preservation of the species' habitat, then

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 20 -

the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitat.

H.R. Rep. No. 887, 94th Cong., 2d Sess. 3 (1976).

24.     Under ESA Section 7, Congress charged each and every federal agency with the affirmative duty to further conservation of imperiled species; the ESA explicitly elevates species protection over the primary missions of federal agencies.  16 U.S.C. § 1536(a).

25.     In addition to an overarching affirmative duty, the ESA requires every federal agency to obtain review and clearance for activities that may affect listed species or their habitat. If an activity authorized, funded, or carried out by a federal agency may affect a listed species or its designated critical habitat, that activity cannot go forward until consultation (a biological review of the proposal by FWS or NMFS) ensures that it will not "jeopardize" the species or result in the "destruction or adverse modification" of designated critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

26.     Agency actions subject to consultation include actions taken by the Services themselves.  *See* FWS and NMFS, Endangered Species Act Consultation Handbook 1-5 to 1-6, App. E (1998) (describing Intra-Service Section 7 Consultation requirements), *available at* http://www.fws.gov/endangered/consultations/s7hndbk/s7hndbk.htm.  When the Services' own actions "may affect" a listed species or critical habitat, they must consult with the Endangered Species office of FWS or the NMFS Office of Protected Resources.

27.     The listing of a species as endangered under the ESA triggers prohibitions under Section 9 of the Act, 16 U.S.C. § 1538, including the prohibition on the "take," of species, which is defined to include "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(18); *see also* 50 C.F.R. § 17.3 (harm "means an act which actually kills or injures wildlife.  Such act may include significant

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 21 -

habitat modification or degradation where it actually kills or injures wildlife by significantly

impairing essential behavioral patterns, including breeding, feeding or sheltering.").

28.     The prohibitions in ESA Section 9 also extend beyond intentional take of

endangered species to "incidental take," or take that is not a direct goal of the proposed action.

During Section 7 consultation, if FWS or NMFS concludes that take will not jeopardize the

species, then the agency may issue a written statement that specifies the impacts of the incidental

taking on the species, mitigation measures, reporting requirements, and any other terms and

conditions with which the action agency must comply ("Incidental Take Statement").  16 U.S.C.

§ 1536(b)(4)(C).

29.     Similarly, ESA Section 10 regulates incidental take by private entities.  FWS or

NMFS may permit "any taking otherwise prohibited by Section 9(a)(1)(B) if such taking is

incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  16.

U.S.C. 1539(a)(1)(B).  If FWS or NMFS finds that the taking will not reduce the likelihood of

the survival and recovery of the species, the agency may issue an Incidental Take Permit.  16

U.S.C. § 1539(a)(2)(B)(iv).

30.     Today, the ESA protects more than 1,600 plant and animal species and millions of

acres have been designated as critical habitat to allow for species' survival and recovery.  Since

its enactment, the ESA has prevented the extinction of 99 percent of the species under its

protections.

II.     OVER FORTY YEARS AGO, FWS PROMULGATED THE BLANKET 4(D) RULE
        TO ENSURE COMPLETE PROTECTION FOR ALL THREATENED SPECIES.

31.     Section 4(d) of the ESA requires the Services to promulgate regulations necessary

and advisable to conserve species listed as threatened, including regulations prohibiting the take

of threatened species.  16 U.S.C. § 1533(d).

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 22 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1    32.    In 1975, only two years after Congress enacted the ESA, FWS exercised its

2    authority and responsibility under Section 4(d) to extend the prohibition on "take" in Section 9 of

3    the ESA to all threatened species.  50 C.F.R. § 17.31(a) (2018); Reclassification of the American

4    Alligator and Other Amendments, 40 Fed. Reg. 44,111, 44,425 (Sept. 26, 1975).  This rule

5    created the default situation that a threatened species would receive all of the "anti-take"

6    protections provided to endangered species, unless FWS promulgated a species-specific rule that

7    changed those protections.

8    33.    Colloquially referred to as the "Blanket 4(d) Rule," *id.,* the D.C. Circuit upheld it

9    against *ultra vires* and contrary to the plain language of the statute challenges.  *Sweet Home*

10   *Chapter of Cmtys. for a Great Or. v. Babbitt*, 1 F.3d 1, 5-8 (D.C. Cir. 1993), *rev'd on other*

11   *grounds*, 515 U.S. 687 (1995).

12   34.    FWS found that presumptively providing threatened species with protection,

13   rather than reserving it solely for endangered species facing imminent extinction, allowed the

14   agency to work towards halting the slide of threatened species to endangered status.  In addition

15   to flexibility, this approach allowed the agency to protect threatened species while working on a

16   species-specific rulemaking.  FWS noted that the presumption of complete protection, along with

17   the ability to tailor protections if need be with a specific 4(d) rule, constituted "the cornerstone of

18   the system for regulating threatened wildlife."  40 Fed. Reg. at 44,414.

19   35.    On September 16, 1977, FWS clarified the Blanket 4(d) Rule and explicitly

20   prohibited the possession of illegally taken threatened species, as well as their commercial

21   transportation and sale in foreign or interstate commerce.  Protection for Threatened Species of

22   Wildlife, 42 Fed. Reg. 46,561-62 (September 16, 1977); *see also* 42 Fed. Reg. 46,539

23   (September 16, 1977) (exercising emergency rulemaking authority to make the prohibition on

24

25   SECOND AMENDED COMPLAINT FOR DECLARATORY
     AND INJUNCTIVE RELIEF - 23 -
26

the possession, transportation, and sale of illegally taken threatened species immediately

effective).  Maintaining the presumption of protection, this clarifying amendment to the Blanket

4(d) Rule continued to presumptively apply the strict prohibitions applicable to endangered

species to threatened species.

36.     Since 1975, FWS has listed over 300 species as threatened and applied the

Blanket 4(d) Rule to them.  Of that number, less than a quarter later received species-specific

Section 4(d) rules.

III.   FOR OVER THIRTY YEARS, THE SERVICES' JOINT REGULATIONS HAVE
       IMPLEMENTED ESA SECTIONS 4 AND 7.

37.     FWS and NMFS are the federal agencies charged by Congress with implementing

the ESA, and most of their ESA regulations have been in effect since 1986 or earlier.  The

Services adopted joint regulations implementing ESA Sections 4 and 7 approximately 30 years

ago.  *See* 45 Fed. Reg. 13,010 (Feb. 27, 1980) (Section 4); 48 Fed. Reg. 38,900 (Oct. 1, 1984

(Section 4); 51 Fed. Reg. 19,926 (June 3, 1986) (Section 7).  The ESA Regulations have not been

substantially amended since that time, with only minor amendments adopted in 2015 and 2016.

*See* 80 Fed. Reg. 26,832 (May 11, 2015) (Section 7); 81 Fed. Reg. 7,214 (Feb. 11, 2016)

(Section 7); 81 Fed. Reg. 7,439 (Feb. 11, 2016) (Section 4).

IV.   THE CHALLENGED REGULATIONS REVERSE PROTECTIONS FOR
      THREATENED AND ENDANGERED SPECIES AND THEIR CRITICAL HABITAT.

A.   The 2018 Proposed Rules

38.     On July 25, 2018, FWS and NMFS issued three proposed regulatory packages

revising the ESA regulations.  All three proposed regulatory changes sought to carry out

Executive Order 13777, which directs federal agencies to eliminate allegedly "unnecessary

regulatory burdens."  Enforcing the Regulatory Reform Agenda, 82 Fed. Reg. 12,285 (Mar. 1,

2017).  First, FWS proposed to repeal the Blanket 4(d) Rule by revising regulations found in 50

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 24 -

1   C.F.R. §§ 17.31, 17.71.  83 Fed. Reg. 35,174-78 (July 25, 2018).  While conceding that the

2   Blanket 4(d) rule represented a reasonable interpretation of the ESA, FWS attempted to justify

3   the proposed repeal of the Blanket 4(d) Rule by asserting that it wished to align itself with the

4   procedures used by NMFS and that it had developed experience on species-specific 4(d) rules

5   over the years.  83 Fed. Reg. at 35,175.

6       39.    The second package of proposed regulatory revisions focused on the rules

7   promulgated by FWS and NMFS implementing the listing, delisting, and designation of critical

8   habitat provisions of ESA Section 4, specifically 50 C.F.R. § 424.11 (Factors for Listing,

9   Delisting, or Reclassifying Species) and 50 C.F.R. § 424.12 (Criteria for Designating Critical

10  Habitat).  83 Fed. Reg. 35,193-201 (July 25, 2018).

11      40.    The third set of proposed regulatory changes involved the FWS and NMFS

12  regulations implementing ESA Section 7.  83 Fed. Reg. 35,178-93 (July 25, 2018).  These

13  revisions proposed changes to the regulatory definitions (50 C.F.R. § 402.02), regulations on

14  formal consultation (50 C.F.R. § 402.14), regulations on reinitiation of formal consultation (50

15  C.F.R. § 402.16), and those for other provisions (50 C.F.R. § 402.17).

16      41.    In both packages proposing changes to the rules implementing ESA Sections 4

17  and 7, FWS and NMFS also asked for input on broad, unfocused swaths of the regulations,

18  seeking comments on "any provisions in part 424 of the regulations, including but not limited to

19  revising or adopted as regulations existing practices or policies, or interpreting terms or phrases

20  from the Act."  83 Fed. Reg. at 35,194.  "[T]he final rule may include revisions to any provisions

21  in part 424 that are a logical outgrowth of this proposed rule."  *Id.*; *see also* 83 Fed. Reg. at

22  35,179 (same for revisions in part 402).  Because the Services failed to provide specific proposed

23

24

25  SECOND AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 25 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1  statutory language or provisions, Plaintiffs were unable to review and comment on these specific

2  changes.  *See* Exh. J, Hartl Decl. ¶¶ 7-9; Exh. L, Jones Decl. ¶ 15; Exh. N, Kurose Decl. ¶¶ 7-9.

3      42.    The federal agencies indicated that they were not likely to undertake an

4  environmental assessment or environmental impact statement under NEPA when promulgating

5  the proposed revisions.  The agencies asserted that the rules would likely fall under a

6  "categorical exclusion" exempting them from NEPA review.  83 Fed. Reg. at 35,176, 35,191,

7  35,200.  Specifically, FWS and NMFS stated that the proposed rules were likely categorically

8  exempt as "policy, directive, regulation, or guideline that is administrative, legal, technical, or

9  procedural in nature" that "would not individually or cumulatively have a significant effect on

10  the human environment."  *Id*.

11     42a.    In comments on the proposed revisions, Plaintiffs reminded the Services of their

12  duty to comply with NEPA and prepare an EIS because (1) the agencies needed to take a "hard

13  look" at the environmental consequences of their actions *before* those actions occurred by in

14  order to ensure that the agencies carefully considered detailed information concerning significant

15  environmental impacts; (2) the agencies needed to consider alternatives to its proposed revisions;

16  and (3) the agencies needed to make the relevant information available to the public so that it

17  could play its role in the decision-making process.  *See* Exh. V, Senatore Decl. ¶ 25 (Defenders

18  deprived of opportunity to review and comment on alternatives and would have submitted NEPA

19  comments); Exh. I, Greenwald Decl. ¶ 30 (harm from lack of NEPA compliance, including lack

20  of analysis of likely environmental effects, failure to consider alternatives, failure to give public

21  information; the Center would have commented if given a chance).

22     43.    FWS and NMFS accepted comments on all three packages of proposed ESA

23  revised regulations through September 24, 2018.  The proposed revisions sparked great concern

24

25  SECOND AMENDED COMPLAINT FOR DECLARATORY
26  AND INJUNCTIVE RELIEF - 26 -

1    and controversy, with over 800,000 comments being submitted to the agencies opposed to the

2    proposed revisions.

3         B.    The Final 2019 FWS Repeal of the Blanket 4(d) Rule

4         44.    On August 12, 2019, FWS issued final rules amending 50 C.F.R. §§ 17.31 and

5    17.71 to eliminate the Blanket 4(d) Rule that prohibits take of threatened animals and plants.

6    Final Rule, Revision of the Regulations for Prohibitions to Threatened Wildlife and Plants, 84

7    Fed. Reg. 44,753 (Aug. 27, 2019).

8         45.    FWS's new rule removes the presumption that threatened species will receive

9    protection from take, which has far-reaching impacts.  Any species listed or reclassified as

10   threatened in the future "would have protective regulations only if the Service promulgates a

11   species-specific rule," 84 Fed. Reg. at 44,753, and yet the new rule imposes no obligation on

12   FWS to adopt any such species-specific rules.

13        46.    FWS gave scant reasons for eliminating the Blanket 4(d) Rule.  First, FWS noted

14   that the Department of Commerce (acting through NMFS) did not have a similar rule for species

15   under its jurisdiction.  84 Fed. Reg. at 44,754.  Second, FWS alleged that it had acquired

16   "considerable experience in developing species-specific rules over the years."  *Id.*  The agency

17   went on to allege that such species-specific 4(d) rules provide benefits such as "removing

18   redundant permitting requirements, facilitating implementation of beneficial conservation

19   actions, and making better use of [the agency's] limited personnel and fiscal resources by

20   focusing prohibitions on the stressors contributing to the threatened status of the species."  *Id.*

21        47.    FWS claimed that reversal of the Blanket 4(d) Rule will allow FWS to "tailor

22   protections to the needs of the threatened species."  84 Fed. Reg. at 44,757.  In support of the

23   revision, FWS noted two species-specific 4(d) rules which were adopted while the Blanket 4(d)

24   Rule was still in effect, citing the coastal California gnatcatcher's and Kentucky arrow darter's

25   SECOND AMENDED COMPLAINT FOR DECLARATORY          *Earthjustice*
                                                       *810 Third Avenue, Suite 610*
26   AND INJUNCTIVE RELIEF - 27 -                      *Seattle, WA  98104-1711*
                                                       *(206) 343-7340*

species-specific 4(d) rules as examples of when species-specific 4(d) rules allowed FWS to "capitalize" on specific regulations to meet the "conservation needs of the species."  84 Fed. Reg. at 44,754.

48.   Commenters on the rule, including Plaintiffs, noted that FWS has issued species-specific 4(d) rules for only a fraction of the species listed in the last ten years; NMFS manages far fewer species than FWS and has still failed to provide species-specific 4(d) rules for all its threatened species; and the Blanket 4(d) Rule in no way prohibited FWS from issuing species-specific 4(d) rules, as its own examples highlighted.

49.   In response to comments critical of FWS's intent to eliminate the Blanket 4(d) Rule, FWS "restate[d] our intention to finalize species-specific 4(d) rules concurrently with final listing or reclassification determinations.  84 Fed. Reg. at 44,755.  However, FWS refused to create a binding regulatory requirement to ensure concurrent promulgation of listing and species-specific 4(d) decisions.  FWS also asserted its interpretation that the statute itself does not require species-specific 4(d) rules to be promulgated at the time of listing.  84 Fed. Reg. at 44, 753 ("[W]e have discretion to revise or promulgate species-specific rules at any time after the final listing or reclassification determination.").

50.   FWS's elimination of the Blanket 4(d) Rule became effective on September 26, 2019.  84 Fed. Reg. at 44,753.

C.   The Final Section 4 Listing and Critical Habitat Regulatory Revisions

51.   On August 12, 2019, FWS and NMFS issued final changes to the joint regulations that implement ESA Section 4 listing and critical habitat requirements.  Final Rule, Revision of the Regulations for Listing Species and Designating Critical Habitat, 84 Fed. Reg. 45,020 (Aug. 27, 2019).  Major changes and revisions are described below.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 28 -

1

### 1.   Adding economic considerations to listing decisions

2      52.    The ESA requires that listing decisions to protect endangered and threatened

3   species be made "solely on the basis of the best scientific and commercial data available."  16

4   U.S.C. § 1533(b)(1)(A).  Congress added the word "solely" in the 1982 amendments to the Act

5   to underscore that non-biological considerations should play no role in listing decisions.  Pub. L.

6   No. 97-304, 96 Stat. 1411; *see also* H.R. Rep. No. 97-567, at 19 (1982) (noting that the term

7   "solely" was added to emphasize that listing determinations were to be made "solely upon

8   biological criteria and to prevent non-biological considerations from affecting such decisions").

9      53.    The Services' final regulation deletes from 50 C.F.R. § 424.11(b), the Services'

10   regulation establishing listing factors, the phrase "without reference to possible economic or

11   other impacts."  84 Fed. Reg. at 45,024.  In adopting this change, the Services made clear that, in

12   the course of making listing decisions they intend to "compil[e] economic information" and

13   "present[] that information to the public" irrespective of Congress's intent that listing decisions

14   be made based solely on non-economic considerations.  *Id.*

15      ### 2.   Revising the definition of foreseeable future

16      54.    The Services finalized a new definition of the term "foreseeable future," which

17   increased the level of certainty required to protect species, contravening Congress's intent to

18   "give the benefit of the doubt to the species."  H.R. Rep. No. 96-697, at 12 (1979) (Conf. Rep.),

19   reprinted in 1979 U.S.C.C.A.N. 2572, 2576.  Listing decisions must be made "solely on the basis

20   of the best scientific and commercial data available," and injecting notions of "likelihood" into

21   those decisions is contrary to the ESA.  While the Services purported to follow the guidance set

22   forth in a 2009 opinion from the Department of the Interior's Solicitor (M-37021, Jan. 16, 2009),

23   the revised definition deviates significantly from current practice and the 2009 opinion.

24

25   SECOND AMENDED COMPLAINT FOR DECLARATORY
26   AND INJUNCTIVE RELIEF - 29 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

55.     The 2009 Opinion's definition of "the foreseeable future" was animated by a desire to avoid "reliance on assumption, speculation, or preconception."  2009 Opinion at 8.  To ensure imperiled species receive the benefit of the doubt in listing decisions, as Congress intended, the 2009 Opinion requires only that predictions be <u>reliable</u>, rejecting a definition that would limit "the foreseeable future" to only "predictions that can be made with certainty."  *Id.* at 9.

56.     The final changes to Section 424.11 do not adopt the 2009 Opinion's definition, instead adding the requirements that "both the future threats and the species' responses to those threats are likely."  84 Fed. Reg. 45,052.  Demanding that both threats and responses to threats be "likely" — which the Services clarified means "more likely than not" — goes beyond ensuring against decisions based on assumption, speculation, or preconception.  The consequence of imposing this increased certainty requirement is that species facing extinction from the impacts of climate change or other future events involving prediction and uncertainty will improperly be deprived of protection until after it is too late to prevent their extinction, violating the ESA's command to use the best available science.

### 3.     *Undermining recovery criteria*

57.     For nearly four decades, the ESA's listing regulations restricted the delisting of a species to only situations where the best scientific and commercial data available "substantiate" that the species is no longer threatened nor endangered.  45 Fed. Reg. 13,010, 13,023 (Feb. 27, 1980) (promulgating original version of 50 C.F.R. § 424.11(d)).  The previous regulations specified that the Services either must know the locations and fate of all individuals of the species or must allow "a sufficient period of time" before delisting to "indicate clearly" the species is actually extinct.  50 C.F.R. § 424.11(d)(1).  The Services insisted on this high bar to ensure that any decision to delist due to extinction is based on "conclusive evidence appropriate

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 30 -

for the species in question."  49 Fed. Reg. 38,900, 38,903 (Oct. 1, 1984); *see* also FWS,

Proposed Rule, Endangered Status for Franklin's Bumble Bee, 84 Fed. Reg. 40,006, 40,008

(Aug. 13, 2019) ("Recent approaches to evaluating extinction likelihood place increased

emphasis on the extensiveness and adequacy of survey effort, and caution against declaring a

species as extinct in the face of uncertainty.") (citation omitted).

58.     The Services' revisions drop the requirement that data "substantiate" any delisting

decision.  84 Fed. Reg. at 45,036.  The revisions also permit the Services, in making delisting

decisions, to disregard formal recovery and/or delisting criteria established in species recovery

plans for the very purpose of gauging species' progress towards recovery.  84 Fed. Reg. at

45,052.

## 4.     *Expanding critical habitat exemptions*

59.     The ESA allows the Services to forego designating critical habitat for a species if

such designation is "not prudent" because it could result in actual harm to the species.  The final

regulations expand the circumstances under which the Services may find designation "not

prudent" to include situations where:  the threatened destruction, modification, or curtailment of

a species' habitat or range is not a threat to the species; threats to habitat "stem solely from

causes that cannot be addressed through management actions resulting from" Section 7

consultations; or, areas within the jurisdiction of the United States provide no more than a

"negligible" conservation value for a species occurring primarily outside the jurisdiction of the

United States.  84 Fed. Reg. at 45,053.

60.     The ESA defines unoccupied critical habitat to include "specific areas outside the

geographical area occupied by the species at the time it is listed" that "are essential for the

conservation of the species."  16 U.S.C. § 1532(5)(A)(ii).  Instead of focusing on whether

unoccupied areas are essential for conservation based on the best available scientific data, the

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 31 -

final regulations limit the designation of unoccupied critical habitat only to those situations where it can be determined with "reasonable certainty" both that the area will contribute to the conservation of the species and that the area contains at least one "physical or biological feature" essential to the conservation of the species.  84 Fed. Reg. at 45,053.  The final rule imposes an elevated certainty requirement on the determination of what areas are "essential," rather than requiring decisions to be made based on the best available science.

61.     The final regulation also impermissibly and unreasonably limits the designation of unoccupied areas as critical habitat to situations where the designation of only occupied areas would be inadequate to ensure the conservation of the species.  84 Fed. Reg. at 45,053.  The Service itself previously identified such a limitation as "unnecessary and unintentionally limiting."  FWS/NMFS, Proposed Regulatory Amendments re Critical Habitat, 79 Fed. Reg. 27,073 (May 12, 2014).

62.     The final regulation also revises the definition of "physical and biological features" at 50 C.F.R. § 424.02 to define such features as "essential" only when they "occur in specific areas."  84 Fed. Reg. at 45,052.  This introduces a new limitation, not based in the statute, that restricts the designation of critical habitat.  This change affects the designation of occupied critical habitat and, under the final rules, unoccupied critical habitat as well.

63.     The Services' revisions to ESA Section 4 regulations became effective September 26, 2019.  84 Fed. Reg. at 45,020.

D.     The Final Section 7 Consultation Regulatory Changes

64.     To ensure that any action by a Federal agency authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered or threatened species, ESA Section 7 requires FWS and NMFS as the consulting agencies to: (1) use the best available science; (2) conduct an independent scientific review as a check on

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 32 -

1   agencies that might seek to take actions at the expense of protecting threatened and endangered

2   species; and (3) if jeopardy or destruction/adverse modification of critical habitat is found,

3   develop alternatives and mitigation that the action agencies must take to protect species and their

4   habitat.

5         65.     The ESA makes the best science currently available the determinant of whether an

6   action must undergo consultation or is likely to cause jeopardy or degrade critical habitat, and the

7   ESA requires that uncertainty be resolved in favor of protection.

8         66.     ESA regulations distinguish between two types of consultation:  formal and

9   informal.  During both types of consultations, the action agencies and the Services have a

10   statutory duty to use the best available scientific information.  16 U.S.C. § 1536(a)(2); 50 C.F.R.

11   402.14(g)(8).

12         67.     Formal consultations culminate with the Services' issuance of a biological

13   opinion, in which the Services determine whether an action is likely to either jeopardize the

14   survival and recovery of a listed species or destroy or adversely modify a species' designated

15   critical habitat.  16 U.S.C. § 1536(b); 50 C.F.R. 402.02 (definition of "formal consultation").  In

16   order to make this determination, the Service must review all relevant information and provide a

17   detailed evaluation of the action's effects, including the cumulative effects of other activities in

18   the area, on the listed species and critical habitat.  16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §

19   402.14(g)-(h).

20         68.     As part of the formal consultation process, the Services must also formulate

21   discretionary conservation recommendations to reduce or minimize the action's impacts on listed

22   species or critical habitat.  50 C.F.R. § 402.14(g)(6).

23

24

25   SECOND AMENDED COMPLAINT FOR DECLARATORY
26   AND INJUNCTIVE RELIEF - 33 -

69.     If the Services determine that the action is likely to jeopardize the species or adversely modify its critical habitat, the biological opinion must specify reasonable and prudent alternatives that will avoid such jeopardy or adverse modification.  16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(h)(3).  If the jeopardy or adverse modification cannot be avoided, however, the agency action may not proceed.

70.     Informal consultations are those consultations in which the action agency determines that an action "may affect," but is "not likely to adversely affect" ("NLAA") the listed species or its critical habitat and the pertinent Service concurs in writing in that determination.

71.     Informal consultation is often a give-and-take process through which the Services can obtain sufficient information about, or modifications to, the action to concur in the action agency's NLAA determination.  During informal consultation, the Services may, and often do, suggest modification to the action that will avoid the "the likelihood of adverse effects to listed species or critical habitat."  50 C.F.R. § 402.13(b).

72.     The informal consultation process does not conclude until the pertinent Service issues its written concurrence, and only then may the consultation be resolved without preparation of a biological opinion.  If the Service does not concur, or if the action agency has determined that the action is "likely to adversely affect" the listed species, the agencies must conduct a formal consultation.  *Id.* §§ 402.02, 402.14(a).

73.     On August 12, 2019, FWS and NMFS issued final changes to the regulations that implement ESA Section 7.  Final Rule, Endangered and Threatened Wildlife and Plants; Revision of Regulations for Interagency Cooperation, 84 Fed. Reg. 44,976 (Aug. 27, 2019). Major changes and revisions are described below.

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 34 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1                    *1.      Unchecked reliance on mitigation promises*

2        74.     Section 7(a)(2) of the ESA expressly requires the Services to "insure" that agency

3    actions are not likely to cause jeopardy or result in the destruction or adverse modification of

4    critical habitat. 16 U.S.C. § 1536(a)(2).  During formal consultation, the Services have an

5    obligation under their own regulations to "use the best available scientific and commercial data

6    available and give appropriate consideration to beneficial actions taken by the Federal agency" in

7    formulating its biological opinion of the impacts of an agency action, any reasonable and prudent

8    alternatives, and reasonable and prudent measures to minimize the impacts of incidental take

9    (mitigation measures).  50 C.F.R. § 402.14(g)(8), 402.02.  Courts have held for almost thirty

10   years that the Services cannot rely on an agency's proposal to undertake mitigation measures that

11   are uncertain to occur or succeed to reach a "no-jeopardy" conclusion.  The Ninth Circuit has

12   held that a no-jeopardy conclusion based on mitigation measures must include "specific and

13   binding plans" with a "clear definite commitment of resources for future improvements."  *Nat'l*

14   *Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935-36 (9th Cir. 2008).

15       75.     The Services finalized a new provision that amends 50 C.F.R. § 402.14(g)(8) to

16   mean that for purposes of rendering a no-jeopardy opinion or finding that the proposed action

17   does not destroy or adversely modify critical habitat, the consulting agency may rely on the

18   action agency's assertion that it will mitigate any incidental take without requiring any additional

19   demonstration of specific binding plans.  84 Fed. Reg. at 45,017.  The Services justify their

20   proposal by asserting that "judicial decisions have created confusion" about the level of certainty

21   required for mitigation measures.  84 Fed. Reg. at 45,002.  But the decisions the Services cite

22   (and many more) have, consistent with Congress's intent, been uniform in holding that

23   mitigation measures cannot be relied on to avoid a jeopardy determination unless those measures

24   are sufficiently concrete, specific, and certain to occur.

25   SECOND AMENDED COMPLAINT FOR DECLARATORY
26   AND INJUNCTIVE RELIEF - 35 -

1

2.     *Definition of destruction or adverse modification of critical habitat*

2      76.     The Services' new definition of "destruction or adverse modification" of critical

3  habitat requires the scale of the impacts to be relative to the value of critical habitat "as a whole."

4  84 Fed. Reg. at 45,016.  Yet the purpose of establishing critical habitat is for the government to

5  delineate territory that is not only necessary for the species' survival but also essential for the

6  species' recovery.  The critical habitat designation already represents the area essential to the

7  survival and recovery of species, adding "as a whole" conflicts with the ESA's plain language

8  and focus on recovery.

9      77.     The "as a whole" language means that the prohibition on "destruction or adverse

10  modification" of critical habitat will not be triggered unless the critical habitat would be reduced

11  below the minimum deemed necessary for survival or recovery of the species, which amounts to

12  jeopardizing the species.  This impermissibly prevents the prohibition on "destruction or adverse

13  modification" from having independent effect from the prohibition on jeopardizing the species.

14      78.     This is a special concern for highly migratory or wide-ranging species that, by

15  definition, require large amounts of designated critical habitat.  The "as a whole" language also

16  disregards circumstances where the Service has designated critical habitat necessary for certain

17  functions, such as dispersal habitat or nesting/roosting/foraging habitat for threatened northern

18  spotted owls in the Pacific Northwest.  While the proposed rule included a recognition that some

19  areas of critical habitat may be disproportionately biologically important or relevant to the

20  species, the final language does not capture those nuances or require an analysis that would

21  ensure the Services' conclusions are based on such biologically determinative distinctions.

22

23

24

25  SECOND AMENDED COMPLAINT FOR DECLARATORY

26  AND INJUNCTIVE RELIEF - 36 -

1

     *3.  Reinitiation of consultation on land management plans*

2   79.  The Services' final regulations exempt programmatic land management plans

3 from the requirement to reinitiate consultation upon listing of the new species or designation of

4 new or additional critical habitat, with several exemptions.  84 Fed. Reg. at 45,017-18

5   80.  Later consultations on site-specific actions cannot fill the void.  Consultation on

6 programmatic actions provides a full picture of all relevant impacts in order to determine

7 whether the combination of activities in the plan will avoid jeopardy and adverse modification of

8 critical habitat.  These determinations are appropriately made at the programmatic level, where

9 the agency is best able to consider the aggregate impacts of all the proposed activities, together

10 with other activities taking place in the same area.  Deferring this analysis to project-specific

11 consultations risks masking or missing these collective impacts.

12     *4.  Definition of environmental baseline*

13   81.  The Services finalized a new definition of the "environmental baseline" that

14 creates a distinction between entirely new and ongoing agency actions.  84 Fed. Reg. at 45,016

15 ("The consequences to listed species or designated critical habitat from ongoing agency actions

16 or existing agency facilities that are not within the agency's discretion to modify are part of the

17 environmental baseline.").

18   82.  Segregating from a proposed action those aspects and effects that are ongoing is

19 inconsistent with the definition of "action" as anything a Federal agency authorizes, funds, or

20 carries out.  50 C.F.R. § 402.02.  For example, where the past and present effects of an on-going

21 federal action hasten or continue a species' decline to extinction, carrying that action forward

22 necessarily means carrying forward those harmful effects.  In other words, a decision to continue

23 an ongoing action (even if modified to be slightly less harmful than it was previously) is as much

24

25 SECOND AMENDED COMPLAINT FOR DECLARATORY

26 AND INJUNCTIVE RELIEF - 37 -

1   a decision to carry forward the harmful effects as it is a decision to continue the action in a

2   slightly less detrimental fashion.

3       83.     Consultation on a proposed modification and continuation of an ongoing action

4   must ensure that the entire ongoing action does not appreciably reduce the likelihood of survival

5   and recovery and/or destroy or adversely modify critical habitat.  The final definition invites that

6   improper comparison between the past and present impacts of an ongoing federal action and the

7   effects of the action.

8               5.     *New definitions for activities reasonably certain to occur and*
                       *consequences of proposed action*
9

10      84.     The Services added a new section, § 402.17 Other Provisions, that defines

11  "activities that are reasonably certain to occur" in subsection (a) and "consequences caused by

12  the proposed action" in subsection (b).  84 Fed. Reg. at 45,018.

13      85.     Subsection (b) states that "[t]o be considered an effect of a proposed action, a

14  consequence must be caused by the proposed action (i.e., the consequence would not occur but

15  for the proposed action and is reasonably certain to occur)."  *Id.*  Including a requirement that the

16  consequence be "reasonably certain to occur" creates a new standard for showing a consequence

17  is caused by the proposed action.  The ESA requires that any doubt should be read in favor of

18  protecting the species and that the proposed action bear the burden of risk and uncertainty.

19      86.     Subsection (b) also lists three mandatory considerations for determining that a

20  consequence is not caused by the proposed action, and is therefore not an effect of the action,

21  including that the consequence is "remote in time," "geographically remote," and "reached

22  through a lengthy causal chain" such that they are not "reasonably certain to occur."  *Id.*

23  Temporal or geographic remoteness do not necessarily bear on whether an impact is reasonably

24  certain to occur.  These criteria would allow the agency to avoid consideration of a particular

25  SECOND AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 38 -
26

1   effect in, among other things, a biological assessment, determination of the lead and cooperating

2   agencies, and reinitiation of formal consultation.  This requirement would require the agency to

3   ignore during Section 7(a)(2) consultation the consequences of a proposed action simply because

4   those consequences do not meet the arbitrary and vague new causation standard.

5   　　　87.    The Services' definition of consequences caused by the proposed action also

6   includes a newly minted "but for" causation test – requiring that a consequence will not be

7   considered unless it would not occur unless exclusively caused by the proposed activity.  This

8   new definition would allow the Services to speculate that certain impacts — for example, the

9   growth inducing effects of a new highway — would occur regardless of the proposed activity

10  and on that basis avoid consideration of those impacts in the ESA Section 7(a)(2) consultation

11  process.

12  　　　88.    Section 7(a)(2) requires Federal agencies to consult with the Services to insure

13  that *any action* authorized, funded, or carried out by such agency is not likely to jeopardize

14  species or adversely modify critical habitat.  Artificially limiting and attempting to draw bright

15  lines around some elements of a proposed action to cabin—or exclude consequences entirely

16  from—the consultation process would result in far greater risk to species listed as endangered

17  and threatened and violates the best available science requirement of the ESA.

18  　　　89.    The Services' revisions to the ESA Section 7 regulations originally had an

19  effective date of September 26, 2019, but the Services delayed the effective date until October

20  28, 2019 to provide additional time "to adequately educate and train staff of the Services and all

21  of the affected Federal agencies."  84 Fed. Reg. 50,333 (Sept. 25, 2019).

22  　　　E.    <u>The Services Failed To Comply with NEPA and ESA Consultation Requirements.</u>

23  　　　90.    The Services did not analyze the impacts of the revised regulations under NEPA.

24  For the elimination of the Blanket 4(d) Rule, FWS invoked two categorical exclusions under 43

25  SECOND AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 39 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

C.F.R. § 46.210(i) — that the revisions were of a legal, technical, or procedural nature and that any potential impacts were too broad, speculative, and conjectural for meaningful analysis.  The Service also found that no extraordinary circumstances were present.  84 Fed. Reg. at 44,759.

91.     For the revisions to the ESA Section 4 regulations, the Services concluded that the regulations were categorically excluded from NEPA review and that no extraordinary circumstances were present.  84 Fed. Reg. at 45,051-52.

92.     For the revision to the ESA Section 7 regulations governing consultation, the Services also concluded that the regulations were categorically excluded from NEPA review and that no extraordinary circumstances were present.  84 Fed. Reg. at 45,015.

93.     Nor did the Services consult on the effects of any of the revised regulations under ESA Section 7 or use the best scientific and technical information available in developing and promulgating the revised regulations.  *See* Exh. V, Senatore Decl. ¶ 26 (failure to prepare a biological opinion deprived Defenders of opportunity to better assess impacts of Services' actions); Exh. I, Greenwald Decl. ¶ 31 (failure to prepare a biological opinion deprived the Center of valuable information).

CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF

Violation of the National Environmental Policy Act
and the Administrative Procedure Act:
Failure to Prepare an Adequate Environmental Impact Statement

94.     NEPA is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1.  Among other things, NEPA requires all agencies of the federal government to prepare a "detailed statement" that discusses the environmental effects of, and reasonable alternatives to, all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  This statement is commonly known as an

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 40 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

Environmental Impact Statement ("EIS").  A "major federal action" upon which an EIS may be required includes "new or revised agency rules [and] regulations." 40 C.F.R. § 1508.18(a).  The environmental effects that must be considered in an EIS include "indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," as well as direct effects.  40. C.F.R. § 1508.8.  An EIS must also consider the cumulative impacts of the proposed action, that is, the environmental impacts that result "from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  40 C.F.R. § 1508.7; *see also* § 1508.27(b)(7).  The purpose of an EIS is to inform the decision-makers and the public of the significant environmental impacts of the proposed action, means to mitigate those impacts, and reasonable alternatives that will have lesser environmental effects.

95.     NEPA requires federal agencies, including FWS and NMFS, to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  40 U.S.C. § 4332(E).  This requires an agency to "[r]igorously explore and objectively evaluate all reasonable alternatives," 40 C.F.R. § 1502.14(a), as well as describe the "underlying purpose and need to which the Agency is responding in proposing the alternatives, including the proposed action." 40 C.F.R. § 1502.13.  The consideration of alternatives is described as the "heart" of the NEPA analysis.  40 C.F.R. § 1502.14.

96.     NEPA also requires that Federal Defendants use high quality, accurate scientific information and ensure the scientific integrity of the analysis in an EIS.  *See* 40 C.F.R. § 1500.1(b); 40 C.F.R. § 1502.24.

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 41 -

97.     The regulations promulgated by the federal agency responsible for overseeing implementation of NEPA, the Council on Environmental Quality ("CEQ"), authorize agencies to specify categories of actions "[w]hich normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4))."  40 C.F.R. § 1507.3(b)(2)(ii).  The CEQ regulations define "categorical exclusion" as "a category of actions which do not individually or cumulatively have a significant effect on the human environment," and they require that all federal agencies establish those categories by rule.  40 C.F.R. § 1508.4.  The CEQ regulations also require that agency regulations establishing categorical exclusions "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect."  *Id.*

98.     FWS has defined a categorical exclusion as "[p]olicies, directives, regulations, and guidelines: that are of an administrative, financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case."  43 C.F.R. § 46.210(i).

99.     NMFS similarly defined categorical exclusions in NOAA Administrative Order 216-6A and Companion Manual, Policy and Procedures for Compliance with the National Environmental Policy Act and Related Authorities (Jan. 13, 2017), Appendix E.

100.     FWS and NMFS have stated that the regulatory revisions were categorically excluded from NEPA because the revisions' environmental impacts are "fundamentally administrative, legal, technical, or procedural in nature," and "too broad, speculative, or conjectural to lend themselves to meaningful analysis."  To the contrary, the ESA revisions remove substantive protections from threatened and endangered species, revise the conditions for

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   listing, delisting, and designating critical habitat, and change substantive measures in ESA

2   biological consultations.  The revisions are likely to have significant adverse environmental

3   effects and are likely to harm threatened and endangered species and their designated critical

4   habitat.

5        101.    Even if the revisions could be covered by a categorical exclusion, extraordinary

6   circumstances require the preparation of an EIS or EA.  The revisions have highly controversial

7   environmental effects, involve unresolved conflicts concerning alternative uses of available

8   resources, have highly uncertain and potentially significant environmental effects, involve

9   unique or unknown environmental risks, establish a precedent for future action and represent a

10  decision in principle about future actions with potentially significant environmental effects, and

11  have significant impacts on listed species, species proposed to be listed, and designated critical

12  habitat under the ESA.  43 C.F.R. § 46.215.

13       102.    FWS and NMFS are subject to NEPA, and the final decisions revising the ESA

14  regulations are major federal actions significantly affecting the human environment within the

15  meaning of 42 U.S.C. § 4332(2)(C) for at least the following reasons:

16       a.      The revised regulations "may adversely affect an endangered or threatened

17  species or its [critical] habitat."  40 C.F.R. § 1508.27(b)(9).

18       b.      The effects of the revised ESA regulations will fall on areas with unique

19  geographic characteristics, including recreation areas, designated wilderness, wild and scenic

20  rivers, and ecologically critical areas within the meaning of 40 C.F.R. § 1508.27(b)(3).

21       c.      The effects of the revised ESA regulations on the quality of the human

22  environment are likely to be "highly controversial" within the meaning of 40 C.F.R. §

23  1508.27(b)(4).

24

25  SECOND AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 43 -
26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

d.      The possible effects on the human environment involve "unique [and] unknown risks" within the meaning of 40 C.F.R. § 1508.27(b)(5).

e.      The revisions "may establish a precedent for future actions with significant effects" within the meaning of 40 C.F.R. § 1508.27(b)(6).

f.      The revisions threaten a violation of federal law imposed for the protection of the environment, namely the ESA, within the meaning of 40 C.F.R. § 1508.27(b)(10).

103.    FWS's and NMFS's promulgation of the 2019 Revised ESA Regulations under a categorical exclusion to NEPA; their promulgation of the ESA regulations without preparing an EIS that (a) examines an adequate range of alternatives, (b) has a statement of purpose and need that corresponds to the agencies' proposed action, (c) identifies the correct no action alternative baseline for comparing and assessing direct, indirect, and cumulative environmental effects, and (d) uses high quality scientific information; and their promulgation of ESA revised regulations without preparing an EIS that examines the overarching direct, indirect, and cumulative environmental effects is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of NEPA, the CEQ regulations, the FWS and NMFS guidelines implementing NEPA, and the APA, 5 U.S.C. § 706(2).

SECOND CLAIM FOR RELIEF

Violation of Administrative Procedure Act:
Failure to Provide Adequate Notice and Comment

104.    Fundamental to the APA's procedural framework is the requirement that, absent narrow circumstances, a federal agency must publish as a proposal any rule that it is considering adopting and allow the public the opportunity to submit written comments on the proposal.  5 U.S.C. § 553.  The proposal must be detailed and described with reasonable specificity to allow a meaningful opportunity to comment.

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 44 -

105.    In the packages of changes to regulations implementing ESA Sections 4 and 7, FWS and NMFS made it clear that they viewed these rulemakings as applying to "all of part 402" and "all of part 424" and asserted that the "final rule[s] may include revisions to any provisions in [Parts 402 and 424] that are a logical outgrowth of this proposed rule…."  83 Fed. Reg. at 35,179; *id.* at 35,194.

106.    On August 12, 2019, FWS and NMFS issued the final regulatory revisions for ESA Section 7, including changes that were not detailed or disclosed in the proposed rules. These include new language amending 50 C.F.R. § 402.17, purporting to define what "activities are reasonably certain to occur," limiting the "consequences caused by the proposed action," and redefining the "environmental baseline."  In changes to 50 C.F.R. § 424.12, the Services also finalized new regulatory language restricting the designation of unoccupied critical habitat by introducing a new requirement for the presence of "physical or biological features" that was not part of the proposed regulation, was not discussed in any way in the proposed regulation, and represents a departure from the Service's past interpretation.  In the same section, the Services finalized new regulatory language imposing a heightened certainty requirement with regard to the designation of unoccupied critical habitat that was not part of or intimated by the proposed rule.

107.    The Services' general requests for comments on topics or potential additional changes, disconnected from any specific proposals, did not provide fair notice of how the agency actually planned to amend those provisions, nor are the added revisions a logical outgrowth of the proposed rules.

108.    FWS's and NMFS's promulgation of the 2019 Revised ESA Regulations without adequate notice and comment as required under 5 U.S.C. § 553, is arbitrary, capricious, an abuse

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 45 -

1  of discretion, not in accordance with law, and without observance of procedure required by law

2  with the meaning of the APA, 5 U.S.C. § 706(2).

3  THIRD CLAIM FOR RELIEF

4  Violation of the Endangered Species Act and Administrative Procedure Act:
   Contrary to Law and Failure of Rational Decisionmaking
5  With Respect to ESA Section 7 Regulatory Revisions

6  109.    The FWS and NMFS cannot adopt regulations that are manifestly contrary to the

7  text and purpose of the ESA.  Under the APA, a "reviewing court shall … hold unlawful and set

8  aside" federal agency action found to be "arbitrary, capricious, an abuse of discretion, or

9  otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction,

10 authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or "without

11 observance of procedure required by law," 5 U.S.C. § 706(2)(D).  An agency does not have

12 authority to adopt a regulation that is "manifestly contrary to the statute."  *Chevron U.S.A., Inc.*

13 *v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

14 110.    When promulgating regulations, FWS and NMFS must articulate a satisfactory

15 explanation for their action, including a rational connection between the facts found and the

16 choice made.  A regulation is arbitrary and capricious under the APA where "the agency has

17 relied on factors which Congress has not intended it to consider, entirely failed to consider an

18 important aspect of the problem, offered an explanation for its decision that runs counter to the

19 evidence before the agency, or is so implausible that it could not be ascribed to a difference in

20 view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*

21 *Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

22 111.    When an agency issues a regulation changing or amending a prior regulation, it

23 faces a high burden.  The agency must demonstrate that (1) a new rule is permissible under the

24 statute; (2) there are good reasons for it; (3) the agency believes it to be better; and (4) the

25 SECOND AMENDED COMPLAINT FOR DECLARATORY
26 AND INJUNCTIVE RELIEF - 46 -

agency displays awareness that it is changing its position. When a new regulation rests upon a factual finding contrary to prior policy, an agency must provide a more detailed justification than what would suffice if the new policy were created on a blank slate. Any unexplained inconsistency between the prior rule and its replacement is a basis for finding the agency's interpretation arbitrary and capricious.

112.    Numerous sections of the 2019 Revised ESA Regulations with respect to ESA Section 7 are contrary to the text and purpose of the ESA, including:

- Unchecked reliance on mitigation promises;

- Redefining ongoing harms as part of the environmental baseline;

- Definition of destruction or adverse modification of critical habitat;

- Limiting the effects and activities considered during consultation; and

- Reinitiation of consultation on land management plans.

113.    Promulgation of these same sections by FWS and NMFS also lack detailed justification and rational basis for a change in longstanding agency practice and is not based on the best available science, as required by the ESA.

114.    FWS's and NMFS's promulgation of the 2019 Revised Regulations with respect to ESA Section 7 is arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

### FOURTH CLAIM FOR RELIEF

FWS Violation of the Endangered Species Act and Administrative Procedure Act:
Failure of Rational Decisionmaking With Respect To Repeal of Blanket 4(d) Rule

115.    In adopting the ESA, Congress's intent was to provide a program for the conservation of … endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 47 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

1   any endangered species or threatened species to the point at which the measures provided

2   pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

3        116.    Nothing in FWS's repeal of the FWS Blanket 4(d) Rule provides rational reasons

4   for departing from the Blanket 4(d) Rule, and the agency provides no explanation of how the

5   repeal of the Blanket 4(d) Rule will further the conservation purposes of the ESA, benefit

6   threatened species, or increase regulatory flexibility.  Rather, the repeal will reverse the

7   presumption of protection that FWS has applied to threatened species for over 40 years.  Indeed,

8   the repeal allows — unless every threatened listing includes a separate species-specific rule —

9   incidental or even purposeful take of threatened species without identifying impacts on the

10  threatened species, mitigation measures, or any reporting.

11       117.    FWS's demonstrated delay in addressing listing petitions and species-specific

12  rules stands in conflict with its assertion that repeal of the Blanket 4(d) Rule would advance

13  conservation purposes and better tailor protections to the needs of threatened species.  FWS faces

14  a backlog of more than 500 species awaiting decisions about their protection.  According to

15  FWS's Draft Effect Data for the Revision of the Regulations for Listing Species and Designating

16  Critical Habitat (June 26, 2018), FWS will need to issue six additional species-specific 4(d) rules

17  every year above its historical average.  Despite FWS's assertions that it intends to

18  simultaneously issue species-specific 4(d) rules when listing threatened species, there is no

19  regulatory requirement for these rules to be issued concurrently.  Given the significant backlog

20  of species awaiting protection, and the Service's own poor track record of issuing species-

21  specific 4(d) rules, threatened species will inevitably be left unprotected.  Finally, in its

22  justification, FWS fails to acknowledge impacts to its other duties under the ESA by excluding

23

24

25  SECOND AMENDED COMPLAINT FOR DECLARATORY
26  AND INJUNCTIVE RELIEF - 48 -

consideration of incidental takings, the prohibition of which will no longer presumptively apply to threatened species.

118.     The repeal provides no additional conservation benefits when compared to the Blanket 4(d) Rule.  FWS provides no rational reason to explain why the Blanket 4(d) rule in any way prevents or impedes FWS from providing the tailored species-specific protections on a case-by-case basis at the time of listing, as it asserts it intends to do after rescinding the Blanket 4(d) rule.  Rather, the Rule was adopted pursuant to a deregulatory agenda unmoored from the purposes of the ESA.

119.     FWS's failure to articulate a rational connection between the facts found and the choice made, and to provide an adequate and detailed justification for the elimination of the long-standing Blanket 4(d) Rule renders the repeal arbitrary, capricious, an abuse of discretion, not in accordance with law, and without observance of procedure required by law with the meaning of the APA, 5 U.S.C. § 706(2).

FIFTH CLAIM FOR RELIEF

Violation of the Endangered Species Act and Administrative Procedure Act:
Contrary to Law and Failure of Rational Decisionmaking
With Respect To ESA Section 4 Regulatory Revisions

120.     The FWS and NMFS cannot adopt regulations that are manifestly contrary to the text and purpose of the ESA.  Under the APA, a "reviewing court shall … hold unlawful and set aside" federal agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C), or "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).  An agency does not have authority to adopt a regulation that is "manifestly contrary to the statute."  *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 49 -

121.    When promulgating regulations, FWS and NMFS must articulate a satisfactory explanation for their action, including a rational connection between the facts found and the choice made.  A regulation is arbitrary and capricious under the APA where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

122.    Numerous sections of the 2019 Revised ESA Regulations with respect to ESA Section 4 are contrary to the text and purpose of the ESA, including:

- elimination of the phrase "without reference to possible economic or other impacts of such determination" in 50 C.F.R. § 424.11(b);

- redefining "foreseeable future" to impose elevated certainty requirements;

- elimination of recovery criteria from delisting factors;

- expanding critical habitat exemptions; and

- restricting designation of unoccupied critical habitat by narrowing the definition of essential for the conservation of the species.

123.    Promulgation of these same sections by FWS and NMFS also lacks detailed justification and rational basis and fails to use the best available science, as required by the ESA.

124.    FWS's and NMFS's promulgation of the 2019 Revised Regulations with respect to ESA Section 4 is arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2).

SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF - 50 -

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*

SIXTH CLAIM FOR RELIEF

Violation of the Endangered Species Act and Administrative Procedure Act:
Failure to Consult Under ESA § 7 on the 2019 Revised ESA Regulations

125.     Section 7(a)(2) of the ESA requires that each federal agency, in consultation with FWS and/or NMFS, ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered species or result in the destruction or adverse modification of critical habitat of such species.  16 U.S.C. § 1536(a)(2).  "Action is defined to include the promulgation of regulations; actions that may directly or indirectly cause modifications to the land, water, or air; and actions that are intended to conserve listed species or their habitat."  50 C.F.R. § 402.02.

126.     If a federal agency, including FWS and NMFS themselves, determines that its proposed action "may affect" listed species or critical habitat, the agency must engage in "formal consultation" with FWS and/or NMFS, depending on the species involved.  50 C.F.R. § 402.14. Courts have recognized that the "may affect" hurdle is extremely low, encompassing any possible effect, whether beneficial, benign, adverse, or of an undetermined character.

127.     Formal consultation concludes with the preparation of a biological opinion by FWS and/or NFMS addressing whether the proposed action will jeopardize threatened or endangered species or result in the destruction or adverse modification of critical habitat and setting forth any necessary measures for avoiding, minimizing, and mitigating any adverse impacts.  16 U.S.C. § 1536(b).  An action agency may avoid formal consultation by engaging in "informal consultation" with FWS and/or NMFS and obtaining a written concurrence that the project is not likely to adversely affect threatened or endangered species or critical habitat.  50 C.F.R. § 402.13(a).

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 51 -

128.    The failure of FWS and NMFS to consult on the revised ESA regulations, regulations that clearly may affect ESA-listed species and critical habitat, is arbitrary, capricious, contrary to the ESA, and in violation of the APA, 5 U.S.C. § 706(2).

PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

(1)    Declare that FWS and NMFS acted arbitrarily, capriciously, and contrary to law, including NEPA and the CEQ regulations, in violation of the APA, by invoking categorical exclusions and failing to prepare an Environmental Impact Statement on the 2019 Revised ESA Regulations, and by failing to evaluate alternatives to, and the full impacts of, the revised regulations in an Environmental Impact Statement;

(2)    Declare that FWS and NMFS acted arbitrarily, capriciously, and contrary to law, including the ESA, in violation of the APA, in promulgating the 2019 Revised ESA Regulations;

(3)    Declare that FWS and NMFS acted arbitrarily, capriciously, contrary to law, abused their discretion, and failed to follow the procedures required by law in their promulgation of the 2019 Revised ESA Regulations, in violation of the APA;

(4)    Declare that FWS and NMFS violated Section 7(a)(2) of the ESA by promulgating the 2019 Revised ESA Regulations by failing to consult on the regulations' effects on listed species and their critical habitat;

(5)    Hold unlawful and vacate the 2019 Revised ESA Regulations, reinstating the prior in-force regulations;

(6)    Enjoin FWS and NMFS from applying or otherwise relying upon the 2019 Revised ESA Regulations;

(7)    Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees; and

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 52 -

1   (8)   Grant Plaintiffs such further and additional relief as the Court may deem just and

2   proper.

3   DATED this 4th day of June, 2020.

4

5   Respectfully submitted,

    *s/ Kristen L. Boyles*
6   KRISTEN L. BOYLES (CSBA # 158450)
    PAULO PALUGOD (NYB # 5047964)
7   [*Admitted Pro Hac Vice*]
    EARTHJUSTICE
8   810 Third Avenue, Suite 610
    Seattle, WA  98104
9   Ph:  (206) 343-7340
    kboyles@earthjustice.org
10  ppalugod@earthjustice.org

11  *Attorneys for Plaintiffs Center for Biological
    Diversity, Defenders of Wildlife, Sierra Club,*
12  *National Parks Conservation Association,
    WildEarth Guardians, and The Humane Society*
13  *of The United States*

14  ANDREA A. TREECE (CSBA # 237639)
    EARTHJUSTICE
15  50 California Street, Suite 500
    San Francisco, CA 94111
16  Ph:  (415) 217-2089
    atreece@earthjustice.org
17
    *Local Counsel for Plaintiffs*
18
    REBECCA RILEY (ISBA # 6284356)
19  [*Admitted Pro Hac Vice*]
    NATURAL RESOURCES DEFENSE COUNCIL
20  20 North Wacker Drive, Suite 1600
    Chicago, IL 60606
21  Tel: 312-651-7900
    rriley@nrdc.org
22
    *Attorney for Natural Resources Defense*
23  *Council*

24

25  SECOND AMENDED COMPLAINT FOR DECLARATORY
    AND INJUNCTIVE RELIEF - 53 -
26

KARIMAH SCHOENHUT (DCBA #1028390)
SIERRA CLUB
[*Admitted Pro Hac Vice*]
50 F. St. NW, 8th Floor
Washington, DC  20001
Tel: 202-548-4584
karimah.schoenhut@sierraclub.org

*Attorney for Sierra Club*

RYAN ADAIR SHANNON (OSBA # 155537)
[*Admitted Pro Hac Vice*]
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Tel: 503-283-5474 ext. 407
rshannon@biologicaldiversity.org

*Attorney for Center for Biological Diversity*

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 54 -

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on June 4, 2020, I electronically filed the foregoing document with

3

the Clerk of the Court using the CM/ECF system, which will send notification of this filing to the

4

attorneys of record and all registered participants.

5

6

*/s/ Kristen L. Boyles*
Kristen L. Boyles

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SECOND AMENDED COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 55 -

26

*Earthjustice*
*810 Third Avenue, Suite 610*
*Seattle, WA  98104-1711*
*(206) 343-7340*