# Exhibit A



August 20, 2019

**BY FEDERAL EXPRESS**

David Bernhardt, Secretary
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C.  20240

Margaret Everson, Acting Director
U.S. Fish & Wildlife Service
1849 C Street N.W.
Washington, D.C.  20240

Wilbur Ross, Secretary
U.S. Department of Commerce
1401 Constitution Avenue N.W.
Washington, D.C.  20230

Chris Oliver, Assistant Administrator for Fisheries
National Marine Fisheries Service
1315 East West Highway, SSMC3
Silver Spring, MD  20910

   Re: Notice of Violation of the Endangered Species Act: 2019 Revised ESA Regulations

Greetings:

  On behalf of Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Natural Resources Defense Council, National Parks Conservation Association, WildEarth Guardians, and The Humane Society of The United States,[1] we ask that you take immediate action to remedy ongoing violations of the Endangered Species Act ("ESA") by the Department of the Interior, Department of Commerce, U.S. Fish and Wildlife Service ("FWS"), and National Marine Fisheries Service ("NMFS") (collectively "the Services") in issuing on August 12, 2019 Final Rules revising regulations implementing the Endangered Species Act of 1973 ("ESA").

  FWS and NMFS are violating Section 7(a)(2) of the ESA by engaging in action that "may affect" ESA-listed species without having first engaged in consultation under the ESA. 16 U.S.C. § 1536(a)(2).  Moreover, implementation of the revised regulations during

---

[1] A list of these organizations' business addresses is appended.

U.S. Department of Interior
U.S. Fish & Wildlife Service
U.S. Department of Commerce
National Marine Fisheries Service
August 20, 2019
Page 2

consultation or prior to initiation of consultation constitutes a violation of Section 7(d) of the Act, which prohibits the "irretrievable commitment of resources" pending completion of consultation. 16 U.S.C. § 1536(d). For the agencies' failure to consult, this letter constitutes notice in accordance with Section 11(g) of the ESA, 16 U.S.C. § 1540(g).

FWS and NMFS are also violating ESA Section 4 by adopting regulations that are manifestly contrary to the text and purpose of the ESA. While a challenge to the agencies' adoption of these regulations arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, out of an abundance of caution, we are also noticing those violations in this 60-day notice letter prior to bringing legal claims.

I.     BACKGROUND

On August 12, 2019, the Services issued three final packages of regulatory revisions amending the regulations that implement ESA Sections 4 and 7, 16 U.S.C. §§ 1533, 1536. The final regulations are currently available at http://www.regulations.gov in Docket Nos. FWS-HQ-ES-2018-0006; FWS-HQ-ES-0007; FWS-HQ-ES-2018-0009. The rules will also be published in the Federal Register.

In the three regulatory packages, one repealed the longstanding FWS regulation that automatically extended certain protections to threatened animals and plants upon listing; one amended other parts of ESA Section 4 that govern listing, delisting, and designation of critical habitat; and one changed the regulations governing ESA Section 7 consultations. Taken together, these packages of regulatory revisions change definitions, substance, and processes used by FWS and NMFS when complying with their ESA duties. These significant changes may harm currently listed and future threatened and endangered species and undermine the fundamental purpose of the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved…." 16 U.S.C. § 1531(b).

II.    FWS AND NMFS VIOLATED THE ESA BY FAILING TO CONSULT ON THE 2019 REVISED ESA REGULATIONS.

   A.    Legal Framework

Under ESA Section 7(a)(2), "[e]ach federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). The obligation to "insure" against a likelihood of jeopardy or adverse modification requires the agencies to give the benefit of the doubt to endangered species and to place the burden of risk and uncertainty on the proposed action. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987). The

U.S. Department of Interior
U.S. Fish & Wildlife Service
U.S. Department of Commerce
National Marine Fisheries Service
August 20, 2019
Page 3

substantive duty imposed by Section 7(a)(2) is constant, relieved only by an exemption from the Endangered Species Committee. 16 U.S.C. § 1536(h); *Conner v. Burford*, 848 F.2d 1441, 1452 n.26 (9th Cir. 1988).

Section 7 establishes an interagency consultation process to assist federal agencies in complying with their duty to ensure against jeopardy to listed species or destruction or adverse modification of critical habitat. An agency must initiate consultation with NMFS or FWS under Section 7 whenever it takes an action that "may affect" a listed species. *See* 50 C.F.R. § 402.14(a). Agency actions subject to consultation includes actions taken by the Services themselves. *See* FWS and NMFS, Endangered Species Act Consultation Handbook 1-5 to 1-6, App. E (1998) (describing Intra-Service Section 7 Consultation requirements), *available at* http://www.fws.gov/endangered/consultations/s7hndbk/s7hndbk.htm. Different offices within the Services have consulted with the Endangered Species office of FWS or the NMFS Office of Protected Resources when the Services' own actions "may affect" a listed species or critical habitat.

Regulations implementing Section 7 broadly define the scope of agency actions subject to consultation. *See* 50 C.F.R. § 402.02 (definition of action). "Examples include, but are not limited to: . . . (b) promulgation of regulations." *Id.* The Ninth Circuit Court of Appeals has construed the term "action" broadly. *See Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054-55 (9th Cir. 1994); *Conner*, 868 F.2d at 1453; *see also National Wildlife Fed'n v. FEMA*, 345 F. Supp. 2d 1151, 1169 (W.D. Wash. 2004).

As a result of consultation, the federal agency will obtain either a written concurrence letter from NMFS or FWS that the proposed action is "not likely to adversely affect" listed species or their habitat, 50 C.F.R. §§ 402.13, 402.14(b)(1), or a biological opinion evaluating the effects of the federal action on listed species and their critical habitat. 50 C.F.R. § 402.14(a); *see generally Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985). If NMFS or FWS concludes that a proposed action is likely to jeopardize a listed species or result in adverse modification of its critical habitat, NMFS or FWS must propose a reasonable and prudent alternative, if available, that will mitigate the proposed action so as to avoid jeopardy and/or adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3).

Section 7(a)(2) also requires agencies to use the best available science in discharging their Section 7 duties: "In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

Separately, ESA Section 7(d) prohibits federal agencies, after the initiation of consultation under ESA Section 7(a)(2), from making any irreversible or irretrievable commitment of resources if doing so would foreclose the implementation of reasonable and prudent alternatives. 16 U.S.C. § 1536(d); *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118,

U.S. Department of Interior
U.S. Fish & Wildlife Service
U.S. Department of Commerce
National Marine Fisheries Service
August 20, 2019
Page 4


1128 & n.6 (9th Cir. 1998) (Section 7(d) violated where Bureau of Reclamation executed water service contracts prior to completion of formal consultation); *Marsh*, 816 F.2d at 1389 (construction of highway outside species habitat barred by Section 7(d) pending completion of consultation). This prohibition is not an exception to the requirements of Section 7(a)(2); it is in addition to the requirements of Section 7(a)(2); and it ensures that Section 7(a)(2)'s substantive mandate is met. *See, e.g.*, *Pacific Rivers Council*, 30 F.3d at 1056-57; *Defs. of Wildlife v. Jackson,* 791 F. Supp. 2d 96, 113 (D.D.C. 2011).

> B. <u>The Services' Failure To Consult on the 2019 Revised ESA Regulations, Which "May Affect" Threatened and Endangered Species and Adversely Modify their Designated Critical Habitat, Violates Section 7(a)(2).</u>

The threshold for a "may affect" determination and required ESA Section 7 consultation is low. *See* 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement."). Promulgation and implementation of the consultation rule amendments unquestionably "may affect" threatened and endangered species and their designated critical habitat. *See National Wildlife Fed'n v. FEMA*, 345 F. Supp.2d at 1176 (responding to FEMA argument that the flood insurance program itself did not affect salmon by noting "[t]he regulations implementing Section 7(a)(2) of the ESA require an action agency to consider 'the effects of the action as a whole'").

Among other things, the revised regulations will: undo default protections for newly listed threatened species; add economic considerations to listing decisions in violation of the statute; raise the bar on the definition of "foreseeable future" which could prevent listings of species that are otherwise warranted by the best available scientific information; undermine recovery criteria; expand critical habitat exemptions; allow unchecked reliance on mitigation promises; raise the bar on finding destruction or adverse modification of critical habitat by adding "as a whole" to the definition; end reinitiation of consultation on land management plans between review cycles when a species is newly listed as threatened or endangered; and place harmful barriers to the designation of unoccupied critical habitat.

The Services did not consult under ESA § 7(a)(2) on the issuance or implementation of the 2019 Revised ESA Regulations. *See* FWS and NMFS, Endangered Species Act Consultation Handbook 1-5 to 1-6, App. E (1998) (describing Intra-Service Section 7 Consultation requirements), *available at* http://www.fws.gov/endangered/consultations/s7hndbk/s7hndbk.htm. This failure to consult on an action that "may affect" listed species violates Section 7 of the Endangered Species Act.

U.S. Department of Interior
U.S. Fish & Wildlife Service
U.S. Department of Commerce
National Marine Fisheries Service
August 20, 2019
Page 5

      C.      FWS's and NMFS's Violation of ESA Section 7(d)

Acting in reliance on the 2019 Revised ESA Regulations prior to the completion of consultation violates ESA Section 7(d)'s prohibition on the irreversible or irretrievable commitment of resources. *Id.* § 1536(d). Neither FWS nor NMFS may use the revised regulations until they complete consultation, using the best available science, and ensure the revised regulations will not jeopardize species or harm critical habitat.

III.      FWS AND NMFS VIOLATED THE APA BY ISSUING THE FINAL 2019 REVISED ESA SECTION 4 REGULATIONS CONTRARY TO THE SPIRIT, PURPOSE, AND TEXT OF THE ESA.

      A.      Legal Framework

The ESA seeks to protect and recover imperiled species and populations by listing them as threatened or endangered based on enumerated statutory factors, 16 U.S.C. § 1533(a)(1)(A)-(E), using the "best scientific and commercial data available." 16 U.S.C. § 1533(b). At the same time as a species is listed as threatened or endangered, the Services must designate and protect critical habitat for the species, subject to certain exceptions. 16 U.S.C. § 1533(a)(3), (b)(2). The ESA directs FWS and NMFS to issue additional protective regulations for threatened species if deemed necessary and advisable, which can include the same protections available to endangered species. 16 U.S.C. § 1533(d). These listing and designation of critical habitat provisions are contained in section 4 of the ESA – the section Congress labeled the "cornerstone of effective implementation" of the Act. S. Rep. No. 97-418, at 10 (1982).

The listing of a species as endangered under the ESA triggers prohibitions under section 9 of the Act, 16 U.S.C. § 1538, including the prohibition on the "take," of species, which is defined to include "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(18); *see also* 50 C.F.R. § 17.3 (harm means "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.").

In adopting the ESA, Congress's intent was to provide a program for the conservation of … endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA defines "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3).

U.S. Department of Interior
U.S. Fish & Wildlife Service
U.S. Department of Commerce
National Marine Fisheries Service
August 20, 2019
Page 6

B.    FWS Repeal of the Blanket 4(d) Rule

In 1975, only two years after Congress enacted the ESA, FWS exercised its authority and responsibility under section 4(d) to extend the prohibition on "take" in section 9 of the ESA to all threatened species.  50 C.F.R. § 17.31(a) (2018); Reclassification of the American Alligator and Other Amendments, 40 Fed. Reg. 44,111, 44,425 (Sept. 26, 1975).  This rule created the default situation that a threatened species would receive all of the "anti-take" protections provided to endangered species, unless FWS promulgated a species-specific rule that changed those protections.

Colloquially referred to as the "Blanket 4(d) Rule," the D.C. Circuit upheld it against ultra vires and contrary to the plain language of the statute challenges.  *Sweet Home Chapter of Cmtys. for a Great Or. v. Babbitt*, 1 F.3d 1, 5-8 (D.C. Cir. 1993), *rev'd on other grounds*, 515 U.S. 687 (1995).

FWS found that presumptively providing threatened species with protection, rather than reserving it solely for endangered species facing imminent extinction, allowed the agency to work towards halting the slide of threatened species to endangered status.  In addition to flexibility, this approach allowed the agency to protect threatened species while working on a species-specific rulemaking.  FWS noted that the presumption of complete protection, along with the ability to tailor protections if need be with a specific 4(d) rule, constituted "the cornerstone of the system for regulating threatened wildlife."  40 Fed. Reg. at 44,414.

Since 1975, FWS has listed over 300 species as threatened and applied the Blanket 4(d) Rule to them.  Of that number, less than a quarter later received species-specific 4(d) rules.

On August 12, 2019, FWS finalized amendments to 50 C.F.R. §§ 17.31 and 17.71 to eliminate the Blanket 4(d) Rule that prohibits take of threatened animals and plants.  FWS's new rule removes the presumption that threatened species will receive protection from take, which has far-reaching impacts.  Any species listed or reclassified as threatened in the future "would have protective regulations only if the Service promulgates a species-specific rule."

When an agency issues a regulation changing or amending a prior regulation, it faces a high burden.  The agency must demonstrate that a proposed rule is (1) permissible under the statute, that (2) there are good reasons for it, and that (3) the agency believes it to be better, which the conscious change of course adequately indicates.  When a new regulation rests upon a factual finding contrary to prior policy, an agency must provide a more detailed justification than what would suffice if the new policy were created on a blank slate.  Any unexplained inconsistency between the prior rule and its replacement is a basis for finding the agency's interpretation arbitrary and capricious.

U.S. Department of Interior
U.S. Fish & Wildlife Service
U.S. Department of Commerce
National Marine Fisheries Service
August 20, 2019
Page 7


      Nothing in the Revised Regulation repealing the FWS Blanket 4(d) Rule meets these requirements.  FWS faces a backlog of more than 500 species awaiting decisions about their protection.  According to FWS's Draft Effect Data for the Revision of the Regulations for Listing Species and Designating Critical Habitat (June 26, 2018), FWS will need to issue six additional species-specific 4(d) rules every year over its historical average.  Repealing the Blanket 4(d) Rule will add to this backlog as FWS will now — if newly listed threatened species are to have any protection from take at all — have to create additional ESA § 4(d) rules for all the species listed as threatened.  Despite FWS's assertions that it will simultaneously issue species-specific 4(d) rules when listing threatened species, the Service arbitrarily and contrary to the ESA refused to adopt any  requirement for these rules, which will leave threatened species unprotected.

      Even NMFS, which manages only 67 threatened species compared to FWS's 328 and does not have a backlog of species awaiting consideration, has failed to provide threatened species protections.  NMFS, for example, designated 20 species of coral as threatened in 2014, but four years later, has still not issued a 4(d) rule to protect these species from harm.

      The repeal will also reverse the presumption of protection that FWS has long applied to threatened species.  Indeed, the repeal allows — unless every threatened listing includes a separate species-specific rule — incidental take of threatened species without identifying impacts on the threatened species, mitigation measures, or any reporting.

      FWS's failure to articulate a rational connection between the facts found and the choice made, and to provide an adequate and detailed justification for the elimination of the longstanding Blanket 4(d) Rule renders the repeal arbitrary and capricious.  FWS's demonstrated delay in addressing listing petitions and species-specific rules stands in conflict with its assertion that repeal of the Blanket 4(d) Rule would advance conservation purposes and better tailor protections to the needs of threatened species.  In addition, the Services refused in the final rule to require the adoption of species-specific rules at the time of listing, meaning that, under the new approach, threatened species are likely to languish indefinitely with no take prohibitions in place.  Finally, in its justification, FWS fails to acknowledge impacts to its other requirements under the ESA by excluding consideration of incidental takings, a significant body of its work that will fail to conserve threatened species if section 9 protections do not apply.

      The repeal provides no additional conservation benefits when compared to the Blanket 4(d) Rule.  FWS provides no rational reason to explain why the Blanket 4(d) rule in any way prevents or impedes it from providing the tailored species-specific protections on a case by case basis at the time of listing, as it asserts it intends to do after rescinding the Blanket 4(d) rule.  Rather, the Rule was adopted pursuant to a deregulatory agenda.

U.S. Department of Interior
U.S. Fish & Wildlife Service
U.S. Department of Commerce
National Marine Fisheries Service
August 20, 2019
Page 8

In short, FWS's repeal of the Blanket 4(d) Rule undermines the conservation purpose of the ESA, runs counter to the evidence before the agency, and is arbitrary and capricious, especially given the fact that FWS has articulated no reasonable justification for the rule change. In addition, by adopting the Blanket 4(d) Rule without requiring that species-specific rules be issued at the time of listing, the Service has violated the requirements of section 4 of the ESA, which mandates that "[w]henever any species is listed as a threatened species pursuant to subsection (c) of this section, the [FWS] shall issue such regulations as [it] deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). The Blanket 4(d) Rule ensured compliance with this provision by providing for a broad take prohibition in the absence of a species-specific regulation. However, by repealing the Blanket 4(d) Rule without replacing it with any regulatory mandate for species-specific rules at the time a species is listed as threatened, the FWS is, in practical effect, ensuring that the agency will *not* adopt 4(d) rules that are "necessary and advisable to provide for the conservation of such species." To the contrary, especially given the resource constraints and backlogs faced by the Service, threatened species will invariably be left with no protection from take at all. This constitutes a violation of section 4(d) requirement for "necessary and advisable" protections "whenever" a species is listed as threatened, as well as being patently arbitrary and capricious.

    C.  <u>The Final Section 4 Listing and Critical Habitat Regulatory Revisions</u>

On August 12, 2019, FWS and NMFS issued proposed changes to the regulations that implement ESA section 4 listing and critical habitat requirements. Final Rule, Revision of the Regulations for Listing Species and Designating Critical Habitat, xx Fed. Reg. xx (date). Major changes and revisions are described below.

      *1.  Adding economic considerations to listing decisions*

The ESA requires that listing decisions to protect endangered and threatened species be made "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). Congress added the word "solely" in the 1982 amendments to the Act to underscore that non-biological considerations should play no role in listing decisions. Pub. L. No. 97-304, 96 Stat. 1411; *see also* H.R. Rep. No. 97-567, at 19 (1982) (noting that the term "solely" was added to emphasize that listing determinations were to be made "solely upon biological criteria and to prevent non-biological considerations from affecting such decisions").

The Services' final regulation deletes from 50 C.F.R. § 424.11(b), the Services' regulation establishing listing factors, the phrase "without reference to possible economic or other impacts."

U.S. Department of Interior
U.S. Fish & Wildlife Service
U.S. Department of Commerce
National Marine Fisheries Service
August 20, 2019
Page 9

### 2. *Revising the definition of foreseeable future*

The Services finalized a new definition of the term "foreseeable future," which increased the level of certainty required to protect species, contravening Congress's intent to "give the benefit of the doubt to the species." H.R. Rep. No. 96-697, at 12 (1979) (Conf. Rep.), reprinted in 1979 U.S.C.C.A.N. 2572, 2576. While the Services purported to follow the guidance set forth in a 2009 opinion from the Department of the Interior's Solicitor (M-37021, Jan. 16, 2009), the revised definition deviates significantly from current practice and the 2009 opinion.

The 2009 Opinion's definition of "the foreseeable future" was animated by a desire to avoid "reliance on assumption, speculation, or preconception." 2009 Opinion at 8. To ensure imperiled species receive the benefit of the doubt in listing decisions, as Congress intended, the 2009 Opinion requires only that predictions be <u>reliable</u>, rejecting a definition that would limit "the foreseeable future" to only "predictions that can be made with certainty." *Id*. at 9.

The final changes to section 424.11 do not adopt the 2009 Opinion's definition, instead adding the requirements that "both the future threats and the species' responses to those threats are likely." Demanding that both threats and responses to threats be "likely" — which the Services clarified means "more likely than not" — goes beyond ensuring against decisions based on assumption, speculation, or preconception. The consequence of imposing this increased certainty requirement is that species facing extinction from the impacts of climate change or other future events involving prediction and uncertainty will improperly be deprived of protection until after it is too late to prevent their extinction.

### 3. *Undermining recovery criteria*

For nearly four decades, the ESA's listing regulations restricted the delisting of a species to only situations where the best scientific and commercial data available "substantiate" that the species is no longer threatened nor endangered. 45 Fed. Reg. 13,010, 13,023 (Feb. 27, 1980) (promulgating original version of 50 C.F.R. § 424.11(d)). The previous regulations specified that the Services either must know the locations and fate of all individuals of the species or must allow "a sufficient period of time" before delisting to "indicate clearly" the species is actually extinct. 50 C.F.R. § 424.11(d)(1). The Services insisted on this high bar to ensure that any decision to delist due to extinction is based on "conclusive evidence appropriate for the species in question." 49 Fed. Reg. 38,900, 38,903 (Oct. 1, 1984); *see also* FWS, Proposed Rule, Endangered Status for Franklin's Bumble Bee, 84 Fed. Reg. 40,006, 40,008 (Aug. 13, 2019) ("Recent approaches to evaluating extinction likelihood place increased emphasis on the extensiveness and adequacy of survey effort, and caution against declaring a species as extinct in the face of uncertainty.") (citation omitted).

U.S. Department of Interior
U.S. Fish & Wildlife Service
U.S. Department of Commerce
National Marine Fisheries Service
August 20, 2019
Page 10

The Services' revisions drop the requirement that data "substantiate" any delisting decision. The revisions also permit the Services, in making delisting decisions, to disregard formal recovery and/or delisting criteria established in species recovery plans for the very purpose of gauging species' progress towards recovery.

### 4. *Expanding critical habitat exemptions*

The ESA allows a "not prudent" exemption to designation of critical habitat if such designation could result in actual harm to the species. The final regulations expand the circumstances under which the Services may find designation "not prudent" to include situations where: the threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species; threats to habitat "stem solely from causes that cannot be addressed through management actions resulting from" section 7 consultations; or, areas within the jurisdiction of the United States provide no more than a "negligible" conservation value for a species occurring primarily outside the jurisdiction of the United States.

The ESA defines critical habitat to include "specific areas outside the geographical area occupied by the species at the time it is listed" that "are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(ii). Instead of focusing on whether unoccupied areas are essential for conservation based on the best available scientific data, the final regulations limit the designation of unoccupied critical habitat only to those situations where it can be determined with "reasonable certainty" both that the area will contribute to the conservation of the species and that the area contains at least one "physical or biological feature" essential to the conservation of the species. The final rule imposes an elevated certainty requirement on the determination of what areas are "essential," rather than requiring decisions to be made based on the best available science.

### 5. *Restricting designation of unoccupied critical habitat*

The final regulation also impermissibly and unreasonably limits the designation of unoccupied areas as critical habitat to situations where the designation of only occupied areas would be inadequate to ensure the conservation of the species. The Service itself previously identified such a limitation as "unnecessary and unintentionally limiting." FWS/NMFS, Proposed Regulatory Amendments re Critical Habitat, 79 Fed. Reg. 27,073 (May 12, 2014). The same revised section in the final rules adds a new requirement that unoccupied critical habitat contain "one or more of those physical or biological features essential to the conservation of the species," which adds a requirement not based on the statute.

The final regulation also revises the definition of "physical and biological features" at 50 C.F.R. § 424.02 to define such features as "essential" only when they "occur in specific areas." This introduces a new limitation, not based in the statute, that restricts the designation of critical

U.S. Department of Interior
U.S. Fish & Wildlife Service
U.S. Department of Commerce
National Marine Fisheries Service
August 20, 2019
Page 11

habitat.  This change affects the designation of occupied critical habitat and, under the final rules, unoccupied critical habitat as well.

The FWS and NMFS cannot adopt regulations that are manifestly contrary to the text and purpose of the ESA.

When promulgating regulations, FWS and NMFS must articulate a satisfactory explanation for their action, including a rational connection between the facts found and the choice made.  A regulation is arbitrary and invalid if the agency relies on "factors which Congress has not intended it to consider" or "entirely fail[s] to consider an important aspect of the problem."

When an agency issues a regulation changing or amending a prior regulation, it faces a high burden.  The agency must demonstrate that a proposed rule is (1) permissible under the statute, (2) there are good reasons for it, and (3) the agency believes it to be better, which the conscious change of course adequately indicates.  When a new regulation rests upon a factual finding contrary to prior policy, an agency must provide a more detailed justification than what would suffice if the new policy were created on a blank slate.  Any unexplained inconsistency between the prior rule and its replacement is a basis for finding the agency's interpretation arbitrary and capricious.

Numerous sections of the 2019 Revised ESA Regulations with respect to ESA section 4 are contrary to the text and purpose of the ESA, including:

- elimination of the phrase "without reference to possible economic or other impacts of such determination" in 50 C.F.R. § 424.11(b);
- redefining "foreseeable future" to impose elevated certainty requirements;
- elimination of recovery criteria from delisting factors;
- expanding critical habitat exemptions; and
- restricting designation of unoccupied critical habitat by narrowing the definition of essential for the conservation of the species.

Promulgation of these same sections by FWS and NMFS also lacks detailed justification and rational basis and fails to use the best available science, as required by the ESA.

FWS's and NMFS's promulgation of the 2019 Revised Regulations with respect to ESA section 4 is arbitrary, capricious, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

U.S. Department of Interior
U.S. Fish & Wildlife Service
U.S. Department of Commerce
National Marine Fisheries Service
August 20, 2019
Page 12

IV.     CONCLUSION

FWS and NMFS have violated and remain in ongoing violation of the ESA and its implementing regulations. If FWS and NMFS fail to cure these violations within 60 days of receiving this letter, the named organizations intend to file legal claims for declaratory and injunctive relief. *See* 16 U.S.C. § 1540(g).

If you believe any of the foregoing is in error, have any questions, or would like to discuss this matter, please do not hesitate to contact me.

Sincerely,

*[signature: Kristen L. Boyles]*

Kristen L. Boyles
Paulo Palugod

*Attorneys for Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Natural Resources Defense Council, National Parks Conservation Association, WildEarth Guardians, and The Humane Society of The United States*

U.S. Department of Interior
U.S. Fish & Wildlife Service
U.S. Department of Commerce
National Marine Fisheries Service
August 20, 2019
Page 13

Business Addresses for Named Organizations:

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**<br>1212 Broadway, St. #800<br>Oakland, CA 94612 | **DEFENDERS OF WILDLIFE**<br>1130 17th Street, NW<br>Washington DC 20036 |
| **SIERRA CLUB**<br>2101 Webster St., Suite 1300<br>Oakland, CA 94612 | **NATURAL RESOURCES DEFENSE COUNCIL**<br>20 North Wacker Drive, Suite 1600<br>Chicago, IL 60606 |
| **NATIONAL PARKS CONSERVATION ASSOCIATION**<br>National Parks Conservation Association<br>777 Sixth St. N.W.<br>Washington, DC | **WILDEARTH GUARDIANS**<br>301 N. Guadalupe St.<br>Suite 201<br>Santa Fe, NM  87501 |
| **THE HUMANE SOCIETY OF THE UNITED STATES**<br>1255 23rd Street NW<br>Suite 450<br>Washington, DC  20037 | |