DAVID ALBERT SCHWARTZ (DC Bar No. 16142355)
INSTITUTE FOR PUBLIC REPRESENTATION
Environmental Law and Justice Clinic
Georgetown University Law Center
600 New Jersey Avenue, NW, Suite 312
Washington, DC 20001
ds1704@georgetown.edu
*[Admitted Pro Hac Vice]*

FRAN M. LAYTON (State Bar No. 111788)
SHUTE, MIHALY & WEINBERGER LLP
396 Hayes Street
San Francisco, California 94102
Telephone: (415) 552-7272
Facsimile: (415) 552-5816
layton@smwlaw.com

Attorneys for *Amici Curiae*
ENVIRONMENTAL LAW PROFESSORS

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, SIERRA CLUB, NATURAL RESOURCES DEFENSE COUNCIL, NATIONAL PARKS CONSERVATION ASSOCIATION, WILDEARTH GUARDIANS, and THE HUMANE SOCIETY OF THE UNITED STATES<br><br>Plaintiffs,<br><br>v.<br><br>DAVID BERNHARDT, U.S. Secretary of the Interior, U.S. FISH AND WILDLIFE SERVICE, WILBUR ROSS, U.S. Secretary of Commerce, and NATIONAL MARINE FISHERIES SERVICE,<br><br>Defendants. | Case No. 4:19-cv-05206-JST<br>Related Case: No. 4:19-cv-06013-JST<br>Related Case: No. 4:19-cv-06812-JST<br><br>**BRIEF *AMICI CURIAE* OF ENVIRONMENTAL LAW PROFESSORS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: July 21, 2021<br>Time: 2:00 p.m.<br>Courtroom: 6, 2nd Floor<br>Judge: The Honorable Jon S. Tigar<br><br>Date Filed: August 21, 2019<br>Trial Date: None Set |

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...................................................................................i

TABLE OF AUTHORITIES ...........................................................................ii

IDENTITIES AND INTERESTS OF THE AMICI ......................................1

BACKGROUND ..............................................................................................1

ARGUMENT ....................................................................................................3

I.    THE ENDANGERED SPECIES ACT IS THE CORNERSTONE STATUTE FOR SPECIES CONSERVATION AND HAS PROTECTED IMPERILED SPECIES FOR OVER FORTY YEARS ........................................................................3

II.    THE ESA'S SUCCESS HINGES ON ITS WELL-CRAFTED STRUCTURE ..........6

    A.  Section 4 Listing of Species and Designation of Critical Habitats is a Biological Determination that Triggers the ESA's Full Protections ......................................6

    B.  Section 4(d) Establishes Protective Measures to Restore the Population of Threatened Species Before They Become Endangered and Extinction Becomes More Probable Than Not ..............................................................................9

    C.  Section 7 Consultation Integrates and Prioritizes the Protection of Listed Species in the Primary Missions of All Federal Agencies .............................................10

III.   THE CHALLENGED REGULATIONS UNDERMINE THE ESA'S WELL-CRAFTED STRUCTURE AND THREATEN ITS CONTINUED SUCCESS IN CONSERVING IMPERILED SPECIES .......................................................11

    A.  The Final Regulations Allow Non-Biological Factors to Influence the Services' Listing and Classification Decisions ..................................................................11

    B.  The Final Regulations Ignore the Benefits of Reducing Controllable Threats to Species and Allow Cumulative Impacts to Chip Away at Species and Their Habitat .......................................................................................................14

    C.  The Final Regulations Will Leave Species Vulnerable to Climate Change Related Impacts ......................................................................................................16

CONCLUSION ...............................................................................................18

ADDENDUM .................................................................................................19

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, (9th Cir. 2016) ................................................7

*Animal Legal Def. Fund v. U.S. Dep't of Interior et al.*, No. 4:19-cv-06812-JST (N.D. Cal. filed Oct. 21, 2019) ....................................................................................................................3

*Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160 (9th Cir. 2010) .......................................8

*State of California et al. v. Bernhardt et al.*, No. 4:19-cv-06013-JST (N.D. Cal. filed Sept. 25, 2019) ...........................................................................................................................3

*Ctr. for Biological Diversity et al. v. Bernhardt et al.,* No. 4:19-cv-05206-JST (N.D. Cal. filed Aug. 21, 2019) ....................................................................................................................3

*Def. of Wildlife v. Andrus*, 428 F. Supp. 167 (D.D.C. 1977) .......................................................9

*Def. of Wildlife v. Babbitt*, 958 F.Supp. 670 (D.D.C. 1997) ........................................................9

*Def. of Wildlife v. Norton*, 258 F.3d 1136 (9th Cir. 2001) .......................................................7, 9

*Greenpeace Action v. Franklin*, 982 F.2d 1342 (9th Cir. 1992) ..................................................8

*Or. Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139 (D. Or. 1998) .............................................9

*Pub. Citizen Health Research Group v. U.S. Dep't of Labor*, 557 F.3d 165 (3d Cir. 2009) ........8

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ....................................................................4, 10

**STATUTES**

16 U.S.C. § 1531(a)(1) ...................................................................................................................4

16 U.S.C. § 1532(5) ..................................................................................................................8, 15

16 U.S.C. § 1532(19) .....................................................................................................................9

16 U.S.C. § 1533 ........................................................................................................................2, 6

16 U.S.C. § 1533(a)-(c) ..................................................................................................................6

16 U.S.C. § 1533(a)(3)(A)(i) ..........................................................................................................8

16 U.S.C. § 1533(b)(1)(A) .......................................................................................................7, 11

16 U.S.C. § 1533(b)(2) ...................................................................................................................8

16 U.S.C. § 1533(d) ...............................................................................................................6, 9, 11

16 U.S.C. § 1535 .............................................................................................................................6

16 U.S.C. § 1536 ........................................................................................................................2, 6

16 U.S.C. § 1536(a)(1) ................................................................................................10

16 U.S.C. § 1536(a)(2) ................................................................................................10

16 U.S.C. § 1536(a)(3) ................................................................................................10

16 U.S.C. § 1536(b)(3)(A) ..........................................................................................10

16 U.S.C. § 1538 .....................................................................................................6, 11

16 U.S.C. § 1539 ..........................................................................................................6

16 U.S.C. § 1540 ..........................................................................................................6

**REGULATIONS**

50 C.F.R. § 17.31(a) (effective March 4, 2005 – Sept. 25, 2019) ...........................7, 9

50 C.F.R. § 17.31(a) (effective Sept. 26, 2019) .............................................14, 15, 17

50 C.F.R. § 17.31(c) effective March 4, 2005 – Sept. 25, 2019) ...............................9

50 C.F.R. § 402.02 (effective March 4, 2005 – Sept. 25, 2019) ................................12

50 C.F.R. § 402.02 (effective Sept. 26, 2019) ...............................13, 17, 18, 20

50 C.F.R. § 402.14(c) (effective March 4, 2005 – Sept. 25, 2019) ............................10

50 C.F.R. § 402.14(c)(8) (effective Sept. 26, 2019) ..................................................14

50 C.F.R. § 402.14(g) (effective March 4, 2005 – Sept. 25, 2019) ...........................10

50 C.F.R. § 402.16 (effective March 4, 2005 – Sept. 25, 2019) ................................10

50 C.F.R. § 402.16(b) (effective Sept. 26, 2019) .......................................................14

50 C.F.R. § 402.17 (effective Sept. 26, 2019) ...........................................................14

50 C.F.R. § 402.17(b) (effective Sept. 26, 2019) .......................................................17

50 C.F.R. § 424.02 (effective Sept. 26, 2019) ........................................................11,15

50 C.F.R. § 424.11 (effective March 4, 2005 – Sept. 25, 2019) ............................... 7

50 C.F.R. § 424.11(b) (effective March 4, 2005 – Sept. 25, 2019) .............................7

50 C.F.R. § 424.11(d) (1984) .....................................................................................13

50 C.F.R. § 424.11(d) (effective Sept. 26, 2019) .......................................................16

50 C.F.R. § 424.11(e) (effective Sept. 26, 2019) .......................................................13

50 C.F.R. § 424.12 (effective March 4, 2005 – Sept. 25, 2019) .................................7

50 C.F.R. § 424.12 (effective Sept. 26, 2019) ............................................................17

iii

50 C.F.R. § 424.12(a)(1)(ii) (effective Sept. 26, 2019) ..............................................16

50 C.F.R. § 424.12(b) (effective Sept. 26, 2019) ......................................................17

Endangered and Threatened Wildlife and Plants; Regulations for Prohibitions to Threatened
    Wildlife and Plants 84 Fed. Reg. 44,753 (Aug. 27, 2019) ............................... 2, 13, 15, 17

Endangered and Threatened Wildlife and Plants; Revision of Regulations for Interagency
    Cooperation 84 Fed. Reg. 44,976 (Aug. 27, 2019) ...................................... 3, 18

Endangered and Threatened Wildlife and Plants; Revision of the Regulations for Listing Species
    and Designating Critical Habitat 84 Fed. Reg. 45,020 (Aug. 27, 2019) ............... 3, 13, 19

Endangered and Threatened Wildlife and Plants; Exclusion of U.S. Captive-Bred Scimitar-Horned
    Oryx, Addax, and Dama Gazelle From Certain Prohibitions,70 Fed. Reg. 52,310 (Sept. 2,
    2005) ................................................................................................16

Endangered and Threatened Wildlife and Plants; Special Rule for the Lesser Prairie-Chicken, 79
    Fed. Reg. 20,074 (Apr. 10, 2014) ................................................... 15

## OTHER AUTHORITIES

BRIAN CZECH & PAUL R. KRAUSMAN, THE ENDANGERED SPECIES ACT (2001) ........................... 3

Ctr. for Biological Diversity, *A Wild Success American Voices on the Endangered Species Act at
    40*, https://www.biologicaldiversity.org/campaigns/esa_wild_success/pdfs/A_Wild_
    Success.pdf (last visited Nov. 24, 2020) (Quote from D-Rep. John Dingell) .................. 4

CHARLES BERGMAN, WILD ECHOES: ENCOUNTERS WITH THE MOST ENDANGERED ANIMALS IN
    NORTH AMERICA 256 (2003) .................................................................... 3

Charlie Savage, *Report Finds Meddling in Interior Dept. Actions*, N.Y. TIMES (Dec. 15, 2008),
    https://www.nytimes.com/2008/12/16/washington/16interior.html ............................... 13

Cristian Román-Palacios & John J. Wiens, *Recent responses to climate change reveal the drivers
    of species extinction and survival*, 117(8) PNAS 4211-4213 (2020) ........................... 16

Gerardo Ceballos et al., *Biological Annihilation via the Ongoing Sixth Mass Extinction Signaled
    by Vertebrate Population Losses and Declines*, PNAS,
    https://www.pnas.org/content/114/30/E6089 (July 10, 2017) .............................. 4

IPBES, SUMMARY FOR POLICYMAKERS OF THE GLOBAL ASSESSMENT REPORT ON BIODIVERSITY
    AND ECOSYSTEM SERVICES OF THE INTERGOVERNMENTAL SCIENCE-POLICY PLATFORM ON
    BIODIVERSITY AND ECOSYSTEM SERVICES (2019)
        https://doi.org/10.5281/zenodo.3553579 .................................................... 5

IPBES, The Regional Assessment Report on Biodiversity and Ecosystem Services for the
    Americas (2019) ............................................................................ 5

J.B. Ruhl, *Section 4 of the ESA—The Cornerstone of Species Protection Law*, 8(1) NAT.
    RESOURCES & ENV'T 26 (1993) .............................................................8, 10

Jeff Curtis & Bob Davison, *The Endangered Species Act: Thirty-Eight Years on the Ark, in* Open Spaces: Voices from the Northwest (2011) ..........................................................5, 8, 10

Jerry Patterson, *Lizard must not impede energy future*, AMARILLO GLOBE-NEWS (June 11, 2011), https://www.amarillo.com/opinion/opinion-columnist/guest-opinion-columnist/2011-06-11/patterson-lizard-must-not-impede-energy-future#.TsbXcnJuqSo .............................12

Jessica E. Thomas et al., Demographic Construction from Ancient DNA Supports Rapid Extinction of the Great Auk, eLife, Nov. 2019, *available at* https://elifesciences.org/articles/47509 ..........................................................................3

JG Mead and ED Mitchell, Atlantic gray whales (1984), in *The Gray Whale*, London: Academic Press (ML Jones et al eds. 2005) ......................................................................................3

John Kostyack et al., *Beyond Reserves and Corridors: Policy Solutions to Facilitate the Movement of Plants and Animals in a Changing Climate*, 61 BIOSCIENCE 713 (2011)…………..17

KEVIN J. O'BRIEN, AN ETHICS OF BIODIVERSITY 114 (2010) ........................................................1

Kieran Suckling & Martin Taylor, *Critical Habitat and Recovery in* THE ENDANGERED SPECIES ACT AT THIRTY: VOLUME 1 RENEWING THE CONSERVATION COMMITMENT (2005)…….15

KIERAN SUCKLING ET AL., CTR. FOR BIOLOGICAL DIVERSITY, ON TIME, ON TARGET: HOW THE ENDANGERED SPECIES ACT IS SAVING AMERICA'S WILDLIFE (2012) ................................5

Mark W. Schwartz, *The Performance of the Endangered Species Act*, 39 ANN. REV. OF ECOLOGY, EVOLUTION, & SYSTEMATICS 279 (2008) ..........................................................5, 6, 14, 15

Martin F.J. Taylor et al., *The Effectiveness of the Endangered Species Act: A Quantitative Analysis*, 55(4) BIOSCIENCE 360 (2005) ................................................................6, 14, 15

Media Kit/Educational Resources, U.S. Fish & Wildlife Serv., https://www.fws.gov/endangered/esa40/resources.html (last visited Oct. 20, 2020) ........................................................ 4, 5

U.S. FISH & WILDLIFE SERV., ESA BASICS: 40 YEARS OF CONSERVING ENDANGERED SPECIES (2017), https://www.fws.gov/endangered/esa-library/pdf/ESA_basics.pdf ......................4

Sandra Diaz et al., *Pervasive Human-Driven Decline of Life on Earth Points to the Need for Transformative Change*, 366 SCIENCE 3 (2019) ...........................................................8, 10

SOUTHWICK ASSOCIATES, THE ECONOMICS ASSOCIATED WITH OUTDOOR RECREATION, NATURAL RESOURCES CONSERVATION AND HISTORIC PRESERVATION IN THE UNITED STATES (2011) ..............................................................................................................................12

*Success Stories*, ENDANGERED SPECIES COALITION, https://www.endangered.org/success-stories/ (last visited Oct. 26, 2020) ........................................................................................ 5, 7

ENDANGERED SPECIES COALITION, BACK FROM THE BRINK: TEN SUCCESS STORIES CELEBRATING THE ENDANGERED SPECIES ACT (2013) ..............................................................................5

Timothy Egan, *Strongest U.S. Environmental Law May Become Endangered Species*, N.Y. TIMES (May 26, 1992), https://www.nytimes.com/1992/05/26/us/strongest-us-environment-law-may-become-endangered-species.html?pagewanted=all ..............................................18

v

Transcript of Personnel Hearing, *Gary Mowad v. Dep't of the Interior*, DA-1221-13-0262-W-4 (Aug. 18, 2014) ................................................................................... 12

U.S. Fish & Wildlife Serv., *Extinct Species, Midwest Region Endangered Species*, https://www.fws.gov/midwest/endangered/lists/extinct.html ........................... 3

UNION OF CONCERNED SCIENTISTS, U.S. FISH AND WILDLIFE SCIENCE SURVEY SUMMARY (2005) ................................................................................. 13

U.S. FISH & WILDLIFE SERV., FEDERAL AND STATE ENDANGERED AND THREATENED SPECIES EXPENDITURES FISCAL YEAR 2017 (2018) ....................................... 12

YA-WEI LI, DEFENDERS OF WILDLIFE, SECTION 4(D) RULES: THE PERIL AND THE PROMISE (2017) ................................................................................... 13

**LEGISLATIVE MATERIALS**

*Actions Overview S.1983—93rd Congress (1973-1974)*, CONGRESS.GOV, https://www.congress.gov/bill/93rd-congress/senate-bill/1983/actions (last visited Dec. 1, 2020) .............................................................................................1

H.R. Rep. No. 95-1625 (Sept. 25, 1978) ........................................................8

H.R. Rep. No. 93-412 (July 27, 1973) .............................................. 7, 8, 10

H.R. Rep. No. 97-567 (May 17, 1982) ............................................................ 7

Pub. L. No. 93-205 (Dec. 28, 1973) ............................................................. 1

S. Rep. No. 93-307 (July 1, 1973) ................................................................. 7

Richard R. Nixon, 37th President of the United States, *Special Message to the Congress Outlining the 1972 Environmental Program* (February 08, 1972) .................................................... 1

**DOCKET ENTRIES**

Order to Adjust Case Management Deadlines, *Ctr. for Biological Diversity et al., v. Bernhardt et al.*, No. 4:19-cv-05206-JST (N.D. Cal. Nov. 19, 2020) (ECF No. 111) ...........................3

vi

## IDENTITIES AND INTERESTS OF THE *AMICI*

*Amici curiae* are seventeen professors of environmental law. *Amici*'s expertise includes the Endangered Species Act, the National Environmental Policy Act, the Administrative Procedure Act, and natural resources management, among other areas of law. Combined, *amici* have decades of experience teaching these topics and have litigated numerous Endangered Species Act cases in many courts, including the United States Supreme Court. *Amici* have an interest in ensuring that the federal government retains its authority to use the Endangered Species Act to protect all listed species, as well as the nation's biodiversity. The list of *amici* and their school affiliations is located in the Addendum.

This *amici curiae* brief is filed upon consent of all parties.

## BACKGROUND

On February 8, 1972, then-President Richard Nixon ("Nixon") made an address to Congress recognizing the responsibility of mankind as conservator of the natural world and outlining his environmental policy to fulfill this responsibility. Richard R. Nixon, 37th President of the United States, *Special Message to the Congress Outlining the 1972 Environmental Program* (February 08, 1972). In the address, Nixon recognized that the Endangered Species Preservation Act of 1966 "simply [did] not provide the kind of management tools needed to act early enough to save vanishing species." Nixon encouraged Congress to enact "a stronger law to protect endangered species." *Id.*

Nixon's address provoked quick and decisive action from Congress. The Endangered Species Act of 1973 ("ESA" or the "Act") was nearly unanimously approved and signed into law in less than a year after its inception. *Actions Overview S.1983—93rd Congress (1973-1974)*, CONGRESS.GOV, https://www.congress.gov/bill/93rd-congress/senate-bill/1983/actions; Pub. L. 93-205. The ESA encountered no significant opposition in Congress and was met with widespread public support. KEVIN J. O'BRIEN, AN ETHICS OF BIODIVERSITY 114 (2010). This broad approval was particularly astonishing given the ESA's sweeping and comprehensive approach to conserving endangered and threatened species of fish, wildlife, and plants. *Id.* As Nixon had proposed, the ESA "provide[s] for early identification…, make[s] taking of endangered species a

1

1  Federal offense…, and permit[s] protective measures to be taken before a species is so depleted

2  that regeneration is difficult or impossible." Nixon, *Special Message to the Congress*.

3      The ESA provides five integral protections to threatened and endangered species: (1)

4  listing classifications; (2) critical habitat designations; (3) take prohibitions; (4) mandatory

5  interagency consultation; and (5) prohibitions on federal activities that jeopardize the recovery of

6  listed species or alter designated critical habitats. 16 U.S.C. §§ 1533, 1536. Congress deliberately

7  structured these protective mechanisms such that they build on one another and ensure that neither

8  federal activities nor a lack of agency funding undermine the protection of listed species.

9      The U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service

10  ("NMFS") (collectively, "the Services") have jointly administered the ESA for nearly forty years

11  with great success and without any significant changes to the implementing regulations. However,

12  in 2019, despite widespread opposition from the scientific and conservation communities, the

13  Services finalized amendments to regulations implementing ESA Section 4 listing decisions and

14  critical habitat designations, Section 4(d) protections for threatened species, and Section 7

15  interagency consultation requirements. Endangered and Threatened Wildlife and Plants;

16  Regulations for Prohibitions to Threatened Wildlife and Plants, 84 Fed. Reg. 44,753 (Aug. 27,

17  2019) (Section 4(d) Regulations); Endangered and Threatened Wildlife and Plants; Revision of the

18  Regulations for Listing Species and Designating Critical Habitat, 84 Fed. Reg. 45,020 (Aug. 27,

19  2019) (Section 4 Regulations); Endangered and Threatened Wildlife and Plants; Revision of

20  Regulations for Interagency Cooperation, 84 Fed. Reg. 44,976 (Aug. 27, 2019) (Section 7

21  Regulations). In pertinent part, the final regulations repeal the blanket "take" protections afforded

22  to threatened species, permit the inclusion of economic factors for consideration in listing

23  decisions, and limit the use and efficacy of interagency consultations. *See id*. These amendments

24  significantly weaken the individual conservation mandates provided in Sections 4, 4(d), and 7 of

25  the ESA, and, taken together, destabilize the Act's carefully crafted structure—leaving more

26  species vulnerable to endangerment and extinction.

27      Several non-profit organizations with an interest in environmental conservation

28

2

("Environmental Group Plaintiffs" or "EGPs")[1] filed this lawsuit challenging the legality of the finalized regulations under the ESA, the Administrative Procedure Act, and the National Environmental Policy Act.[2] The court is currently handling dueling motions for summary judgment from the EGPs and the Federal Defendants. *See* Order to Adjust Case Management Deadlines, *Ctr. for Biological Diversity et al., v. Bernhardt et al.*, No. 4:19-cv-05206-JST (N.D. Cal. Nov. 19, 2020) (ECF No. 111). *Amici curiae* Environmental Law Professors now respectively submit their position to aid the Court in adjudicating this matter.

## ARGUMENT

**I.      THE ENDANGERED SPECIES ACT IS THE CORNERSTONE STATUTE FOR SPECIES CONSERVATION AND HAS PROTECTED IMPERILED SPECIES FOR OVER FORTY YEARS.**

In the 366 years between British colonization of North America and the enactment of the ESA, more than 500 North American species went extinct due to overhunting and commercial sale. BRIAN CZECH & PAUL R. KRAUSMAN, THE ENDANGERED SPECIES ACT (2001). These losses include Eastern Elk and other plains animals,[3] large predators such as Cascade Mountain Wolves,[4] marine mammals such as Atlantic Gray Whales,[5] and coastal wildlife such as Great Auks.[6] In passing the ESA, Congress declared that extinction related to human activity is antithetical to mankind's responsibility as nature's conservator because "only natural extinction is part of natural

---

[1] *Ctr. for Biological Diversity et al. v. Bernhardt et al.,* No. 4:19-cv-05206-JST (N.D. Cal. filed Aug. 21, 2019). Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Natural Resources Defense Council, National Parks Conservation Association, WildEarth Guardians, and the Humane Society of the United States are collectively the Environmental Group Plaintiffs.

[2] *See Animal Legal Def. Fund v. U.S. Dep't of Interior et al.*, No. 4:19-cv-06812-JST (N.D. Cal. filed Oct. 21, 2019); *State of California et al. v. Bernhardt et al.*, No. 4:19-cv-06013-JST (N.D. Cal. filed Sept. 25, 2019).

[3] Extinct as of 1880. U.S. Fish & Wildlife Serv., *Extinct Species, Midwest Region Endangered Species*, https://www.fws.gov/midwest/endangered/lists/extinct.html (last visited Nov. 04 2020).

[4] CHARLES BERGMAN, WILD ECHOES: ENCOUNTERS WITH THE MOST ENDANGERED ANIMALS IN NORTH AMERICA 256 (2003).

[5] JG Mead and ED Mitchell, Atlantic gray whales (1984), in *The Gray Whale*, London: Academic Press (ML Jones et al eds. Pp. 33-53 2005) (Extinct in America as of mid-1700s due to over whaling).

[6] Jessica E. Thomas et al., Demographic Construction from Ancient DNA Supports Rapid Extinction of the Great Auk, eLife, Nov. 2019, Abstract (Great Auk extinction in mid-1700s tied to the use of the species for its feathers), *available at* https://elifesciences.org/articles/47509.

order." Ctr. for Biological Diversity, *A Wild Success American Voices on the Endangered Species Act at 40*, https://www.biologicaldiversity.org/campaigns/esa_wild_success/pdfs/A_Wild_Success.pdf (Quote from D-Rep. John Dingell).

Congress intended the ESA to protect species from extinction as "a consequence of economic growth and [societal] development un-tempered by adequate concern and conservation." 16 U.S.C. § 1531(a)(1). To accomplish this aim, Congress designed the ESA with measures "to halt and reverse the trend towards species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). These measures include the identification of imperiled species and their habitats, and the protection of both from federal activity that may directly or incidentally jeopardize species' continued existence. Congress intended the Services to facilitate species conservation until the species "recover" to the point where they no longer require the ESA's safeguards. *See* Media Kit/Educational Resources, U.S. Fish & Wildlife Serv., https://www.fws.gov/endangered/esa40/ resources.html; U.S. FISH & WILDLIFE SERV., ESA BASICS: 40 YEARS OF CONSERVING ENDANGERED SPECIES (2017), https://www.fws.gov/ endangered/esa-library/pdf/ESA_basics.pdf.

Even with the ESA's protections, human activities of the last fifty years have altered the natural world at a rate "unprecedented in human history." IPBES, SUMMARY FOR POLICYMAKERS OF THE GLOBAL ASSESSMENT REPORT ON BIODIVERSITY AND ECOSYSTEM SERVICES OF THE INTERGOVERNMENTAL SCIENCE-POLICY PLATFORM ON BIODIVERSITY AND ECOSYSTEM SERVICES 5 (2019) https://doi.org/10.5281/zenodo.3553579. Today, human activities linked to habitat destruction and climate change threaten more species with extinction than ever before. *Id*. Biologists believe there is only a short twenty- to thirty-year window to effectively combat mass extinction, and that such efforts, if undertaken, will require transformative change. Gerardo Ceballos et al., *Biological Annihilation via the Ongoing Sixth Mass Extinction Signaled by Vertebrate Population Losses and Declines*, PNAS, https://www.pnas.org/content/114/30/E6089 (July 10, 2017).

Through the ESA, Congress committed the entire country to the task of conserving every species at risk of extinction, recognizing that "the value of genetic heritage is, quite literally,

4

incalculable." Jeff Curtis & Bob Davison, *The Endangered Species Act: Thirty-Eight Years on the Ark, in* Open Spaces: Voices from the Northwest 139 (2011) (Spoken by the House Marchant Marine and Fisheries Committee, now defunct).[7] In developing the ESA, Congress examined the relationship between species diversity and mankind, and determined that a symbiotic relationship connects ecological and human health. *See* Curtis & Davison, *The Endangered Species Act: Thirty-Eight Years on the Ark* at 139. Congress developed an awareness that "as we homogenize the habitats in which [imperiled] plants and animals evolved, we threaten their—and our own— genetic heritage." *Id*.

The ESA boasts a ninety-nine percent success rate in preventing extinction, Media Kit/Educational Resources, U.S. Fish & Wildlife Serv., https://www.fws.gov/endangered/esa40/ resources.html, and has saved several of our most iconic species from extinction, including the bald eagle, the gray wolf, and the green sea turtle, among many others. *Success Stories*, ENDANGERED SPECIES COALITION, https://www.endangered.org/success-stories/ (last visited Oct. 26, 2020); ENDANGERED SPECIES COALITION, BACK FROM THE BRINK: TEN SUCCESS STORIES CELEBRATING THE ENDANGERED SPECIES ACT AT 40 (2013). Without the ESA's protections, fifteen percent of listed species would have gone extinct by 2006, and an even greater percentage likely would have faced extinction by 2018, when the contested regulations were proposed. KIERAN SUCKLING ET AL., CTR. FOR BIOLOGICAL DIVERSITY, ON TIME, ON TARGET: HOW THE ENDANGERED SPECIES ACT IS SAVING AMERICA'S WILDLIFE 2 (2012).

Simply put: the rate of extinction for species unprotected by the ESA is much higher than the rate of extinction for protected species. *Id*. Further, protected species are three times more likely than unprotected species to recover than to go extinct. Mark W. Schwartz, *The Performance of the Endangered Species Act*, 39 ANN. REV. OF ECOLOGY, EVOLUTION, & SYSTEMATICS 279, 290

---

[7] Some scientists and economists have tried to quantify the value of nature's genetic diversity, finding that nature provides $24 trillion of non-monetized benefits to humans each year through food security, clean water, and reduction in coastal flooding. IPBES, The Regional Assessment Report on Biodiversity and Ecosystem Services for the Americas 56 (2019).

(2008). Listing under the ESA, designation of critical habitat, and the regulation of "take" collectively promote the survival and recovery of imperiled species. Martin F.J. Taylor et al., *The Effectiveness of the Endangered Species Act: A Quantitative Analysis*, 55(4) BIOSCIENCE 360, 361-65 (2005); Schwartz, *The Performance of the Endangered Species Act*, 39 ANN. REV. OF ECOLOGY, EVOLUTION, & SYSTEMATICs at 290. The ESA's long history of success in protecting and conserving species is due to the statute's carefully crafted structure and longstanding implementing regulations.

## II.  THE ESA'S SUCCESS HINGES ON ITS WELL-CRAFTED STRUCTURE.

The ESA's structure articulates a clear strategy to accomplish its conservation purposes. Generally, each section of the statute following the statement of purpose sets out a policy initiative and procedures to accomplish that initiative. These policy initiatives build on one another, with one section of the statute tending to trigger the requirements of the next. These initiatives are as follows: species designation as endangered or threatened, 16 U.S.C. § 1533; critical habitat designation, *id*.; cooperation between the Services, states, other federal agencies, and international bodies, *id.* §§ 1535, 1536; the Services' duty to manage the conservation program and base determinations on the best biological information, *id.* § 1533; protective measures for endangered species, *id.* §§ 1533(d), 1538; exceptions to prohibited acts against endangered species, *id.* § 1539; and penalties and enforcement procedures for violations of the ESA, *id.* § 1540.

### A.  Section 4 Listing of Species and Designation of Critical Habitats is a Biological Determination that Triggers the ESA's Full Protections.

Listing a species as endangered or threatened under Section 4 is a threshold status that triggers the rest of the ESA's protections. *See id*. § 1533. In pertinent part, Section 4 provides the statutory framework upon which the Services may list or reclassify a species as threatened or endangered; permits the Services to delist species; and requires the Services to designate critical habitat for listed species. *Id*. § 1533(a)-(c). The prior long-standing regulations implementing Section 4 required that listing and reclassification decisions be made solely on the basis of the best available science, without reference to economic or other impacts; that decisions to delist a species be substantiated by data showing the species is clearly extinct, recovered, or was initially

6

classified in error; and described the rare circumstances in which the Services could find the designation of critical habitat to be imprudent. 50 C.F.R. §§ 424.11, 424.12 (effective March 4, 2005 – Sept. 25, 2019).

*The "Threatened" Classification Was Intended to Prevent Species from Becoming Endangered.*

The purpose of Section 4 is "not only to protect the last remaining members of the species but to take steps to ensure that species which are likely to be threatened with extinction never reach the state of being presently endangered." *Def. of Wildlife v. Norton*, 258 F.3d 1136, 1142 (9th Cir. 2001) (quoting legislative history); *see also Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 555 (9th Cir. 2016) (noting that the ESA is "concerned with protecting the future of the species, not merely the preservation of existing [animals]"). Congress placed great importance on "extending protections to species that may become endangered in the future." H.R. Rep. No. 93-412 at 2, S. Rep. No. 93-307 at 3. The purpose of creating a separate threatened designation to protect those species before the danger of extinction becomes imminent and long-term action is required. S. Rep. No. 93-307 at 3. For nearly forty years, the FWS applied blanket protections to threatened species. 50 C.F.R. § 17.31(a) (effective March 4, 2005 – Sept. 25, 2019) (first enacted in April 1978 – Protection for Threatened Species of Wildlife, 43 Fed. Reg. 18181 (Apr. 28, 1978)). This approach was both efficient and effective, as evidenced by the ESA's successful conservation of threatened species. *Success Stories*, ENDANGERED SPECIES COALITION, https://www.endangered.org/success-stories/.

*Listing and Delisting Decisions are Based Solely on the Best Available Science.*

As originally enacted, the ESA dictates that "economic considerations have no relevance to determinations regarding the [listing] status of species," because the question of whether a species has experienced sufficient decline to justify listing is not based on economics, but on biology. H.R. Rep. No. 97-567, at 19 (1982). The ESA requires the Services to consider only the best available science on the biological security of a species when making a listing decision. 16 U.S.C. § 1533(b)(1)(A); 50 C.F.R. § 424.11(b) (effective March 4, 2005 – Sept. 25, 2019). Congress revised the ESA to clarify that listing decisions are to be based solely on the best available science after then-Secretary of the Interior James Watt insisted that listing decisions be subject to

7

economic analysis and veto by the Office of Management and Budget when they had negative economic consequences. Curtis & Davison, *The Endangered Species Act: Thirty-Eight Years on the Ark,* at 141-42. The best available science "standard does not require that FWS act only when it can justify its decision with absolute confidence." *Ariz. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1164 (9th Cir. 2010) (citing *Pub. Citizen Health Research Group v. U.S. Dep't of Labor*, 557 F.3d 165, 176 (3d Cir. 2009)); *Greenpeace Action v. Franklin*, 982 F.2d 1342, 1354-55 (9th Cir. 1992). Rather, the ESA encourages the Services to make listing decisions in the face of uncertainty because of the permanence of extinction. *See Salazar*, 606 F.3d at 1164.

### *Critical Habitat Designations were Intended to Support the Recovery of Listed Species by Countering Habitat Destruction, the Primary Cause of Species Decline.*

Unlike species listing decisions, the ESA allows the Services to account for economic considerations in critical habitat designations. 16 U.S.C. § 1533(b)(2). The change in factors appropriate for consideration with respect to critical habitat designation represents the balance Congress struck between the responsibility of mankind as species conservator, and the competitive need of United States for continued development and invention.

In developing the ESA, Congress determined that "the most significant [threat facing imperiled species] has proven also to be the most difficult to control: the destruction of critical habitat." H.R. Rep. 93-412. Congress provided critical habitat designation as a mechanism for the Services to protect the environment in which imperiled species reside and on which they depend for recovery. *See* 16 U.S.C. §§ 1532(5), 1533(a)(3)(A)(i). Congress recognized that protecting an imperiled species' critical habitat from destruction had the incidental effect of protecting all the species that reside in the same environment. H.R. Rep. No. 95-1625 at 17 (Sept. 25, 1978), U.S. Code Cong. & Admin. News 1978, pp. 9453, 9467. Congress intended the Services to designate critical habitat for most species because the designations greatly benefit the unlisted majority of species. *Id*. Despite this, only 20 percent of listed species have designated critical habitat, and habitat destruction remains the predominant cause of species endangerment. Sandra Diaz et al., *Pervasive Human-Driven Decline of Life on Earth Points to the Need for Transformative Change*, 366 SCIENCE 3, 4 (2019); J.B. Ruhl, *Section 4 of the ESA—The Cornerstone of Species Protection*

8

*Law*, 8(1) Nat. Resources & Env't 26, 70 (1993).

   **B. Section 4(d) Establishes Protective Measures to Restore the Population of Threatened Species Before They Become Endangered and Their Extinction Becomes More Probable Than Not.**

Congress created Section 4(d) to provide the Services with a mechanism to implement protections for threatened species that halt their progress towards endangerment and extinction. Courts agree that the Services must do more than simply determine that a species is threatened—they are required to take affirmative steps to prevent the species from becoming endangered. *Def. of Wildlife v. Norton*, 258 F.3d at 1142 (Congress intended to give FWS "the ability to… take steps to insure that species which are likely to be *threatened* with extinction never reach the state of being presently endangered.") (quoting 120 Cong. Rec. 25,668 (1973)); *Or. Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1152 (D. Or. 1998) (finding the purpose of listing species is not simply to memorialize those on the path to extinction, but also to compel those changes needed to save the species from extinction); *Def. of Wildlife v. Andrus*, 428 F. Supp. 167, 170 (D.D.C. 1977) (finding the Service must do more than merely avoid the elimination of a protected species—it must recover the species).

Section 4(d) requires the Services to issue regulations to conserve threatened species, including extending any or all Section 9 "take"[8] prohibitions to threatened species. 16 U.S.C. § 1533(d). The Services' prior long-standing regulation implementing Section 4(d) extended a blanket protection to threatened species where nearly all Section 9 "take" prohibitions were applicable to threatened species immediately upon listing. 50 C.F.R. § 17.31(a) (effective March 4, 2005 – Sept. 25, 2019). For certain species, the FWS promulgated "special" protective regulations which described the applicable prohibitions and exceptions for that species, but that was a rare occurrence. *Id*. § 17.31(c) (effective March 4, 2005 – Sept. 25, 2019). Although Section 4(d) provides the Services with discretionary authority as to how they "take preventative measures *before* a species is conclusively headed for extinction," the FWS has consistently applied the blanket approach for nearly 40 years. *Def. of Wildlife v. Babbitt*, 958 F.Supp. 670, 679–80 (D.D.C.

---

[8] The ESA defines "take" as "to harass, harm, pursue, hunt, shoot, would, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

Brief *Amici Curiae* of Environmental Law Professors
Case No. 4:19-cv-05206-JST

1  1997) (emphasis added).

2  **C. Section 7 Consultation Integrates and Prioritizes the Protection of Listed Species in the Primary Missions of All Federal Agencies.|**

3

4  Under Section 7, "all… federal agencies shall… utilize their authorities in furtherance of

5  the purposes of [the ESA] by carrying out programs for the conservation of endangered species

6  and threatened species." 16 U.S.C. § 1536(a)(1). In Section 7, Congress made a conscious

7  decision to prioritize the conservation of endangered species over the primary missions of all other

8  federal agencies. Curtis & Davison, *The Endangered Species Act: Thirty-Eight Years on the Ark*,

9  at 144. Section 7 clearly bestows a duty to conserve listed species on all federal agencies. In fact,

10  "one would be hard pressed to find a statutory provision whose terms were any plainer than those

11  in Section 7." *TVA v. Hill*, 437 U.S. at 173. This duty requires all federal agencies to participate in

12  consultation with the Services prior to commencing a federally authorized or funded action to

13  "insure" that the action will not jeopardize the continued existence of any listed species or

14  adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2).

15  The long-standing prior regulations implementing Section 7 required a federal agency

16  proposing a project to consult with the Services and provide them with a report describing the

17  anticipated activity, a wide range of potential alternatives, and an analysis of their environmental

18  impacts. 50 C.F.R. § 402.14(c) (effective March 4, 2005 – Sept. 25, 2019). The proposing agency

19  was required to commit to, or to have already taken, mitigation actions before the Services

20  considered any beneficial effects of the proposed activity. 16 U.S.C. § 1536(b)(3)(A). Proposing

21  agencies and the Services were required to reinitiate consultation, if a new species listing or new

22  designation of critical habitat might have affected a previously approved action. *Id.* § 1536(a)(3);

23  50 C.F.R. §§ 402.14(g), 402.02, 402.16 (effective March 4, 2005 – Sept. 25, 2019). During

24  consultation, the Services were also required to account for any proposed project's incremental

25  alteration to, and degradation of, critical habitat. 16 U.S.C. § 1536(b)(3)(A). The Services'

26  assessment of impacts to critical habitat are essential to the mission of the ESA because habitat

27  destruction is the primary cause of species decline. H.R. Rep. 93-412; Diaz et al., at 4; J.B. Ruhl,

28  at 70. Therefore, these assessments guarantee that all the other conservation efforts performed

10

1    under the ESA are not undermined, ensuring that the regulatory scheme is effectively carried out.

2    **III.     THE CHALLENGED REGULATIONS UNDERMINE THE ESA'S WELL-**
      **CRAFTED STRUCTURE AND THREATEN ITS CONTINUED SUCCESS IN**
3    **CONSERVING IMPERILED SPECIES.**

4           The challenged final regulations collectively interact to dismantle key species' protections

5    afforded under the ESA. The challenged regulations grant excessive discretion to the Services in

6    implementing their duties and invite political interference in what should be purely biological

7    determinations. Several significant definitional changes made under the guise of "clarity"

8    contribute to this ambiguity. *See* 50 C.F.R. § 424.02 (effective Sept. 26, 2019) (altering definition

9    of "physical or biological features" in critical habitat designation); *id.* § 424.11(d) (providing new

10   definition of "foreseeable future" in the classification decision); *id.* § 402.02 (altering definitions

11   of "destruction or adverse modification" of critical habitat, "effects of an action" considered in

12   consultation, and "environmental baseline" in consultation). The contested regulations effectively

13   dismantle the ESA from the inside—undermining its well-crafted structure and ultimately leaving

14   species unprotected.

15        **A.  The Final Regulations Allow Non-Biological Factors to Influence the Services'**
            **Listing and Classification Decisions.**
16

17          The final regulations allow the Services to reference non-biological factors in listing

18   determinations, 84 Fed. Reg. at 45,024 (removing "without reference to possible economic or

19   other impacts" from listing criteria), and strip threatened species of statutory protections. 84 Fed.

20   Reg. at 44,753 ("Species listed or reclassified as threatened species after the effective date of this

21   rule would have protective regulations only if the Service promulgates a species-specific rule.").

22   Together, these provisions politicize listing decisions by permitting bases for decisions other than

23   the best available science. *See* 16 U.S.C. § 1533(b)(1)(A) (requiring that listing determinations be

24   made "solely on the basis of the best scientific and commercial data available"). Because a

25   species' protections now hinge upon its classification (i.e., as endangered rather than threatened),

26   the initial listing determination is now more important than ever. *Compare* 16 U.S.C. § 1538

27   (prohibiting "take" of endangered species) *with* 16 U.S.C. § 1533(d) (permitting the Secretary to

28   extend the "take" prohibitions of § 1538 to threatened species) *and* 50 C.F.R. § 17.31(a) (noting

1    that the prohibitions in 50 C.F.R. § 17.21 do not apply to species listed or re-classified as

2    threatened after September 26, 2019 "unless the Secretary has promulgated species-specific

3    provisions").

4           Any reference to possible economic impacts in listing determinations will likely support

5    classifying species as threatened, rather than endangered, thereby excluding those species from

6    ESA protections due to the revised Section 4(d) regulation.[9] Allowing economic data to be

7    considered in the listing process facilitates the argument that a species' classification should be

8    less protective than what is biologically necessary because data reflecting the economic impacts of

9    listing are likely to account for the costs of species conservation, but not the benefits. *Compare*

10   U.S. FISH & WILDLIFE SERV., FEDERAL AND STATE ENDANGERED AND THREATENED SPECIES

11   EXPENDITURES FISCAL YEAR 2017 57 (2018) (finding $1,289,373,123 in total species expenditures

12   in FY 2017) *with* SOUTHWICK ASSOCIATES, THE ECONOMICS ASSOCIATED WITH OUTDOOR

13   RECREATION, NATURAL RESOURCES CONSERVATION AND HISTORIC PRESERVATION IN THE UNITED

14   STATES 3 (2011) (finding that ecosystem services provided by natural habitat in the continental

15   United States amount to $1.6 trillion annually). The release of this skewed data may inspire

16   political opposition to listing determinations or encourage the Services to classify a species as less

17   imperiled than the best available science reflects.[10]

18          Further, the final regulations permit the Services to pursue an initial threatened

19   classification, or a reclassification from endangered to threatened, for a species in order to benefit

20   industry, at the expense of imperiled species.[11] Under the final regulations, threatened species will

21   _____

22   [9] Although the Services contend that economic data will not impact listing decisions, the
     collection and public dissemination of the data indicates that the Services intend this information

23   to have some effect upon the listing process. Otherwise, collection would be an illogical waste of
     scarce agency resources.

24   [10] For example, political interference prevented the listing of the Dunes Sagebrush Lizard. *See
     e.g.*, Jerry Patterson, *Lizard must not impede energy future*, AMARILLO GLOBE-NEWS (June 11,

25   2011), https://www.amarillo.com/opinion/opinion-columnist/guest-opinion-columnist/2011-06-
     11/patterson-lizard-must-not-impede-energy-future#.TsbXcnJuqSo; *see also* Transcript of

26   Personnel Hearing, *Gary Mowad v. Dep't of the Interior*, DA-1221-13-0262-W-4. (Aug. 18,
     2014).

27   [11] There are numerous examples of FWS and NMFS officials who either come from industry, or

28   retain financial ties to industry, performing their duties under the ESA to benefit industry. *See e.g.*,

12

1    receive Section 9 take protections only if the Services promulgate species-specific protective

2    regulations, which is not required. 84 Fed. Reg. at 44,753; 50 C.F.R. § 17.31(a) (noting that the

3    prohibitions in 50 C.F.R. § 17.21 do not apply to species listed or re-classified as threatened after

4    September 26, 2019 "unless the Secretary has promulgated species-specific provisions"). If the

5    Services refuse to promulgate species-specific regulations, industry will benefit from reduced

6    compliance burdens because no Section 9 take prohibitions will apply to the newly-listed or

7    reclassified threatened species, and Section 7 consultation will be the only regulatory burden.

8    Historically, species-specific protective regulations were criticized for being more *permissive* of

9    human activity—including industry activity—than *protective* of species. YA-WEI LI, DEFENDERS

10    OF WILDLIFE, SECTION 4(D) RULES: THE PERIL AND THE PROMISE 2 (2017); *see also* Endangered

11    and Threatened Wildlife and Plants; Special Rule for the Lesser Prairie-Chicken, 79 Fed. Reg.

12    20,074 (Apr. 10, 2014) (authorizing high-impact development activities that threatened the

13    species' habitat and members); Endangered and Threatened Wildlife and Plants; Exclusion of U.S.

14    Captive-Bred Scimitar-Horned Oryx, Addax, and Dama Gazelle From Certain Prohibitions,70

15    Fed. Reg. 52,310 (Sept. 2, 2005) (permitting the canned-hunting industry to breed and offer the

16    species for on-site sport hunting).

17        Lastly, the final regulations not only slacken the criteria to delist species at the expense of

18    species' recovery, but they also alter the Services' decision to delist from a discretionary to a

19    mandatory duty. *Compare* 50 C.F.R. § 424.11(d) (1984) *with* 50 C.F.R. § 424.11(e) (2019). The

20    new delisting criteria are also far less stringent than prior criteria, which maintained protections

21    for species until data demonstrated the protections were no longer warranted.[12] Now, species will

22    be delisted without rigorous proof of recovery or extinction. 50 C.F.R. § 424.11(e) (2019).

23

24    UNION OF CONCERNED SCIENTISTS, U.S. FISH AND WILDLIFE SCIENCE SURVEY SUMMARY 1 (2005) ("More than half of all respondents (56%) knew of cases where 'commercial interests have

25    inappropriately induced the reversal or withdrawal of scientific conclusions or decisions through political intervention;' and [m]ore than two out of three staff scientists (70%) and nearly 9 out of

26    10 scientist managers (89%) knew of cases 'where U.S. Department of Interior political appointees have injected themselves into Ecological Services determinations.'"); Charlie Savage,

27    *Report Finds Meddling in Interior Dept. Actions*, N.Y. TIMES (Dec. 15, 2008), https://www.nytimes.com/2008/12/16/washington/16interior.html.

28    [12] The prior regulations only permitted delisting if robust evidence proved a species to be extinct, recovered, or originally classified in error. 50 C.F.R. § 424.11(d) (1984).

1     Further, the mandate that species meeting the new, lessened criteria be delisted prioritizes

2     removing species from federal protection over the conservation of species. These changes will

3     leave imperiled species, including near-extinct species, totally stripped of protections through

4     Section 9 take prohibitions and Section 7 consultation, further risking extinction.

5
        **B. The Final Regulations Ignore the Benefits of Reducing Controllable Threats to Species and Allow Cumulative Impacts to Chip Away at Species and Their**
6           **Habitats.**

7        The prior regulations identified what actions would harm species and identified actions for

8     agencies, including the Services, to take to prevent those threats. The challenged final regulations

9     collectively ignore impending threats to species and permit cumulative threats that incrementally

10    harm species and their habitats to go unaddressed until those threats would foreclose the

11    possibility of species survival.

12       First, the Services underestimate the benefits of blanket Section 9 protections for

13    threatened species. Stripping newly-listed or reclassified threatened species of all Section 9

14    protections unless and until the Services decide to promulgate a species-specific protective

15    regulation ignores the benefits of reducing controllable threats to species. Specifically, even if a

16    manner of "take" prohibited in Section 9 is not a species' primary threat, when it comes to

17    extinction, it is always better to be over-protective than under-protective. Martin F.J. Taylor et al.,

18    *The Effectiveness of the Endangered Species Act*, 55(4) BIOSCIENCE at 361-65; Schwartz, *The*

19    *Performance of the Endangered Species Act*, 39 ANN. REV. OF ECOLOGY, EVOLUTION, &

20    SYSTEMATICS at 290. Under these final regulations, threatened species have essentially no

21    protections because promulgation of a species-specific protective regulation is not required, 84

22    Fed. Reg. at 44,753; 50 C.F.R. § 17.31(a) (noting that the prohibitions in 50 C.F.R. § 17.21 do not

23    apply to species listed or re-classified as threatened after September 26, 2019 "unless the Secretary

24    has promulgated species-specific provisions") and the newly-limited scope of the threats and

25    effects considered in the consultation process is unlikely to adequately protect threatened species.

26    *See* 50 C.F.R. § 402.02 (redefining "effects of the action"); *id.* §§ 402.14(c)(8), 402.16(b), 402.17.

27       Second, the new restrictions on critical habitat designation and consultation prevent the

28    Services from protecting species from habitat destruction and, instead, permit cumulative threats

14

1   that incrementally harm species and their habitats. The final regulations will prevent the

2   designation of new occupied and unoccupied critical habitat by expanding the circumstances in

3   which critical habitat designation can be found imprudent and by restricting the designation of

4   unoccupied habitat to circumstances in which occupied areas alone would fail to ensure species'

5   conservation. 50 C.F.R. §§ 424.02, 424.12. The Services must not narrow the circumstances in

6   which critical habitat can be designated because habitat loss is the main driver of extinction.

7   Martin F.J. Taylor et al., *The Effectiveness of the Endangered Species Act: A Quantitative*

8   *Analysis*, 55(4) BIOSCIENCE at 361-65; Schwartz, *The Performance of the Endangered Species*

9   *Act*, 39 ANN. REV. OF ECOLOGY, EVOLUTION, & SYSTEMATICS at 290; Kieran Suckling & Martin

10   Taylor*, Critical Habitat and Recovery in* THE ENDANGERED SPECIES ACT AT THIRTY: VOLUME 1

11   RENEWING THE CONSERVATION COMMITMENT (2005). Mitigating further habitat loss through

12   robust and proactive critical habitat designation would support species' recovery.

13       The final regulations also countenance incremental habitat degradation, which further

14   exacerbates the perils of habitat loss. The regulations permit incremental degradation of habitat

15   provided that the habitat "as a whole" maintains its conservation value. 50 C.F.R. § 402.02. This

16   "as a whole" approach is detrimental to meaningful habitat protection because it both allows

17   incremental harms in the present and prevents future critical habitat designations. It does this by

18   allowing habitat to become degraded until it loses those physical or biological features essential to

19   the conservation of the species—thereby precluding its designation as "critical." *See* 16 U.S.C. §

20   1532(5) (defining "critical habitat").

21       The final regulations also permit the Services to ignore controllable threats in the

22   consultation process. Specifically, the regulations now require that "effects of the [agency] action"

23   considered in consultation would not occur *but-for* the agency action and that those effects must

24   be *reasonably certain to occur*. 50 C.F.R. § 402.02. This permits the Services to disregard

25   controllable effects of agency actions that harm species because the agency action is not the *sole*

26   cause of the threat or because the threat is less likely to happen, without regard to the severity of

27

28

1    the threat.[13]

2    **C.  The Final Regulations Will Leave Species Vulnerable to Climate Change
3         Related Impacts.**

4    The final regulations fail to protect species threatened by climate change. Ignoring the

5    threat posed to species by climate change and allowing climate-related threats to continue

6    unmitigated will only further imperil species. By 2070, between sixteen and fifty-five percent of

7    species may go extinct. Cristian Román-Palacios & John J. Wiens, *Recent responses to climate*

8    *change reveal the drivers of species extinction and survival*, 117(8) PNAS 4211-4213 (2020).

9    First, the final regulations provide the Services with excessive discretion to determine

10   when climate-related threats can serve as the basis for threatened classification. A species

11   imperiled by climate-related threats can only be classified as threatened if, in the Services'

12   discretion, those threats are likely to endanger the species within the "foreseeable future." 50

13   C.F.R. § 424.11(d) (effective Sept. 26, 2019). The new definition of "foreseeable future" is

14   intentionally vague and the determination of what qualifies as the "foreseeable future" will be

15   made on a case-by-case basis. 84 Fed. Reg. at 45,020. This permits the Services to withhold

16   protections from species imperiled by climate-related threats based solely on their discretionary

17   determination of what is "foreseeable," which the Services can manipulate to serve political will.

18   Further, the final regulations provide the Services with excessive discretion in designating

19   critical habitat. The Services can now avoid critical habitat designation upon a determination that

20   designation would be imprudent because "threats to the species' habitat stem solely from causes

21   that cannot be addressed through" Section 7 consultation. 50 C.F.R. § 424.12(a)(1)(ii). The final

22   regulation states that the Services can deem critical habitat designation imprudent for species

23   threatened by "melting glaciers, sea level rise, or reduced snowpack." 84 Fed. Reg. at 45,042. The

24   Services essentially conclude that critical habitat designation is useless, if future consultations for

25   hypothetical agency actions would not address climate-related destruction of species' habitats.

26

27   ───────────────────

     [13] For example, in consultation for the proposed construction of a federal right-of-way, the
28   development of a private wind farm on non-federal lands would not be an effect of the proposed
     action considered in consultation if a prospective alternative approach to realize the effect (e.g., a
     private access road) might exist. 84 Fed. Reg. at 44,977.

                                                    16

1  This permits the Services to leave imperiled species vulnerable to climate change and to ignore the
2  importance of protecting species' habitats as climate change worsens.

3          Additionally, this new exception to critical habitat designation, combined with the new
4  provision preventing unoccupied critical habitat designation without designation of occupied
5  habitat, 50 C.F.R. § 424.12(b), will prevent the protection of habitat that will be essential for
6  species survival after climate-induced species migration. *See* John Kostyack et al., *Beyond*
7  *Reserves and Corridors: Policy Solutions to Facilitate the Movement of Plants and Animals in a*
8  *Changing Climate*, 61 BIOSCIENCE 713, 717 (2011).[14] Together, these regulations prevent robust
9  critical habitat designation, decreasing the likelihood of species survival and rendering useless one
10  of the ESA's key functions that facilitates species recovery. Suckling & Taylor*, Critical Habitat*
11  *and Recovery*, at 89.

12          Second, the final regulations permit the Services to ignore climate-related threats to species
13  and their habitats during Section 7 consultation. The final regulations redefine "effects of the
14  action" considered during consultation as consequences reasonably certain to occur that would not
15  occur but-for the proposed agency action. 50 C.F.R. § 402.02. The final regulations provide the
16  Services with excessive discretion to determine which effects are reasonably certain to occur and
17  which effects will be ignored as tangential or uncertain climate-related threats.

18          Perhaps most importantly, the regulatory changes effectively ensure that any critical
19  habitat that is designated under the new regulatory regime will either be of lower quality or not as
20  expansive as would be designated under the prior regime. This will have dire consequences for
21  species whose habitats are irreparably altered or simply erased due to climate change. Specifically,
22  the final regulations permit the incremental degradation of designated critical habitat, provided
23  that the habitat retains its conservation value "as a whole." *Id*. The final regulations also permit the
24  Services to ignore the consequences of proposed agency actions that are "remote in time" or
25  "reached through a lengthy causal chain" in Section 7 consultation. *Id.* § 402.17(b). These

26

27

28  [14] Further, because these post-climate migration habitats will not be protected as "critical," they
will not receive the Section 7 consultation protections that attach to "critical" habitats despite the
importance of the habitat to species survival.

17

1   provisions allow the Services to find that climate change-related habitat degradation does not alter

2   the current conservation value of the habitat "as a whole" and that climate-related impacts upon

3   the habitat and species are too remote to consider in consultation. This lack of robust critical

4   habitat designation and protection will ultimately render certain species' critical habitat unsuitable

5   to support their recovery as climate change worsens.

6                                    **<u>CONCLUSION</u>**

7          Because the final regulations considered in this brief contort the ESA's requirements and

8   render the "pit bull of environmental laws"[15] toothless, this Court should grant plaintiffs' motion

9   for summary judgment and block the implementation of the Services' final regulations.

10  Dated: January 25, 2021                    Respectfully Submitted,

11

12                                             /s/ Fran M. Layton
                                               Fran M. Layton (State Bar No. 111788)
                                               Shute, Mihaly & Weinberger LLP
13                                             396 Hayes Street
                                               San Francisco, California 94102
14                                             Telephone: (415) 552-7272
                                               Facsimile: (415) 552-5816
15                                             layton@smwlaw.com

16                                             David Albert Schwartz (DC Bar No. 16142355)
                                               Institute for Public Representation
17                                             Environmental Law and Justice Clinic
                                               Georgetown University Law Center
18                                             600 New Jersey Avenue, NW, Suite 312
                                               Washington, DC 20001
19                                             ds1704@georgetown.edu
                                               *[Admitted Pro Hac Vice]*
20
                                               Attorneys for *Amici Curiae*
21                                             ENVIRONMENTAL LAW PROFESSORS

22

23

24

25

26

27

---

[15] Timothy Egan, *Strongest U.S. Environmental Law May Become Endangered Species*, N.Y.
28  TIMES (May 26, 1992), https://www.nytimes.com/1992/05/26/us/strongest-us-environment-law-may-become-endangered-species.html?pagewanted=all.

                                               18

1

2

**<u>ADDENDUM</u>**

**<u>IDENTITY OF *AMICI CURIAE*</u>**

3

4

- William L. Andreen, Edgar L. Clarkson Professor of Law and Director, Alabama-ANU Exchange Program, The University of Alabama School of Law

5

- Michael C. Blumm, Jeffrey Bain Faculty Scholar & Professor of Law, Lewis and Clark Law School

6

7

- William W. Buzbee, Edward and Carole Walter Professor of Law, Georgetown University Law Center

8

9

- Kim Diana Connolly, Professor of Law, Director of Clinical Legal Education, Vice Dean for Advocacy and Experiential Education, University at Buffalo School of Law, State University of New York

10

- Myanna F. Dellinger, Professor of Law, University of South Dakota School of Law

11

- Timothy Duane, Professor in Residence, University of San Diego School of Law

12

- Richard M. Frank, Professor of Environmental Practice, Director, California Environmental Law & Policy Center, University of California – Davis School of Law

13

14

- Sam Kalen, Associate Dean, William T. Schwartz Distinguished Professor of Law, Co-Director, Center for Law and Energy Resources in the Rockies, University of Wyoming College of Law

15

16

- Albert C. Lin, Martin Luther King Jr. Professor of Law, University of California – Davis School of Law

17

- Linda A. Malone, Marshall-Wythe Foundation Professor of Law, William and Mary Law School

18

19

- Patrick C. McGinley, Charles H. Haden II Professor of Law, West Virginia University College of Law

20

- Joel A. Mintz, Professor of Law Emeritus and C. William Trout Senior Fellow in Public Interest Law, Nova Southeastern University College of Law

21

22

- Patrick Parenteau, Professor of Law, Senior Counsel, Environmental Advocacy Clinic, Vermont Law School

23

- Anne Powers, Professor, Pace University Elisabeth Haub School of Law

24

- Zygmunt Plater, Professor of Law, Boston College Law School

25

- Kalyani Robbins, Morris I. Leibman Professor of Law, Loyola University Chicago School of Law

26

- Irma S. Russell, Edward A. Smith / Missouri Endowed Chair in Law, the Constitution, and Society, University of Missouri-Kansas City School of Law

27

1330303.2

28

19

## <u>CERTIFICATE OF SERVICE</u>

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of San Francisco, State of California. My business address is 396 Hayes Street, San Francisco, California 94102.

I hereby certify that on this 25th day of January, 2021, I electronically filed the foregoing **BRIEF OF ENVIRONMENTAL LAW PROFESSORS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system.

/s/ Patricia Larkin
PATRICIA LARKIN

Brief *Amici Curiae* of Environmental Law Professors
Case No. 4:19-cv-05206-JST